# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

NORFOLK MEDICAL PRODUCTS, INC.,

       Plaintiff,

v.

ANGIODYNAMICS, INC.,

       Defendant.

Case No.: 1:15-cv-00215
Hon. Sharon Johnson Coleman

# DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS COUNTS I THROUGH IV OF PLAINTIFF'S COMPLAINT

# **TABLE OF CONTENTS**

I.      INTRODUCTION AND STATEMENT OF FACTS ........................................................ 1

II.     LEGAL STANDARD OF REVIEW .............................................................................. 2

III.    ARGUMENT ................................................................................................................. 3

     A.      COUNTS I-IV SHOULD BE DISMISSED FOR FAILURE TO COMPLY
         WITH FEDERAL RULE OF CIVIL PROCEDURE 9(b) .................................... 3

     B.      DEFENDANT'S FAILURE TO ESTABLISH THE ELEMENTS OF ITS
         TORTIOUS INTERFERENCE CLAIM REQUIRES DISMISSAL OF
         COUNT I .......................................................................................................... 5

     C.      COUNT III SHOULD BE DISMISSED FOR FAILURE TO STATE A
         CAUSE OF ACTION ........................................................................................ 8

         1.      Plaintiff Failed To Establish That It Has A Protectable Mark ................... 8

         2.      Plaintiff Failed To Establish Use In Commerce ........................................ 9

         3.      Plaintiff Failed To Establish The Required Elements Of Its False
             Advertising Claim And Its Unfair Competition Claim ............................ 10

             (a)    Plaintiff fails to plead the elements of a false advertising claim .. 10

             (b)    Plaintiff fails to plead the elements of an unfair competition
                  claim based on false designation of origin .................................... 11

             (c)    Plaintiff fails to plead the elements of an unfair competition
                  claim based on confusion .............................................................. 11

     D.      DEFENDANT'S STATE STATUTORY AND COMMON LAW CLAIMS
         (COUNTS II AND IV) SHOULD BE DISMISSED FOR AT LEAST THE
         SAME REASONS THAT ITS LANHAM ACT CLAIM (COUNT III)
         SHOULD BE DISMISSED ............................................................................ 13

     E.      DEFENDANT'S STATE STATUTORY CLAIM (COUNT IV) SHOULD BE
         DISMISSED FOR THE FURTHER REASON THAT IT FAILED TO SHOW
         THE ALLEGEDLY DECEPTIVE BEHAVIOR OCCURRED IN ILLINOIS.... 14

IV.     CONCLUSION ............................................................................................................ 15

# **TABLE OF AUTHORITIES**

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................... 2

*Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677 (7th Cir. 1992) ................................... 3

*BlueStar Management v. The Annex Club, LLC*,

    2010 WL 2802213 (N.D. Ill. July 12, 2010) (Exhibit B) .......................................... 14

*Cassetica Software, Inc. v. Computer Sciences Corp.*,

    2011 WL 4431031 (N.D. Ill. Sept. 22, 2011) (Exhibit C) ......................................... 14

*Conditioned Ocular Enhancement, Inc. v. Bonaventura*, 458 F. Supp. 2d 704 (N.D. Ill. 2006).... 4

*Control Solutions, LLC v. Oshkosh Corp.*,

    2011 WL 1131329 (N.D. Ill. Mar. 28, 2011) (Exhibit D) ................................................. passim

*Desmond v. Chicago Boxed Beef Distributors, Inc.*, 921 F. Supp. 2d 872 (N.D. Ill. 2013) ......... 13

*Dynamic Fluid Control Ltd. v. Int'l Valve Manuf., LLC*, 790 F. Supp. 2d 732 (N.D. Ill. 2011) .. 13

*First Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800 (7th Cir. 2001) ........................ 11

*Frontline Communications, Inc. v. Comcast Corp.*,

    2013 WL 4777370 (N.D. Ill. Sept. 5, 2013) (Exhibit E) .................................................... 4, 6, 7

*Gaffrig Performance Indus., Inc. v. Livorsi Marine, Inc.*,

    2003 WL 23144859 (N.D. Ill. Dec. 22, 2003) (Exhibit F) ............................................. 8, 11, 12

*Instant Technology, LLC v. DeFazio*, 2014 WL 1759184 (N.D. Ill. May 2, 2014) (Exhibit G) .... 7

*Kennedy v. Nat'l Juvenile Detention Ass'n*, 187 F.3d 690 (7th Cir. 1999) ................................. 11

*Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614 (7th Cir. 2007) ........................................ 2

*KJ Korea, Inc. v. Health Korea, Inc.*, 2014 WL 4344307 (N.D. Ill. Sept. 2, 2014) (Exhibit H).... 9

*LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, 809 F. Supp. 2d 857 (N.D. Ill. 2011) ............... 14

*Medscript Pharmacy, LLC v. My Script, LLC*,

    2015 WL 149062 (N.D. Ill. Jan. 12, 2015) (Exhibit I) ........................................................ 4, 10

*Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc.*,

    2005 WL 3159680 (N.D. Ill. Nov. 22, 2005) (Exhibit J) ........................................................... 6

*MJ & Partners Rest. Ltd. P'ship v. Zadikoff*, 10 F. Supp. 2d 922 (N.D. Ill. 1998) ...................... 13

*Packman v. Chicago Tribune Co.*, 267 F.3d 628  (7th Cir. 2001) ................................................ 13

*PharMerica Chicago, Inc. v. Meisels*, 772 F. Supp. 2d 938 (N.D. Ill. 2011) ................................ 4

*Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722 (7th Cir. 1998)...... 9

*Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210 (7th Cir. 1997) ........................... 12

*SB Designs v. Reebok Int'l, Ltd.*, 338 F. Supp. 2d 904  (N.D. Ill.2004) ...................................... 13

*Underground Solutions, Inc. v. Palermo*,

    2014 WL 4703925 (N.D. Ill. Sept. 22, 2014) (Exhibit K) ...................................................... 14

*Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918 (7th Cir. 1992)................................................ 3

*Unique Envelope Corp. v. GSAmerica, Inc.*,

    2002 WL 598511 (N.D. Ill. Apr. 16, 2002) (Exhibit L)............................................................ 6

**Statutes**

15 U.S.C. § 1125(a) ...................................................................................................................... 3

15 U.S.C. § 1125(a)(1)................................................................................................................... 8

15 U.S.C. § 1127............................................................................................................................ 9

35 U.S.C. § 1125(a)(1)(A) .......................................................................................................... 11

35 U.S.C. § 1125(a)(1)(B) .......................................................................................................... 10

815 ILCS §§ 510, *et seq.*......................................................................................................... 3, 13

**Rules**

*Fed. R. Civ. P.* 12(b)(6)............................................................................................................. 1, 2

*Fed. R. Civ. P.* 8(a)(2)............................................................................................................... 2, 3

*Fed. R. Civ. P.* 9(b) .................................................................................................................. 1, 3

## I.    INTRODUCTION AND STATEMENT OF FACTS[1]

Defendant AngioDynamics, Inc. ("Defendant" or "AngioDynamics") respectfully submits this memorandum in support of its motion pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) to dismiss, with prejudice, Counts I through IV of the Complaint of Plaintiff Norfolk Medical Products, Inc. ("Plaintiff" or "Norfolk").

The instant lawsuit is nothing more than misplaced retaliation by Norfolk against AngioDynamics for its well-grounded patent and trademark infringement lawsuit filed in the United States District Court for the District of Massachusetts on May 21, 2014 ("Boston Action").[2] (*See* Exhibit A, Complaint of AngioDynamics).

AngioDynamics is a leading manufacturer and innovator of medical devices, including those called vascular access ports, which are small devices placed under a patient's skin for the purpose of inserting and extracting fluids from a body. (*See* Exhibit A, ¶ 7). Among other vascular access ports, AngioDynamics manufacturers and sells the SMARTPORT®,[3] *id.*, ¶ 10, which is covered by AngioDynamics-owned United States Patent Nos. 5,951,512 and 8,926,573 ("the '512 patent" and "the '573 patent," respectively).[4]

---

[1] Unless otherwise indicated, this memorandum assumes the truth of the allegations set forth in the Complaint of the Plaintiff and should not be construed as containing any factual admissions.

[2] The Boston Action, case no. 1:14-cv-12246, is in the early stages of discovery. AngioDynamics' Complaint alleges that a significant portion, if not the majority, of Norfolk's vascular access port offerings infringe AngioDynamics' patents, and are marketed to intentionally pass off on AngioDynamics' high quality and substantial goodwill in the marketplace.

[3] AngioDynamics' SMARTPORT® mark is Federally Registered, as is its VORTEX® mark, which connotes the type of technology contained in several of AngioDynamics' ports; specifically, a toroid-like shaped reservoir and/or a tangential outlet, but is not, itself, the name of a port.

[4] On March 6, 2015, the Court in the Boston Action granted AngioDynamics' Motion for Leave to Amend the Complaint to add the '573 patent to the case.

Unlike AngioDynamics, which sells its ports for human use, Norfolk sells its ports primarily for use in veterinary medicine. Nonetheless, in early 2014, AngioDynamics became aware that Norfolk had introduced a vascular access port in the human market, calling it the SportPort, although the name is not federally registered. AngioDynamics discovered that Norfolk had been advertising its SportPort by using AngioDynamics' VORTEX® mark and logo, along with copies of AngioDynamics' promotional materials, falsely suggesting that Norfolk has rights to such technology, and that there exists an affiliation between AngioDynamics and Norfolk. *Id*. ¶¶ 16-19. AngioDynamics then also discovered that Norfolk had been selling ports in the veterinary market that embody and infringe AngioDynamics' proprietary '512 patent technology. *Id*. ¶ 16. Accordingly, AngioDynamics sent Norfolk a cease and desist letter and filed the Boston Action.

The instant Complaint is an attempt to gain leverage against, to retaliate against and to inconvenience AngioDynamics. In view of this tactic, along with the fatal deficiencies in the pleading of the Complaint, AngioDynamics respectfully requests that it be dismissed with prejudice.[5]

## II.    LEGAL STANDARD OF REVIEW

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court accepts well-pleaded allegations of the complaint as true and draws all reasonable inferences in favor of the non-moving party. *See Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). Federal Rule of Civil Procedure 8(a)(2) requires the complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." The pleader must allege sufficient facts that, when accepted as true, state a claim to relief that is

---

[5] In the event that the entire Complaint is not dismissed with prejudice, AngioDynamics intends to respectfully request a transfer to the Dist. Of Mass. of any remaining causes of action, as they derive from a common nucleus of operative fact.

plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the [pleader] pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Additionally, claims sounding in fraud are subject to the heightened pleading requirement of Federal Rule of Civil Procedure 9(b), which requires the plaintiff at a minimum to allege "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992) (internal citations omitted). Further, "allegations made upon information and belief are insufficient, even if the facts are inaccessible to the plaintiff, unless the plaintiff states the grounds for his suspicions." *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992).

As set forth below, all four of Plaintiff's causes of action are subject to the stringent pleading requirements of Rule 9(b). They do not, however, meet the standards required by the heightened scrutiny, nor are they sufficient under the Rule 8(a) standard.

## III.    ARGUMENT

### A.    COUNTS I-IV SHOULD BE DISMISSED FOR FAILURE TO COMPLY WITH FEDERAL RULE OF CIVIL PROCEDURE 9(b)

Plaintiff has alleged: (1) tortious interference with prospective business relationship; (2) common law unfair competition; (3) Federal unfair competition and false advertising under 15 U.S.C. § 1125(a); and (4) violation of the Illinois Uniform Deceptive Trade Practices Act ("UDTPA"), 815 ILCS §§ 510, *et seq.* Each of these causes of action sound in fraud in view of Plaintiff's allegations. Accordingly, each of Counts I-IV of Plaintiff's Complaint are subject to

the heightened pleading requirement of Federal Rule of Civil Procedure 9(b).[6] In other words, all

of Plaintiff's causes of action are subject to the pleading requirements of Rule 9(b), and Plaintiff

has failed to meet that requirement in any of them.

The totality of AngioDynamics' alleged behavior giving rise to the instant Complaint

appears in paragraphs 14 through 16 of the Complaint, as follows:

- "*On information and belief*, on or about August 28, 2014, Blake McMillan, a representative from Angiodynamics made the false statement that Angiodynamics owns the SportPort product line." (Complaint ¶ 14).

- "*On information and belief*, on or about July 2014, a representative from Angiodynamics made the false statement that Norfolk would no longer be offering the SportPort™ product line." (*Id.* ¶ 15).

- "*On information and belief*, on or about February 2014, Natalie Williams, a representative of Angiodynamics, made the false statement that Norfolk ports were made to be placed in animals for use in the veterinary market and to halt the evaluation." (*Id.* ¶ 16).

Plaintiff claims that these alleged false and misleading statements resulted in UT

Southwestern Medical Center terminating its study of the SportPort product. (Complaint ¶ 17).

Absent from Plaintiff's Complaint is any basis supporting such a conclusion, or how conducting

a study gave Plaintiff a reasonable basis to believe that an economically beneficial relationship

would ensue.

---

[6] *Medscript Pharmacy, LLC v. My Script, LLC*, 2015 WL 149062, at *2 (N.D. Ill. Jan. 12, 2015) (finding claim of false advertising pursuant to 15 U.S.C. § 1125, claim of violation of the UDTPA, and claim of tortious interference with prospective economic advantage subject to Rule 9(b)); *Frontline Communications, Inc. v. Comcast Corp.*, 2013 WL 4777370, at *2 (N.D. Ill. Sept. 5, 2013) (finding claim of tortious interference with prospective economic advantage subject to Rule 9(b)); *Control Solutions, LLC v. Oshkosh Corp.*, 2011 WL 1131329, at *2 (N.D. Ill. Mar. 28, 2011) (finding unfair competition, false designation of origin, and false advertising claims under 15 U.S.C. § 1125(a) and common law unfair competition claim subject to Rule 9(b)); *PharMerica Chicago, Inc. v. Meisels*, 772 F. Supp. 2d 938, 955 (N.D. Ill. 2011) (claims sounding in fraud that allege tortious interference with prospective business advantage are subject to Rule 9(b)); *Conditioned Ocular Enhancement, Inc. v. Bonaventura*, 458 F. Supp. 2d 704, 709 (N.D. Ill. 2006) ("Claims that allege false representation or false advertising under the Lanham Act are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b)").

Because Plaintiff's allegations regarding the alleged statements are solely made on information and belief, Plaintiff must state a basis for its suspicion, *i.e.*, how it was informed, and why it believes, that these allegations occurred. Plaintiff failed to do so.

Plaintiff also failed to allege with particularity the who, what, where and when of these allegations. In paragraph 15 of the Complaint, the alleged representative of AngioDynamics is not even identified. Additionally, the places where any of the alleged misrepresentations were made are not provided. Further, Plaintiff's allegations are silent not only as to the method of communicating the alleged misrepresentations, but also as to who received them – the allegations even fail to allege if, when and how the statements ever were made to or received by the Plaintiff or the UT Southwestern Medical Center.

Additionally, no basis is provided to support Plaintiff's bald conclusory allegation that the study was terminated as a result of any alleged misrepresentation or that the statements were even received by UT Southwestern Medical Center. When the study was terminated and who terminated the study is not provided. No individual from UT Southwestern Medical Center is ever identified.

Each of these flaws are fatal to each of Plaintiff's claims. Counts I-IV should therefore be dismissed for this reason alone.

### B. DEFENDANT'S FAILURE TO ESTABLISH THE ELEMENTS OF ITS TORTIOUS INTERFERENCE CLAIM REQUIRES DISMISSAL OF COUNT I

The elements required for showing tortious interference with prospective business relationship are: "'1) a reasonable expectancy of a valid business relationship; 2) defendant must know about it; 3) defendant must intentionally interfere and defeat this legitimate expectancy; and 4) the intentional interference must injure the plaintiff.'" *Frontline Communications, Inc.*,

2013 WL 4777370, at *5 (quoting *Unique Envelope Corp. v. GSAmerica, Inc.*, 2002 WL 598511, at *4 (N.D. Ill. Apr. 16, 2002)). Further, a cause of action is stated by Plaintiff "'only if he alleges a business expectancy with a specific third party and action by the interfering party directed toward the party with whom the plaintiff expects to do business.'" *Id.* Plaintiff has failed to show each of the required elements of this claim, particularly in view of the heightened pleading requirement of Rule 9(b).[7]

The only third party specifically identified by Plaintiff is UT Southwestern Medical Center. Plaintiff fails to allege that AngioDynamics had knowledge about Plaintiff's alleged expectancy of entering into a valid business relationship with UT Southwestern Medical Center. Plaintiff only alleges that AngioDynamics was aware of Plaintiff's relationship with UT Southwestern Medical Center to the extent that a study was being conducted. Plaintiff's failure to allege that AngioDynamics had knowledge of any alleged prospective business expectation is fatal to its claim. *See Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc.,* 2005 WL 3159680, at *9 (N.D. Ill. Nov. 22, 2005).

Plaintiff also fails to allege that AngioDynamics ever contacted or interacted with UT Southwestern Medical Center for the purpose of intentionally interfering with the alleged expected business relationship. Specifically, Plaintiff does not allege that any of AngioDynamics' allegedly false statements were ever made to UT Southwestern Medical Center.

---

[7] Count I alleges a cause of action based on tortious interference with a prospective business relationship, not tortious interference with contract. Plaintiff's Complaint does not separately allege a cause of action for tortious interference with contract despite the phrase "tortious interference with contract" being mentioned in passing within Plaintiff's Complaint. (Complaint, ¶ 3). Regardless, any claim for tortious interference for contract alleged by Plaintiff would fail at least because Plaintiff did not allege: (1) the existence of a valid and enforceable contract with UT Southwestern Medical Center; (2) AngioDynamics' awareness of any such contract; (3) AngioDynamics inducement of breach; or (4) breach by UT Southwestern Medical Center – all required elements of such cause of action, further subject to the heightened pleading requirement of Rule 9(b). *See Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc.,* 2005 WL 3159680, at *7 (N.D. Ill. Nov. 22, 2005).

Instead, Plaintiff's Complaint only states in a conclusory manner that "Defendant intentionally and unjustifiably interfered with Norfolk's *relationship* with the health facility UT Southwestern Medical Center." (Complaint, ¶ 23; emphasis added). Plaintiff fails to allege how or when AngioDynamics interfered with Norfolk's relationship, let alone how, when or if AngioDynamics actually interacted with UT Southwestern Medical Center.[8]

Such omissions are also fatal to Plaintiff's claim. *See Frontline Communications, Inc.*, 2013 WL 4777370, at *5 (dismissing plaintiff's interference with prospective economic advantage claim for failure to allege that defendant ever contacted third party with whom plaintiff alleged to have an expected business relationship); *see also See Mercury Skyline Yacht Charters*, 2005 WL 3159680, at *9 (dismissing plaintiff's claim for tortious interference with prospective business relationship because plaintiff failed to allege acts of intentional interference by defendant directed at third party).

Plaintiff's claim is also deficient for failing to allege a reasonable expectancy of a valid business relationship. Plaintiff has only alleged that UT Southwestern Medical Center agreed to conduct a study and that the study was terminated. Plaintiff has not alleged that any future business relationship with or sales to the UT Southwestern Medical Center were dependent upon the study. Plaintiff has not alleged any past business relationship with UT Southwestern Medical Center. Plaintiff has therefore provided no reasonable basis for the expectation of a business relationship with the UT Southwestern Medical Center, particularly in view of the requirement to meet the heightened pleading standard of Rule 9(b). *See Instant Technology, LLC v. DeFazio*, 2014 WL 1759184, at *22 (N.D. Ill. May 2, 2014) (finding no reasonable expectation of future

---

[8] Further, the Complaint fails to link the alleged statements to when UT Southwestern Medical Center actually terminated the study and does not account of the inconsistency of at least some of the alleged actionable conduct taking place well before results from the study were generated, meaning that AngioDynamics' alleged statements did not trigger termination of the study. (*See* Complaint, ¶¶ 12, 16).

business where plaintiff failed to provide a basis for the same and only relied on past business relationships). For these reasons, Count I should be dismissed.

## C.  COUNT III SHOULD BE DISMISSED FOR FAILURE TO STATE A CAUSE OF ACTION

Count III of Plaintiff's Complaint is a Lanham Act claim and should be dismissed for any of the following reasons as discussed in detail below: (1) Plaintiff failed to establish that it has a protectable mark; (2) Plaintiff failed to establish required use in commerce; and (3) Plaintiff failed to establish the elements of a false advertising claim or an unfair competition claim.

### 1.  Plaintiff Failed To Establish That It Has A Protectable Mark

Section 43(a) of the Lanham Act provides that:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>>
>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a)(1).

To establish a claim under 15 U.S.C. § 1125(a)(1), Plaintiff "must establish that [] they own a valid, protectable mark." *Gaffrig Performance Indus., Inc. v. Livorsi Marine, Inc.*, 2003 WL 23144859, at *6 (N.D. Ill. Dec. 22, 2003). "A party who has not registered its marks with

the PTO bears the burden to establish protection under the Lanham Act." *Id.* (citing *Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 727 (7th Cir. 1998)). "Where a mark . . . is unregistered, a Plaintiff may state a claim . . . by showing that the mark is protectable based on the degree of its distinctiveness." *KJ Korea, Inc. v. Health Korea, Inc.*, 2014 WL 4344307, at *5 (N.D. Ill. Sept. 2, 2014).

Plaintiff's SportPort mark is unregistered. Plaintiff provided no information in the Complaint regarding the protectability of its SportPort mark. Plaintiff provided no basis that its SportPort mark is protectable based on its distinctness. Absent a showing that Plaintiff owns a valid, protectable mark, Plaintiff cannot establish a claim under 15 U.S.C. § 1125(a)(1). Count III should therefore be dismissed.

### 2. Plaintiff Failed To Establish Use In Commerce

To establish a claim under 15 U.S.C. § 1125(a)(1), Plaintiff must also show that Defendant used the trademark at issue in commerce or that the Defendant used in commerce the misrepresentation. *See Control Solutions, LLC,* 2003 WL 23144859, at *3. "Use in commerce" is defined within the Lanham Act as follows:

> The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce—
>
> (1) on goods when—
>
> > (A) ***it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto***, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, ***and***
> >
> > (B) ***the goods are sold or transported in commerce***[.] (Emphasis added.) 15 U.S.C. § 1127

Plaintiff did not allege at all that AngioDynamics used Plaintiff's alleged trademark in connection with any goods. Plaintiff only alleges that representatives of AngioDynamics made misleading statements to some unidentified person regarding Plaintiff's product, and makes no allegation that the alleged misrepresentation was made in commerce. Count III should therefore be dismissed.

3. **Plaintiff Failed To Establish The Required Elements Of Its False Advertising Claim And Its Unfair Competition Claim**

(a) *Plaintiff fails to plead the elements of a false advertising claim*

To state a claim for false advertising under 35 U.S.C. § 1125(a)(1)(B) of the Lanham Act, Plaintiff must plead with particularity:

> "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products."

*Control Solutions, LLC*, 2011 WL 1131329, at *4. Plaintiff has not adequately pled any of these elements, in particular that AngioDynamics participated in "commercial advertisement." Commercial advertising within the meaning of the Lanham Act requires communication to "a significant portion of the relevant industry." *MedScript Pharmacy LLC*, 2015 WL 149062, at *4. "[P]erson-to-person contact is not commercial advertising under the Act." *Control Solutions, LLC*, 2011 WL 1131329, at *4; *see also First Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 803 (7th Cir. 2001) (holding that "advertising is a form of promotion to anonymous recipients, as distinguished from face-to-face communication").

10

Plaintiff fails to allege that any alleged false statement by AngioDynamics was made in commercial advertising. Plaintiff has failed to even allege that any allegedly false statement made by AngioDynamics was received by any other person. Further, the allegedly false statements made by AngioDynamics are not alleged to have been communicated to a significant portion of the relevant industry or communicated as part of a promotion to anonymous recipients as required under the Lanham Act. At most, the allegations are limited to personal communications that fall outside the scope of the Lanham Act. Count III should therefore be dismissed.

### *(b)*  *Plaintiff fails to plead the elements of an unfair competition claim based on false designation of origin*

To state a claim for false designation under 35 U.S.C. § 1125(a)(1)(A) of the Lanham Act, Plaintiff must plead:

> "(1) that the defendant used a false designation of origin or false description or representation in connection with goods or services;
> (2) that such goods or services entered interstate commerce; and
> (3) that the plaintiff is a person who believes he is likely to be damaged as a result of the misrepresentation."

*Gaffrig Performance Indus., Inc.*, 2003 WL 23144859, at *15 (quoting *Kennedy v. Nat'l Juvenile Detention Ass'n*, 187 F.3d 690, 695–96 (7th Cir. 1999)). Any claim by Plaintiff of false designation of origin by AngioDynamics fails for at least the reasons discussed *supra* in section C-2; specifically, Plaintiff has not alleged, and cannot allege, that AngioDynamics used Plaintiff's alleged trademark in connection with goods or services that entered commerce. Count III should therefore be dismissed.

### *(c)*  *Plaintiff fails to plead the elements of an unfair competition claim based on confusion*

To state a claim for unfair competition based on confusion under the Lanham Act, 15 U.S.C. § 1125(a), Plaintiff "must establish that (i) they own a valid, protectable mark; and (ii) the use of either the same or a similar mark by the accused party creates a likelihood of consumer confusion as to the source of goods sold under the mark." *Gaffrig Performance Indus., Inc.*, 2003 WL 23144859, at *6. As discussed above, Plaintiff has failed to show that it owns a valid, protectable mark. Any claim by Plaintiff of confusion is also fatally flawed.

"The test for likelihood of confusion is whether the defendant's use of the challenged mark would cause the plaintiff to lose a ***substantial number*** of consumers." *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1216 (7th Cir. 1997) (emphasis added). The only third party identified by Plaintiff is UT Southwestern Medical Center. One third party is not a substantial number of customers.

Further, Plaintiff failed to allege that UT Southwestern Medical Center was confused or likely to be confused based on the alleged false and misleading statements in a manner to meet the heightened pleading requirement of Rule 9(b). Specifically, "[c]ourts in the Seventh Circuit analyze the likelihood of confusion under a seven-factor test: '(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6) actual confusion; and (7) intent of the defendant to 'palm off' his product as that of another.'" *KJ Korea, Inc.*, 2014 WL 4344307, at *6 (quoting *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 643 (7th Cir. 2001)). Plaintiff has failed to allege any of these factors to establish likelihood of confusion.

"Additionally, a single instance of confusion has been found insufficient 'confusion' to support a violation of the [Lanham] Act." *Control Solutions, LLC*, 2011 WL 1131329, at *3

12

(citing *Packman*, 267 F.3d at 645). Accordingly, Plaintiff's basis for alleging confusion is not only unsupported but at best relies on insufficient instances of confusion. Claim III should therefore be dismissed.

**D.**  DEFENDANT'S STATE STATUTORY AND COMMON LAW CLAIMS (COUNTS II AND IV) SHOULD BE DISMISSED FOR AT LEAST THE SAME REASONS THAT ITS LANHAM ACT CLAIM (COUNT III) SHOULD BE DISMISSED

Count IV alleges violation of the UDTPA, 815 ILCS §§ 510, *et seq.* based on the same alleged false representations forming the basis of Plaintiff's Lanham Act claim (Count III). "Where, as here, the 'plaintiff's factual allegations under the UDTPA also form the basis for the plaintiff's claim under the Lanham Act, the legal inquiry is the same under both statutes. Claims for unfair competition and deceptive business practices brought under Illinois statutes are to be resolved according to the principle set forth under the Lanham Act.'" *Desmond v. Chicago Boxed Beef Distributors, Inc.*, 921 F. Supp. 2d 872, 884 (N.D. Ill. 2013) (quoting *SB Designs v. Reebok Int'l, Ltd.*, 338 F. Supp. 2d 904, 914 (N.D. Ill. 2004). Plaintiff's UDTPA claim "'must rise or fall based on the Lanham Act claim.'" *Dynamic Fluid Control Ltd. v. Int'l Valve Manuf., LLC*, 790 F. Supp. 2d 732, 739 (N.D. Ill. 2011) (quoting *MJ & Partners Rest. Ltd. P'ship v. Zadikoff*, 10 F. Supp. 2d 922, 929 (N.D. Ill. 1998)). Accordingly, Plaintiff's claim under the UDTPA should be dismissed for at least the same reasons as Plaintiff's Lanham Act claim.

Count II alleges common law unfair competition. The allegations underlying Plaintiff's common law unfair competition claim are substantially the same as those put forth for Plaintiff's Lanham Act claim (Count III) and Illinois statutory claim (Count IV).

A common law unfair competition claim need not be separately addressed since it is codified by the UDTPA. *MJ & Partners Rest. Ltd. P'ship*, 10 F. Supp. 2d at 929. As such, a common law unfair competition claim also rises and falls based on the Lanham Act claim. *Id.*

Moreover, Plaintiff's common law unfair competition claim is identical to its UDPTA claim and Plaintiff failed to provide any reasons as to why it should be allowed to pursue a separate unfair competition claim. *See Cassetica Software, Inc. v. Computer Sciences Corp.*, 2011 WL 4431031, at *4 (N.D. Ill. Sept. 22, 2011) (dismissing unfair competition claim that was substantially identical to UDTPA claim); *see also BlueStar Management v. The Annex Club, LLC*, 2010 WL 2802213, at *9 (N.D. Ill. July 12, 2010) (dismissing unfair competition claim absent any reason why it should be pursued in view of substantially identical claim under UDTPA). Accordingly, Plaintiff's common law unfair competition claim should be dismissed for at least the same reasons as Plaintiff's Lanham Act claim and Plaintiff's UDTPA claim.

> **E.  DEFENDANT'S STATE STATUTORY CLAIM (COUNT IV) SHOULD BE DISMISSED FOR THE FURTHER REASON THAT IT FAILED TO SHOW THE ALLEGEDLY DECEPTIVE BEHAVIOR OCCURRED IN ILLINOIS**

A UDTPA claim can stand only when the Plaintiff shows that the activities surrounding the claim occurred primarily and substantially in Illinois. *LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, 809 F. Supp. 2d 857, 861 (N.D. Ill. 2011). There is no bright-line test for determining whether a transaction occurred in Illinois. *Underground Solutions, Inc. v. Palermo*, 2014 WL 4703925, at *10 (N.D. Ill. Sept. 22, 2014). Instead, a determination is made based on several factors including "the plaintiff's residence, where the deception occurred, where the damage to the plaintiff occurred, and whether the plaintiff communicated with the defendant or its agents in Illinois." *Id.*

Plaintiff did not allege where damage occurred or where interaction with AngioDynamics occurred. Defendant's actions alleged to be violative of the UDTPA are not alleged to have occurred primarily and substantially within Illinois. Accordingly, Count IV should therefore be dismissed.

14

## IV.    CONCLUSION

For the foregoing reasons, the Court should (1) dismiss Counts I through IV of the

Complaint with prejudice, and (2) grant such other and further relief as the Court deems just and

proper.


Dated: March 9, 2015                          Respectfully submitted,

                                              */s/ William P. Oberhardt*
                                              William P. Oberhardt
                                              WILLIAM P. OBERHARDT, LLC
                                              70 West Madison Street
                                              Suite 2100
                                              Chicago, Illinois 60602
                                              (312) 251-1100

                                              *Counsel for Defendant AngioDynamics, Inc.*


*Of Counsel for Defendant AngioDynamics, Inc.*

Scott T. Bluni
Suzanne M. Parker
Wesley Jones
KACVINSKY DAISAK BLUNI PLLC
50 Doaks Lane
Marblehead, Massachusetts 01945
(781) 336-0113

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 9th day of March, 2015, the foregoing document was filed electronically with the Clerk of the Court using the CM/ECF system, to be served by operation of the Court's electronic filing system upon all counsel of record.


*/s/ William P. Oberhardt*
William P. Oberhardt
Atty. Reg. No. 3122407
WILLIAM P. OBERHARDT, LLC
70 West Madison, Suite 2100
Chicago, Illinois  60602
Tel:  312-251-1100
Fax:  312-251-1175

*Attorney for Defendant AngioDynamics, Inc.*

# Exhibit A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ANGIODYNAMICS, INC., | Civil Action No. _____ |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| NORFOLK MEDICAL PRODUCTS, INC., | |
| Defendant. | |

## COMPLAINT AND JURY DEMAND

Plaintiff AngioDynamics, Inc. ("AngioDynamics") hereby alleges as follows for its complaint against Defendant Norfolk Medical Products, Inc. ("Norfolk"):

### THE PARTIES

1.      AngioDynamics is a Delaware corporation having its principal place of business at 14 Plaza Drive, Latham, New York 12110. AngioDynamics maintains corporate offices at 26 Forest Street, Marlborough, Massachusetts 01752.

2.      On information and belief, Defendant Norfolk is an Illinois corporation having its principal place of business at 7350 N. Ridgeway Avenue, Skokie, Illinois 60076. Norfolk includes a division named Access Technologies ("Access"), with a common principal place of business. Norfolk has committed the wrongful acts complained of herein within this judicial district and elsewhere.

**JURISDICTION AND VENUE**

3.      This is a civil action for patent infringement, trademark infringement, unfair competition, and false designations, descriptions, and representations arising under the laws of the United States and under the state law and common law of the Commonwealth of Massachusetts.

4.      This court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338(a), and 1367.

5.      This court has personal jurisdiction over Defendant because, upon information and belief, Defendant has knowingly and purposefully transacted business in Massachusetts by selling, offering to sell, and/or distributing products, promotional materials, and advertisements to residents of Massachusetts.  In addition, the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs, and jurisdiction is, therefore, proper pursuant to 28 U.S.C. § 1332(a), (b), and (c).

6.      On information and belief, Defendant conducts business in this judicial district, Defendant has caused tortious injury in this commonwealth through the wrongful acts complained of herein, and/or the infringing goods have been advertised and/or distributed in this state and, therefore, this court has personal jurisdiction over Defendant under the Massachusetts long arm statute, M.G.L. Ch. 223A, Section 3, and venue is proper under 28 U.S.C. § 1391.

**FACTUAL BACKGROUND**

7.      Plaintiff is a leading manufacturer, innovator, and patent owner of medical devices known as ports. A port is a vascular access device implanted under a patient's

skin for the repeated injection of medications into the patient's body. Medications are injected into a reservoir through a needle that pierces a septum, and the medications flow through an outlet extending from the reservoir into a catheter, which is inserted into the patient's vasculature. An exemplary illustration of a cross section of a port is shown below:



8.    Plaintiff's implantable port products include the VORTEX® and SMART PORT® families of implantable port products, which include the Plaintiff's proprietary VORTEX port technology. Among other features, VORTEX port technology includes a tangential outlet that helps to create a flushing action within the port to cleanse the entire reservoir during the injection of fluids. VORTEX port technology offers significant advantages over competing products such as a decreased sludge build-up and a reduced rate of occlusions.

9.    Plaintiff has extensively advertised and promoted the use of VORTEX ports, SMART PORT ports, and VORTEX port technology on the internet, in nationally circulated promotional materials, and in other widely circulated advertisements and marketing materials.

10.    As a result of the long and extensive advertising and promotion of VORTEX ports, SMART PORT ports, and VORTEX port technology by Plaintiff,

3

VORTEX ports, SMART PORT ports, and VORTEX port technology have become widely recognized and well-known throughout the United States and have become associated with Plaintiff as a source of these products and technologies.

11.     On September 14, 1999, United States Patent No. 5,951,512 ("the '512 patent") entitled "Infusion Port with Modified Drug Reservoir," was duly and legally issued by the United States Patent and Trademark Office. Plaintiff owns the '512 patent by assignment. A true and correct copy of the '512 patent is attached as Exhibit A to this Complaint. Among other things, the '512 patent covers Plaintiff's proprietary VORTEX port technology, including ports having a tangential outlet and the use thereof.

12.     Michael J. Dalton is the sole named inventor of the '512 patent. On information and belief, Mr. Dalton is the current president and chief executive officer of Norfolk.

13.     On June 2, 1998, Norfolk and Mr. Dalton entered into an Asset Purchase Agreement with Horizon Medical Products, Inc. ("Horizon"), pursuant to which Norfolk and Mr. Dalton sold certain port-related assets to Horizon. The patent application that issued as the '512 patent was among the assets sold by Norfolk and Mr. Dalton to Horizon. In conjunction with the Asset Purchase Agreement, Norfolk and Mr. Dalton entered into a Patent Assignment, pursuant to which Norfolk and Mr. Dalton assigned all of their right, title and interest in the patent application that issued as the '512 patent and other patent assets to Horizon. A true and correct copy of the Patent Assignment is attached to this Complaint as Exhibit B, wherein the '512 patent is identified by its application serial number, 08/653,880, and its filing date, May 28, 1996. Accordingly, as

of June 2, 1998, Norfolk, its subsidiaries and affiliates, and Mr. Dalton relinquished any and all rights in the '512 patent.

14.     On July 30, 2004, Horizon merged with RITA Medical Systems, Inc. ("RITA"), and on January 29, 2007, AngioDynamics acquired RITA. True and correct copies of assignment documents that evidence the chain of title of the '512 patent from Horizon to RITA, and from RITA to AngioDynamics, are attached to this Complaint as Exhibit C. Accordingly, Plaintiff AngioDynamics is the sole owner of the '512 patent.

15.     Defendant has known of Plaintiff's rights in the '512 patent, including the rights of Plaintiff's predecessors-in-interest, since at least June 2, 1998. Moreover, Plaintiff's VORTEX ports and SMART PORT ports are marked with the '512 patent, thereby providing notice in accordance with 35 U.S.C. § 287.

16.     Defendant currently makes, uses, distributes, sells, and/or offers to sell, in this jurisdiction and others, a number of implantable port products, including without limitation the SPORTPORT, CLEARPORT, GRIDLOCK, and SWIRLPORT implantable port products. Each of these implantable port products includes a tangential outlet and closely resembles Plaintiff's implantable port products, including Plaintiff's proprietary VORTEX port technology.

17.     Plaintiff is the owner of the United States Trademark Registration No. 3,607,814, issued April 14, 2009, for the mark SMART PORT for "vascular access ports for medical use," a true and correct copy of which is attached to this Complaint as Exhibit D. The above trademark registration is valid and subsisting, and is in full force and effect.

5

18.     Defendant's promotional materials and publications indicate that VORTEX port technology was developed by Defendant in a manner that falsely suggests that Defendant has rights to such technology, and/or that there is an affiliation and/or sponsorship between AngioDynamics and Norfolk that does not exist.

19.     Defendant's promotional materials depict illustrations that have been copied or derived from Plaintiff's promotional materials directed to Plaintiff's proprietary VORTEX port technology.

## COUNT I
## PATENT INFRINGEMENT

20.     This cause of action for patent infringement arises under 35 U.S.C. § 271 *et seq*. Plaintiff repeats and realleges paragraphs 1 through 19 of this Complaint.

21.     Defendant has infringed and is still infringing the '512 patent directly, contributing to the infringement of the '512 patent, and/or inducing the infringement of the '512 patent by making, selling, offering to sell, using, distributing, advertising, promoting the use of, and/or supplying implantable ports, such as the SPORTPORT, CLEARPORT, GRIDLOCK, and SWIRLPORT products, that embody the patented invention, and Defendant will continue to do so unless enjoined by this court.

22.     The aforementioned implantable port products are specialized products that have no non-infringing uses and are typically sold to medical institutions and researchers for human and animal use.

23.     With knowledge of the '512 patent, Defendant has marketed and advertised the use of, and has instructed others to use, its infringing implantable port products through at least distributed marketing materials and other materials found on its website, emphasizing advantages and efficiencies to customers and users of the

aforementioned implantable port products.  As an example, Defendant has instructed others regarding the use, advantages and efficiencies of a tangential port outlet, thus knowingly, and with specific intent, encouraging customers and users of the aforementioned infringing implantable port products to directly infringe the '512 patent.

24.     Such infringement has been and continues to be willful and deliberate.

25.     Plaintiff has given the Defendant written notice of its infringement.

26.     The aforesaid acts by Defendant have caused and, unless enjoined by this court, will continue to cause, irreparable damage, loss, and injury to Plaintiff.

## COUNT II
## FEDERAL TRADEMARK INFRINGEMENT

27.     This cause of action for trademark infringement arises under § 32 of the Lanham Act, 15 U.S.C. § 1114(a) *et seq*. Plaintiff repeats and realleges paragraphs 1 through 26 of this Complaint.

28.     Defendant's use of the product name SPORTPORT in commerce is likely to cause confusion, mistake, or deception as to the origin of Defendant's products and mislead purchasers and potential purchasers of Defendant's products to believe that Defendant's products originate from, are affiliated with, or are sponsored by Plaintiff.

29.     The aforesaid acts of Defendant constitute infringement of Plaintiff's United States Trademark Registration No. 3,607,814, issued April 14, 2009, for the mark SMART PORT, in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114.

30.     Such infringement has been and continues to be willful and deliberate.

31.     Plaintiff has given the Defendant written notice of its infringement.

32.     The aforesaid acts of infringement by Defendant have caused and, unless enjoined by this court, will continue to cause, irreparable damage, loss, and injury to Plaintiff.

## COUNT III
## FEDERAL UNFAIR COMPETITION, FALSE DESIGNATIONS, DESCRIPTIONS, AND REPRESENTATIONS

33.     This cause of action arises under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Plaintiff repeats and realleges paragraphs 1 through 32 of this Complaint.

34.     Defendant's promotional materials and publications falsely suggest that Defendant has rights to the VORTEX port technology, and/or that there is an affiliation and/or sponsorship between AngioDynamics and Norfolk.   Moreover, Defendant's infringement of Plaintiff's SMART PORT trademark, and its use of illustrations that have been copied or derived from Plaintiff's promotional materials, falsely suggest an affiliation and/or sponsorship between Plaintiff and Defendant.

35.     The acts of Defendant complained of herein constitute unfair competition, false designation of origin and false and misleading descriptions and representations that are likely to cause confusion, mistake and deception as to the affiliation, connection, or association between Plaintiff and Defendant, and/or as to the origin, sponsorship or approval of Defendant's products and commercial activities by Plaintiff, in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

36.     The aforesaid acts by Defendant have caused and, unless enjoined by this court, will continue to cause, irreparable damage, loss, and injury to Plaintiff.

## COUNT IV
## MASSACHUSETTS UNFAIR COMPETITION

37.     This cause of action for unfair competition arises under the state law of Massachusetts. Plaintiff repeats and realleges paragraphs 1 through 36 of this Complaint.

38.     Plaintiff is engaged in the conduct of a trade or commerce in Massachusetts.

39.     Defendant's aforesaid actions in its promotional and sales materials, including its infringement of Plaintiff's SMART PORT trademark, its use of illustrations that have been copied or derived from Plaintiff's promotional materials, and its false suggestion of having rights to the VORTEX port technology and/or an affiliation or sponsorship with Plaintiff constitute an unfair method of competition and/or an unfair or deceptive act or practice in violation of Mass. Gen. Laws Chapter 93A, Section 2.

40.     The aforesaid acts of Defendant have caused, and unless enjoined by this court, will continue to cause, irreparable damage, loss, and injury to Plaintiff.

## COUNT V
## COMMON LAW TRADEMARK INFRINGEMENT

41.     This cause of action for trademark infringement arises under the common law of Massachusetts. Plaintiff repeats and realleges paragraphs 1 through 40 of this Complaint.

42.     Defendant's use of a the product name SPORTPORT is likely to cause confusion, mistake, or deception as to the origin of Defendant's products and mislead purchasers and potential purchasers of Defendant's products to believe that Defendant's products originate from, are affiliated with, or are sponsored by Plaintiff.

43.     The aforesaid acts of Defendant constitute infringement of Plaintiff's SMART PORT trademark, in violation of the common law of Massachusetts.

44.     Plaintiff has suffered damage to its business and reputation because of Defendant's unlawful conduct, and the Defendant will be unjustly enriched.

45.     Such infringement has been and continues to be willful and deliberate.

46.     Plaintiff has given the Defendant written notice of its infringement.

47.     The aforesaid acts of Defendant have caused, and unless enjoined by this court, will continue to cause, irreparable damage, loss, and injury to Plaintiff.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests judgment against Defendant as follows:

A.      A judgment in favor of Plaintiff that Defendant has infringed, directly and indirectly by way of inducement and contributory infringement, the '512 patent;

B.      A permanent injunction enjoining Defendant and its officers, directors, agents, servants, employees, affiliates, divisions, branches, subsidiaries, parents, and all others acting in concert or privity with any of them from further infringing, inducing the infringement of, or contributing to the infringement of the aforementioned patent;

C.      An award to Plaintiff of the damages to which it is entitled under at least 35 U.S.C. § 284 for Defendant's past infringement and any continuing or future infringement, including both compensatory damages and treble damages for willful infringement;

D.      That Defendant, its subsidiaries, officers, agents, employees, servants, attorneys, successors, and assigns, and all persons in active concert or participation with it and anyone else who receives actual notice or knowledge of this injunction by personal service or otherwise, be preliminarily and permanently enjoined from:

i.  Infringing Plaintiff's trademarks, as set forth above; and

ii.  Exploiting, distributing, selling, offering for sale, promoting, or advertising any product, including any online advertising, which makes use of the trademarks set forth herein or any other trademarks or trade dress likely to cause confusion with or likely to dilute Plaintiff's marks; from further unlawfully trading upon and misappropriating the goodwill and reputation of Plaintiff and competing unfairly with Plaintiff and from inducing, encouraging, aiding, abetting, or contributing to any of the aforesaid acts;

E.  That a copy of any order issued from this action be served upon any agent, subsidiary, parent, or servant of Defendant, involved in the design, manufacture, distribution, or advertising of implantable port products;

F.  That Defendant file with the court and serve on Plaintiff in accordance with 15 U.S.C. § 1116, within thirty (30) days after service on Defendant of such injunction (or such extended period as the court may direct), a report in writing and under oath, setting forth in detail the manner and form in which Defendant has complied with the injunction;

G.  That, in accordance with 15 U.S.C. § 1118, all brochures, stationery, merchandise, labels, signs, prints, packages, package wrappers, photographs, and negatives, cards, publications, books, advertisements, and the like in Defendant's possession, custody or control, and all plates, molds, matrices, dies, and other means of making the same, which might, if used, violate the injunction herein granted, be delivered up and destroyed as the court shall direct;

11

H.     That Plaintiff recover from Defendant the amount of damages sustained by Plaintiff as found by the Court, in consequence of Defendant's unlawful acts, together with appropriate interest on such damages, and that, pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117, such damages be trebled;

I.     That Defendant be ordered to account for and pay over to Plaintiff all the gains, profits, savings, and advantages realized by Defendant from its acts of trademark infringement, use of a false designation of origin or false description or representation, and unfair competition;

J.     That Plaintiff recover from Defendant exemplary damages by reason of their wanton and willful acts of common law trademark infringement;

K.     A judgment and order requiring Defendant to pay the costs of this action (including all disbursements), as well as attorneys' fees as provided by 35 U.S.C. § 285;

L.     An award to Plaintiff of pre-judgment and post-judgment interest on its damages; and

M.     Such other further relief in law or equity to which Plaintiff may be justly entitled.

## JURY TRIAL DEMAND

In accordance with Fed. R. Civ. P. 38, Plaintiff demands a trial by jury on all

issues so triable.


Dated: May 21, 2014                      Respectfully submitted,


                              By:    /s/ Scott T. Bluni
                                     Scott T. Bluni, BBO #660187
                                     sbluni@kdbfirm.com
                                     **KACVINSKY DAISAK BLUNI PLLC**
                                     50 Doaks Lane
                                     Marblehead, Massachusetts 01945
                                     (781) 336-0113

                                     *Attorneys for Plaintiff*

# Exhibit B

2010 WL 2802213
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

BLUESTAR MANAGEMENT LLC d/b/a Wrigley
Done Right, Plaintiff,
v.
THE ANNEX CLUB, LLC d/b/a the Ivy League
Baseball Club, Wrigley Rooftops IV, LLC d/b/a
Sheffield Baseball Club, Wrigley Rooftops III, LLC
d/b/a Wrigley Field Rooftop Club and Thomas
Gramatis, Defendants.

No. 09 C 4540. | July 12, 2010.

## Attorneys and Law Firms

Robert Edward Browne, Sr., Gregory James Leighton,
Michael Gary Kelber, Michael R. Turner, Neal, Gerber &
Eisenberg, Chicago, IL, for Plaintiff.

Thomas Stephen Moore, Jane Farwell Anderson,
Anderson & Moore, P.C., Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

ROBERT W. GETTLEMAN, District Judge.

**\*1** Plaintiff, BlueStar Management LLC ("BlueStar")
d/b/a Wrigley Done Right ("Wrigley Done Right"), has
brought a seven-count complaint against defendants, The
Annex Club d/b/a The Ivy League Baseball Club (the
"Ivy League Club"), Wrigley Rooftops IV, LLC d/b/a
Sheffield Baseball Club (the "Sheffield Club"), Wrigley
Rooftops III, LLC d/b/a Wrigley Field Rooftop Club (the
"Wrigley Rooftop Club"), and Thomas Gramatis
("Gramatis"), alleging: false designation of origin in
violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)
(Count I); false advertising in violation of the Lanham
Act, 15 U.S.C. § 1125(a)(1)(B) (Count II);
anticompetitive conspiracy in violation of Section I of the
Sherman Act, 15 U.S.C. § 1 (Count III); tortious
interference with a prospective business relationship
(Count IV); violation of the Illinois Deceptive Trade
Practices Act, 815 ILCS 510/1 *et seq.* (Count V);
violation of the Illinois Consumer Fraud and Deceptive

Business Practices Act, 815 ILCS 505/1 *et seq.* (Count
VI); and common law unfair competition (Count VII).
Defendants have moved to dismiss the complaint in its
entirety pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b). For
the reasons discussed below, defendants' motion is
granted as to Counts III, IV, and VII, and denied as to
Counts I, II, V, and VI.

## BACKGROUND

BlueStar is the proprietor of a rooftop club—Wrigley
Done Right—licensed by the City of Chicago (the "City")
to charge admission to view Chicago Cubs baseball
games and other events at Wrigley Field. There are fifteen
such clubs with current Special Club Licenses issued by
the City. BlueStar promotes its club through a variety of
marketing initiatives and maintains a website at <
wrigleydoneright.com>.

In 2008, BlueStar alleges that Gramatis began to spread
false rumors and statements about BlueStar's consultant,
Dean Bravos, and manager, Lee Gramatis, to City
inspectors with the intent of interfering with the process
of inspection and permit issuance for Wrigley Done
Right. In addition, Gramatis allegedly told prospective
customers of Wrigley Done Right that the club "would
never get a license or occupancy card to open."Gramatis
made these statements even though he was aware that the
Wrigley Done Right facility had previously complied
with City ordinances when Gramatis leased the same
building during the 2004 and 2005 baseball seasons. The
City subsequently issued BlueStar all the permits required
for operation.

The complaint further alleges that the Wrigley Rooftop
Club is currently paying for a "sponsored result"
advertisement on the website < www.purelocal.com> that
features a photograph of the Wrigley Done Right roof top
building adjacent to a link to the website for the Wrigley
Rooftop Club. Aside from being a direct competitor of the
Wrigley Rooftop Club, Wrigley Done Right is situated in
a well-known building that is twice as wide and better
located than the Wrigley Rooftop Club.

The complaint further alleges that the Ivy League Club
and Gramatis have misrepresented that the Ivy League
Club, located at 3637 Sheffield, is open for business,
when it has in fact been closed for construction since prior
to the 2008 season. From January 2008 until sometime in
2009, the Ivy League Club was being promoted and
advertised on <ivyleaguebaseballclub.com> without any

2010 WL 2802213

disclosure to consumers that the rooftop was closed. Sometime in June 2009, a small disclaimer was added to the Ivy League Club's website stating:

> **\*2** Please Note: Ivy League Baseball Club is currently undergoing a complete renovation and we anticipate the grand reopening on July 24, 2009. In the event that Ivy League Baseball Club is not available for your event, customers will be accommodated at one of our new facilities at Sheffield Baseball Club located at 3619 N. Sheffield or Wrigley Field Rooftop Club located at 3617 N. Sheffield.

Despite being under construction and lacking the necessary permits, the Ivy League Club took a significant number of reservations in 2009. Only after guests arrive for a game were they notified that the Ivy League Club was closed, and redirected to the Sheffield Baseball Club and the Wrigley Rooftop Club. These other clubs are located approximately 200 feet away from the Ivy League Club's mid-center field location. Only after receiving a cease and desist letter from BlueStar did the Ivy League Club change its reopening date on its website to September 2009.

Notwithstanding its closure, a link to the Ivy League Club website remained listed on <ballparkrooftops.com>, an internet directory authorized by and listed on the Chicago Cub's official website under "Rooftop Partners." This website allegedly generates significant business among Cubs fans. In addition, Gramatis allegedly has falsely represented on the Wrigley Rooftop Club's Facebook page that consumers can "[e]njoy a fantastic unobstructed view of Wrigley Field and the Chicago Cubs from any one of our three new state of the art facilities."

Additionally, the complaint alleges that defendants have intentionally used their collective power and influence to preclude Wrigley Done Right from joining the Wrigley Rooftop Association (the "Rooftop Association"), an association of most of the Special Club License holders and operators of Wrigley rooftop venues. Without membership in the Rooftop Association, Wrigley Done Right is prevented from participating in organized meetings with the local community and alderman to discuss issues related to operation of the rooftops, including new ordinances and license requirements, and to advocate on behalf of its business interests.

Defendants have also allegedly interfered with Wrigley Done Right's sales by interfering with its inclusion on the <ballparkrooftops.com> website. According to the WHOIS database, the <ballparksrooftops.com> domain name is owned by the Rooftop Association, and Gramatis is listed as the administrative contract. The Rooftop Association is not incorporated and is not listed with the Illinois Secretary of State Corporate records. A "Wrigley Rooftops Property Owners Association" is identified, but was dissolved in 2004. From approximately January 7, 2008, until May 5, 2008, Gramatis repeatedly refused to list Wrigley Done Right on the <ballparksrooftops.com> website and instead fraudulently linked it to his own rooftop's website <wrigleyfieldrooftopclub.com>. This allegedly resulted in lost sales for Wrigley Done Right.

### DISCUSSION

**\*3** When ruling on a motion to dismiss for failure to state a claim, the court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *Sprint Spectrum L.P. v. City of Carmel, Indiana,* 361 F.3d 998, 1001 (7th Cir.2004). The complaint must describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds on which the claims rest. The allegations must plausibly suggest that the plaintiff has a right to relief, raising the possibility above the "speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–73, 167 L.Ed.2d 929 (2007).

As a preliminary matter, defendants argue that the complaint should be dismissed in its entirety because plaintiff's predicate allegations fail to comply with Fed.R.Civ.P. 9(b). The court will consider this argument in its analysis of the individual counts.

### Counts I & II—Lanham Act

Count I of the complaint alleges that the Wrigley Rooftop Club and Gramatis deliberately and willfully displayed photographic images of BlueStar's rooftop facility in an internet advertisement in an attempt to pass off Wrigley Done Right's facility as the Wrigley Rooftop Club and to confuse consumers into believing that they could purchase tickets to Wrigley Done Right's facility by contracting with the Wrigley Rooftop Club. Count II alleges that defendants deliberately and willfully misrepresented to consumers that the Ivy League Club was open for business through advertisements posted on <

ivyleaguebaseballclub.com>, <ballparkrooftops.com>, and Gramatis' Facebook page.

### Rule 9(b)

Defendants argue that claims alleging false representation under the Lanham Act are subject to Rule 9(b).*MPC Containment Sys., Ltd. v. Moreland,* 2006 WL 2331148, at *2–3 (N.D.Ill. Aug.10, 2006) (applying Rule 9(b) to unfair competition claim brought under § 1125(a)(1)(A)) (collecting cases). Regardless of whether a Lanham Act false representation claim must be plead with particularity, in the instant case BlueStar has pled allegations of the "who, what, where, when, and how" of Count I with respect to the Wrigley Rooftop Club and Gramatis. Although it appears that BlueStar intended to bring Count I against all defendants, the complaint does not sufficiently plead how the other defendants were involved in placing the purportedly misleading advertisement. The court will therefore consider Count I only as against the Wrigley Rooftop Club and Gramatis. The other defendants, the Ivy League Club and the Sheffield Club, are therefore dismissed from Count I.

Similarly, BlueStar is apparently seeking to hold all defendants liable for Count II, but it has not pled any facts describing the Sheffield Club's role in placing or promoting the offending web advertisement. Absent such allegations, the court will consider Count II only as against the Wrigley Rooftop Club, Gramatis, and the Ivy League Club. The Sheffield Club is therefore dismissed from Count II.

### Lanham Act

**\*4** Defendants argue that Count I fails to state a claim under § 1125(a)(1)(A) and is more properly analyzed as a claim under § 1125(a)(1)(B) using the standard set forth in *Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d 813, 819 (7th Cir.1999). BlueStar maintains that Count I properly states a claim for false designation under § 1125(a)(1)(A) and, without offering an alternative standard, argues that the *Hot Wax* standard is inapplicable to Count I.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides, in relevant part that:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

### Count I

False designation claims are generally either "passing-off" claims or "reverse passing-off" claims that involve misuse of a name or trademark. *Web Printing Controls Co., Inc. v. Oxy–Dry Corp.,* 906 F.2d 1202, 1203 n. 1 (7th Cir.1990). The court notes that both Subsections A or B could apply to the instant case because Gramatis and the Wrigley Rooftop Club were allegedly attempting to pass-off the Wrigley Done Right facility as their own in an advertisement.

To state a claim under § 1125(a)(1)(B) for false designation, a plaintiff must allege: " '(1) that the defendant used a false designation of origin or false description or representation in connection with goods or services; (2) that such goods or services entered interstate commerce; and (3) that the plaintiff is a person who believes he is likely to be damaged as a result of the misrepresentation.' "*Gaffrig Performance Indus., Inc. v. Livorsi Marine, Inc.,* 2003 WL 23144859, *15 (N.D.Ill.Dec.19, 2003) (quoting *Kennedy v. Nat'l Juvenile Detention Ass'n,* 187 F.3d 690, 695–96 (7th Cir.1999)).

Taking all reasonable inferences in favor of plaintiff, the allegations of Count I satisfy the elements of a false designation claim under the Lanham Act. BlueStar has alleged that: (1) Gramatis and the Wrigley Rooftop Club sponsored an advertisement featuring a photo of Wrigley Done Right's building next to a link to the Wrigley

Rooftop Club's website; (2) Gramatis and the Wrigley Rooftop Club caused the advertisement to enter instate commerce when they sponsored the advertisement on the internet on the <ballparkrooftops .com> website; and (3) BlueStar has been injured as a result of the misrepresentation because sales have been diverted from Wrigley Done Right to the Wrigley Rooftop Club.

**\*5** Defendants urge the court to consider the fact that the source code for the advertisement reveals that the picture was posted on the internet by a company with the email address <worthathousandwords.com>, not defendants, and that BlueStar has not alleged a relationship between these separate entities. Nonsense. Even if the court were to consider the source code of the advertisement, which was supplied by defendants and not mentioned in the complaint,[i] it does not take a great inferential leap to conclude that BlueStar has alleged that defendants supplied the content of the advertisement to <worthathousandwords.com>, whom they hired to post the advertisement. Defendants' remaining arguments—that the advertisement was a mistake or the photograph was too small to influence purchasing decisions—are fact-based and not appropriate for consideration at this stage in the proceedings. Because Count I adequately states a claim for false designation under the Lanham Act, § 1125(a)(1)(A), against Gramatis and the Wrigley Rooftop Club, defendants' motion to dismiss Count I is denied.

### *Count II*

Count II sufficiently states a claim for false advertising under § 1125(a)(1)(B). To state a claim under the false or deceptive advertising prong of § 43(a) of the Lanham Act, a plaintiff must plead: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products." *Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d 813, 819 (7th Cir.1999).

The complaint alleges that from January 2008 until some time in 2009, Gramatis and the Ivy League Club promoted and advertised the availability of services at the Ivy League Club on the <ivyleaguebaseballclub.com> website and Gramatis' Facebook page despite the fact that the facility was closed for renovation through the 2009

baseball season and lacked the Special Club License required for hosting patrons. BlueStar alleges that Gramatis and the Ivy League Club accepted reservations for the closed facility and later fulfilled purchasers' tickets at one of Gramatis' other facilities—either the Sheffield Club or the Wrigley Rooftop Club. These alternative facilities allegedly have less favorable viewing locations than the Ivy League Club's, and the web advertisements for the Ivy League Club were used to deceive consumers into booking reservations for inferior services. Finally, BlueStar alleges that the Ivy League Club has booked a significant number of reservations as a result of these misleading advertisements and that the diversion of sales has injured BlueStar's business.

**\*6** Defendants argue that the construction delays that the Ivy League Club experienced did not amount to fraud and that disclaimers were posted on both Gramatis' Facebook page and <ivyleaguebaseballclub.com> informing consumers of the on-going construction and alternative seating arrangements in the event that construction was not complete. BlueStar concedes that a disclaimer was placed on the Ivy League Club's website, but argues that the disclaimer was inconspicuous and ineffective. Without considering the size or efficacy of the disclaimer, the crucial fact is that it did not appear on the Ivy League Club's website until June 2009. For more than a year and a half, defendants were advertising and selling seats for a venue that was not operational. This goes beyond conduct consistent with a mere construction delay. Consequently, plaintiff has successfully stated a claim for false advertising under the Lanham Act, and defendants' motion to dismiss Count II is denied.

### Count III—Sherman Act

15 U.S.C. § 1 of the Sherman Act provides in relevant part that:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal ...

To state a claim under § 1, a plaintiff must plead "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury." *MCM Partners v. Andrews–Bartlett & Assocs.,* 161 F.3d 443, 448 (7th Cir.1998) (internal citations omitted). The two standards for determining whether an alleged restraint of trade is

unreasonable are the rule of reason and the per se rule.*Denny's Marina v. Renfro Prods.,* 8 F.3d 1217, 1220 (7th Cir.1993). The rule of reason, the standard traditionally applied to most § 1 actions, requires a sufficient allegation of anticompetitive effects to state a claim, whereas a per se offense is "so destructive of free competition that deleterious effects will be conclusively presumed."*Havoco of America, Ltd. v. Shell Oil Co.,* 626 F.2d 549, 555 (7th Cir.1980). Examples of per se offenses include price fixing agreements, group boycotts, and market allocation.[2]*Id* .

Count III alleges that defendants conspired to keep BlueStar out of the Rooftop Association and prevented Wrigley Done Right from being listed on the < ballparkrooftops.com> website. Although the complaint does not specify the nature of the § 1 claim, BlueStar clarifies in its papers in opposition to the instant motion that it considers the alleged conduct to be a type of group boycott. Therefore, the court first considers whether defendants' denial of plaintiff's membership to the Rooftop Association constitutes a per se, group boycott violation of the Sherman Act.

A group boycott is a "concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level."*Tolkan,* 672 F.2d at 1284 (quoting *Smith v. Pro Football, Inc.,* 593 F.2d 1173 (D.C.Cir.1978)). In *Tolkan* the Seventh Circuit recognized that where a group boycott does not involve "a direct effort to influence the supply of, or demand for, a competitor's product, per se treatment may not be appropriate."*Id.* at 1286.The Supreme Court similarly held in *Northwest Wholesale Stationers, Inc. v. Pacific Stationary & Printing Co.,* that unless a wholesale cooperative "possess[es] market power or exclusive access to an element essential to effective competition, the conclusion that exclusion [from the group] is virtually always likely to have anticompetitive effect is not warranted."472 U.S. 284, 296, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985).

**\*7** There are no allegations in the complaint that plausibly suggest that the Rooftop Association has the market power whereby BlueStar's exclusion from the group would result in serious anticompetitive effects. All that is alleged is that: (1) the Rooftop Association is an unincorporated organization composed of most, but not all, of the Special Club License holders and Wrigley rooftop operators other than Wrigley Done Right; (2) the Rooftop Association members participate in organized meetings with the local community and the alderman to discuss important issues related to operation of Wrigley rooftops;

and that (3) BlueStar's exclusion from the Rooftop Association has prevented Wrigley Done Right's ability to monitor discussions with its competitors. In conjunction with the allegations specific to Count III, BlueStar urges the court to consider that defendants allegedly interfered with the inclusion of Wrigley Done Right on the <ballparkrooftops.com> website one month after BlueStar entered into a licensing agreement with the Chicago Cubs.

Far from establishing a viable per se claim, these allegations do nothing to plausibly suggest that the Rooftop Association had "exclusive access to an essential element of effective competition," or the market power to influence the supply or demand for BlueStar's products or services. To the contrary, the complaint merely suggests that the Rooftop Association is an informal group of rooftop vendors who have built relationships and lines of communication with the local community and the alderman. There is nothing to suggest that these relationships are exclusive, or that BlueStar was prevented from building its own relationships and establishing lines of communication with local residents or the alderman's office. Indeed, the complaint acknowledges that BlueStar was listed on <ballparkrooftops.com> within a month of entering into a licensing agreement with the Cubs. There is nothing in the complaint to plausibly suggest that Wrigley Done Right has lost customers or revenue from its lack of membership in the Rooftop Association. Because defendants' alleged actions do not amount to a per se violation of the Sherman Act, the next question is whether BlueStar's allegations state a claim under the rule of reason.

To state a claim under the rule of reason, a plaintiff must allege anticompetitive market effects, that plaintiff's injury is of the type the Sherman Act was designed to prevent, and that the antitrust violation was the direct cause of plaintiff's injury. *Havoco,* 626 F.2d at 556. At issue here is the first of these three elements. The parties agree that to allege an injury to the market, plaintiff must allege that prices are no longer competitively determined, or that the quality or quantity of the services or products has deteriorated. *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1109–1110 (7th Cir.1984).

BlueStar's allegations that its exclusion from the Rooftop Association, the one month delay in Wrigley Done Right being listed on the < ballparksrooftops.com> website, and defendants' false advertising for the Ivy League Club somehow resulted in "unreasonably restrained trade in the Wrigleyville rooftop market" are not only implausible under Rule 12(b)(6), but are nonsensical. BlueStar

concedes that the complaint does not correlate the first two of these allegations to the diminished quality of the rooftop facilities. In addition, the alleged false advertising is not an antitrust violation, and therefore cannot be the premise of an antitrust claim. *Nelson v. Monroe Regional Medical Center,* 925 F.2d 1555, 1564 (7th Cir.1991). Because BlueStar has failed to state a § 1 violation under either the per se rule or the rule of reason, Count III is dismissed with prejudice.

**Count IV—Tortious Interference with a Prospective Contract**

**\*8** To state a claim for tortious interference with a prospective business relationship under Illinois law, a plaintiff must allege: (1) "[her] reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference."*International Mktg., Ltd. v. Archer–Daniels–Midland Co., Inc.,* 192 F.3d 724, 731 (7th Cir.1999) (quoting *Dowd & Dowd, Ltd. v. Gleason,* 181 Ill.2d 460, 693 N.E.2d 358, 370, 230 Ill.Dec. 229 (Ill.1998)). Competition is one of the numerous privileges that serve as a complete defense to a claim for tortious interference. *Speakers of Sport, Inc. v. ProServ, Inc.,* 178 F.3d 862, 865 (7th Cir.1999). In Illinois, the competition defense is recognized so long as competitive conduct is not motivated solely by spite or ill will. *International Mktg.,* 192 F.3d at 731; see also, *Speakers of Sport,* 178 F.3d at 867 ("[T]he tort of interference with business relationship should be confined to cases in which the defendant employed unlawful means to stiff a competitor.").

Defendants argue that even if BlueStar has sufficiently alleged each of the required elements, Count IV should be dismissed because BlueStar's complaint admits all of the facts necessary for defendants to establish a competition defense. Although competition would normally be regarded as an affirmative defense, the Seventh Circuit has recognized that "in some cases a complaint so clearly reveals the existence of the defense that judgment on the pleadings is possible."*International Mktg.,* 192 F.3d at 731. This is such a case.

Although the complaint sets forth the necessary elements of a tortious interference claim, the complaint also establishes that the parties are competitors. BlueStar argues that because it has pled allegations of defendants' predatory and anti-competitive conduct, if proven true these facts overcome a competition defense. The problem

with this argument is threefold: (1) the court has found that BlueStar's allegations of anti-competitive conduct is implausible; (2) the complaint is bereft of allegations of predatory conduct; and (3) BlueStar has not alleged that defendants' conduct was motivated solely by spite or ill will. Consequently, defendants' motion to dismiss Count IV is granted.

**Counts V and VI—Illinois Deceptive Trade Practices Act and Illinois Consumer Fraud Act**

The parties agree that Count V, based on the Illinois Deceptive Trade Practices Act, 815 ILCS § 510/1 *et seq.,* and Count VI, based on the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS § 505/1 *et seq.,* must rise or fall based on the outcome of the Lanham Act claim. "This is because the legal inquiry is the same under the Lanham Act as under the Consumer Fraud Act and the Deceptive Trade Practices Act."*MJ & Partners Restaurant Ltd. Pshp. v. Zadikoff,* 10 F.Supp.2d 922, 929 (N.D.Ill.1998). Because BlueStar has successfully stated claims under the Lanham Act, defendants motion to dismiss Counts V and VI are denied.

**Count VII—Unfair Competition**

**\*9** Defendants argue that Count VII should be dismissed because BlueStar has failed to alleged sufficient facts to support a common law claim for unfair competition as set forth in *Wilson v. Electro Marine Systems, Inc.,* 915 F.2d 1110 (7th Cir.1990) (holding that common law unfair competition is reserved for the "most egregious of cases"). BlueStar argues that the pleading requirements articulated in *Wilson* are inapplicable here because the Seventh Circuit applied New York law, not Illinois law. Nevertheless, BlueStar has not offered an alternative standard by which to analyze the sufficiency of Count VII.

Stating a claim for unfair competition under Illinois common law is not a simple task because the Illinois courts have not specifically enumerated the requisite elements. *Custom Bus. Sys., Inc. v. Boise Cascade Corp.,* 68 Ill.App.3d 50, 52, 385 N.E.2d 942, 944, 24 Ill.Dec. 801 (Ill.App. 2 Dist.1979). As the Seventh Circuit has stated, "the law of unfair competition ... is elusive; its elements escape definition."*Wilson,* 915 F.2d at 1118. The Illinois courts have, however, recognized that the Uniform Deceptive Trade Practices Act ("UDTPA") has codified most aspects of the common law tort of unfair competition. *Custom Bus. Sys.,* 68 Ill.App.3d at 52–53, 24 Ill.Dec. 801, 385 N.E.2d 942. The allegations underlying Count VII are identical to those of Count V, and BlueStar

2010 WL 2802213

has not explained why its common law claim for unfair competition is still viable given the codification of UDTPA. Moreover, courts in this district have recognized that the allegations underlying a claim of tortious interference with prospective economic advantage also suffice to state a claim for unfair competition. See *Zenith Elec. Corp. v. Exzec, Inc.,* 1997 WL 798907 (N.D.Ill.Dec.24, 1997) (equating an unfair competition claim with a claim for tortious interference with prospective economic advantage). Because BlueStar has: (1) failed to state a claim for tortious interference with prospective economic advantage as discussed above; and (2) has already stated an identical claim under the UDTPA, defendants' motion to dismiss Count VII is granted.

### CONCLUSION

For the reasons stated herein, defendants' motion to dismiss Count I as against the Ivy League Club and the Sheffield Club, and the motion to dismiss Count II as against the Sheffield Club are granted. In addition, defendants' motion to dismiss Counts III, IV, and VII is granted, and their motion is denied as to Counts I, II, V, and VI. The defendants named in these counts are directed to answer them on or before August 9, 2010. The parties are directed to file with the court a joint status report using the court's form on or before August 9, 2010. This matter is set for a report on status August 17, 2010, at 9:00 a.m.

Footnotes

1    Defendants have attached a copy of the source code of the advertisement to their motion and argue that the court can consider it without converting their motion to a motion for summary judgment. The Seventh Circuit recognizes a narrow exception to Fed.R.Civ.P. 12(b) that arises most frequently where a complaint references but does not attach a document central to a claim and necessary for disposition of a motion to dismiss. *Tierney v. Vahle,* 304 F.3d 734, 738 (7th Cir.2002). However, "documents that are neither included in the plaintiff's complaint nor central to the claim should not be considered on a motion to dismiss."*Albany Bank & Trust Co. v. Exxon Mobil Corp.,* 310 F.3d 969, 971 (7th Cir.2002) (quoting *Berthold Types Ltd. v. Adobe Sys. Inc.,* 242 F.3d 772, 775 (7th Cir.2001)). Here, the source code is outside the four corners of the complaint, does not fall within the exception to the rule because the advertisement cannot be characterized as a portion of the relevant document, and the source code is not necessary for disposition of the instant motion.

2    "Only after courts have considerable experience with a particular type of conduct, and application of the rule of reason has inevitably resulted in a finding of anticompetitive effect, will the practice in question generally be deemed a per se violation."*Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advertising Ass'n. Inc.,* 672 F.2d 1280, 1284 (7th Cir.1982).

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit C

2011 WL 4431031
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

CASSETICA SOFTWARE, INC., Plaintiff,
v.
COMPUTER SCIENCES CORP., Defendant.

No. 11 C 2187. | Sept. 22, 2011.

**Attorneys and Law Firms**

Michael R. La Porte, William W. Flachsbart, Flachsbart & Greenspoon, LLC, Chicago, IL, for Plaintiff.

Michael J. Allan, Arnold & Porter, Washington, DC, Thomas Lee Holt, Steptoe & Johnson LLP, Chicago, IL, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

HARRY D. LEINENWEBER, District Judge.

**\*1** Plaintiff Cassetica Software, Inc. (hereinafter, "Cassetica") brought the instant suit alleging copyright infringement against Computer Sciences Corp. (hereinafter, "CSC"). Cassetica now moves to dismiss CSC's counterclaims and strike its affirmative defenses. For the reasons stated herein, Cassetica's Motion to Dismiss CSC's Counterclaims is granted, with CSC given leave to replead its claim under the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), 815 Ill. Comp. Stat. 510, *et seq.,* within 30 days of the date of this Order. Cassetica's Motion to Strike CSC's Affirmative Defenses is granted, except that the defense of unclean hands may stand.

### I. *BACKGROUND*

Cassetica is a software developer that developed a companion program to Lotus Notes called "NotesMedic." It contends that CSC's employees, acting within the scope of their employment, have copied Cassetica's software

code and infringed Cassetica's copyright and that CSC is vicariously liable for these infringements.

This is not the first lawsuit involving these parties. In 2009, Cassetica sued CSC for infringement of its copyright on a prior version of the NotesMedic program and sought statutory damages. Judge Virginia Kendall dismissed the suit. *Cassetica Software, Inc. v. Computer Scis. Corp.,* 09 C 0003, 2009 WL 1703015 (N.D.Ill. June 18, 2009). Her ruling was based on the fact that the alleged infringement started prior to the effective date of the copyright registration, which was January 22, 2007. *Id.* at *2; *see*17 U.S.C. § 412(2).

Cassetica contends that since the dismissal of that suit, CSC employees have continued to download new, separately copyrighted versions of its NotesMedic software (referred to as Versions 6 and 7). Both of these versions have been registered with the Copyright Office, and all the illegal downloading took place after registration, the Complaint alleges.

CSC has filed counterclaims under the IUDTPA and for common law unfair competition. Cassetica seeks to dismiss these counterclaims for failure to state a claim pursuant to FED. R. CIV. P. 12(b) (6). CSC also has pleaded several affirmative defenses. Cassetica seeks to strike each of these defenses pursuant to FED. R. CIV. P. 12(f). Each motion will be addressed in turn.

### II. *CSC's COUNTERCLAIMS*

#### A. Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a pleading. *In re Health Care Compare Corp. Sec. Litig.,* 75 F.3d 276, 279 (7th Cir.1996). In ruling on a motion to dismiss a counterclaim, the court accepts the well-pleaded allegations of the counterclaim as true and construes them in the light most favorable to the counter-plaintiff. *Terrell v. Childers,* 889 F.Supp. 311, 314 (N.D.Ill.1995).

#### B. IUDTPA

CSC's claim under the IUDTPA alleges that Cassetica

markets and promotes its NotesMedic software in a deceptive and misleading fashion in order to trick businesses into entering into unwanted licenses for the software. Although CSC alleges that this scheme has gone on for the last several years, carried out through misrepresentations on Cassetica's web site, its Counterclaim is muddled. For example, CSC first alleges that Cassetica has marketed its product as free for home users. Def.'s Countercl. at ¶ 7. But in the next paragraph, CSC alleges that Cassetica has engaged in a bait-and-switch scheme by falsely promoting the product as free, and then seeking to enforce a putative enterprise license agreement with the individual's employer for the unwanted software. Id. at ¶ 8. The Court is unsure what promoting a product as free for home users has to do with a bait-and-switch scheme involving business licenses.

**\*2** Perhaps more on point is CSC's allegation that Cassetica has at times offered its license free for one user per company. However, according to the Counterclaim, Cassetica never informed employees at the time of download as to whether any other employee in their company had already downloaded the software. And it never informed employers at the time of download that, because of their employees' actions, they had entered into enterprise-wide license agreements. Def.'s CounterCl. at ¶ 12–13.

It is difficult to tell from CSC's Counterclaim what was offered to whom, and when. This lack of clarity may stem from the fact that Cassetica has apparently changed the terms upon which it offers the NotesMedic software over the years, depending on the version at issue. For example, according to Cassetica's Memorandum in Support of its Motion to Dismiss, the company now offers a free home user option, an "enterprise license," that covers a single corporate entity, and a "global license" that covers a corporate entity and any subsidiaries or affiliates. Cassetica acknowledges that in the past it has offered a free version of its NotesMedic software for one user per company, but maintains that it no longer does so. In its Counterclaim, CSC acknowledges without elaboration that Cassetica's licensing terms have changed, but maintains that they have "at all times remained deceptive and misleading."Def.'s CounterCl. at ¶ 12.

The IUDTPA allows for the enjoining of deceptive or unfair trade practices, and "is primarily directed towards acts which unreasonably interfere with another's conduct of his business."*Popp v. Cash Station, Inc.,* 244 Ill.App.3d 87, 184 Ill.Dec. 558, 613 N.E.2d 1150, 1156 (Ill.App.Ct.1992). The statute principally serves as a means to stop unfair competition, not to protect consumers. *Id.* However, a consumer action is possible

under the statute if the consumer alleges facts that indicate he is likely to be damaged in the future. *Id.* at 1157.This is a difficult showing to make, because ordinarily in a consumer action under the IUDTPA, the harm from the allegedly deceptive practice has already occurred. *Id.*

As an initial matter, the parties disagree as to whether CSC's Counterclaim under the IUDTPA is governed by the heightened pleading standards that apply to claims sounding in fraud under FED. R. CIV . P. 9(b). Claims under the IUDTPA are not automatically subject to Rule 9(b) because the Act provides relief for a variety of unfair or deceptive trade practices, some of which do not amount to fraud but which create a likelihood of confusion or misunderstanding. 815 Ill. Comp. Stat. 510/2(12); *see Publications Int'l, Ltd. v. Leapfrog Enters., Inc.,* No 01 C 3876, 2002 WL 31426651, at \*6 (N.D.Ill. Oct.29, 2002) (holding that allegations of an IUDTPA violation based on trademark infringement were not subject to Rule 9(b)).

CSC relies in part on *Sotelo v. DirectRevenue, LLC,* 384 F.Supp.2d 1219 (N.D.Ill.2005). There, the defendant was accused of using misleading advertising that promised free software downloads, but failed to reveal that the software was bundled with Spyware that tracked which web sites the computer's user had viewed. *Id.* at 1223.The court held that the plaintiff's claims based on the IUDTPA were not subject to Rule 9(b) because the plaintiff disavowed a theory of recovery based on fraud and instead alleged that defendant's conduct created a likelihood of confusion or misunderstanding. *Id.* at 1233–34.

**\*3** *Sotelo* is not exactly on point in part because CSC has not disavowed its reliance on a fraud theory. It alleges that Cassetica marketed its software in a deceptive manner "as part off a scam to cause companies to unknowingly enter into putative licenses of unwanted Cassetica software."Def.'s CounterCl. at ¶ 6. Additionally, in its response brief, CSC cites to Section 2(a)(5) of the IUDTPA, which prohibits representations that goods have qualities or benefits that they do not have. 815 Ill. Comp. Stat. 510/2(a)(5). This portion of the statute essentially forbids fraudulent misrepresentations. *See Dynamic Fluid Control (PTY) Ltd. v. Int'l Valve Mfg., LLC,* ——F.Supp.2d ——, 2011 WL 1838872, at \*6 (N.D.Ill. May 11, 2011).

However, read generously, the Counterclaim alleges conduct that is not only deceptive but unfair, and the IUDTPA applies to both. An action for unfair practices need only meet the liberal notice pleading requirements of FED. R. CIV. P 8(a).*Cf. Windy City Metal Fabricators &*

2011 WL 4431031

*Supply, Inc. v. CIT Tech. Fin. Serv., Inc.,* 536 F.3d 663, 670 (7th 2008) (applying the same reasoning to a claim under the Illinois Consumer Fraud Act). But deciding the correct pleading standard does not resolve the motion because in order for a consumer claim under the IUDTPA to stand, the consumer must allege the elements required to entitle it to injunctive relief, including that it is likely to be damaged in the future. *Int'l Star Registry of Ill. v. ABC Radio Network, Inc.,* 451 F.Supp.2d 982, 991 (N.D.Ill.2006). CSC's Counterclaim fails to do this.

As noted above, it is impossible to tell when Cassetica made certain offers or representations and about which version of the software. In fact, CSC's Counterclaim refers to "NotesMedic Pro," a version of the software that predates the version at issue in this lawsuit. Def.'s CounterCl. at ¶ 10. It appears that CSC has conflated representations made about different versions of the NotesMedic product. This is important because if Cassetica no longer offers a free version of its NotesMedic software to a single corporate user, as appears to be the case, then it is difficult for the Court to see how CSC employees could be tricked into entering into enterprise licenses in the future under the guise of downloading one free copy of the software. CSC argues there is a risk of future harm because its employees have continued to download Cassetica's software even after the previous infringement suit and even after CSC blocked Cassetica's web sites from its servers. But even accepting that as true, CSC must plead facts to show that deception or unfair practices on the part of Cassetica are the cause of the future harm. As it stands, CSC's Counterclaim under the IUDTPA does not do this.

As such, CSC's Counterclaim under the IUDTPA is dismissed pursuant to FED.R.CIV.P. 12(b)(6), with leave to replead within 30 days from the date of this Order if CSC can show a likelihood of future harm. However, in the event CSC chooses to replead, the Court notes that punitive damages are not available under the IUDTPA. Rather, the sole remedy is injunctive relief. *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA,* 384 Ill.App.3d 849, 323 Ill.Dec. 507, 893 N.E.2d 981, 996 (Ill.App.Ct.2008).

### C. Common Law Unfair Competition

**\*4** CSC attempts to state an Illinois common law claim for unfair competition based on the same facts outlined above, namely that Cassetica acted in bad faith by enticing employees to download software that was deceptively promoted as free in order to lure their

employers into paying for enterprise licenses. Illinois courts have not specified the elements of a common law claim for unfair competition. *BlueStar Mgmt. LLC v. Annex Club,* 09 C 4540, 2010 WL 2802213, at *9 (N.D.Ill. July 12, 2010). Indeed, the Seventh Circuit has aptly declared its elements to be "elusive." *Wilson v. Electro Sys.,* 915 F.2d 1110, 1118 (7th Cir.1990).

Given that uncertainty, CSC is correct that the tort of unfair competition is somewhat broadly defined. However, courts have noted that the IUDTPA has codified most aspects of the common law of unfair competition. *BlueStar,* 2010 WL 2802213, at *9. And where applicable, the tort generally applies either to tortious interference with prospective economic advantage or to actions that misappropriate the labor or ideas of another. *Wilson,* 915 F.2d at 1118; *Zenith Elecs. Corp. v. Exzec, Inc.,* 93 C 5041, 1997 WL 223067, at *6 (N.D.Ill. March 27, 1997). CSC does not allege either type of wrongdoing. Nor has CSC presented any reason why it should be allowed to pursue an unfair competition claim that is identical to its statutory claim under the IUDTPA. Its unfair competition claim is dismissed with prejudice.

### III. *MOTION TO STRIKE*

CSC has pleaded eight affirmative defenses: (1) failure to state a claim; (2) estoppel; (3) statute of limitations; (4) laches; (5) acquiescence; (6) unclean hands; (7) *res judicata* or collateral estoppel based on Judge Kendall's June 18, 2009 order; and (8) a lack of damages.

Cassetica moves to strike all of CSC's affirmative defenses on various grounds. FED. R. CIV. P. 12(f) provides that a court may strike an insufficient defense or "any redundant, immaterial, impertinent, or scandalous matter."Generally, motions to strike are disfavored, but they are appropriate to remove "unnecessary clutter" from the litigation. *Heller Fin., Inc. v. Midwhey Powder Co.,* 883 F.2d 1286, 1294 (7th Cir.1989). The decision of whether to strike material is within the discretion of the trial court. *Talbot v. Robert Matthews Distrib. Co.,* 961 F.2d 654, 665 (7th Cir.1992).

Courts apply a three-part test in examining the sufficiency of affirmative defenses under Rule 12(f): (1) whether the matter is properly pleaded as an affirmative defense; (2) whether the affirmative defense complies with FED R. CIV. P. 8 and 9; and (3) whether the affirmative defense can withstand a challenge under Rule 12(b)(6).*Ortho–Tain, Inc. v. Rocky Mountain*

*Orthodontics, Inc.,* No. 05 C 6656, 2007 WL 1238917, at *1 (N.D.Ill. April 25, 2007). An affirmative defense that fails to meet any of these standards must be stricken to make the pleadings more precise. *Id* .

**\*5** The parties dispute whether the pleading standards of *Twombly/Iqbal* apply here. This Court, like the majority of courts within this circuit, finds that they do. *Massenberg v. A & R Sec. Servs., Inc.,* No. 10 C 7187, 2011 WL 2909364, at *1 (N.D.Ill. July 18, 2011). However, the Court notes that Judge George M. Marovich's ruling in *Leon v. Jacobson Transp.,* No. 10 C 4939, 2010 WL 4810600 (N.D.Ill. Nov.19, 2010), taking the opposite position and cited by CSC, makes several insightful observations. In particular, it is often true that affirmative defenses, even if technically inappropriate, cause no real prejudice, and striking them is not worth the time and expense it takes for the parties and the Court to brief and rule on such a motion. *Id.* at *1.

That said, the Court will briefly discuss each of the affirmative defenses at issue here. First, Cassetica is correct that "failure to state a claim" is not a proper affirmative defense, so it is stricken with prejudice. *Ill. Wholesale Cash Register, Inc. v. PCG Trading, LLC,* No. 08 C 363, 2009 WL 1515290, at *2 (N.D.Ill. May 27, 2009).

Next, Cassetica challenges CSC's affirmative defenses of estoppel, laches, acquiescence, statute of limitations, and *res judicata* or collateral estoppel based on Judge Kendall's 2009 order. First, CSC does not plead its defense of laches or estoppel with particularity, which is a sufficient basis for striking these defenses. *See Microthin.com, Inc. v. Siliconezone USA, LLC,* No. 06 C 1522, 2006 WL 3302825, at *10 (N.D.Ill. Nov.14, 2006). CSC explains in its response brief that those defenses—as well as acquiescence, the statute of limitations, and res judicata/collateral estoppel—are based on its belief that Cassetica's Complaint alleges infringement dating back nearly 10 years. However, the Court does not read the Complaint so broadly, and as such these affirmative defenses are immaterial to the case.

While the Complaint refers to prior alleged infringement, Cassetica seeks relief only for infringement of Versions 6 and 7 of its NotesMedic program, neither of which had been published or registered with the Copyright Office at the time of the prior lawsuit before Judge Kendall. Because they are inapplicable to the software at issue here, the Court strikes the affirmative defenses of laches, estoppel, acquiescence, statute of limitations, and *res*

*judicata* /collateral estoppel. If Cassetica seeks leave to amend its Complaint to pursue claims related to prior works, CSC will be given leave to replead these affirmative defenses.

Next, Cassetica seeks to strike CSC's affirmative defense that Plaintiff has suffered no damages by way of the conduct complained of in the Complaint. Although Cassetica seeks both actual and statutory damages, actual damages are not a necessary element of its copyright claims. *See* 17 U.S.C. § 504(c)(1). An affirmative defense, by definition, admits the matters in the complaint, but suggests a reason why the plaintiff nonetheless cannot recover. *Bobbitt v. Victorian House, Inc.,* 532 F.Supp. 734, 736 (N.D.Ill.1982). Because a lack of actual damages does not call Cassetica's right of recovery into question, the defense of lack of damages is stricken with prejudice.

**\*6** However, CSC's affirmative defense of unclean hands is properly pleaded. CSC's IUPTPA claim, while insufficient to show a likelihood of future harm, contains sufficient background facts to alert Cassetica to the nature of its defense. Further, it is an appropriate defense where Cassetica is seeking injunctive as well as monetary relief. *Young v. Verizon's Bell Atl. Cash Balance Plan,* 667 F.Supp.2d 850, 905 (N.D.Ill.2009). As such, the Court grants Cassetica's Motion to Strike CSC's Affirmative Defenses, except that the defense of unclean hands may stand.

## IV. *CONCLUSION*

For the reasons stated herein, the Court rules as follows:

1. Cassetica's Motion to Dismiss CSC's Counterclaims is granted, and its common law unfair competition claim is dismissed with prejudice.

2. CSC is given 30 days from the date of this Order to replead its claim alleging a violation of the IUDTPA.

3. Cassetica's Motion to Strike CSC's Affirmative Defenses is granted, except that the defense of "unclean hands" will stand.

**T IS SO ORDERED.**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext® © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit D

2011 WL 1131329
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

CONTROL SOLUTIONS, LLC, a Delaware Limited
Liability Company, Plaintiff,
v.
OSHKOSH CORPORATION, a Wisconsin
Corporation, Defendant.
Oshkosh Corporation, a Wisconsin Corporation,
Counterclaimant,
v.
Control Solutions, LLC, a Delaware Limited
Liability Company, Counterclaim Defendant.

No. 10 C 121. | March 28, 2011.

**Attorneys and Law Firms**

Frederic Mark Levy, McKenna Long & Aldridge LLP,
Washington, DC, Gary M. Miller, Pei Yuan Chung,
Grippo & Elden, Chicago, IL, Michael E. Petrella, Sean
F. O'Shea, O'Shea Partners, LLP, New York, NY,
Virginia M. Gomez, McKenna Long & Aldridge LLP,
Los Angeles, CA, for Plaintiff/Counterclaim Defendant.

James Daniel Dasso, Jonathan William Garlough, Foley
& Lardner, Chicago, IL, Bradley D. Wine, Harvey G.
Sherzer, Scott Arnold, Dickstein Shapiro LLP,
Washington, DC, for Defendant/Counterclaimant.

**_MEMORANDUM OPINION AND ORDER_**

SHARON JOHNSON COLEMAN, Judge.

**\*1** Plaintiff-counter defendant, Control Solutions LLC,
moves to dismiss Counts II through VIII of
defendant-counterclaimant Oshkosh Corporation's First
Amended Counterclaim pursuant to Rule 12(b)(6) for
failing to state a claim. For the reasons that follow, the
motion is granted.

**_Background_**
The following facts are taken as true for the purposes of

this motion. Control Solutions designs and manufactures
"control and user interface devices" for use in a variety of
commercial, medical and military applications. The
particular component at issue in this case is Control
Solutions' power door system designed for armored
vehicles. Oshkosh designs and manufactures armored
vehicles and is owner of the common-law and
federally-registered "OSHKOSH" trademark in
connection with its trucks and tactical vehicles.

In December 2008, the U.S. Army solicited bids for a new
vehicle, the Mine Resistant Ambush Protected ("MRAP")
All Terrain Vehicle ("M–ATV"). The vehicle was
designed to be outfitted with armor kits to upgrade the
protection on the doors. The doors on these vehicles are
very heavy and require powered assistance to operate
safely. Control Solutions built and installed a prototype
power door system on some of Oshkosh's prototype
vehicles, which Oshkosh used to bid on the Army
contract. On June 30, 2009, the Army awarded Oshkosh
the contract to manufacture the M–ATV. The Army also
awarded to Oshkosh the separate contract to manufacture
the armor up-grade kits for the doors. Oshkosh began
producing the finished MATVs, but did not use Control
Solutions' power door systems. Control Solutions filed
the instant lawsuit claiming breach of contract. Oshkosh
answered the complaint and filed the counterclaim that is
the subject of the motion currently under consideration.

**_Counterclaim_**
Oshkosh filed an eight count counterclaim, which Control
Solutions now seeks dismissal of Counts II through VIII.
Counts II, III, IV, and V, are brought under the Lanham
Act alleging trademark infringement, unfair competition,
false designation of origin, dilution, and false advertising.
The remaining Counts VI, VII, VII, involve the same
allegations brought under Illinois law.

Control Solutions moves to dismiss arguing that: (1)
Oshkosh has failed to state a claim for false advertising,
unfair competition, and false designation of origin
(Counts III, V, VIII) because Oshkosh does not plead
with sufficient particularity to satisfy the heightened
pleading standard of Rule 9(b); (2) Counts II through VIII
fail to sufficiently allege damages; (3) the Lanham Act
claims (Counts II–V) do not allege that Control Solutions
used any infringing mark or made any false or misleading
representations "in commerce" within the meaning of the
Act; (4) Oshkosh lacks standing to assert false advertising
(Count V) and fails to allege that Control Solutions
engaged in "commercial advertising"; (5) the alleged

trademark infringement (Count II) is protected by the fair use doctrine; (6) Oshkosh's trademark does not qualify for dilution protection because it is not "famous" within the meaning of the Lanham Act; (7) Oshkosh's state law claims fail for the same reasons as its federal claims.

## Legal Standard

**\*2** When considering a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all well-pleaded allegations (*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 59, 127 S.Ct. 1955, ——, 167 L.Ed.2d 929, —— (2007)), and draw all reasonable inferences in favor of the nonmoving party.*Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 633 (7th Cir.2007). In order to withstand a motion to dismiss a complaint must provide a short and plain statement of the claim showing that the pleader is entitled to relief.Fed.R.Civ.P. 8(a). The pleader must show that it is plausible, rather than merely speculative, that he is entitled to relief. *INEOS Polymers, Inc. v. BASF Catalysts*, 553 F.3d 491, 497 (7 th Cir.2009).

Under Federal Rule of Civil Procedure 9(b), in all allegations sounding in fraud or mistake, a plaintiff must plead with specificity the who, what, where, and when of the alleged fraud or mistake. Fed.R.Civ.P. 9(b); *Fidelity Nat. Title Ins. Co. of New York v. Intercountry Nat. Title Ins. Co.,* 412 F.3d 745, 749 (7th Cir.2005). Allegations stated on information and belief are inadequate to support a fraud claim unless the facts are inaccessible to the plaintiff. *Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 684 (7th Cir.1992). If the facts are inaccessible to the plaintiff, the complaint must state a basis for the plaintiff's suspicion. *Id.*

## Discussion

Counts III, V, and VIII, involve allegations sounding in fraud, namely unfair competition and false designation of origin, false advertising in violation of section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), and common law unfair competition.

The Lanham Act ("Act") prohibits false designation of origin, false descriptions, and dilution. 15 U.S.C. § 1125(a). Under the Act,

"Any person who, on or in connection with any goods or services, or any container for such goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."15 U.S.C. § 1125(a).

Oshkosh's counterclaim falls short of the Rule 9(b) standard for specificity in several ways. First, Oshkosh's only allegation of misrepresentation is that, "on information and belief, on at least one occasion Control Solutions made an advertising presentation to the United States military wherein Control Solutions claimed that its power door system was being used on the Oshkosh M–ATV vehicles."(First Amended Counterclaim, Dkt. 36 at ¶ 36.) Oshkosh further alleges, "on information and belief, Control Solutions' statements to the United States military regarding the use of its power door system on the Oshkosh M–ATV vehicles are false and misleading."(FAC, Dkt. 36 at ¶ 38.) Oshkosh alleges actual confusion based on one telephone call from an "individual within the military regarding Control Solutions' presentation and its claim that Oshkosh was using its power door systems on the M–ATV" and Oshkosh had to clarify that Control Solutions' power doors did not go into the vehicles produced by Oshkosh. (FAC, Dkt. 36 at ¶ 41.)

**\*3** These allegations form the basis of Oshkosh's counterclaim. Since these allegations are made on information and belief, Oshkosh must state a basis for its suspicion that these allegations occurred, which it does not. Moreover, Oshkosh fails to meet the pleading standard of Rule 9(b) because it fails to allege with particularity the who, what, where and when of the allegations. Even if this Court were to accept the "United States military" as the "who," there is no indication of where and when such a conversation allegedly took place. Additionally, a single instance of confusion has been found insufficient "confusion" to support a violation of the Act. *See Packman v. Chicago Tribune Co.,* 267 F.3d 628, 645 (7th Cir.2001) (holding that the district court properly discounted four phone calls as de minimis evidence of confusion). Accordingly, Counts III, V, and VIII are dismissed without prejudice.

Counts II and VI for trademark infringement under both the Lanham Act and the Illinois statute and Counts III and V for false designation of origin and false advertising must also be dismissed for failing to allege that Control Solutions "used in commerce" Oshkosh's trademark.

Section 1114(1) (a), (b), governing trademark infringement, and section 1 125(a)(1), governing false designation of origin and false advertising, apply only where the defendant uses the trademark in commerce or where the defendant uses in commerce the misrepresentation. The Act defines the phrase in section 1127:

"The term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this Act, a mark shall be deemed to be in use in commerce—

(1) on goods when—

(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, *and* (B) the goods are sold or transported in commerce."(Emphasis added.) 15 U.S.C. § 1127

Here, none of the allegations in Oshkosh's counterclaim even suggest that Control Solutions used Oshkosh's trademark "in commerce" within the meaning of the Act. At most, Oshkosh claims that on one occasion Control Solutions stated that its power door systems were used on Oshkosh's M–ATV vehicles. Oshkosh does not dispute that it used Control Solutions' power door systems on some of its prototypes. There are no allegations that Control Solutions sold or transported any goods with the Oshkosh mark. Accordingly, Counts II, III, V, and VI, must be dismissed on that basis without prejudice.

In Counts IV and VII, Oshkosh alleges trademark dilution pursuant to the Lanham Act and Illinois statute. These Counts fail to allege that Oshkosh's trademark is famous, beyond merely claiming that it is famous. (FAC, Dkt. 36 at ¶ 33.) The Lanham Act (15 U.S.C. § 1125(c)) as well as the Illinois statute governing dilution (765 ILCS 1036/65) protect only "famous" marks from dilution. Under the Lanham Act a mark is famous if it is "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."15 U.S.C. § 1125(c). The Illinois statute enumerates several factors to guide courts in determining whether a mark is famous, including the scope of

advertising and the duration and extent of use of the mark in advertising and publicity. *See*765 ILCS 1036/65. Here, Oshkosh supplies armored vehicles to the military and, thus, is not advertising to the general public. There is no evidence that the general consuming public would in any way associate Oshkosh with armored vehicles. Therefore, Counts IV and VII are dismissed with prejudice.

**\*4** Although this Court has already addressed Count V for failing to comply with Rule 9(b), this Court further finds Oshkosh's false advertising claim deficient. In order to state a claim for false advertising, a plaintiff must plead with particularity: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products. *See*15 U.S.C. § 1125(a)(1)(B); *Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d 813, 819 (7th Cir.1999). Oshkosh fails to allege that the false statement was in commercial advertising. Instead, Oshkosh bases its claim on a single instance of an in person "sales pitch." Such person-to-person contact is not commercial advertising under the Act. *See First Health Group Corp. v. BCE Emergis Corp.,* 269 F.3d 800, 804 (7th Cir.2001) (holding that "advertising is a form of promotion to anonymous recipients, as distinguished from face-to-face communication."). Therefore, Count V must also be dismissed for failing to allege that any statements were made in commercial advertising.

Control Solutions also moves to dismiss Counts II–VIII on the basis that Oshkosh has failed to adequately plead damages. This Court notes that Oshkosh has not alleged in what manner it has been damaged. (FAC, Dkt. 36 at ¶ 46, 50, 56, 60, 64, 69, 73.) However, as this Court has already dismissed Counts II, III, V, VI, VIII without prejudice, Counts IV and VII with prejudice, an additional reason for dismissal is unnecessary.

With respect to Control Solutions' argument that its use of Oshkosh's mark is allowed by the doctrine of fair use, a plaintiff need not anticipate or attempt to defuse potential defenses. *See Doe v. Smith,* 429 F.3d 706, 709 (7th Cir.2005).

### Conclusion

Based on the foregoing, Control Solutions' Motion to Dismiss Counts II–VIII of Oshkosh's First Amended Counterclaim [43] is granted. Counts II, III, V, VI, VIII, are dismissed without prejudice, and Counts IV and VII, are dismissed with prejudice.

IT IS SO ORDERED.

---

**End of Document**                                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit E

2013 WL 4777370
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

FRONTLINE COMMUNICATIONS, INC.,
Plaintiff,
v.
COMCAST CORPORATION and Comcast Cable
Communications Management, LLC, Defendants.

No. 12–cv–8527. | Sept. 5, 2013.

**Attorneys and Law Firms**

Richard James Miller, Miller Law Firm, PC, Schaumburg, IL, Scott C. Polman, Attorney at Law, Niles, IL, for Plaintiff.

Hugo Chaviano, Neal Beaton McQueeney, Sanchez & Daniels, Chicago, IL, for Defendants.

**MEMORANDUM OPINION AND ORDER**

SHARON JOHNSON COLEMAN, District Judge.

**\*1** Plaintiff Frontline Communications, Inc. ("Frontline") brings this action against Comcast Corporation and Comcast Cable Communications Management, LLC (collectively "Comcast") alleging four counts stemming from the parties' Preferred Vendor Agreement. Frontline alleges fraud (Count I), civil conspiracy (Count II), breach of contract (Count III), and intentional interference with prospective economic advantage (Count IV). Comcast moves to dismiss Frontline's complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) and for lack of particularity as required under Fed.R.Civ.P. 9(b). For the following reasons, Comcast's motion is granted in its entirety.

**Background**

Comcast provides cable, entertainment, and communication services throughout the United States and Frontline installs cable television services in Illinois and Florida. In January 2009 Frontline and Comcast entered into a Preferred Vendor Agreement (the "Agreement") whereby Comcast would hire Frontline to install its services in Illinois and Florida. The contract was terminable at will and provided that Frontline must meet certain performance objectives and metrics in order to continue receiving work from Comcast and to maintain the parties' contract. Frontline alleges that Comcast assured it that it would continue to receive work if it met the performance objectives and metrics provided by Comcast. Frontline alleges that in weekly performance review meetings, Comcast repeatedly assured it that in order to maintain its contract and to continue receiving more work, Frontline had to meet performance objectives and metrics.

Frontline alleges that in reliance on Comcast's representations, it expanded its business first to Fort Lauderdale, Florida in February 2009 and then to West Palm Beach, Florida in June 2011. Frontline alleges that despite consistently being in the top ninetieth percentile of all contractors regarding performance metrics, Comcast unlawfully terminated Frontline for refusing to provide gifts, money and other benefits in exchange for being awarded installment work ("pay for play" scheme). Frontline alleges that Comcast's termination of their contract interfered with a potential business opportunity it had to sell its Florida operations to a third party. Comcast denies these allegations and moves to dismiss Frontline's complaint in its entirety.

**Legal Standard**

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true all of the well-pleaded facts alleged in the complaint and construes all reasonable inferences in favor of the nonmoving party. *See Killingsworth v. HSBC Bank Nev., N.A.,* 507 F.3d 614, 619 (7th Cir.Ill.2007). To state a claim, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."Fed.R.Civ.P. 8(a)(2). "Detailed factual allegations" are not required, but the plaintiff must allege facts that, when accepted as true state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A claim has facial plausibility when the factual content pleaded in the complaint allows the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged. See *id.* at 678.

**\*2** Additionally, claims alleging fraud must satisfy the heightened pleading requirement of Rule 9(b), which

requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."Fed.R.Civ.P. 9(b).Rule 9(b) requires the plaintiff to state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Uni\*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 923 (7th Cir.1992) (internal quotations omitted). The heightened pleading requirement of Federal Rule of Civil Procedure 9(b) therefore mandates that a complaint alleging fraud contain more substance in order to survive a motion to dismiss than a complaint based on another cause of action governed only by the minimal pleading standards of Rule 8(a)(2). See *Ackerman v. Nw. Mut. Life Ins. Co.,* 172 F.3d 467, 469 (7th Cir.1999) (Rule 9(b) forces "the plaintiff to do more than the usual investigation before filing his complaint").

## Discussion

### 1. Count I: Fraud

Comcast first argues that Frontline's promissory fraud claim should be dismissed because future promises are not actionable in Illinois. Frontline concedes that future promises are not generally actionable in Illinois, but argues that its fraud claim falls under an exception to the rule. Promissory fraud applies where a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where the other party relies on it to its detriment. *Metro Premium Wines v. Bogle Vineyards, Inc.,* No. 11 C 911, 2011 U.S. Dist. LEXIS 65306, at \*24–26, 2011 WL 2432957 (N.D. Ill. June 14, 2011). Under Illinois law, however, a promise to perform an act in the future is not actionable unless the false promise is part of a larger scheme or device to defraud another of their property. *Haught v. Motorola Mobility, Inc.,* 12 C 2515, 2012 U.S. Dist. LEXIS 119575, at \*20, 2012 WL 3643831 (N.D.Ill. Aug. 23, 2012). Therefore, to survive a motion to dismiss, a claimant relying on a theory of promissory fraud must allege specific, objective manifestations of fraudulent intent—of a scheme or device to defraud. *Id.*

Moreover, "the distinction between a mere promissory fraud and a scheme of promissory fraud is elusive, and has caused, to say the least, considerable uncertainty, as even the Illinois cases acknowledge."*J.H. Desnick v. American Broadcasting Cos.,* 44 F.3d 1345, 1354 (7th Cir.1995). Some cases suggest that the exception has swallowed the rule while others seem unwilling to apply the exception. *Id.* The Seventh Circuit's best interpretation of Illinois case law "is that promissory

fraud is actionable only if it either is particularly egregious or, what may amount to the same thing, it is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy."*Id.*

**\*3** The fraud alleged in this case does not meet this standard. Frontline alleges that between April 2009 and November 2011 Comcast made false representations that Frontline had to meet performance objectives and metrics in order to maintain its contract and continue receiving future work. (Compl. at ¶¶ 28–29). Frontline alleges that "in reliance on such representations it made significant investments in its business—purchasing vehicles, buying equipment, hiring employees, and expanding its operations to Florida."(Compl. at ¶ 30). However, Frontline began expanding its business operations to Fort Lauderdale, Florida in February 2009, one month after entering the Agreement, which was terminable at will, and two months before any alleged representations were even made. (Compl. at ¶¶ 17–18, 29). Comcast's representations made after Frontline's decision to expand its operations to Florida could not have reasonably induced Frontline's reliance.

Additionally, even if Frontline were to argue that Comcast's promises induced its expansion of its Florida operations from Fort Lauderdale to West Palm Beach in June 2011, such reliance would be unreasonable. Frontline alleges that on two separate occasions in December 2009 and July 2010, Comcast executives attempted to get Frontline to partake in a "pay for play" scheme whereby Frontline would provide Comcast executives with money or gifts in order to be awarded work. These alleged solicitations were made prior to Frontline expanding its Florida operations to West Palm Beach. It is unreasonable for Frontline to make significant business investments based on a contract that was terminable at will and in light of alleged interactions with Comcast executives which indicated that Comcast may be engaged in a "pay for play" scheme. Moreover, Frontline alleges that it "was advised by Comcast that in order to receive work and maintain its contract, Frontline needed to meet certain performance metrics and objectives set forth by Comcast."(Compl. at ¶¶ 28–29). The Court agrees with Comcast that such representations do not amount to an express promise that Comcast would affirmatively give Frontline future work.*Dawson v. W. & H. Voortman, Ltd.,* 853 F.Supp. 1038, 1045 (N.D.Ill.1994). At best, such representations were qualifications for eligibility to continue to receive work under the contract, which by its terms was terminable at will. Accordingly, Frontline's promissory fraud claim is dismissed with prejudice

2013 WL 4777370

*2. Count II: Civil Conspiracy Claim*
Comcast argues that Frontline's civil conspiracy claim should be dismissed as barred by the intracorporate conspiracy doctrine and for failing to meet the particularity standards of Fed.R.Civ.P. 9(b). The intracorporate conspiracy doctrine provides that an agent acting within the scope of his employment cannot conspire with the principal or with other agents because the acts of an agent are considered to be the acts of the principal. *Milliman v. McHenry County,* 1 C 50361, 2012 U.S. Dist. LEXIS 151570, at *11–12, 2012 WL 5200092 (N.D.Ill. Oct. 22, 2012). Therefore, Illinois law is clear that a civil conspiracy does not exist between a corporations' own officers or employees.*Id.* There are two exceptions to the intracorporate conspiracy doctrine when: (1) a conspirator acts out of self-interest rather than in the principal's interest; or (2) the scope of the act goes beyond the conspirator's official duties. *Bryant v. QuiBids LLC,* No. No. 11–cv–1013, 2012 U.S. Dist. LEXIS 14658, 2012 WL 394154 (N.D.Ill. Feb. 3, 2012).

**\*4** Frontline argues that it has properly alleged a conspiracy between "two separate corporate entities of Comcast" (the two named defendants in this case) and that it has sufficiently pled with the specificity required pursuant to Rule 9(b). (Resp. at 10). The Court however, cannot determine whether the intracorporate conspiracy doctrine is applicable here because Frontline has failed to plead its civil conspiracy claim with the requisite specificity.Fed.R.Civ.P. 9(b) requires Frontline to allege with particularity the "who, what, where, when, and how" of the alleged fraud. *Suburban Buick, Inc. v. Gargo,* No. No. 08 CV 370, 2011 U.S. Dist. LEXIS 50036, 2011 WL 1792072 (N.D.Ill. May 9, 2011). Frontline does not distinguish between the two Comcast defendants throughout the entirety of its complaint. Indeed, Frontline refers to the two individual defendants collectively as ("Comcast") and never differentiates them in its civil conspiracy count. It is only in its response to Comcast's motion to dismiss that Frontline attempts for the first time to distinguish between the two corporate defendants as separate entities in an effort to argue that the intracorporate conspiracy doctrine is inapplicable.

While Frontline lists several specific "Comcast" executives alleged to have solicited and/or accepted cash, gifts and other benefits from contractors, Frontline does not delineate which specific defendant corporation these agents are employed for or with whom exactly they engaged in the alleged conspiracy. The Court notes however that if there is a principal/agent relationship between defendants Comcast Corporation and Comcast Cable Communications Management, LLC, the intracorporate conspiracy doctrine would still be applicable. *See Milliman,* 2012 U.S. Dist. LEXIS 151570, at * 11–12, 2012 WL 5200092.Accordingly, Frontline's civil conspiracy claim is dismissed without prejudice.

*3. Count III: Breach of Contract*
Section 7(t) of the parties' contract specifically provides that Frontline will "not directly or indirectly offer or provide any employee, agent or representative of [Comcast], with any gift, gratuity, or any other form of compensation."(Compl. at ¶ 66). Comcast argues that Frontline's breach of contract claim should be dismissed because Section 7(t) sets out Frontline's obligations and duties and not Comcast's duties. Comcast argues that Frontline's breach of contract claim cannot be based on a contract term defining Frontline's own duties. Frontline concedes that Section 7(t) sets forth its duties and not Comcast's duties. Frontline argues, however, that the duties of good faith and fair dealing prevent Comcast from soliciting and causing a contractor to breach Section 7(t) of the Agreement.

As Comcast correctly argues, the "breach of the duty of good faith and fair dealing arises only when one party is vested with contractual discretion and exercises that discretion arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectation of the parties."*VR Holdings, Inc. v. LaSalle Bus. Credit, Inc.,* No. 01 C 3012, 2002 U.S. Dist. LEXIS 3654, 2002 WL 356515 (N.D.Ill. Mar. 5, 2002) (internal quotations omitted). Accordingly, it is clear that "the good faith duty to exercise contractual discretion reasonably is inapplicable where no contractual discretion exists."*Id.* Here, Frontline concedes that the provision allegedly breached by Comcast does not provide Comcast with any duties or discretion. Therefore, the duty of good faith is inapplicable. Accordingly, Frontline's breach of contract claim is dismissed with prejudice.

*4. Count IV: Intentional Interference with Prospective Economic Advantage*
**\*5** Lastly, Comcast moves to dismiss Count IV of Frontline's complaint for tortious interference with prospective economic advantage on the grounds that Frontline has failed to state a claim upon which relief can be granted. The elements for a tortious interference with prospective economic advantage claim are: "1) a reasonable expectancy of a valid business relationship; 2) defendant must know about it; 3) defendant must intentionally interfere and defeat this legitimate

expectancy; and 4) the intentional interference must injure the plaintiff." *Unique Envelope Corp. v. GSAmerica, Inc.,* 2002 U.S. Dist. LEXIS 6871, 9–10, 2002 WL 598511 (N.D.Ill. Apr. 16, 2002). A plaintiff states a cause of action "only if he alleges a business expectancy with a specific third party and action by the interfering party directed toward the party with whom the plaintiff expects to do business." *Id.*

In this case Frontline has not adequately alleged a cause of action for tortious interference with prospective economic advantage. Frontline alleges that it entered into negotiations with a third party, FTS USA, Inc. ("FTS"), for the purpose of selling its Florida operations. (Compl. at ¶¶ 78–79). Frontline claims that it reasonably expected to consummate a transaction whereby FTS would purchase its Florida operations. Frontline alleges that Comcast learned of its contract negotiations with FTS from both Frontline and FTS on at least three different occasions. (Compl. at ¶¶ 80–82). However, Frontline does not allege that Comcast ever contacted FTS for the purpose of intentionally interfering with the expected contract between Frontline and FTS. Frontline merely alleges that Comcast terminated its contract with Frontline because of Frontline's refusal to partake in the

alleged "pay for play" scheme. *See Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc.,* No. 05 C 1698, 2005 U.S. Dist. LEXIS 29663, 2005 WL 3159680 (N.D.Ill. Nov.22, 2005) (holding that "because Plaintiff solely alleges acts of intentional interference that were directed at Plaintiff itself rather than at prospective passengers, it does not state a required element of the claim for tortious interference with prospective business relationships"). Accordingly, Frontline's intentional interference with prospective economic advantage claim is dismissed with prejudice.

**Conclusion**

For the foregoing reasons Comcast's motion to dismiss Frontline's complaint in its entirety is granted. Counts I, III, and IV are dismissed with prejudice. Count II is dismissed without prejudice.

IT IS SO ORDERED.

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit F

Gaffrig Performance Industries, Inc. v. Livorsi Marine, Inc., Not Reported in F.Supp.2d...

2003 WL 23144859

2003 WL 23144859
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

GAFFRIG PERFORMANCE INDUSTRIES, INC.,
Plaintiff/Counter–Defendant,
v.
LIVORSI MARINE, INC.,
Defendant/Counter–Plaintiff.

Nos. 99 C 7778, 99 C 7822. | Dec. 22, 2003.

**Attorneys and Law Firms**

Stephen G. Kehoe, Bellows & Bellows, Harry F. Wiggins, Attorney at Law, Chicago, IL, for plaintiff/counter–defendant.

Allen H. Gerstein, Gregory James Chinlund, Marshall, Gerstein & Borun, Chicago, IL, for defendant/counter–claimant.

*MEMORANDUM OPINION AND ORDER*

HIBBLER, J.

**\*1** On December 1, 1999, Livorsi Marine, Inc. ("LMI") brought an action against Gaffrig Performance Industries, Inc. ("GPI2") alleging (i) common law infringement of the GAFFRIG PRECISION INSTRUMENTS, GAFFRIG, and GAFFRIG II trademarks; (ii) false designation of origin and unfair competition; (iii) trademark dilution under the Lanham Act and common law; and (iv) trademark infringement, trademark imitation, trademark dilution, deceptive trade practices and consumer fraud under Illinois law for allegedly using the GAFFRIG and GAFFRIG PERFORMANCE INDUSTRIES marks in connection with the promotion and sale of the marine products listed in LMI's federal certificates of registration. On that same day, GPI2 sued LMI, alleging that LMI obtained the federal registration for its GAFFRIG PRECISION INSTRUMENTS trademark by fraudulent means, and that GPI2 had superior rights in the GAFFRIG marks, such that LMI's use of the GAFFRIG marks constitutes (i) trademark infringement under 35 U.S.C. § 1114; (ii) false designation of origin in violation of 15 U.S.C. § 1125(a);

and (iii) a deceptive trade practice and consumer fraud under Illinois law. These actions were consolidated by stipulation of the parties on March 29, 2000.

After a bench trial was held before this Court on March 11, 12, 13, 14, and 15, 2002, the Court finds as follows:

*FINDINGS OF FACT*

1. On July 24, 1984, James Gaffrig incorporated "Gaffrig Precision Instruments, Inc." ('GPI'). ((Amended) Joint Statement of Uncontested Facts ("Uncontested"), ¶ 4.)

2. James Gaffrig was the majority owner, chief executive, and president of GPI for the length of its existence. (Uncontested, ¶ 5.)

3. Andrew Gorchynsky was minority co-owner, director and secretary of GPI from 1988 until July 1990. (Trial Transcript ("Trial Tr.") at 354.)

4. Between 1984 and 1988, GPI began manufacturing and selling speedometers, mufflers, silencers, flame arrestors, headers and throttle brackets under the GAFFRIG PRECISION INSTRUMENTS and/or GAFFRIG marks. (Uncontested, ¶ 6.)

5. On April 12, 1988, Gaffrig, on behalf of GPI, entered into an Asset Purchase Agreement (APA) with Michael Livorsi. (Uncontested, ¶¶ 18–20.)

6. Under the APA, GPI sold, assigned, transfered, and conveyed to Livorsi the assets of GPI's speedometer business. The conveyance included certain quantities of: Pitot Tube, Pitot Tube Mount, AN # 4 Hose Fitting, Speedo Head Fitting 1/4″ NPT, Pitot Tube Fitting, Push–Lock Hose Feet, Pick–Up Assembles with Fittings; Liquid Filled Completed; Dry Gauges; Raw Gauges; Tell Tale Needles; Glycerin; Oil Tester; Screens; and Vinyl Wash. (APA, § 1, Exhibit ("Ex.") A.)

7. The APA gave Livorsi the exclusive right to use the GAFFRIG trademarks in connection with the manufacture and sale of speedometers and in advertising subject to the two-year

Gaffrig Performance Industries, Inc. v. Livorsi Marine, Inc., Not Reported in F.Supp.2d...

2003 WL 23144859

limitation in Section 9 of the APA. (APA, §§ 1, 9.)

8. Section 1 of the APA stated that "Livorsi shall have the right to use the GAFFRIG PRECISION INSTRUMENTS trade name in connection with the manufacture and sale of speedometers and in advertising subject to Section 9 herein."(APA, § 1.)

**\*2** 9. Section 9 of the APA stated that "[i]n consideration of the purchase of the assets, GPI agrees that neither it nor James W. Gaffrig (who is a major shareholder of GPI) shall, during the period of two years which commences on the closing date, directly or indirectly, engage in or render services to any business engaged in manufacturing or selling finished or semi-finished speedometers, or acquire an interest as stockholder, director, partner, agent or individual, in any such business."(APA, § 9.)

10. The APA did not restrict GPI from making and selling speedometers after two years, or from using of the GAFFRIG marks on speedometers or other products after the expiration of the license, on April 12, 1990. (APA, §§ 1–9.)

11. Gaffrig and GPI were not restricted from the manufacture or sale of other products, or from the use of the GAFFRIG marks on other products during this two year time. (APA, § 9(b)).

12. The APA stated that the purchase price for the speedometer assets was $20,000 minus the amount of liabilities of GPI to Livorsi. (APA, § 2.)

13. On April 12, 1988, Livorsi and Gaffrig also entered into a "License Agreement" (LA). The APA stated that the LA, together with the APA, was to be considered an entire agreement. APA § 17. In the LA, Gaffrig sold to Livorsi an exclusive license to manufacture, use, market and sell products based on or utilizing Gaffrig's patent no. 4,622,850 covering a certain pitot mount assembly. APA § 2.1. The license was to end on December 31, 1997. (APA, § 3.)

14. Under the LA, GPI kept ownership of at least one piece of equipment related to its speedometer business: a certain pitot tube mount described in United States patent NO.

462285, owned by Gaffrig. (LA, § 2.)

15. Under the LA, Livorsi agreed to pay Gaffrig a 3% royalty on annual sales of speedometers exceeding $50,000. (LA, § 5.1, Ex. A.)

16. Between 1988 and November 1990, GPI continued to manufacture and sell marine mufflers, silencers, flame arrestors, headers, and throttle brackets under the GAFFRIG PRECISION INSTRUMENTS and/or GAFFRIG marks. (Uncontested, ¶ 6.)

17. LMI was incorporated by Michael Livorsi on May 16, 1988. Livorsi is the owner and president of LMI. (Uncontested, ¶¶ 22–23.)

18. Livorsi and Gaffrig were the two directors of LMI. (Joint Written Consent by the Sole Shareholder and Directors of LMI, LMI Ex. 106.)

19. Livorsi began using the GAFFRIG and GAFFRIG PRECISION INSTRUMENTS marks in connection with the promotion and sale of marine speedometers, pitot tubes and pitot tube mounts shortly after the APA was signed on April 12, 1988. (Uncontested, ¶ 24.)

20. By 1989, LMI expanded its line of marine products to include other types of marine instruments and marine gauges (e.g., tachometers and various types of fluid level and pressure gauges), and LMI used the GAFFRIG trademarks in connection with the promotion and sale of these products. (Uncontested, ¶ 25.)

**\*3** 21. GPI made an Assignment for the Benefit of Creditors (ABC) in October or November of 1990 because GPI was unable to pay its bank debts. (Trial Tr. at 656–58.)

22. On November 16, 1990, Gaffrig incorporated GPI2 as a new Illinois corporation. (Uncontested, ¶ 8.)

23. Gaffrig became the president and sole owner of GPI2. (Uncontested, ¶ 8.)

24. Most of GPI's employees continued to work for GPI2 in the same or similar positions to what they had in GPI: Robert Divilbiss continued to work as general manager; Michael Schultz continued to work in assembling and shipping parts; and Angel Castenada continued to work as a welder. (Trial Tr. at 56, 661–62.)

Gaffrig Performance Industries, Inc. v. Livorsi Marine, Inc., Not Reported in F.Supp.2d...

2003 WL 23144859

25. There was no written assignment of any assets from GPI to GPI2. (Uncontested, ¶ 9.)

26. Gaffrig moved some equipment from GPI to GPI2. (Trial Tr. at 56.)

27. On December 5, 1990, GPI's assets were auctioned off for the benefit of creditors in an ABC proceeding. ((Amended) Joint Statement of Contested Issues and Facts ("Contested"), ¶ 4.)

28. By December 9, 1990, LMI had expanded its product line to include vacuum gauges, trim meters, compasses, depth finders, tool cases, and instrument cases, and was using the GAFFRIG trademarks in connection with the promotion and sale of these products. (Uncontested, ¶ 26.)

29. By late 1990, GPI2 began manufacturing the same marine products—mufflers, silencers, flame arrestors, headers and throttle brackets—that had previously been manufactured and sold by GPI using the GAFFRIG and the GAFFRIG PERFORMANCE INDUSTRIES marks. (Uncontested, ¶ 12.)

30. By January 1991, GPI2 was also advertising and selling those same types of GAFFRIG marine products and continues to do so to this day. (Uncontested, ¶ 12.)

31. On February 1, 1991, Livorsi and Gaffrig entered into another written agreement whereby Gaffrig sold his rights under U.S. Patent No. 4,622,850, covering the pitot tube Gaffrig had previously licensed to Livorsi under the LA. In the February 1991 agreement, in exchange for certain consideration, Gaffrig agreed to refrain from making the pitot tubes covered by the patent until at least February 1, 2001, and he relinquished any interest in LMI's instrument engine gauges business "which may currently exist from previous oral contracts."(GPI2 Ex. 39.)

32. Beginning in 1991, LMI purchased mufflers and flame arrestors from GPI2 and sold them bearing the GAFFRIG PRECISION INSTRUMENTS and LIVORSI MARINE trademarks. GPI2 was unaware at this time that LMI was removing the "Gaffrig Performance Industries, Inc ." stickers from the mufflers and

passing them off as its own. (Trial Tr. at 741, 760–61.)

33. In 1991, GPI2 began manufacturing at least samples of speedometer gauges. (Trial Tr. at 493.)

34. By 1991, GPI2 manufactured, advertised, and sold marine products, including at least mufflers, silencers, and flame arrestors, using the GAFFRIG PERFORMANCE INDUSTRIES and GAFFRIG marks. (Uncontested, ¶ 12.)

**\*4** 35. Beginning in 1991, LMI promoted its products bearing the GAFFRIG trademark in press releases in marine industry publications. (Uncontested ¶ 35.)

36. On December 2, 1991, GPI was dissolved involuntarily by the Illinois Secretary of State. (Uncontested ¶ 7.)

37. On March 9, 1992, LMI filed an application in the United States Patent and Trademark Office (PTO) to register the GAFFRIG PRECISION INSTRUMENTS trademark for use on the marine products it was currently selling, including engine monitoring devices, marine controls such as throttle handle assemblies, mufflers, silencers, and flame arrestors; marine navigational instrumetns including compasses and depth sounders; marine operational gauges and other devices including speedometers and pitot mount assemblies, tachometers, fuel, water and oil monitoring instruments, bilge monitors, and flow meters; and other boating accessories, and was using the GAFFRIG trademarks in connection with the promotion and sale of these products. (Uncontested, ¶ 29.)

38. In March 1992, LMI was aware that GPI2 was using a confusingly similar mark on at least mufflers and flame arrestors. (Trial Tr. at 760–61; Uncontested, ¶¶ 40–41.)

39. On June 4, 1992, the PTO initiated an office action in which it stated that LMI must "indicate whether 'Gaffrig' has any significance in the relevant trade, any geographical significance or any meaning in a foreign language;" and "disclaim the descriptive wording 'precision instruments' apart from the mark as shown" because the terms merely

describe a feature of navigational instruments. (Uncontested, ¶ 30; LMI Ex. 2.)

40. On June 24, 1992, LMI responded that "[t]he name 'Gaffrig' has no significance in the relevant trade other than to identify one of applicant's lines of Marine instruments and has no geographical significance."LMI also agreed that "[n]o claim is made to the exclusive right to use 'precision instruments' apart from the mark as shown."(Uncontested, ¶ 30; LMI Ex. 2.)

41. Mr. Gaffrig died in December 1992, at which point ownership of GPI2 passed to Mr. Gaffrig's widow, Patricia Gaffrig. (Uncontested, ¶¶ 10–11.)

42. LMI's trademark registration application was published for opposition on August 10, 1993, and went unopposed. (Uncontested, ¶ 31.)

43. In 1993, GPI2 and LMI entered into an oral agreement whereby GPI2 agreed to sell mufflers and flame arrestors to LMI for 20% under original equipment manufacturer (OEM) prices, and LMI agreed to sell speedometers and gauges to GPI2 for 20% under OEM prices. LMI sold GPI2's products as its own. GPI2 did not alter LMI's mark on the products. The parties continued this arrangement until at least 1997. (Trial Tr. at 577.)

44. LMI's trademark registration for the GAFFRIG PRECISION INSTRUMENTS trademark issued on November 2, 1993, as Registration No. 1,801,915. The goods for which the trademark applied were identified as: "Marine instruments and controls, namely: engine monitoring devices, throttles, tachometers, memory tachometers, controls, and mufflers; marine navigational instruments, namely compasses and depth sounders; and marine operational devices, namely, both liquid filled and dry speedometers, pitot mount assemblies, both electronic and mechanical monitoring instruments for fuel and oil pressure, fuel level, trim, water and oil temperature, water and fuel pressure and vacuum boost, water temperature indicators, bilge monitors, and flo-meters, together with all parts thereof."(Uncontested, ¶ 31.)

**\*5** 45. By 1995, GPI2 was aware that LMI was removing the GAFFRIG PERFORMANCE INDUSTRIES stickers from the mufflers, and

continued selling the mufflers to LMI. (Trial Tr. at 313.)

46. Since 1997, LMI has also used the GAFFRIG II mark on its marine products and packaging advertised in the U.S. and abroad. (Uncontested, ¶¶ 33–34.)

47. Mike Schultz purchased GPI2 from Ms. Gaffrig in January 1997 and is currently the owner and president of the company. (Uncontested, ¶¶ 13–14.)

48. On March 17, 1997, Livorsi sent Schultz a letter stating that he considered GPI2's use of the GAFFRIG PERFORMANCE INDUSTRIES mark to be an infringement of Livorsi's registered GAFFRIG PRECISION INSTRUMENTS trademark. (Uncontested, ¶ 38.)

49. On September 7, 1999, LMI filed with the PTO a Combined Declaration of Use and Incontestability under 15 U.S.C. §§ 1058 and 1065 in connection with the GAFFRIG PRECISION INSTRUMENTS trademark. (Uncontested, ¶ 36.)

50. The Declaration was accepted and acknowledged by the PTO, and the GAFFRIG PRECISION INSTRUMENTS trademark registration was granted incontestible status. (Uncontested, ¶ 37.)

51. LMI has continued its use of the GAFFRIG, GAFFRIG PRECISION INSTRUMENTS, and GAFFRIG II marks in connection with the promotion and sale of its line of marine products to the present day. (Uncontested, ¶ 32.)

52. GPI2 currently sells marine mufflers, silencers, flame arrestors, throttle brackets, speedometers, and other various types of marine gauges and instruments with the GAFFRIG marks and the GAFFRIG PERFORMANCE INDUSTRIES mark. (Uncontested, ¶¶ 15–16.)

### CONCLUSIONS OF LAW

**I. Trademark Infringement and Unfair Competition under the Lanham Act, 15 U.S.C. §§ 1125(a) and 1114; Trademark Dilution and Unfair Competition Arising Under the Illinois Consumer Fraud and Deceptive**

2003 WL 23144859

**Business Practices Act, 815 ILCS § 505/2; and Deceptive Practices Arising Under the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510/2.**

Both LMI and GPI2 allege that the other committed common law trademark infringement and unfair competition under the Lanham Act,[1] deceptive trade practices under the Illinois Uniform Deceptive Trade Practices Act, and various violations under the Illinois Consumer Fraud and Deceptive Business Practices Act. GPI2 claims that LMI's continued use of the GAFFRIG, GAFFRIG PRECISION INSTRUMENTS, and GAFFRIG II marks and registration of the GAFFRIG PRECISION INSTRUMENTS mark after its license to use the mark expired was in derogation of GPI2's senior rights and constituted trademark infringement, unfair competition, and a violation of the aforementioned Illinois statutes. LMI claims that GPI2's continued use of the GAFFRIG, GAFFRIG PRECISION INSTRUMENTS, and GAFFRIG PERFORMANCE INDUSTRIES marks after LMI acquired secondary meaning in the marks and registered the marks constituted trademark infringement, unfair competition, and a violation of the aforementioned Illinois statutes. Section 43 of the Lanham Act provides that:

> **\*6** [a]ny person who, on or in connection with goods or services, or any container for goods, uses in commerce any word, term, name, symbol or device, or any combination thereof ... which—is likely to cause confusion, or to cause mistake, or to deceive as to affiliation, connection, or association of such person with another person, or as to the origin, sponsorship or approval of his or her goods, services, or commercial activities by another person, ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Lanham Act, § 43, 15 U.S.C. § 1125(a)(1)(A).

A trademark is any word, name, symbol or device, or any combination of those, that is adopted and used by a manufacturer or a merchant to identify its products and to distinguish them from those manufactured or sold by others, or to designate the source or origin of a product, usually the manufacturer or seller of the product. Lanham Act, § 45, 15 U.S.C. § 1127; *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 953 (7th Cir.1992). To prove trademark infringement or unfair competition under the Lanham Act, 15 U.S.C. §§ 1125(a) and 1114, the parties must establish that (i) they own a valid, protectable mark; and (ii) the use of either the same or a similar mark by the accused party creates a likelihood of consumer confusion as to the source of goods sold under the mark. *CAE, Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, 673–74 (7th Cir.2001); *Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.,* 149 F.3d 722, 726 (7th

Cir.1998)."Claims for unfair competition and deceptive business practices brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act," and thus, a party cannot prevail on its claims under the Deceptive Trade Practices Act, 815 ILCS § 510/2, or the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/2, if the party does not own a valid, protectable mark. *Spex, Inc. v. Joy of Spex, Inc.,* 847 F.Supp. 567, 579 (N.D.Ill.1994) (citing *Gimix, Inc. v. JS & A Group, Inc.,* 699 F.2d 901, 908 (7th Cir.1983); *Thompson v. Spring–Green Lawn Care Corp.,* 126 Ill.App.3d 99, 104–05, 81 Ill.Dec. 202, 466 N.E.2d 1004 (1st Dist.1984) (Illinois courts look to federal case law and apply the same analysis to state infringement claims). A party who has not registered its marks with the PTO bears the burden to establish protection under the Lanham Act. *Platinum,* 149 F.3d at 727.

**A. Likelihood of Confusion**

In this case, the parties agree that the GAFFRIG PRECISION INSTRUMENTS, GAFFRIG, GAFFRIG II, and GAFFRIG PERFORMANCE INDUSTRIES marks (collectively, the "GAFFRIG marks") are confusingly similar to consumers when used in connection with the promotion and sale of the marine products manufactured, advertised, and/or sold by both parties, and consumers of the marine products manufactured, advertised, and/or sold by both parties have suffered actual confusion caused by the parties' use of their respective marks. Both parties currently sell marine mufflers, silencers, flame arrestors, throttle brackets, speedometers, and other various types of marine gauges and instruments. The likelihood of confusion, however, easily extends to the rest of the marine items sold by LMI: engine monitoring devices, throttle controls, marine navigational instruments including compasses and depth sounders, marine, tachometers, fuel, water and oil monitoring instruments, bilge monitors, flow meters and other boating accessories. In assessing the likelihood of consumer confusion, the Seventh Circuit considers:

> **\*7** (1) the similarity between the marks in appearance and suggestion, (2) the similarity of the products, (3) the area and manner of concurrent use of the products, (4) the degree of care likely to be exercised by consumers, (5) the strength of the plaintiff's marks, (6) any evidence of actual confusion, and (7) the defendant's intent to palm off its goods as those of the plaintiff's. None of these factors

Gaffrig Performance Industries, Inc. v. Livorsi Marine, Inc., Not Reported in F.Supp.2d...

2003 WL 23144859

are dispositive and the proper weight given to each will vary in each case. However, the similarity of the marks, the defendant's intent, and evidence of actual confusion are of particular importance.

*Promatek Indus., Ltd. v. Equitrac Corp.,* 300 F.3d 808, 812 (7th Cir.2002) (internal citations omitted). The parties agree on the similarity of the marks and actual confusion in the marketplace. LMI's trademark application explained that the additional marine items sold by LMI are used in conjunction with the other marine items (which are sold by both parties), and therefore, the confusion in the marketplace would extend to these additional items as well.

**B. Ownership of the GAFFRIG Trademarks**
Therefore, the only remaining issue in determining the merits of the parties' claims is the validity of the mark; i.e., who owns the right to the GAFFRIG trademarks. LMI holds a federally registered trademark in the GAFFRIG PRECISION INSTRUMENTS mark,[2] which it claims is *prima facie* evidence that it owns the right to the GAFFRIG trademarks. GPI2, on the other hand, argues that it holds superior common law trademark rights, and that the federally registered trademark was achieved by fraud. A federal trademark application is always subject to previously established common law trademark rights of another party. *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.,* 188 F.3d 427, 434–35 (7th Cir.1999) (citing *The Money Store v. Harriscorp Fin., Inc.,* 689 F.2d 666, 672 (7th Cir.1982) (quoting J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 19:2, at 656)). In order to determine who owns the rights to the GAFFRIG marks, the Court must determine: first, the nature of GPI's common law rights in the GAFFRIG marks; second, whether LMI has common law rights in the GAFFRIG marks; third, whether GPI assigned its common law rights to GPI2; and fourth, whether LMI has federally registered rights in the GAFFRIG marks or whether LMI committed fraud in the procurement of its federal trademark registration.

**1. What Rights Did GPI Have In The GAFFRIG Marks Between 1984 And 1988?**
Although the parties do not dispute that GPI had common law rights in the GAFFRIG marks from 1984 to 1988, they do not agree on the nature of those rights; that is, whether the GAFFRIG marks are primarily a surname or

inherently distinctive. Because the nature of the marks changes the analysis that follows, the Court will decide this issue first. The Lanham Act states that a mark that is "primarily a surname" is descriptive and may be registered only if it is shown that the mark has acquired secondary meaning, such that the mark "has become distinctive of the applicant's goods in commerce."15 U.S.C. § 1052(e), (f). A mark is primarily a personal name, or surname, if the primary significance of the mark to the purchasing public is that of a personal name or surname. *Peaceable Planet, Inc. v. Ty, Inc.,* No. 01 C 7350, 2003 WL 22024992, at *5 (N.D.Ill.2003) (citing *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.,* 192 F.3d 337, 345 (2d Cir.1999); *In re Hutchinson Tech., Inc.,* 852 F.2d 552, 554 (Fed.Cir.1988)). If the mark is primarily a personal name, then the senior user must prove the existence of secondary meaning in its mark at the time and place that the junior user first began use of that mark. *Johnny Blastoff,,* 188 F.3d at 433–34 (internal citations omitted).*See also Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 503 (7th Cir.1992). In contrast, if the family feature or surname is distinctive enough to trigger recognition in and of itself, then the mark may be inherently distinctive. *Spraying Systems Co. v. Delavan, Inc.,* 975 F.2d 387, 395 (7th Cir.1992). If the mark is inherently distinctive, then the party to first use the mark has ownership rights to it.

**\*8** The parties have offered no evidence that the GAFFRIG marks are inherently distinctive. Rather, the parties' evidence of the popularity and recognition of the GAFFRIG marks is attributable to the secondary meaning that has become attached to the marks. Therefore, the Court finds that the GAFFRIG marks are primarily a surname, and the question remains as to when the GAFFRIG marks acquired secondary meaning. The parties' evidence supports a finding that the GAFFRIG marks acquired secondary meaning from GPI's use of the marks between 1984 and 1988. LMI agrees that GPI was the first to use and manufacture products under the GAFFRIG PRECISION INSTRUMENTS trademark. In addition, LMI agrees that GPI established exclusive rights in the use of the GAFFRIG PRECISION INSTRUMENTS trademark on marine speedometers and related marine gauges in 1984, which Gaffrig possessed until April 12, 1988. Indeed, the evidence shows that the trademark, GAFFRIG PRECISION INSTRUMENTS, did acquire secondary meaning between 1984 and 1988, as even Livorsi admitted that by 1988, the GAFFRIG marks had acquired recognition in the marine industry as representative of a superior marine product. Thus, the GAFFRIG marks had a distinctiveness or secondary meaning warranting trademark protection before Gaffrig and Livorsi entered into the APA in 1988, and GPI had

Gaffrig Performance Industries, Inc. v. Livorsi Marine, Inc., Not Reported in F.Supp.2d...

2003 WL 23144859

priority of ownership at that time.

**2. Did LMI Acquire Common Law Rights In The GAFFRIG Marks By Virtue Of The APA In 1988?**
LMI claims that GPI assigned all of its rights in the GAFFRIG marks to LMI by virtue of the Asset Purchase Agreement (APA) Livorsi and GPI signed on April 12, 1988.[3]GPI2, however, argues that the APA constituted a two-year license of the GAFFRIG PRECISION INSTRUMENTS mark to LMI. The Court agrees with GPI2.

Contrary to LMI's arguments, the plain language of the APA shows that Livorsi purchased all of the assets of GPI's speedometer business, except one pitot tube assembly (a speedometer-related item) which Livorsi agreed to license from Gaffrig for nine years, and a two-year exclusive license from GPI to manufacture and sell the speedometers with the GAFFRIG PRECISION INSTRUMENTS mark. During this two-year period, Gaffrig agreed not to manufacture or sell speedometers. The APA states, in relevant part:

> Livorsi shall have the right to use the GAFFRIG PRECISION INSTRUMENTS trade name in connection with the manufacture and sale of speedometers and in advertising subject to Section 9 herein.

APA, Section 1.

> In consideration of the purchase of the assets, GPI agrees that neither it nor James W. Gaffrig (who is a major shareholder of GPI) shall, during the period of two years which commences on the closing date, directly or indirectly, engage in or render services to any business engaged in manufacturing or selling finished or semi-finished speedometers, or acquire an interest as stockholder, director, partner, agent or individual, in any such business.

APA, Section 9.

**\*9** LMI's arguments appear to overlook the text of the APA itself. First, nowhere does the APA even suggest

that Livorsi would get more than a right to use the GAFFRIG PRECISION INSTRUMENTS mark in connection with speedometers. Second, Section 1 states that it must be read in conjunction with Section 9, which specifically limited Gaffrig's exclusion from the speedometer market to only two years. Because the APA did not limit Gaffrig's use of the GAFFRIG PRECISION INSTRUMENTS mark on any other marine products, GPI2 is correct that Section 9, read in conjunction with Section 1, also limited Livorsi's exclusive use of the GAFFRIG PRECISION INSTRUMENTS marks on speedometers to two years.

LMI attempts to divert the Court's attention from the APA by pointing to extrinsic evidence which purportedly supports LMI's understanding of the APA: testimony by Gorchynsky and Livorsi regarding the purported intent of the APA to assign the GAFFRIG PRECISION INSTRUMENT mark and all derivative marks and the entire gauge business to Livorsi. However, if the language of the contract itself unambiguously answers the question at issue, the inquiry is over.*Much v. Pacific Mut. Life Ins. Co.,* 266 F.3d 637, 643 (7th Cir.2001) (interpreting Illinois law)."In such a case, the intent of the parties must be determined solely from the contract's plain language, and extrinsic evidence outside the 'four corners' of the document may not be considered."*Id.* (citing *Omnitrus Merging Corp. v. Ill. Tool Works, Inc.,* 256 Ill.App.3d 31, 195 Ill.Dec. 701, 628 N.E.2d 1165, 1168 (Ill.App.Ct.1993)).*See also Bowles v. Quantum Chem. Co.,* 266 F.3d 622, 635 (7th Cir.2001) ( "[A]s a general rule, an unambiguous contract should be construed without reference to extrinsic evidence....[I]f the language of the contract provides an answer, then the inquiry is over; parol evidence is neither necessary nor admissible.") (internal citations omitted). As explained above, the language of the APA did unambiguously answer the question at issue. Therefore, the Court will not consider Livorsi's and Gorchynsky's interpretation of the APA.

Moreover, despite LMI's arguments, its two-year right to the mark was not accompanied by the goodwill of the business. Goodwill includes the corporate identity, confidence, reputation, and recognition of the product. *Sands,* 978 F.2d at 957.GPI's agreement to provide its customer lists to LMI did not amount to a transfer as the evidence showed that Gaffrig continued to make other recognized marine products with the GAFFRIG PRECISION INSTRUMENTS and GAFFRIG marks. In addition, GPI was properly ensuring that it provided actual quality control over the products LMI produced with the GAFFRIG PRECISION INSTRUMENTS marks, as GPI was required to do in a licensing agreement.*Sterling Drug, Inc. v. Lincoln Labs., Inc.,* 322

2003 WL 23144859

F.2d 968 (7th Cir.1963); Trial Tr. at 113–15, 649.

In sum, the above discussion shows that GPI did not assign its rights to the GAFFRIG PRECISION INSTRUMENTS in 1988. As such, GPI maintained its ownership of the GAFFRIG PRECISION INSTRUMENTS and GAFFRIG marks. Consequently, LMI's use of the GAFFRIG and GAFFRIG PRECISION INSTRUMENTS marks on items other than speedometers during the two years of the APA license, and LMI's use of those and the GAFFRIG II marks on speedometers and other items after the two year period, constituted an infringement of GPI's common law trademark. An ex-licensee's continued use of the trademark after the period of the license is a violation of trademark law. *Gorenstein,* 874 F.2d at 435.

### 3. Did GPI Assign Its Common Law Rights In The GAFFRIG Marks To GPI2?

**\*10** GPI2 claims that GPI assigned its common law rights in its trademarks to GPI2 when Gaffrig created GPI2 on November 16, 1990. The Court agrees with GPI2. Gaffrig's actions after July 1990 demonstrate that Gaffrig assigned his rights in the marks to GPI2. In July 1990, Gaffrig became the sole shareholder of GPI. Gaffrig created GPI2 in November 1990 (which Divilbiss stated was "almost immediately" after GPI's doors were closed), before GPI's assets were auctioned in December 1990, and before GPI was dissolved by the Illinois Secretary of State in December 1991. GPI2 had an almost identical workforce as GPI, including Gaffrig himself, Schultz, Angel Castenada, and Divilbiss. GPI2 began producing almost immediately the same or similar products as GPI (mufflers, flame arrestors, and throttle brackets, and eventually even more marine products), and GPI2 affixed the GAFFRIG marks on these products. The evidence above demonstrates that the goodwill in the GAFFRIG marks traveled with Gaffrig to GPI2, and that Gaffrig assigned his trademark rights to GPI2. Thus, GPI2 succeeded to GPI's rights in the GAFFRIG marks.

LMI, however, argued that GPI could not have assigned its trademark rights to GPI2 for several alternative reasons: (1) GPI abandoned its rights to the GAFFRIG marks when it signed the APA with Livorsi; (2) GPI transferred its rights to the GAFFRIG marks in an Assignment for the Benefit of Creditors; (3) the mark inured to GPI's, rather than Gaffrig's benefit; (4) there was no written assignment from GPI to GPI2; or (5) the alleged transfer of the mark was not accompanied by the transfer of any physical assets. The Court deals with each of these arguments in turn.

#### a. Did GPI abandon its rights to the GAFFRIG marks when it signed the APA with Livorsi?

LMI argues that GPI abandoned all of its rights to the GAFFRIG marks under the APA before it could transfer any rights to GPI2. A mark is deemed abandoned if its use has been discontinued with an intent not to resume such use or if there has been nonuse for 3 consecutive years. 15 U.S.C.A. § 1127. Contrary to divesting or abandoning its trademark rights, however, the APA expressly contemplated GPI's return to the speedometer market after two years. In addition, GPI continued to manufacture other marine products with the GAFFRIG and GAFFRIG PRECISION INSTRUMENTS marks, such as mufflers and flame arrestors, throughout the two year term and afterward.

Moreover, this Court has already held that the APA only conveyed a license to LMI to use the GAFFRIG marks. A licensee's use of a mark inures to the benefit of the licensor, and the licensee acquires no ownership rights in the mark itself. *Gorenstein Enter.s, Inc. v. Quality Care–USA, Inc.,* 874 F.2d 431, 435 (7th Cir.1989) (internal citations omitted); *Smith v. Dental Prod.s Co. .,* 140 F.2d 140, 148 (7th Cir.1944) ("A grant of an exclusive use of a trade-mark, limited as to duration and place, whether made in contracts for sale of its associated wares or by specific license, does not convey title or establish ownership of the trade-mark in the licensee or in one who purchases marked goods for resale."); *United States Jaycees v. Phila. Jaycees,* 639 F.2d 134, 143 (3d Cir.1981); *Prof'l Golfers' Assn. v. Bankers Life & Cas. Co.,* 514 F.2d 665, 670 (5th Cir.1975). Therefore, the Court finds that GPI did not abandon its rights to the GAFFRIG marks when it signed the APA.

#### b. Did GPI transfer its rights to the GAFFRIG marks in an Assignment for the Benefit of Creditors?

**\*11** LMI also alleges that GPI could not have assigned its rights in the marks to GPI2 because GPI transferred all of its assets in an Assignment for the Benefit of Creditors ("ABC") before the assets were auctioned off in December 1990. Because the ABC document is not in the record, LMI relies on its witness, Robert Divilbiss for the proposition that all of GPI's assets were transferred in the ABC; however, Divilbiss admitted that he never actually read the ABC document, and he could not remember exactly when the transfer occurred. In contrast, Schultz testified that Gaffrig, as the sole shareholder of GPI and GPI2 at the time, assigned his common law rights in the GAFFRIG marks to GPI2, in addition to transferring necessary equipment, machinery, employees, and raw

Gaffrig Performance Industries, Inc. v. Livorsi Marine, Inc., Not Reported in F.Supp.2d...

2003 WL 23144859

materials to GPI2.

The existence of the ABC and the accompanying transfer of assets does not necessarily mean that the GAFFRIG marks were assigned for the benefit of creditors as well. "[A] trademark owner will not necessarily be found to have abandoned marks upon liquidation of a business if the owner intends to reestablish his business."*Koretz v. Heffernan,* No. 92 C 5419, 1993 WL 524438, at *6 (N.D.Ill.1993) (citing *Berni v. Int'l Gourmet Rest.s of Am., Inc.,* 838 F.2d 642, 647 (2d Cir.1988)). In *Berni,* the Second Circuit held that:

> We have recognized that a trademark may be retained by its owner even though the existing business' assets are sold. Where the owner has sold its equipment, inventory and other assets, discharged its work force and announced that it has discontinued manufacturing its products, it may nevertheless retain a protectable interest in its mark, if it evidences an intention not to abandon the mark. That intention can be inferred from evidence that the owner is undertaking to resume use of the mark within a reasonable time after the sale of the other assets.

*Berni,* 838 F.2d at 646–647 (internal citations omitted).*See also Pappan Enter.s, Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 806 (3rd Cir.1998) ("Courts have recognized that a trademark owner's decision to reduce the size of its business or to cease operations alone does not undermine the owner's legal right to enforce and protect its trademark.") The Court finds that the evidence as laid out above shows that the GAFFRIG marks were assigned to GPI2, and not for the benefit of creditors.

**c. Did the mark inured to GPI's or Gaffrig's benefit?**

Even if the marks were not assigned for the benefit of creditors, however, LMI argues that Gaffrig, as an individual shareholder, could not assign the rights to the marks because a trademark inures to the corporation and not to an individual. Although generally this principle is true, courts may presume that a real person who owns all the stock of a corporation controls the corporation so that use of the mark by the corporation inures to the benefit of the real person, who is presumed to be the "owner" of the

mark. *See In re Hand,* 231 U.S.P.Q. 487 (T.T.A.B.1986) (Trademark Manual of Examining Procedure § 1201.03(b) presumption of sufficient control over a wholly owned subsidiary corporation applies to a real person as well as to a corporation.) *See also Smith v. Coahoma Chemical Co. Inc.,* 46 C.C.P.A. 801, 264 F.2d 916, 920 (C.C.P.A.1959); McCarthy, § 16:36, at 16–59. In this case, Gaffrig, whose name forms the basis of the marks at issue, became the sole owner of GPI after July 1990, before the ABC or the auction of the assets. Consequently, the use of the GAFFRIG marks inured to Gaffrig's benefit, and he was the owner of the GAFFRIG trademarks. Therefore, Gaffrig had the ability to assign his rights in the marks to GPI2, and he did so as explained above.

**d. Does the lack of a written assignment from GPI to GPI2 preclude an assignment?**

**\*12** LMI next argues that GPI2's claim of an assignment of the rights in the marks fails because GPI2 has no evidence of a written assignment. "Assignments of trademark rights do not have to be in writing, but an implied agreement to transfer requires conduct manifesting agreement, not just conduct that might be characterized as being shady or otherwise inequitable."*TMT North America, Inc. v. Magic Touch GmbH,* 124 F.3d 876, 884 (7th Cir.1997) (internal citations omitted). Unlike in *TMT,* however, the evidence here is not ambiguous or contradictory. As explained above, Gaffrig owned the GAFFRIG marks, he did not give the marks up in the ABC, and then he did all he could, short of a written document, to assign the GAFFRIG marks to GPI2. Gaffrig created GPI2 in November 1990 (which Divilbiss stated was "almost immediately" after GPI's doors were closed), before GPI's assets were auctioned in December 1990, and before GPI was dissolved by the Illinois Secretary of State in December 1991. GPI2 had an almost identical workforce as GPI, including Gaffrig himself, Schultz, Castenada, and Divilbiss. GPI2 began producing almost immediately the same or similar products as GPI, and GPI2 affixed the GAFFRIG marks on these products. Therefore, Gaffrig's conduct manifested an agreement to assign his trademark rights to GPI2.

**e. Did Gaffrig transfer his rights in the marks even though the alleged transfer of the marks was not accompanied by the transfer of any physical assets?**

Finally, LMI argues that Gaffrig did not transfer his rights in the GAFFRIG marks to GPI2 because there was no accompanying transfer of any physical assets. This

Gaffrig Performance Industries, Inc. v. Livorsi Marine, Inc., Not Reported in F.Supp.2d...

2003 WL 23144859

argument is without merit. Even if the physical assets were transferred in the ABC, "transfer of a mark need not be accompanied by the transfer of any physical or tangible assets in order to be valid. All that is necessary is the transfer of the goodwill to which the mark pertains."*Sands,* 978 F.2d 947, 956 (7th Cir.1992) (internal citations omitted). In addition, "assignments of marks separate from the underlying business have been upheld when the assignee is producing a product ... substantially similar to that of the assignor [such that] consumers would not be deceived or harmed or when there is continuity of management. Thus, a trademark may be validly transferred without the simultaneous transfer of any tangible assets, as long as the recipient continues to produce goods of the same quality and nature previously associated with the mark."*Defiance Button Machine Co. v. C & C Metal Products Corp.,* 759 F.2d 1053, 1059 –1060 (2nd Cir.1985). In this case, GPI2 produced products substantially similar to GPI and kept nearly the same workforce as at GPI. The evidence above demonstrates that the goodwill in the GAFFRIG marks traveled with Gaffrig to GPI2, and that Gaffrig did assign his trademark rights to GPI2. Thus, GPI2 succeeded to GPI's rights in the GAFFRIG marks.

**4. Does LMI Have Any Ownership Rights In The GAFFRIG Marks By Virtue Of Its Federal Trademark Registration Of The GAFFRIG PRECISION INSTRUMENTS Name?**

**\*13** LMI claims that it is entitled to a presumption that its federal registration of the GAFFRIG PRECISION INSTRUMENTS trademark is valid, and GPI2 bears the burden of overcoming the presumption by clear and convincing evidence. GPI2 claims that LMI committed fraud in the procurement of its federal registration, and that the registration is thus invalid. LMI is correct that the registration of a mark is *prima facie* evidence of "the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration."15 U.S.C. § 1115. *See also*15 U.S.C. § 1057(b). In addition, a mark that has become incontestable—such as happened in this case in 1999—"shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce."*Id.*

However, a federal trademark registration, even one that has grown to incontestability, can be vitiated with proof of fraud. A federal trademark registration "shall not preclude another person from proving any legal or equitable defense or defect, including those set forth in subsection (b) of this section, which might have been asserted if such mark had not been registered."15 U.S.C. § 1115. With regard to an incontestable mark, section (b) states that "[s]uch conclusive evidence of the right to use the registered mark ... shall be subject to the following defenses or defects: (1) That the registration or the incontestable right to use the mark was obtained fraudulently."15 U.S.C. § 1115(b). Furthermore, Section 15 U.S.C. § 1065, specifically excepts from incontestable status situations where there are "ground[s] for which application to cancel may be filed at any time under paragraphs (3) and (5) of section 1064 of this title," and where "the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of registration under this chapter of such registered mark."15 U.S.C. § 1065.

GPI2 claims that LMI committed fraud in the procurement of its federal registration of the GAFFRIG PRECISION INSTRUMENTS mark by stating to the PTO that (1) the name "Gaffrig" had no significance other than to identify LMI's products; and (2) Livorsi had used the mark since 1984.⁴LMI disputes these claims, arguing that it did not intentionally make any false or misleading statements to the PTO in connection with its application for registration of the GAFFRIG PRECISION INSTRUMENTS mark. To establish that LMI committed fraud in the procurement of the federal registration, GPI2 must prove by clear and convincing evidence: (1) the false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false; (3) the intention to induce action or refraining from action in reliance on the misrepresentation; (4) reasonable reliance on the misrepresentation; and (5) damages proximately resulting from the reliance.*Thomas Industries, Inc. v.. L.E. Mason Co.,* No. 90 C 4099, 1991 WL 83821, at \*2 (N.D.Ill. May 12, 1991) (citing *San Juan Prod.s, Inc. v. San Juan Pools of Kansas, Inc.,* 849 F.2d 468, 473 (10th Cir.1988)).*See also United Phosphorus, Ltd. v. Midland Fumigant, Inc.,* 205 F.3d 1219, 1226 –1227 (10th Cir.2000); *Texas Pig Stands, Inc. v. Hard Rock Cafe Intern., Inc.,* 951 F.2d 684, 693 (5th Cir.1992).

**\*14** LMI attempts to argue that GPI2 is merely alleging "fraud in the oath," that is, a false statement in the trademark registration applicant's oath "that no other person, firm, corporation, or association, to the best of [the applicant's] knowledge and belief, has the right to use such mark in commerce."*See*15 U.S.C. § 1051. In

Gaffrig Performance Industries, Inc. v. Livorsi Marine, Inc., Not Reported in F.Supp.2d...

2003 WL 23144859

matters of fraud in the oath, an applicant's good faith belief that it is the senior user is sufficient to negate allegations of fraud. *San Juan Prods.,* 849 F.2d at 472 (citation omitted); *United Phosphorus,,* 205 F.3d at 1226 −1227; McCarthy, § 31:77, at 31−140. However, unlike most of the cases where fraudulent procurement is at issue, the fraud at issue here did not occur in the oath Livorsi took in his trademark registration application. In this case, the PTO did not leave room for LMI's "good faith belief" in whether he was the senior user. The PTO initiated an office action on June 4, 1992, requiring that "the applicant must indicate whether Gaffrig has any significance in the relevant trade, any geographical significance or any meaning in a foreign language. 37 C.F.R. section 2.61(b)." Livorsi responded that "[t]he name "Gaffrig" has no significance in the relevant trade other than to identify one of applicant's lines of Marine instruments and has no geographical significance."

GPI2 claims that this response constitutes fraudulent procurement, and this Court agrees. First, this misrepresentation was false because GPI2 has shown by clear and convincing evidence that its use of the name "Gaffrig" did have significance in the marine trade at the time of LMI's trademark application. In addition, this representation is material because without this misrepresentation, the federal registration should not, or would not, have been issued. Second, LMI knew that the representation was false. Livorsi admitted that he knew that GPI2 was producing at least some marine items, such as mufflers and flame arrestors, at the time of LMI's registration application. Thus, even according to Livorsi's testimony, the name "Gaffrig" had at least some significance in the relevant trade. Third, LMI intended to induce the PTO into relying on his representation and issuing him a registered trademark. Fourth, the PTO reasonably relied on this misrepresentation because in his application, Livorsi verified that all facts set forth in his application were true to the best of his knowledge. And, fifth, GPI2 has proved damages proximately resulting from the reliance, as the PTO registered GPI2's trademark to LMI due to LMI's misrepresentations.

LMI's arguments to the contrary are unavailing. LMI argues that an applicant has no duty to investigate and report to the PTO all other possible users of the same or a similar mark, or the fact that "Gaffrig" was James Gaffrig's surname. Although it is true that in the initial application there is no duty to so investigate and report, as explained above, in this case the PTO explicitly requested this information. Moreover, the Seventh Circuit contemplated that the registration process would include an *ex parte* search and examination by the PTO examiner. *Money Store v. Harriscorp Fin., Inc.,* 689 F.2d 666, 671

(7th Cir.1982). The PTO's office actions are part of such a search and examination, and LMI was obligated to truthfully answer whether there was other significant use of the mark—regardless of whether LMI believed them to be junior users—in response to the PTO questioning. LMI further points out that the Trademark Manual of Examining Procedure (2d Edition, May 1993, rev. April 1997) at 1211.02(a) places the initial burden on the examining attorney to establish the mark is primarily a surname—which is exactly why LMI is under a duty to answer truthfully when the examiner followed up with an office action asking for the significance of the name Gaffrig. Therefore, the Court finds that GPI2 proved clearly and convincingly that LMI committed fraud in its trademark application.

## II. False Designation of Origin Under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and Unlawful Trademark Imitation Under the Illinois Counterfeit Trademark Act, 765 ILCS § 1040/2.

**\*15** Both GPI2 and LMI brought claims for false designation of origin under the Lanham Act, and LMI also claimed unlawful trademark imitation under Illinois law. Any person who uses a false designation of origin in connection with goods and services that is likely to cause confusion as to: (1) the origin of that company's goods; (2) that company's affiliation, connection or association with another company; or (3) the endorsement or approval of the goods by another person, is liable to anyone who is or is likely to be damaged by the false designation of origin. 15 U.S.C. § 1125. A plaintiff must prove the following three elements to state a claim for false designation of origin under the Lanham Act: "(1) that the defendant used a false designation of origin or false description or representation in connection with goods or services; (2) that such goods or services entered interstate commerce; and (3) that the plaintiff is a person who believes he is likely to be damaged as a result of the misrepresentation."*Kennedy v. Nat'l Juvenile Detention Ass'n,* 187 F.3d 690, 695–96 (7th Cir.1999) (citing *Web Printing Controls Co., Inc. v. Oxy–Dry Corp.,* 906 F.2d 1202, 1204 (7th Cir.1990)).

Generally, allegations of false designation of origin are either "passing-off" claims or "reverse passing-off" claims. *Francorp, Inc. v. Siebert,* No. 00 C 1248, 2002 WL 731170, at \*2 (N.D.Ill.2002) (citing *Web Printing,* 905 F.2d at 1203 n. 1.) LMI's claim is one of "passing-off," that GPI2's use of the GAFFRIG and GAFFRIG PERFORMANCE INDUSTRIES marks on its marine products created a likelihood of confusion by "passing off" GPI2's products as LMI's products.*Francorp,* 2002 WL 731170, at \*2. GPI2 alleges

2003 WL 23144859

claims of "passing off and "reverse passing-off." GPI2 claims that LMI removed the name or trademark of GPI2's product and sold it with a different name, thus confusing the public.*Id.* Livorsi testified that LMI did, in fact, remove GPI2's marks and replace them with LMI's GAFFRIG marks. In addition, GPI2 claims that LMI's continued use and registration of the GAFFRIG marks after its license to use the mark expired constituted "palming off" (the same as "passing off"), as it falsely led the public to believe that the GAFFRIG marks or GPI were still connected to LMI. *See Kennedy,* 187 F.3d at 696.

A claim for unlawful trademark imitation under the Illinois Counterfeit Trademark Act is similar to an allegation of "passing off" or "palming off" under a Lanham Act claim for false designation of origin. Illinois law, 765 ILCS § 1040/2, provides for criminal penalties for "[w]hoever counterfeits or imitates any trade-mark or service mark of which he or she is not the rightful owner or in any way utters or circulates any counterfeit or imitation of such a trade-mark or service mark or knowingly uses such counterfeit or imitation or knowingly sells or disposes of or keeps or has in his or her possession, with intent that the same shall be sold or disposed of...." Courts analyze this claim in the same manner as the Lanham Act claim. *See Dorr–Oliver, Inc. v. Fluid–Quip, Inc.,* 94 F.3d 376, 379 (7th Cir.1996); *S Indus., Inc. v. Diamond Multimedia Sys., Inc.,* 17 F.Supp.2d 775, 780 (N.D.Ill.1998).

**\*16** LMI's claims must fail because the Court has found that GPI2 had a valid ownership right in the GAFFRIG marks. Therefore, GPI2's use of the GAFFRIG PERFORMANCE INDUSTRIES and GAFFRIG marks do not constitute a false designation of origin, but rather properly show GPI2's ownership of the marks. To the contrary, LMI's use of the GAFFRIG marks, and its admitted removal of GPI2's marks and replacement with its own, constituted a false designation of origin since LMI did not have a valid ownership right in the marks. In addition, GPI2 was damaged by LMI's passing off and reverse passing off of the marine products it sold.

## III. Laches
LMI further claims that GPI2 should be barred from raising any claims for trademark infringement or false designation of origin because GPI2 had known for years about LMI's use of the GAFFRIG marks before initiating this lawsuit. The Lanham Act specifically contemplates that both injunctive relief and awards of damages for violations of 15 U.S.C. § 1125 shall be subject to the principles of equity, which include the doctrine of laches.

*Hot Wax, Inc. v. Turtle Wax. Inc.,* 191 F.3d 813, 822 (7th Cir.1999).

> The equitable doctrine of laches is derived from the maxim that those who sleep on their rights, lose them. Laches addresses delay in the pursuit of a right when a party must assert that right in order to benefit from it. For laches to apply in a particular case, the party asserting the defense must demonstrate: (1) an unreasonable lack of diligence by the party against whom the defense is asserted and (2) prejudice arising therefrom.

*Hot Wax,* 191 F.3d at 820.In addition, for laches to occur, a plaintiff must have actual or constructive notice of the defendant's activities.*Chattanoga Mfg., Inc. v. Nike, Inc.,* 301 F.3d 789, 793 (7th Cir.2002)."[A] trademark owner is chargeable with information it might have received had due inquiry been made."*Id* . at 793.GPI2 had actual or constructive notice of LMI's infringing activities as early as 1993, when LMI received a federally registered trademark for GAFFRIG PRECISION INSTRUMENTS, because registration of a mark provides constructive notice throughout the United States of the registrant's claim to ownership. 15 U.S.C. § 1072; *Park 'N Fly, Inc. v. Dollar Park and Fly. Inc.,* 469 U.S. 189, 202, 105 S.Ct. 658, 83 L.Ed.2d 582 (U.S.1985). In addition, Schultz testified that as early as 1993, GPI2 was purchasing gauges, instruments and controls from LMI. GPI2 received these items with the GAFFRIG marks as they had been attached by LMI, and Schultz testified that GPI2 did not alter these marks.

With regard to the first prong of the laches test—an unreasonable lack of diligence by the party against whom the defense is asserted—the Seventh Circuit has stated that "it cannot be equitable for a well-informed merchant with knowledge of a claimed invasion of right, to wait to see how successful his competitor will be and then destroy with the aid of court decree, much that the competitor has striven for and accomplished."*Hot Wax,* 191 F.3d at 823 (citation omitted). In *Chattanoga,* the Seventh Circuit held that courts should refer to analogous state statutes of limitations to determine whether a presumption of laches should apply in a Lanham Act case. *Chattanoga,* 301 F.3d at 793–94.The Seventh Circuit upheld the district court's finding that the party's delay was unreasonable where the district court held that the most analogous Illinois limitation period was the three-year statute of limitations found in the Illinois

Gaffrig Performance Industries, Inc. v. Livorsi Marine, Inc., Not Reported in F.Supp.2d...

2003 WL 23144859

Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/10.

**\*17** In *Chattanoga,* the plaintiff's delay of at least nine years created a presumption of laches because it far exceeded the statute of limitations in the Illinois Consumer Fraud and Deceptive Business Practices Act. Because the plaintiff failed to rebut this presumption and excuse its delay, the district court found the plaintiff's delay to be unreasonable. *Chattanoga,* 301 F.3d at 793 –794.In this case GPI2 delayed a *maximum* of nine years (LMI's license to use the GAFFRIG marks expired in 1990 and GPI2 did not file suit until 1999) and a minimum of six years (when in 1993 GPI2 began purchasing items from LMI and LMI registered the mark). Using the same statute of limitations used in *Chattanoga* as a guide, the Court finds GPI2's delay unreasonable under the reasoning of *Chattanoga* and *Hot Wax.*A presumption of laches arose after the three year period set forth in the Illinois Consumer Fraud and Deceptive Business Practices Act, and GPI2 failed to rebut this presumption. GPI2 has put forth no argument or facts justifying its six to nine year delay. Rather, GPI2 tries to argue that it did not have notice of LMI's use and registration of the GAFFRIG marks until 1995, even though Schultz's testimony shows that GPI2 had notice by 1993. Moreover, GPI2 does not even attempt to justify its delay after 1995, which is still greater than the relevant three year statute of limitations. Therefore, GPI2 failed to rebut the presumption of laches and demonstrated an unreasonable lack of diligence in asserting its trademark infringement claims.

With regard to the second prong of the laches test—prejudice—the Seventh Circuit has held that:

> A defendant has been prejudiced by a delay when the assertion of a claim available some time ago would be 'inequitable' in light of the delay in bringing that claim and ensues when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed. In this context, we have explained that laches is a question of degree. To this end, if only a short period of time has elapsed since the accrual of the claim, the magnitude of prejudice required before the suit should be barred is great, whereas if the delay is lengthy, prejudice is more likely to have occurred and

less proof of prejudice will be required.

*Hot Wax,* 191 F.3d at 824 (internal citations omitted). Rather than seeking cancellation in the PTO or otherwise contesting LMI's use of the marks, in 1996 GPI2 expanded its use of the GAFFRIG and GAFFRIG PERFORMANCE INDUSTRIES marks by manufacturing a broader range of marine products, similar to LMI's products, and applying the marks to them. In the meanwhile, LMI was investing a great deal of money in the GAFFRIG marks in advertising, marketing, legal fees, and registration fees, and LMI presented tax returns and other evidence demonstrating this. This is similar to the situation in *Hot Wax,* where the Seventh Circuit found the defendant was prejudiced because (i) plaintiff permitted defendant's advertising and product development to go unchecked for years; (ii) plaintiff idly sat by while defendant invested significant amounts of time and money in product development and advertising; and then, (iii) rather than contesting defendant's rights, plaintiff attempted to break into the same market with similar products. Had GPI2 pressed its claims in a timely manner, LMI "could have invested its time and money in other areas or simply renamed its products."*Hot Wax,* 191 F.3d at 824.Accordingly, the Court finds that GPI2 unreasonably delayed bringing suit, and LMI was thereby prejudiced.

**IV. Remedies**

**\*18** As a remedy for LMI's trademark infringement and false designation of origin, GPI2 seeks damages and wrongfully derived profits from LMI, in addition to an injunction against LMI's use of the GAFFRIG marks. A finding of laches bars a trademark infringement plaintiff, GPI2, from recovering damages or wrongfully derived profits during the time prior to filing suit. *James Burrough Ltd. v. Sign of Beefeater, Inc.,* 572 F.2d 574, 578 (7th Cir.1978). However, "[u]pon a showing of infringement ... the plaintiff may still be entitled to injunctive relief ... and to damages and profits for the period subsequent to the filing of suit" because of the continuous nature of trademark infringement. *Id.* Under the Lanham Act courts have power to grant injunctions according to the principles of equity. An injunction is only denied "if the delay is so prolonged and inexcusable that it would be inequitable to permit the plaintiff to seek injunctive relief as to future activities."*Hot Wax,* 191 F.3d at 825.In *Hot Wax,* the court found that the plaintiff's delay was prolonged and inexcusable because it waited more than 20 years to file suit. *Id.* The delay in the instant case—six to nine years—does not fall into this category, and GPI2 may acquire injunctive relief. The Court,

Gaffrig Performance Industries, Inc. v. Livorsi Marine, Inc., Not Reported in F.Supp.2d...

2003 WL 23144859

however, denies GPI2 damages and profits for the period subsequent to the filing of suit because of GPI2's failure to excuse its delay or to provide evidence of these damages or profits.

GPI2, however, argues that LMI should be barred from using its defense of laches because LMI had unclean hands in the fraud it committed in procurement of its trademark application. Fraud in the procurement of a registered mark constitutes unclean hands. *Elec. Info. Publ'ns, Inc. v. C–M Periodicals, Inc.,* 163 U.S.P.Q. 624, 633 (N.D.Ill.1969). A party's unclean hands may stand as an obstacle to the application of the doctrine of laches in certain circumstances. The notion of unclean hands working as a bar to the application of laches stems from the belief that an equitable defense, such as laches, cannot be used to reward a party's inequities or to defeat justice. *Hot Wax,* 191 F.3d at 825 (citing *Precision Inst. Mfg. Co. v. Auto. Maint. Mach. Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) (unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief")).*See also Jarrow Formulas, Inc. v. Nutrition Now, Inc.,* 304 F.3d 829, 841 (9th Cir.2002).

In this case, the Court would come to the same result whether or not LMI's unclean hands barred it from asserting the laches defense.

> In the interests of justice the court should not automatically condone the defendant's infractions because the plaintiff is also blameworthy, thereby leaving two wrongs unremedied and increasing injury to the public.... The relative extent of each party's wrong upon the other and upon the public should be taken into account and an equitable balance struck.

**\*19** *Republic Molding Corp. v. B.W. Photo Util.s,* 319 F.2d 347, 350 (9th Cir.1963). An equitable balance in this case involves granting GPI2 an injunction against LMI's use of the GAFFRIG marks, but not rewarding GPI2 with damages. Whether or not laches applies to GPI2, this Court recognizes that GPI2 is not clear of wrong, since not only did it wait many years before raising the issue of LMI's infringement before the Court, but GPI2 allowed LMI to continue spending money on advertising while GPI2 attempted to break further into the market.

Moreover, despite the fraud in its application, LMI believed that it had a senior right to the GAFFRIG marks. Therefore, because of LMI's violations of Section 1125 of the Lanham Act and its fraudulent registration of the GAFFRIG marks, GPI2 is entitled to an injunction under 15 U.S.C. § 1116 against LMI's use of any trademark or tradename incorporating the word GAFFRIG, or the use of such a mark on, or in connection with the sale of, any marine products. However, no damages will be awarded to GPI2 in light of LMI's belief that it had senior rights to the marks and GPI2's delay.

Furthermore, "[i]n any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action."Lanham Act, § 37, 15 USCA § 1119. In addition, the Lanham Act permits cancellation of a registration at any time if the registration of the mark was obtain fraudulently, even if the mark has acquired incontestable status. Lanham Act, §§ 14(c), 33(b)(1); 15 U.S.C. §§ 1064(c), 1115(b)(1). A party in an infringement suit is not barred from counterclaiming for cancellation merely because he never petitioned the PTO to cancel. *Nancy Ann Storybook Dolls, Inc. v. Dollcraft Co.,* 197 F.2d 293, 295–96 (9th Cir.1952). Therefore, the Court orders the cancellation of the federal trademark registrations issued to LMI for the (1) GAFFRIG PRECISION INSTRUMENTS trademark (U.S. Registration No. 1,801,915); (2) GAFFRIG trademark (U.S. Registration No. 2,528,898); and (3) GAFFRIG II trademark (U.S. Registration No. 2,535,322).

In conclusion, the Court orders that: (1) GPI2's request for an injunction against LMI's use of any trademark or tradename incorporating the word GAFFRIG, or the use of such a mark on, or in connection with the sale of, any marine products, is GRANTED; and (2) LMI's federal trademark registrations for the GAFFRIG PRECISION INSTRUMENTS trademark (U.S. Registration No. 1,801,915); the GAFFRIG trademark (U.S. Registration No. 2,528,898); and the GAFFRIG II trademark (U.S. Registration No. 2,535,322) will be CANCELLED. All other relief is DENIED.

IT IS SO ORDERED.

Footnotes

1       LMI's claim of trademark infringement under 765 ILCS § 1035/15 does not apply here. This statute was repealed in 1998, and its closest current equivalent is 765 ILCS § 1036/65. Section 1036/65, however, only provides a remedy for dilution of a mark that is so inherently distinctive that it is "famous." LMI, however, does not argue and provides no evidence of the eight factors under the statute that could make the GAFFRIG marks famous. Even if the GAFFRIG marks were found to be famous, however, LMI's claims under 765 ILCS § 1035/15 would be analyzed in the same manner as the other claims in this section.

2       Since the initiation of this lawsuit, LMI was issued a federal trademark registration for the GAFFRIG trademark on January 15, 2002 (U.S. Registration No. 2,528,898), and for the GAFFRIG II trademark on February 5, 2002 (U.S. Registration No. 2,535,322).

3       GPI2 attempts to argue that the APA is invalid for lack of consideration because LMI allegedly did not pay the full $20,000 owing to Gaffrig under the APA or the required 3% royalties to Gaffrig. Contrary to GPI2's claims, failure to pay the full amount owing under a contract does not render a contract invalid. Instead, it gives GPI a remedy for breach of contract. A contract may be invalid for want or lack of consideration, but here, GPI2 agrees that the contract stated the consideration that must be paid. GPI2 instead claims that the consideration was not paid in full. Thus, the APA is a valid agreement regardless of whether Livorsi provided the consideration for the 1988 APA.

4       The Court finds no merit in GPI2's second claim of fraud. On November 11, 1991, in a Declaration to the Patent and Trademark Office, Livorsi stated that the GAFFRIG and GAFFRIG PRECISION INSTRUMENTS marks were first used in the summer of 1984. Livorsi stated that he did not intend to represent that the first use was by Livorsi, and indeed, the first use by Gaffrig was in 1984. The Trademark Trial and Appeals Board has repeatedly held that an erroneous date of first use is immaterial to an allegation of fraud, because an erroneously asserted date, even if intentional, could not result in the allowance of a registration which would otherwise not be allowed, so long as the applicant used the mark prior to filing the application. *Western Worldwide Enter.s Group Inc. v. Qinqdao Brewery,* 17 U.S.P.Q.2d 1137, 1141 (T.T.A.B.1990) (The Board repeatedly has held that the fact that a party has set forth an erroneous date of first use does not constitute fraud unless, inter alia, there was no valid use of the mark until after the filing of the application). In this case, however, GPI2 has provided no evidence that LMI intentionally misstated the date of his first use, and thus GPI2 cannot satisfy the elements of fraud in this instance.

---

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit G

Instant Technology, LLC v. DeFazio, --- F.Supp.2d ---- (2014)

2014 WL 1759184, 38 IER Cases 427

2014 WL 1759184
United States District Court,
N.D. Illinois, Eastern Division.

Instant Technology, LLC, an Illinois, limited
liability company, Plaintiff,
v.
Elizabeth DeFazio, Laura Rehn, Megan Marker,
Bethany Meek, Erin Bauer, Joel Katz, Andrea Katz
individuals, and **Connect Search LLC**, a Delaware
Limited Liability Company, Defendants.

No. 12 C 491 | Signed May 2, 2014

**Synopsis**
**Background:** Employer, as information technology (IT)
staffing company, filed suit asserting claims against
former employees for breach of employment agreements,
breach of fiduciary duty, and violation of Computer Fraud
and Abuse Act (CFAA), claims against employees,
non-employees, and competitor for violating Illinois
Trade Secrets Act (ITSA), tortious interference with
business expectancies, and civil conspiracy, and claims
against one employee and competitor for tortious
interference with contract. One employee counterclaimed
for violation of Illinois Wage Payment and Collection Act
(IWPCA) by employer's failure to pay portions of her
bonus.

**Holdings:** The District Court, James F. Holderman, J.,
held that:

[1] non-solicitation covenants were invalid;

[2] non-recruitment covenants were invalid;

[3] non-disclosure covenants were not breached;

[4] ITSA was not violated;

[5] fiduciary duties were not breached;

[6] CFAA was not violated;

[7] tortious interference with business expectancies claim
was not viable; and

[8] IWPCA counterclaim was not actionable.

Ordered accordingly.

**Attorneys and Law Firms**

David Brian Ritter, Alison C. Conlon, Kaitlyn N.
Jakubowski, Megan M. Lazar, Austin Jennings Burke,
Barnes & Thornburg LLP, Chicago, IL, for Plaintiff.

Hal J. Wood, Megan Mae Mathias, Richard Zachary
Wolf, Horwood Marcus & Berk Chartered, Chicago, IL,
for Defendants.

*MEMORANDUM OPINION AND ORDER
CONTAINING COURT'S FINDINGS OF FACT AND
CONCLUSIONS OF LAW*

JAMES F. HOLDERMAN, District Judge:

**\*1** Plaintiff Instant Technology, LLC ("Instant"), a
company in the information technology ("IT") staffing
industry, sued five of its former employees, Ms. Elizabeth
DeFazio ("DeFazio"), Ms. Laura Rehn ("Rehn"), Ms.
Megan Marker ("Marker"), Ms. Bethany Meek ("Meek"),
and Ms. Erin Bauer ("Bauer") (collectively "Employee
Defendants"), as well as two non-employees, Mr. Joel
Katz ("Joel Katz") and Ms. Andrea Katz ("Andrea Katz"),
and one of Instant's competitors, Connect Search, LLC
("Connect") (collectively "Connect Defendants")
(altogether "Defendants"). Instant sought in its First
Amended Verified Complaint ("Amended Complaint")
(Dkt. No. 40 ("Am. Compl.")) injunctive and other relief
from the Employee Defendants for what Instant alleged to
be breach of employment agreements, breach of fiduciary
duty, and alleged violations of the Computer Fraud and
Abuse Act ("CFAA"), 18 U.S.C. § 1030. Instant also
sought injunctive and other relief from all Defendants for
what Instant alleged to be violations of the Illinois Trade
Secrets Act ("ITSA"), 765 ILCS 1065/2–3, tortious
interference with business expectancies, and civil
conspiracy, and from DeFazio and the Connect
Defendants for what Instant alleged to be tortious
interference with contract.

In April 2014, the court conducted a bench trial at which
Instant withdrew its requests for injunctive relief. The
parties presented evidence regarding Instant's other
claims, as well as DeFazio's counterclaim against Instant
for what DeFazio alleged were unpaid portions of her

2011 bonus. At the trial, Instant presented the testimony of twelve witnesses. Ms. Ronna Borre ("Borre"), Instant's President and CEO, testified about Instant's business and revenue, the IT staffing industry, and the Defendants' alleged conduct. Mr. Alfredo Aoun ("Aoun"), DeFazio's partner, testified about his computerized backup of DeFazio's email. The five Employee Defendants each testified about Instant's business, the IT staffing industry, their employment at Instant, and the formation of Connect. Joel Katz and Andrea Katz each testified about the IT staffing industry and the formation of Connect. Ms. Rebecca Rouhoff ("Rouhoff"), an Instant administrative employee, testified about her observations after the departure of the Employee Defendants. Mr. Wolfe Wilke ("Wilke"), Director of Operations–Forensic Services at the Barrington, Illinois office of CyberControls, LLC, testified about his examination of the Employee Defendants' computers after their termination or resignation from Instant. Mr. Anthony Raimonde ("Raimonde"), a former accountant at Instant, testified regarding Instant's purported losses as a result of Defendants' conduct.[1] Instant also offered certain parts of the deposition testimony of Ms. Christina Peterson. (PTX 328.) Instant did not present the testimony of its previously disclosed damages expert, Dr. Dwight Stewart. Defendants presented the testimony of six witnesses, including the five Employee Defendants and Joel Katz.

**\*2** After considering all of the evidence presented at the April 2014 trial, the court finds the Employee Defendants did not breach their Employment Agreements with Instant (Count I) or their fiduciary duties to Instant (Count IV). The court further finds that none of the Defendants violated the Illinois Trade Secrets Act (Count II) or the Computer Fraud and Abuse Act (Count V), nor did any of the Defendants commit any common law torts (Counts III and VI) or participate in a civil conspiracy (Count VII). Finally, the court finds that DeFazio did not prove her counterclaim seeking money damages. This Memorandum Opinion and Order, as outlined below, constitutes the court's findings of fact and conclusions of law.

I. Stipulations of Uncontested Facts
A. The Parties

B. Instant's History and Business

C. Employee Defendants' Employment at Instant and Employment Agreements

D. Events of October 2011 through December 2011

E. Events of January 2012

F. Connect Search Solicitations and Placements

II. Further Factual Findings
A. Instant's Business

B. Instant's Workforce

C. Instant's Business Data

D. Instant's Candidate Hotlist

E. Instant's Candidate Roll–Off List

F. Instant's Employees' Data Practices

G. Events of 2011 and 2012

H. Instant's Investigation after Employee Defendants' Terminations and Resignations

I. Startup of Connect

III. Applications of Fact and Conclusions of Law
A. Employee Defendants' Alleged Breach of Employment Agreements (Count I)

   i. Inadequate Consideration for Restrictive Covenants

   ii. Non–Solicitation Covenants in Employee Defendants' Agreements with Instant

      a. Non–Solicitation of Instant's Candidates

      b. Non–Solicitation of Instant's Clients

      c. Instant's Purported Confidential Information

   iii. Non–Recruitment Covenants in Employee Defendants' Agreements with Instant

   iv. Non–Disclosure Covenants in Employee Defendants' Agreements with Instant

B. Defendants' Alleged Violation of Illinois Trade Secrets Act (Count II)

C. DeFazio's and Connect Defendants' Alleged Tortious Interference with Contract (Count III)

D. Employee Defendants' Alleged Breach of Fiduciary Duty (Count IV)

E. Employee Defendants' Alleged Violation of the

Computer Fraud and Abuse Act (Count V)

F. Defendants' Alleged Tortious Interference with Business Expectancies (Count VI)

G. Defendants' Alleged Civil Conspiracy (Count VII)

H. DeFazio's Counterclaim for Alleged Breach of Agreement and Violation of Illinois Wage Payment and Collection Act

IV. Conclusion

## I. Stipulations of Uncontested Facts

Before the trial commenced, consistent with the high level of professionalism displayed by the counsel of record throughout pendency of this litigation and with the court's appreciation, the parties agreed to stipulations regarding numerous facts which this court adopts as uncontested. The stipulated facts as set forth in the parties' final pretrial order (Dkt. No. 266–1) are as follows:

## A. The Parties

1. Connect Search is a Chicago-based staffing firm that specializes, in part, in the recruitment and placement of IT professionals.

2. DeFazio, Rehn, Marker, Meek and Bauer are all former employees of Instant.

3. DeFazio, Marker, Meek and Bauer currently work for Connect Search. Rehn formerly worked for Connect Search.

4. DeFazio is the President and Co–Founder of Connect Search. She is also a member of the Board of Managers of Connect Search.

5. DeFazio owns approximately 15% of Connect Search.

6. During her employment at Connect Search, Rehn was a Vice President of Sales.

7. Marker is a Vice President of Sales at Connect Search. She is also an owner of Connect Search.

8. Meek is a Vice President of Recruiting at Connect Search.

9. Bauer is a Vice President of Recruiting at Connect Search.

10. Defendant Joel Katz has worked in the staffing business for more than 20 years.

**\*3** 11. Joel Katz is the former President and CEO of Addison Search, a professional staffing company he founded in 1999. Joel Katz was an owner of Addison Search until 2011.

12. Joel Katz is a member of the Board of Managers of Connect Search.

13. Joel Katz is the Chief Investment Officer of a company called Brown Lab Investments, LLC ("Brown Lab").

14. Brown Lab is the majority owner of Connect Search.

15. Defendant Andrea Katz is married to Joel Katz.

16. Andrea Katz has worked in the staffing business for more than 20 years.

17. Andrea Katz co-founded Addison Search with Joel Katz. She was employed by Addison Search until early 2010 and was an owner of Addison Search until 2011.

18. Andrea Katz is a member of the Board of Managers of Connect Search.

19. Andrea Katz is the majority owner of Brown Lab and currently serves as Brown Lab's Chief Executive Officer. Andrea Katz organized Brown Lab in 2011 as an investment vehicle.

20. Prior to forming Connect Search, Joel Katz and Andrea Katz had worked with DeFazio.

21. Bauer formerly worked for Addison Search.

## B. Instant's History and Business

22. Instant was formed in 2001 by its President and CEO, Borre.

23. Borre left a position at a global staffing company to launch Instant.

24. Instant is wholly-owned by Borre.

25. As part of its business, Instant helps companies locate IT professionals needed to fill temporary, permanent and/or temporary-to-permanent positions.

## C. Employee Defendants' Employment at Instant and Employment Agreements

26. DeFazio worked for Instant from 2003 until January 3, 2012.

27. DeFazio's most recent title at Instant was Executive Vice President, Sales & Operations.

28. DeFazio reported directly to Borre.

29. DeFazio received over $300,000 in base salary, bonus and commissions in 2010, and more than $222,000 in total compensation in 2011.

30. Rehn began working for Instant on or about June 17, 2010. She held the position of Senior Account Manager, and was responsible for, among other duties, maintaining and increasing sales of Instant's services and developing new clients and accounts.

31. Marker began working for Instant on or about March 24, 2010. She held the position of Senior Account Manager, and was responsible for, among other duties, maintaining and increasing sales of Instant's services and developing new clients and accounts.

32. Meek began working for Instant on or about January 7, 2008. She held the position of Lead/Senior Recruiter, and was responsible for, among other duties, identifying and vetting placement candidates' skills and qualifications, submitting candidates' profiles to the company's account managers, and helping to facilitate the placement of the candidates with clients.[2]

33. Meek also conducted training workshops and wrote Instant's training manual.

34. Bauer worked at Instant from 2005 to 2008. She later returned to Instant in March of 2011. Bauer held the position of Recruiter, and was responsible for, among other duties, identifying and vetting placement candidates' skills and qualifications, submitting candidates' profiles to the company's account managers, and helping to facilitate the placement of the candidates

with clients.

35. Instant divides its employees between sales (client side) and recruiters (candidate side). Meek and Bauer were on the candidate side, and were responsible for sourcing candidates to fill open positions at clients. Marker and Rehn were on the client side, and were responsible for generating sales and facilitating placements of candidates at clients. At the time of her termination, DeFazio was in a sales role on the client side of the business.

**\*4** 36. DeFazio, Rehn, Marker, Meek and Bauer signed employment agreements with Instant (collectively, the "Employment Agreements" or singularly, the "Employment Agreement").

37. Among other things, the Employment Agreements contained a "Covenant Not to Solicit Instant's Clients or Employees," which states, in relevant part:

Employee shall not directly or indirectly, for a period of two years after termination of Employee's employment with Instant, perform IT Staffing Services for or accept IT Staffing Services business from, or assist any person, firm, partnership, corporation or other entity to perform IT Staffing Services for or accept IT Staffing Services from, any of [Instant's Serviced Clients]. In furtherance of the foregoing, Employee agrees that ... (a) Employee shall not contact or solicit any of Instant's Serviced Clients for a period of two years from termination of Employee's employment with Instant ... (b) Employee shall not notify any of Instant's Serviced Clients of the termination of Employee's employment with Instant ... (c) Employee shall not notify any of Instant's Serviced Clients where Employee is employed at any time during said period of two (2) years from termination of Employee's employment with Instant ...

(Employment Agreements at § 8 (referred hereafter as "Non–Solicitation Covenants").)

38. The "Covenant Not to Solicit Instant's Clients or Employees" further provides:

Employee agrees that during and after termination of Employee's employment with Instant, she will not directly or indirectly encourage, solicit, or otherwise attempt to

persuade any employee or consultant of Instant to leave the employ of Instant, to breach any employment or consulting agreement with Instant, or to violate any procedure or policy of Instant.

(Employment Agreements at § 8(e) (referred hereafter as "Non–Recruitment Covenants").)

39. "Instant's Serviced Clients" are defined in the Employment Agreements as "any of Instant's Clients who have been serviced by Instant within three (3) years prior to the termination of Employee's employment with Instant...." (Employment Agreements at § 8.)

40. The Employment Agreements also contained a clause regarding the nondisclosure of Instant's proprietary property which states, in relevant part:

The Employee covenants and agrees that she/he shall not, while in the employ of Instant, or thereafter, communicate or divulge to, or use for the benefit of himself/herself or any other person, firm, association or corporation, without the prior written consent of Instant, and information in any way relating to the Proprietary Property. The Proprietary Property shall remain the sole property of Instant or Instant's Clients, as the case may be and upon termination of his/her employment with Instant, the Employee shall thereupon return all Proprietary Property in his/her possession or control to Instant.

(Employment Agreements at § 7(b) (referred hereafter as "Non–Disclosure Covenants").)

41. "Proprietary Property" is defined in the Employment Agreements as:

information regarding the business, procedures, activities and services of Instant or Instant's Clients, including but not limited to, memoranda; files; programs; clients account and customer lists; information about and notes regarding customers, candidates and consultants and their reserves (placed, active and inactive); costs and prices of Instant; client needs, requirements and business affairs; records; manuals; computer data and reports ...

**\*5** (Employment Agreements at § 7(a).)

42. DeFazio had a written compensation plan

for 2011, pursuant to which DeFazio was entitled to a performance bonus if Instant achieved certain revenue and net income goals.

43. Instant paid DeFazio $10,000 in bonus compensation for 2011.

**D. Events of October 2011 through December 2011**

44. On October 26, 2011, Andrea Katz contacted DeFazio via LinkedIn. Andrea Katz and DeFazio then had lunch on November 3, 2011.

45. In November 2011, DeFazio had lunch with Joel Katz. At that lunch, Joel Katz told DeFazio that he was considering starting a new staffing company. He also asked DeFazio if she would consider leaving Instant.

46. Later that month, DeFazio met Joel Katz for breakfast. At that breakfast, Joel Katz told DeFazio that she could be a candidate to run his new staffing venture.

47. On December 9, 2011, Instant hosted its annual holiday party. Meek came to Chicago from St. Louis for the party and rented a hotel room. DeFazio met Meek at her hotel room before the party to talk.

48. On December 12, 2011, John Kinsella, the Senior Vice President of real estate company Grubb & Ellis, sent Joel Katz a preliminary market survey showing available office space in Chicago.

49. On December 13, 2011, DeFazio and Joel Katz exchanged emails regarding their itinerary for viewing available office space in Chicago.

50. On December 14, 2011, DeFazio and Joel Katz toured available office space in Chicago, including an office at 10 South LaSalle Street.

51. On December 15, 2011, DeFazio signed a revenue goal sheet saying she would attempt to generate $2.5 million in revenue at Instant in 2012.

52. Also on December 15, 2011, Meek spoke with Andrea Katz over the telephone. Following their conversation, Meek sent Andrea Katz a thank you email saying: "I'm thrilled to be a part of this new chapter." In her email, Meek also mentioned the possibility of meeting with

Andrea and Joel Katz in Chicago on December 29, 2011.

53. On December 16, 2011, DeFazio sent Joel Katz an email saying: "I wanted to reach out and let you know that I am super excited and am so 'in' with our plan and partnership."

54. On December 29, 2011, DeFazio sent Joel Katz an email saying: "i hope we can also get the ladies on board w us, so i do not have to leave them behind."

55. Also on December 29, 2011, Marker sent Joel Katz an introductory email saying:

> "Hi Joel, My name is Megan Marker and I am Account Manager [sic] at Instant. I was referred to you by one of my connections on LinkedIn and heard you were looking to open a staffing service in the Chicagoland area. I am interested to hear more about this."

55. On December 30, 2011, Rehn sent DeFazio an email saying: "Call [me] after you talk to Joel."

**E. Events of January 2012**

57. On January 3, 2012, Borre terminated DeFazio's employment with Instant at a restaurant, without notice, and DeFazio never returned to Instant's office.

**\*6** 58. Connect Search was formed on January 4, 2012, but did not begin operating until February 27, 2012.

59. On January 5, 2012, Marker resigned her employment with Instant via telephone.

60. On January 6, 2012, Meek similarly resigned her employment with Instant via telephone.

61. On or around January 9, 2012, DeFazio, Rehn, Marker, Meek and Bauer all signed employment agreements with Connect Search.

62. On January 10, 2012, Instant, through its

counsel, sent separate cease and desist letters to DeFazio, Rehn, Marker, Meek, and Bauer.

63. The cease and desist letters expressed Instant's concerns about certain of Defendants' pre- and post-employment activities and warned that if the parties were not able to resolve the matter in an amicable fashion by January 17, 2012, Instant would file suit.

64. On January 17, 2012, Instant, through its counsel, sent a cease and desist letter to Joel Katz.

**F. Connect Search Solicitations and Placements**

65. In 2012, Connect Search placed multiple candidates at The University of Chicago.

66. One such candidate was Olumide Kehinde.

67. Instant had placed Mr. Kehinde at its client Accenture in 2010. Certain of the Defendants were aware of this placement.

68. In 2012, while Mr. Kehinde was still working at Accenture, Connect Search set up an interview for him at the University of Chicago.

69. Connect Search successfully placed Mr. Kehinde as a Windows System Administrator at the University of Chicago on May 22, 2012. Defendants Meek and Rehn worked on this placement.

70. Connect Search placed Brandon Rowe at the University of Chicago effective September 4, 2012. Rehn and Meek worked on this placement.

71. Connect Search placed Chris Sersic at the University of Chicago effective October 15, 2012. Rehn and Meek worked on this placement.

72. Connect Search placed Daniel Weiske (through his company IT Federal Services) at the University of Chicago effective July 9, 2012. Rehn and Meek worked on this placement.

73. Connect Search placed George Moraetes (through his company Securityminders, Inc.) at the University of Chicago effective June 11, 2012.

74. Connect Search placed Jareth Nicasio at the University of Chicago effective July 23, 2012. Rehn and Meek worked on this placement.

75. Connect Search placed Stephen Adams at the University of Chicago effective October 8, 2012. Rehn and [non-defendant Laura] Cation worked on this placement.

76. In 2012, Connect Search placed at least one candidate at Orbitz. [Non–Defendant] Christina Peterson worked on this placement.

77. Bauer began soliciting business from Orbitz on behalf of Connect Search in the summer of 2012.

78. On July 11, 2012, Connect Search executed a Master Services Agreement with Orbitz.

79. Around that time, Connect Search employees began submitting candidates for an open Windows Engineer position at Orbitz. Connect Search successfully placed a candidate, Jeffrey Snyder, in the Windows Engineer position on November 26, 2012.

80. On August 1, 2012, Rehn emailed Anixter's Corporate IT Supervisor, Razz Cura, and submitted two candidates for an open "QA" role. Based on this submission, Anixter agreed to conduct a phone interview with one of the candidates, James Budilovsky.

*7 81. Marker submitted candidates to Augmentity on behalf of Connect Search.

82. Marker worked on the Banker's Life account at Instant. On April 18, 2012, while employed at Connect Search, Marker sent an email to Jim Gucciard at Banker's Life recommending an "all-star" candidate, Kurt Weissgerber.

83. In July and August of 2012, Bauer sourced candidates for a Security Log Management Engineer position at Blue Cross–HCSC.

84. Marker placed candidates at Brightstar while employed at Instant. On June 27, 2012, while employed at Connect Search, Marker emailed Sapna Rao at Brightstar and submitted two potential candidates for an open position there. In response, Ms. Rao asked Marker to set up a phone interview with one of the candidates, Avinash Athelli.

85. In March and April of 2012, Rehn reached out to Tamara Brown at Chamberlain and submitted a candidate for an open QA Testing Manager position there.

86. On August 16, 2012, Marker emailed Mark Francetic at CME and asked him to consider a candidate named Anish Jacob for a C++ Developer position.

87. In April and May of 2012, Meek submitted candidates for an Oracle R12 Implementation Lead position at Hyatt.

88. Meek and DeFazio both worked on the Law Bulletin account at Instant. In April of 2012, Meek and DeFazio sourced candidates for an open Java Developer position at Law Bulletin on behalf of Connect Search.

89. In May of 2012, Marker contacted Sue Hardek at Manifest and asked her to consider a candidate named Kimberlee Mulherin for an Interactive Project Manager position.

90. Rehn worked on the NORC account at Instant. In July of 2012, while employed at Connect Search, Rehn submitted multiple candidates for an open Quality Assurance position at NORC. Rehn also submitted candidates for other open positions at NORC, including Programmer, Mobile Developer and Java roles.

91. Rehn worked on the Pactiv account while employed at Instant. Rehn submitted at least one candidate for an open position at Pactiv on behalf of Connect Search.

92. Bauer sourced positions at Sears while employed at Instant. Bauer has sourced positions at Sears on behalf of Connect Search.

93. In April of 2012, Rehn submitted a candidate for an open position at Shop Local.

94. Marker placed candidates at Videojet while she was employed at Instant. Marker submitted candidates to Videojet on behalf of Connect Search.

95. Meek sourced candidates for West Monroe Partners when she worked at Instant. Meek sourced candidates for "a handful" of positions at West Monroe Partners on behalf of Connect Search.

96. Marker placed candidates at ZS Associates when she worked at Instant. Marker submitted candidates for two open positions at ZS Associates on behalf of Connect Search.

97. On May 14, 2012, Rehn sent an email to Joanne King at Accenture. In the email, Rehn notes Connect Search's "25+ years of professional recruiting and staffing experience" and asks about the process for "becoming an approve [sic] staffing vendor for Accenture." Rehn goes on to tell Ms. King that Connect Search "would welcome the opportunity to prove our value to you."

**\*8** 98. In the spring of 2012, Rehn sent multiple emails to William Boroski at Fermi, attempting to schedule a time to meet. In one such email, Rehn stated she would love to tell Boroski more about the "new company" she founded with "5 other colleagues."

99. Marker worked on the Tribune account at Instant. On April 26, 2012, Marker emailed Joe Adamo at Tribune and asked if there was any way Connect Search could help "fill [ ] open roles with [its] candidates."

100. Rehn placed candidates at United Airlines while employed at Instant. On May 11, 2012, Rehn sent an email to Dwight Nielsen at United Airlines, saying: "I would love the opportunity for Elizabeth [DeFazio] and myself to sit down with you to tell you more about our firm [Connect Search] and the best way to partner with United."

(Dkt. No. 266–1 ¶¶ 1–100.)

## II. Further Factual Findings

The court's further findings of fact as set forth below are made based on the evidence presented by the parties at the bench trial.[3]

## A. Instant's Business

Most business entities in the twenty-first century maintain record keeping systems that are computerized. Consequently, most businesses employ an IT staff for day-to-day operations as well as employees with IT skills for special projects, such as implementing a new database architecture or an enterprise resource planning ("ERP") system. Instant's clients reflect the widespread demand

for employees with IT skills and have included a major airline, a large metropolitan university, an investment bank, and a local news bulletin.

Instant's products, like other businesses in the IT staffing industry, are the people with IT skills it can identify and convince to become job candidates. Instant makes money when a client, which is a company with IT staffing needs, hires a job candidate put forth by Instant as an employee. In exchange for Instant's successful search, the client pays Instant a commission, typically based on the employee's starting salary. No newly hired employee or job candidate pays Instant anything.

Although Instant enters into a Master Services Agreement ("MSA") with most of its clients, an MSA does not guarantee Instant will earn revenue from any particular client. Clients want to fill their IT needs as soon as possible and consequently solicit candidates through multiple IT staffing firms and through a number of different online job boards. According to a consulting presentation prepared for Instant in 2011, mid-market clients rely on four to five different IT staffing firms. (JTX 10 at 16.) Large clients, by contrast, use a network of more than ten different vendors. (*Id.*) The fierce competition for clients' open jobs is not an industry secret. CME Group, for example, conducts a regular conference call with its network of IT vendors to discuss current and future staffing needs. Another client, University of Chicago, announces open IT jobs in a single email to 20 or 30 recipients; the recipients, which are all IT staffing firm representatives, see their competition in the "To" line of each email. Clients do not even limit themselves to IT staffing firms. Almost every client—big and small—posts available IT positions to the more popular job boards, including: Dice, which specializes in high tech jobs; Monster; CareerBuilder; and LinkedIn, the social media platform for professional networking.

**\*9** The result is an IT professional staffing market replete with robust competition. Instant does not have an exclusive relationship with any client, nor does any client guarantee Instant a certain level of business. Although some clients regularly include Instant in their network of "preferred" IT staffing firms, mere inclusion does not translate to a high rate of compensated placements. For every ten job openings where a client invites Instant to compete, Instant places a candidate (and bills the client) only once.

Instant and its competitors also provide the same product, IT candidates. According to Borre, the IT staffing industry is a "very commoditized business." (DTX 10.)[4] Neither Instant nor its competitors enjoy a reputation for

providing higher quality candidates than the rest of the IT staffing industry, partially because the staffing firms market and provide the same candidates. Like clients, candidates have little incentive to limit themselves to a single staffing firm. Instead, like clients, candidates use multiple staffing firms—as well as online job boards—to maximize their opportunities to find a job. The hiring manager for a client may see the same candidate presented by a number of staffing firms and, according to Borre, ultimately buys "from people [he or she] likes." (DTX 10.) Because Instant and its competitors are providing, at any point in time, the same or similar available candidates to an easily identifiable client base, Instant relies heavily on its sales force to drive its business.

**B. Instant's Workforce**
As stipulated, Instant divides its workforce into two segments: sales and recruiting. The sales team is in charge of identifying clients, which are companies seeking IT professionals to fill temporary, permanent, or temporary-to-permanent positions. Instant's sales people find prospective clients by performing internet research, cold-calling hiring managers, searching online job boards, such as Monster.com and CareerBuilder.com, and searching social networking sites like LinkedIn. Because Instant's clients' chief goal is to hire qualified candidates, clients readily volunteer information about available jobs. As discussed earlier, sophisticated clients advertise job openings on conference calls or emails with a network of competing IT staffing firms, and all clients—large and small—advertise open jobs on public jobs boards.

Instant's recruiters are in charge of finding Instant's product, job seekers with IT skills, referred to by Instant as candidates. Instant's recruiters find candidates in much the same way Instant's sales people find clients: scouring online job boards such as Dice, Monster.com, CareerBuilder.com, personal networking through social networking sites like LinkedIn, and, on occasion, within Instant's own database of past candidates. Once an Instant recruiter locates a candidate, the recruiter often conducts a telephonic or Skype interview with the candidate to gather further information about the candidate's specific IT skills, preferred location, preferred salary, and past experience.

Like many businesses reliant on direct sales, Instant's business thrives on volume. The more points of contact with clients and candidates, the higher rate of billable placements. Instant's 2010 Employee Handbook advises new hires that "[the] job is not difficult," and that "[s]tarting out in this business is a numbers game." (JTX

8 at 0002123.) In order to achieve success, Instant stresses that sales people and recruiters "MUST be on the phone connecting with people to make things happen." (*Id.*) Given the nature of the work, direct sales businesses typically experience high rates of workforce turnover. Instant is no different. Instant lost 13 employees in 2009, 21 employees in 2010, 19 employees in 2011, and 9 employees during the first quarter of 2012. (DTX 9.) At any given time, Instant has between 25 and 40 employees. Since March 26, 2012, 77% of the 26 people employed by Instant on that date have left the firm. (*Id.*) Because neither sales nor recruiting require a high degree of technical skill beyond interpersonal skills and a strong work ethic, sales people and recruiters are replaceable. Each year, despite the turnover, Instant fills its ranks with new recruiters and sales people without significant disruption to its business.

**C. Instant's Business Data**
**\*10** Like every other IT staffing firm, Instant uses a database to aggregate information about its clients and candidates. Instant licenses a database product called SmartSearch, which is popular among recruiting and staffing firms. At the trial, Instant did not present an extract of its SmartSearch database or even a list of the populated fields. The Employee Defendants testified that SmartSearch typically contains the name of a client, contact information for a client's hiring manager, and certain information about a client's open IT positions. On the candidate side, SmartSearch typically contains past and prospective candidates' names and contact information, location preferences, IT skills, employment status, and occasionally some notes about recruiters' personal interactions candidates.

Instant's employees access Instant's network with a username and password unique to each employee. Once an employee is on Instant's network, however, he or she has free access to SmartSearch. Because Instant's sales people and recruiters need to access SmartSearch regularly throughout the day, any additional security measures would be inconvenient.

Instant also uses the information contained in SmartSearch to generate two key reports: a hotlist and a roll-off list.

**D. Instant's Candidate Hotlist**
Instant's hotlist or "hot candidate list" is a list of candidates who are ready to work or will be ready to work within 30 days. The hotlist also includes candidates who

2014 WL 1759184, 38 IER Cases 427

are not actively looking for a job but would entertain the "right" opportunity; these candidates are listed as "passive public" job seekers on the hotlist. (JTX 8 0002130.) The hotlist typically takes the form of a spreadsheet generated from the data stored in SmartSearch. Unlike SmartSearch, however, Instant presented a sample hotlist from August 2010 at the trial. (PTX 78.) The hotlist, as of August 2010, contained the following fields: 'Name', 'Skill Set', 'Contract, C2H, Perm.', 'Salary', 'Visa Status', 'Location', 'Date Available', 'Recruiter Name', 'Met in House Y/N', 'Date Entered', and 'Notes'. (*Id.*) The 'Notes' field in the August 2010 hotlist included short recruiter comments like "awesome personality," "10+ years of Java," "proven entity," and "trader stud." (*Id.*) Because the hotlist reflects candidates seeking jobs immediately or in the near future, a hotlist that is more than one or two months old is not useful for recruiters or sales people. Many of the candidates on an outdated hotlist have already found jobs or, if they have not, may not be attractive candidates.

### E. Instant's Candidate Roll–Off List
Instant's roll-off list is similar to the hotlist but pertains to temporary, or contract, workers. The roll-off list is a list of candidates previously placed by Instant in temporary positions. The list is generated from SmartSearch and contains the same fields as the hotlist. The roll-off list also includes the dates on which candidates' temporary assignments end, which is presumably when the candidates will need another contract job. Although Instant cannot always predict with certainty when a candidate's temporary assignment will end, having some estimate gives Instant a head start on competing IT staffing firms in search of skilled candidates.

The roll-off list, like the hotlist, becomes stale after one or two months. A candidate "rolling off" a temporary assignment does not remain available for long; in order to maximize their earning potential, candidates must minimize the time between jobs.

### F. Instant's Employees' Data Practices
With the exception of DeFazio, Instant did not typically provide its employees with laptops during the relevant time period. Consequently, in order to work from home, many employees—including the Employee Defendants—transferred copies of the active hotlist and roll-off list to USB thumb drives or emailed copies of the documents to themselves. Instant encouraged working from home on the nights and weekends, (JTX 8 0002124), and had no policy prohibiting employees from using

portable media to facilitate working remotely.

### G. Events of 2011 and 2012
**\*11** DeFazio joined Instant in 2003 and, for the majority of her tenure, was in charge of training and managing Instant's sales team. DeFazio's last title at Instant was Executive Vice President, Sales & Operations. In 2010, DeFazio and Borre agreed upon a phantom stock ownership plan, whereby DeFazio would receive five percent of cash proceeds if Borre sold Instant. (JTX 5; PTX 172 Ex. A.) DeFazio did not receive voting rights, a seat on Instant's board of directors, or any right to dividends. As stipulated by the parties, "Instant is [and was] wholly-owned by Borre." (Dkt. No. 266–1 ¶ 24.)

In February 2011, Instant hired Ms. Mirjana Schultz ("Schultz") as Instant's Chief Financial Officer. As 2011 progressed, Borre and Schultz decided to change Instant's operations and transition DeFazio's management duties to Schultz. In August 2011, because Instant was not on target to meet its revenue goals, Borre told DeFazio that she should focus on generating sales rather than managing the team. Although DeFazio agreed to spend more time on sales, she was not happy with the change. She enjoyed managing a team more than direct sales. In October 2011, DeFazio told Borre that she wanted to continue training and managing Instant's sales team. Borre refused and expressly told DeFazio in no uncertain terms that "she [was] no longer responsible for any operations of the firm." (JTX 2.)

On October 26, 2011, after she had been stripped of her management responsibilities, DeFazio received a LinkedIn message from Andrea Katz. DeFazio knew Andrea Katz from her time at Saffire, another IT staffing firm. Andrea Katz and her husband Joel Katz had years earlier founded Addison Search, another staffing firm, which they ultimately sold to a private equity firm. After they sold and left Addison Search, the Katzes started Brown Lab as an investment vehicle to re-enter the search business in Chicago. DeFazio had lunch with Andrea Katz in late October 2011 and met with Joel Katz for breakfast and lunch in November 2011. The Katzes told DeFazio that they planned to start a new IT staffing firm in Chicago and, if DeFazio were interested in leaving Instant, she would be a candidate to run the firm. By mid-December 2011, DeFazio had decided to leave Instant for the Katzes' new firm. Although Katz testified that he was still considering other candidates to run the new firm in late December, he and DeFazio toured potential office space together on December 14, 2011 and were in the final stages of negotiating DeFazio's Connect contract by the end of the month.

*Instant Technology, LLC v. DeFazio*, --- F.Supp.2d ---- (2014)

2014 WL 1759184, 38 IER Cases 427

At the same time, Bethany Meek, who was working for Instant as a recruiter in St. Louis, Missouri, was looking for a new job in the Chicago area. In December 2011, DeFazio put Meek in touch with the Katzes to discuss the new staffing firm. On December 29, 2011, Meek met with Joel Katz to discuss a position with the new firm. The same day, DeFazio sent Joel Katz an email discussing the details of her future compensation package at the new firm and stating "[I] hope we can also get the ladies on board w us, so [I] do not have to leave them behind." (PTX 150.) As stipulated, Rehn and Marker contacted Joel Katz to discuss his new venture between December 29, 2011 and December 30, 2011.

On January 1, 2012, as DeFazio and Aoun were preparing for a trip to Panama, Aoun accessed DeFazio's laptop. Aoun synchronized DeFazio's music with her phone and created a backup of her Microsoft Outlook email box, which he testified he had done every few months in the past. The backup of DeFazio's email was stored on the hard drive of her laptop as a .pst file, which is Outlook's default storage format.

**\*12** On January 3, 2012, Borre terminated DeFazio's employment with Instant for, among other reasons, "undermining" Borre and Instant. Borre spoke with Bauer the same day and after it became clear to Borre that Bauer was "not on board," Borre terminated Bauer as well. One day later, Borre spoke with Rehn about Instant's future and DeFazio's and Bauer's terminations. Borre determined from Rehn's "attitude and smugness" that Rehn "didn't want to have any part of the company." Borre terminated Rehn the next day. On January 5, 2012, following Borre's termination of three employees in three days, Marker resigned her employment with Instant. On January 6, 2012, Meek resigned as well. All of the Employee Defendants joined Connect after their termination or resignation from Instant.

### H. Instant's Investigation after Employee Defendants' Terminations and Resignations

Rebecca Rouhoff is an administrative assistant at Instant who is in charge of closing the user accounts of former employees. When an employee leaves Instant, it is and has been Rouhoff's responsibility to terminate the employee's network password and company credit cards. It is also Rouhoff's procedure to look through the former employee's email and calendar to ensure Instant does not miss any appointments with clients or candidates. On January 3, 2012, after Borre terminated DeFazio, Rouhoff looked through DeFazio's email and did not notice anything missing. During the second week of January

2012, after Borre instructed Rouhoff to look through DeFazio's email again for signs of misconduct, Rouhoff noticed that a large number of emails had been deleted from DeFazio's inbox. Although some of the emails remained in the Trash folder, some did not.

Rouhoff also testified that upon her post-resignation review of Meek's email, she discovered that Meek had deleted all of the emails in her inbox. Rouhoff discovered this because all of the emails appeared in the Trash folder of Meek's local copy of Outlook and remained accessible.

On January 10, 2012, Instant retained Wilke to conduct a forensic examination of the Employee Defendants' computers. Instant instructed Wilke to search for user activity between December 15, 2011 and January 2, 2012. Wilke picked up the Employee Defendants' computers from Instant on January 10, 2012, imaged the computers' hard drives, and returned the computers to Instant shortly thereafter. Wilke testified that based on his examination of DeFazio's computer, it had not been "booted," *i.e.,* turned on, since January 3, 2012.[5]

Wilke testified that his examination of DeFazio's computer revealed that someone using DeFazio's computer downloaded WinRAR, a compression software, on January 1, 2012. Wilke testified that a two files—12–12.pst and 12–12.RAR—existed on DeFazio's hard drive at some point between December 5, 2011 and January 10, 2012, but were no longer present on DeFazio's hard drive. Finally, Wilke testified that someone using DeFazio's computer between December 15, 2011 and January 10, 2012 accessed several spreadsheets stored on a thumb drive.

Wilke performed a similar examination of Rehn's computer. Wilke testified that on December 29, 2011 at approximately 10:00 a.m., someone plugged a thumb drive into Rehn's computer and accessed several files stored on the thumb drive. The files stored on the thumb drive included several spreadsheets, one of which was named Hot Candidates August 2010. Wilke also testified that someone using Rehn's computer accessed files on Instant's servers on December 29, 2011. Wilke's analysis did not reveal any evidence that files were transferred to the thumb drive from Instant's servers or Rehn's computer.

**\*13** Wilke's examination of Marker's computer revealed that someone using Marker's computer accessed a thumb drive on December 29, 2011. The thumb drive contained a number of documents, including the following: Candidates.xls, Potential Clients (email), Bob Padilla (email), Wall Street Journal (email), B–I Overview for

Instant.pdf, Trading Companies.xls, Career Search–Instant Technology.xls, Future Roll–Offs as of 3–17–11 for Distribution.xls, and Sales Leads March 201 1.xls. Wilke could not ascertain the contents of any of the documents, merely the document names. Wilke found no evidence that any of the files had been transferred from Marker's computer to the thumb drive.

Instant did not ask Wilke to determine whether Instant still had access to the documents stored on the thumb drives, nor did Instant grant Wilke access to its servers to search for copies of the documents stored on the thumb drives.

**I. Startup of Connect**

As stipulated, Connect was formed on January 4, 2012. On January 23, 2012, Instant filed this lawsuit against the Defendants. After the lawsuit commenced, the Defendants returned all of Instant's electronic and hard copy documents still in their possession. On February 27, 2012, Connect began operating as an IT staffing firm.

At the time Connect started operating, its database containing client and candidate information, which is similar to SmartSearch, was empty. Since that time, Connect has successfully placed job-seeking candidates at a number of current and former Instant clients, including the University of Chicago, CME Group, and Orbitz.

**III. Applications of Fact and Conclusions of Law**

**A. Employee Defendants' Alleged Breach of Employment Agreements (Count I)**

Instant asserted that each Employee Defendant breached the Non–Solicitation Covenant, Non–Recruitment Covenant, and Non–Disclosure Covenant (collectively, the "Restrictive Covenants") contained in her Employment Agreement. Instant argued each Employee Defendant violated her Non–Solicitation Covenant and Non–Recruitment Covenant by contacting Instant's clients, candidates, and employees in an effort to transfer Instant's clients, candidates, and employees to Connect. Instant further contended that each Employee Defendant breached her Non–Disclosure Covenant by misappropriating Instant's proprietary information. At the trial, the Employee Defendants did not dispute that, while operating as and for Connect, they contacted Instant's former clients, candidates, and employees in violation of the Non–Solicitation and Non–Recruitment Covenants; the Employee Defendants argued instead that both covenants are unreasonable based on the facts and

circumstances in this case. By contrast, the Employee Defendants argued they did not breach their Non–Disclosure Covenants because they returned all of Instant's information and did not disclose anything confidential. As set forth below, the court agrees. Although the Employee Defendants breached the Non–Solicitation and Non–Recruitment Covenants, those covenants are unreasonable and unenforceable. The court further finds that Instant failed to prove the Employee Defendants violated their Non–Disclosure Covenants.

**i. Inadequate Consideration for Restrictive Covenants**

Before trial, Defendants argued the Restrictive Covenants are not enforceable against Rehn, Marker, and Bauer because the restrictive covenants lack adequate consideration. Rehn, Marker, and Bauer were all employed by Instant for less than two years and received only their employment in exchange for their agreement to the Restrictive Covenants. Instant terminated Bauer on January 3, 2012 and Rehn on January 5, 2012. Marker resigned on January 5, 2012.

**\*14** [1] [2] In Illinois, before determining whether a restrictive covenant is reasonable, a court must determine: (i) whether the covenant is ancillary to a valid contract; and (ii) whether the covenant is supported by adequate consideration. *Fifield v. Premier Dealer Services, Inc.,* 373 Ill.Dec. 379, 993 N.E.2d 938, 942 (Ill.App.Ct. 1st Dist.2013) (citing *Lawrence & Allen, Inc. v. Cambridge Human Res. Grp., Inc.,* 292 Ill.App.3d 131, 226 Ill.Dec. 331, 685 N.E.2d 434, 440 (1997)). The traditional rule regarding contractual consideration is that a court need not inquire into the adequacy of the consideration to support a promise, merely that consideration existed. *Curtis 1000, Inc. v. Suess,* 24 F.3d 941, 945 (7th Cir.1994). Illinois courts, however, do not follow this traditional rule when analyzing restrictive employment covenants because the consideration—new or continued employment—may be illusory when the employment is at will, meaning the employee can be fired at any time. *Id.* at 945–46. In other words, the consideration is inadequate if the employee's employment can be terminated the minute after the employee agrees to the restrictive covenant. Accordingly, in Illinois, a restrictive covenant is supported by adequate consideration only if, after signing the covenant, an employee remains employed "for a substantial period of time beyond the threat of discharge." *Brown & Brown, Inc. v. Mudron,* 379 Ill.App.Ct. 724, 320 Ill.Dec. 293, 887 N.E.2d 437, 440 (2008) (internal citations omitted).

This court has reviewed and considered the *Montel Aetnastak, Inc. v. Miessen,* No. 13 C 3801, ––– F.Supp.2d ––––, 2014 WL 702322 (N.D.Ill. Jan. 28, 2014) opinion by Chief Judge Castillo, for whom this court holds great respect. This court, however, predicts the Illinois Supreme Court upon addressing the issue would not alter the doctrine established by the recent Illinois appellate opinions, which clearly define a "substantial period" as two years or more of continued employment. *See Fifield,* 993 N.E.2d at 943 ("Illinois courts have repeatedly held that there must be at least two years or more of continued employment to constitute adequate consideration in support of a restrictive covenant."); *see also Diederich Insurance Agency, LLC v. Smith,* 351 Ill.Dec. 792, 952 N.E.2d 165, 169 (Ill.App.Ct. 5th Dist.2011) (two years); *Lawrence & Allen,* 685 N.E.2d at 434 (two years); *Brown & Brown,* 887 N.E.2d at 440 (two years).

In *Fifield,* the Illinois Appellate Court for the First Judicial District affirmed the 2013 determination of then Cook County Circuit Judge, and now Illinois Appellate Justice, Mary Ann Mason. Citing several Illinois appellate opinions, the *Fifield* court reaffirmed the holdings in the recent Illinois appellate cases that the "substantial period of time" for an individual's employment required to support adequate consideration is two years or more. The Illinois Appellate Court in *Fifield* further held that the two-year requirement applies equally to factual situations where the restrictive covenant is part of a new employment offer and to those where an employer amends an existing employment relationship. *Fifield,* 993 N.E.2d at 943; *see also Curtis 1000,* 24 F.3d at 947 (rejecting distinction between pre- and post-hire covenants). At least two circuit courts in Cook County, Illinois have acknowledged and applied the bright line two-year rule reaffirmed in *Fifield. See Vapor 4 Life, Inc. v. Nicks,* No. 13 CH 14827, 2013 WL 6631082, at *1 (Ill.Cir.Ct. Dec. 3, 2013); *Klein Tools, Inc. v. Stanley Black & Decker, Inc.,* No. 13 CH 13975, 2013 WL 6149305, at *2 (Ill.Cir.Ct. Oct. 10, 2013).

[3]Bauer, Marker, and Rehn were all employed by Instant for less than two years. At the trial, Instant did not prove—or even argue—that Bauer, Marker, and Rehn received any additional compensation (other than their employment) in exchange for the Restrictive Covenants. Consequently, under Illinois law, the Restrictive Covenants are not enforceable against Bauer, Marker, or Rehn.

DeFazio and Meek, by contrast, were each employed by Instant for more than two years. Accordingly, the court need not inquire into the adequacy of consideration before assessing whether the Restrictive Covenants are enforceable against DeFazio and Meek.

## ii. Non–Solicitation Covenants in Employee Defendants' Agreements with Instant

### a. Non–Solicitation of Instant's Candidates

*15 [4]Instant claims that its Non–Solicitation Covenants prohibit former employees from soliciting (i) the candidates Instant has placed, or attempted to place with a client, and (ii) any client employer where Instant has placed a candidate or with whom Instant has a signed MSA. The plain language of each Non–Solicitation Covenants, however, only limits solicitation of "Instant's Serviced Clients." The Employment Agreement defines "Instant's Serviced Clients" as "any of Instant's Clients who have been serviced by Instant within three (3) years prior to the termination of Employee's employment with Instant...." (Employment Agreements at § 8.) At the trial, Borre stated that "Instant's Serviced Clients" include any client employer Instant has "billed or executed work for within the past three years," as well as any client employer with whom Instant has "a signed MSA." Borre also testified that Instant does not bill its job-seeking candidates, only its client employers. Instant's 2010 Employee Handbook described a "client" as "[a] company which has asked Instant Technology to locate personnel," (JTX 8 at 0002132), and a "job seeker" as "[a] candidate looking to better their employment opportunities," (JTX 8 at 0002129). Accordingly, Instant presented no evidence at trial that Instant's definition of clients, let alone "Instant's Serviced Clients," includes job-seeking candidates. Because each Non–Solicitation Covenant only limits solicitation of "Instant's Serviced Clients," the court finds that none of the Non–Solicitation Covenants prohibit the solicitation of any *candidates,* whether previously placed with an employer by Instant or not.

### b. Non–Solicitation of Instant's Clients

[5] [6] [7] [8] [9]By contrast, the plain language of Instant's Non–Solicitation Covenants expressly bars the solicitation of Instant's clients, which are defined by Instant as companies that have "asked Instant Technology to locate personnel." (JTX 8 at 0002132.) But the court's analysis does not, and under the law should not, end with the language of Instant's Non–Solicitation Covenants. In

Illinois, a restrictive covenant is enforceable only if it is reasonable based on the facts and circumstances of the individual case. *Reliable Fire Equip. Co. v. Arredondo,* 358 Ill.Dec. 322, 965 N.E.2d 393, 402 (2011). The Illinois Supreme Court has made it clear that courts considering the question should evaluate the reasonableness of such restrictive covenants under a "three dimensional rule of reason" holding that a covenant is reasonable only if it "(1) is no greater than is required for the protection of a legitimate business interest of the employer-promissee; (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public." *Reliable Fire,* 965 N.E.2d at 396 (internal citations omitted). Post-employment restraints like Instant's Non–Solicitation Covenants are "usually justified on the ground that the employer has a legitimate business interest in restraining the employee from appropriating the employer's (1) confidential trade information, or (2) customer relationships." *Id.* at 401. The existence of a legitimate business interest turns on the totality of the circumstances of each case. Factors the court may consider include, but are not limited to, "the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions." *Id.* at 403.

Generally, near-permanency of customer relationships "turns in large degree on the nature of the business involved, and certain businesses are just more amenable to success under it." *Lawrence & Allen, Inc.,* 685 N.E.2d at 444 (citing *Office Mates 5, North Shore v. Hazen,* 234 Ill.App.3d 557, 175 Ill.Dec. 58, 599 N.E.2d 1072, 1082 (1992)). "[A] near-permanent relationship is generally absent where the nature of the plaintiff's business does not engender customer loyalty by providing a unique product or personal service and customers utilize many suppliers simultaneously to meet their needs." *Id.* at 444.

[10]Based on the evidence presented at trial, Instant does not enjoy a near-permanent relationship with any of its clients. The IT staffing market is highly competitive. By nature and practice it is non-exclusive. Instant's own business documents reflect the fact that the companies Instant considers its clients typically use between five and ten different staffing firms simultaneously to fill their employment needs. (JTX 10 at 16.) Borre, in her candid recorded remarks, (DTX 10), acknowledged the staffing business is a "commoditized industry," based on sales, where clients ultimately use "people they like" to satisfy their staffing needs. (*Id.*) Although certain clients sign an MSA, an MSA merely qualifies a staffing company as a vendor with that client. An MSA does not guarantee that any IT staffing provider, such as Instant, will receive any

business from that company, let alone enjoy a "near permanent" client relationship with that company in connection with its IT staffing needs.

### c. *Instant's Purported Confidential Information*

**\*16** [11]Instant alleged that information related to its clients—such as the names of its clients, Instant's contact people at its clients, the services purchased by Instant, and the prices charged by Instant—constitutes confidential information that is not known or easily ascertainable by the general public. The evidence presented at trial, however, did not support Instant's position. The names of Instant's clients and the "services purchased," *i.e.,* the clients' IT hiring needs, are simply not confidential. To the extent that job openings or hiring needs are not publicly posted elsewhere, the information is readily attainable using Instant's traditional method: cold-calling and cold-emailing. Instant had no contractual arrangements with its clients that required Instant's clients to keep any such information, or information about Instant's candidates, confidential. No client would agree to such an arrangement because it would be inconsistent with the non-exclusive, competitive nature and practice in the industry, and would not be in any client's best interests.

Instant's information about job-seeking candidates is similarly not confidential. Candidates post their qualifications publicly on sites like LinkedIn, inform a number of different staffing firms that they are seeking employment, and provide each of those staffing firms with all of the information contained in Instant's SmartSearch database. Although certain information contained in the 'Notes' field of Instant's hotlist and roll-off list—such as the observation that a candidate has an "awesome personality" or is a "trader stud"—is not likely to appear on a resume or LinkedIn, other staffing firms harvest personality information the same way Instant does: by cold-calling the candidates.

Even if Instant's clients' hiring needs, candidates' credentials, or candidates' availability had been confidential at any point in time, and the court finds they were not, the information available during the Employee Defendants' employment with Instant is no longer useful. Clients' hiring needs and the pool of available applicants are far from static; they change constantly as clients fill open positions and job-seeking candidates find jobs. Thus, the information that was available to the Employee Defendants during their employment with Instant is now, two years later, out of date.

In light of the foregoing facts and circumstances, the court finds that Instant failed to prove by a preponderance of the evidence that Instant's Non–Solicitation Covenants with the Employee Defendants were not greater than required to protect Instant's legitimate business interests. Instant did not prove a "near-permanent" relationship between Instant and its clients, nor did Instant prove that the Employee Defendants gained access to non-public, confidential information during the course of their employment. Consequently, the court finds the restrictive Non–Solicitation Covenants are invalid and unenforceable.

This court's findings are consistent with past determinations by the Illinois appellate courts concerning restrictive covenants in the staffing industry. *See, e.g.,Lawrence & Allen, Inc,* 685 N.E.2d at 444 (holding covenants unenforceable because "the [staffing] industry is highly competitive, the identity of customers or clients is well known in the industry, employers rely heavily on their sales force, and customers satisfy their needs through cross-purchasing"); *Office Mates 5, North Shore,* 599 N.E.2d at 1082 (restrictive covenants are unenforceable when staffing firms "utilize basic sales techniques such as cold calls to make sales" and "[t]he identity of customers or clients are known by all in the industry").

### iii. Non–Recruitment Covenants in Employee Defendants' Agreements with Instant

The language of Instant's Non–Recruitment Covenants prohibits current or former Instant employees from persuading any employee to leave Instant's employ or breach their Employment Agreement with Instant. *See* Employment Agreements § 8(e). Instant contends that it needs the Non–Recruitment Covenants to maintain stability within its workforce, and that the covenants are reasonably tailored for that purpose.

**\*17** [12] [13] [14] [15]In certain circumstances, maintaining stability within an employer's workforce can be a legitimate business interest and thus the basis for a restrictive covenant. *See Pampered Chef v. Alexanian,* 804 F.Supp.2d 765, 781–86 (N.D.Ill.2011) (Cole, M.J.); *see also YCA, LLC v. Berry,* No. 03 C 3116, 2004 WL 1093385, at \*17–19 (N.D.Ill. May 7, 2004) (Leinenweber, J.) (holding non-recruitment clauses should be upheld only to the extent they prevent former employees from recruiting competitors' employees who possess confidential business information). But like any restrictive

covenant, the recruitment restrictions must be no greater than necessary to protect the interests at stake. *Reliable Fire,* 965 N.E.2d at 396. Although the necessity and reasonableness of the restrictions are dictated by the facts and circumstances of an individual case, blanket prohibitions are rarely necessary or reasonable. *Pampered Chef,* 804 F.Supp.2d at 787 (citing *YCA, LLC,* 2004 WL 1093385, at \*17–18). The business interest underlying this covenant must also be real—not merely aspirational. The "maintenance of a stable work force ... requires a work force that is stable in the first instance or at least one whose stability will likely result from the restrictive covenant." *Id.*

[16]Here, as a result of departures or terminations, Instant lost 13 employees in 2009, 21 employees in 2010, 19 employees in 2011, and 9 employees during the first quarter of 2012 (including the 5 Employee Defendants). Although neither Instant nor Defendants provided the total number Instant employees in any of those years, Instant currently has about 40 employees. Since March 26, 2012, nearly four months after the Employee Defendants left Instant, 77% of the 26 people employed at Instant on that date have left the firm. Instant's explanation for the substantial employee turnover rate—that it is the result of the Employee Defendants' departures—does not square with Instant's high employee turnover before and after the Employee Defendants' departures. The reality is that Instant's business relies on a high volume of direct sales, which is a business model traditionally characterized by "massive" turnover. *See, e.g.,Pampered Chef,* 804 F.Supp.2d at 788 (summarizing historic turnover in direct sales industries).

Instant's historic turnover rate is inconsistent with a finding that Instant's Non–Recruitment Covenants are necessary to maintain a stable work force. To the contrary, the evidence presented at trial proved that Instant's Non–Recruitment Covenants have been wholly ineffective as a means to maintain workforce continuity. The absence of any other basis to justify such covenants, as well as the absence of any place or time restrictions—the covenants prohibit solicitation of former employees everywhere and in perpetuity—render Instant's Non–Recruitment Covenants unreasonable and unenforceable.

### iv. Non–Disclosure Covenants in Employee Defendants' Agreements with Instant

[17]Instant alleged that the Employee Defendants violated the Non–Disclosure Covenants by disclosing Instant's

"proprietary property" to individuals outside of the firm without Instant's consent. The Employment Agreement defines "proprietary property" as:

> information regarding the business, procedures, activities and services of Instant or Instant's Clients, including but not limited to, memoranda; files; programs; clients account and customer lists; information about and notes regarding customers, candidates and consultants and their reserves (placed, active and inactive); costs and prices of Instant; client needs, requirements and business affairs; records; manuals; computer data and reports ...

(Employment Agreements § 7(a).)

As a threshold matter, Instant did not prove at the trial that any of the Employee Defendants disclosed any of Instant's Proprietary Property to individuals outside of Instant. Instant retained Wilke, a computer forensics expert, to investigate the Employee Defendants' computers after the Employee Defendants had left Instant by termination or resignation. Wilke testified that DeFazio's computer contained evidence that, at some point before her termination, DeFazio created a backup of Instant emails and stored the backup on her laptop. Wilke did not find the backup information when he examined DeFazio's computer after her termination. Wilke also testified that Rehn and Marker, while employed by Instant, accessed certain files stored on thumb drives, which were plugged into their computers. Wilke did not testify regarding what information was contained in these files, nor did Wilke testify that Rehn or Marker disclosed the files stored on the thumb drives after they left Instant. In other words, with regard to Rehn and Marker, Wilke's testimony established one point: Rehn and Marker used a thumb drive to store Instant files during the course of their employment with Instant.

*18 In January 2012, immediately after Instant filed this lawsuit and before Connect began operating on February 27, 2012, the Employee Defendants returned all of Instant's documents and data still in their possession, including any documents on thumb drives. The return of these materials to Instant was consistent with and satisfied the Employee Defendants' obligations under section 7(b) of their respective Employment Agreements. At the trial, Instant did not prove—or even argue—that the Employee Defendants retained any of the Instant documents stored

on thumb drives. Instant at trial did not prove that the Employee Defendants used any of Instant's information while operating as Connect. In fact, at the start of operations, Connect's internal database of clients and candidates was empty. Because Instant failed to prove that the Employee Defendants disclosed or even retained any of Instant's Proprietary Property, the court finds the Employee Defendants did not violate their respective Non–Disclosure Covenants.

**B. Defendants' Alleged Violation of Illinois Trade Secrets Act (Count II)**

Instant claims that Defendants violated the Illinois Trade Secrets Act ("ITSA") by actual or threatened misappropriation of Instant's "Confidential Information." (Am. Compl. ¶ 93.) Instant defines "Confidential Information" as:

> Instant keeps records for each client, candidate and third party supplier, including, among other things, the client's, candidate's and supplier's addresses and telephone numbers, the names of the client and supplier contacts, the candidate's resume, and other information unique to the client, candidate and third party supplier. All of this information is not known by third parties outside of Instant and cannot be compiled and organized through public sources. Accordingly, this information is proprietary and confidential to Instant (the "Confidential Information").

(Am. Compl. ¶ 24.)

[18] [19]Under Illinois law, a party pursuing an action under the ITSA must prove that it possessed and preserved trade secrets and that the defendant misappropriated those secrets, as defined by the provisions of the ITSA. *See, e.g., Applied Indus. Materials Corp. v. Brantjes,* 891 F.Supp. 432, 437 (N.D.Ill.1994) (Holderman, J.). The ITSA defines a trade secret as information that is not "generally known to other persons." 765 ILCS 2(d)(1). Moreover, "it is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets." *Composite Marine Propellers, Inc. v. Van Der Woude,* 962 F.2d 1263, 1266 (7th Cir.1992).

[20]The second prong of the ITSA, misappropriation, occurs by improper acquisition, unauthorized disclosure, or unauthorized use. 765 ILCS 1065/2(b); *Lumenate Techs., LP v. Integrated Data Storage, LLC*, No. 13 C 3767, 2013 WL 5974731, at *5 (N.D.Ill. Nov. 11, 2013) (St. Eve, J.) (citations omitted). Misappropriation by improper acquisition requires acquisition by improper means, which the ITSA defines as "theft, bribery, breach of inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means." 765 ILCS 1065/2(a). Misappropriation by unauthorized disclosure or unauthorized use requires a defendant to use the alleged trade secrets or disclose them to others "for purposes other than serving the interests of" the owner of the trade secrets. *Lumenate Techs.*, 2013 WL 5974731, at *4 (citations omitted).

[21] [22]As discussed above, none of the client or candidate information maintained by Instant is secret. The identity of Instant's clients, the clients' hiring needs, and the qualifications of Instant's candidates are not secrets. Information regarding open positions is often available publicly, is provided to Instant's competitors by Instant's clients, and is provided by Instant to potential candidates Instant would like to place. The identity, qualifications, and availability of Instant's candidates are published on public job boards and known by Instant's competitors, who are often trying to place the same candidates. Under Illinois law, where information is generally known to others who could benefit from using it, the information is not a trade secret. *See, e.g.,Mangren Research & Dev. Corp. v. National Chem. Co.,* 87 F.3d 937, 943 (7th Cir.1996). In this case, Instant's clients, candidates, and competitors all have access to the information Instant claims is secret and they can all benefit from the information. Consequently, because Instant failed to prove that any of its purportedly confidential information is actually secret and not readily ascertainable by its competitors or the public at large, it cannot sustain a claim under the ITSA.

*19 [23]Even if Instant's client and candidate information were secret (which the court has found it is not), Instant did not prove that Defendants misappropriated any of its information. Like many workers, Instant's employees used thumb drives to store and transport documents. At the time, the Employee Defendants were authorized to access the documents stored on the thumb drives. When the Employee Defendants left Instant, through resignation or termination, the Employee Defendants did not immediately return every Instant thumb drive in their possession. Upon Instant's request, however, the Employee Defendants returned all of Instant's thumb drives, data, and documents before Connect opened for business. There was no proof presented at trial of any unauthorized disclosure and, consequently, no misappropriation by the Employee Defendants within the meaning of the ITSA.

## C. DeFazio's and Connect Defendants' Alleged Tortious Interference with Contract (Count III)

Because the court finds the Restrictive Covenants unenforceable, Instant's claim for tortious interference with contract against DeFazio, Joel Katz, Andrea Katz, and Connect also fails. Instant claimed that DeFazio, the Katzes, and Connect wrongfully and unjustifiably interfered with the relationships by causing DeFazio, Rehn, Marker, Meek, and Bauer to: (a) solicit and do business with Instant's clients and candidates on behalf of Connect; and (b) take, disclose and/or misappropriate Instant's confidential information. (Am.Compl.¶ 99.)

[24]In Illinois, the elements necessary for tortious interference with contract are: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.,* 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 676 (1989).

[25]As set forth above, Instant failed to satisfy the threshold element: a valid and enforceable contract. Since the Restrictive Covenants are not valid or enforceable, they cannot serve as the underlying basis for Instant's tortious interference with contract claim.

## D. Employee Defendants' Alleged Breach of Fiduciary Duty (Count IV)

[26]Instant alleged that the Employee Defendants, while they were employed by Instant, breached their fiduciary duties to Instant, which included

> devoting their full working time and efforts to Instant, refraining from forming and operating Connect Search and competing against Instant, soliciting Instant's clients, candidates, suppliers, and employees on behalf of Connect Search, diverting Instant

Technologies corporate opportunities, sabotaging Instant's computer systems, and stealing Instant's Confidential Information and/or obtaining and misusing such Confidential Information.

(Am. Compl. ¶ 104.) Instant also alleged that the Employee Defendants continue to breach their fiduciary duties by unlawfully and unfairly competing with Instant as part of Connect. (*Id.* ¶ 105.)

At the trial, Instant presented evidence that DeFazio, while employed by Instant, met with Joel and Andrea Katz to discuss forming Connect and subsequently toured potential office space for Connect. Instant stipulated, however, that Connect did not commence its business activities until February 27, 2012, nearly two months after all of the Employee Defendants left Instant. (Dkt. No. 266–1 ¶ 58.) Instant did not prove or argue that any of the Employee Defendants solicited Instant's clients or candidates before leaving Instant, nor did Instant prove that the Employee Defendants engaged in any activities in competition with Instant during their employment.

The Employee Defendants were entitled to prepare Connect to do business as long as they did not actually compete with Instant. *See Voss Engineering, Inc. v. Voss Industries, Inc.,* 134 Ill.App.3d 632, 89 Ill.Dec. 711, 481 N.E.2d 63, 66 (1985) ("[a]n employee may legitimately go so far as to form a rival corporation and outfit it for business while still employed by the prospective competitor") (citing *Lawter International, Inc. v. Carroll,* 116 Ill.App.3d 717, 72 Ill.Dec. 15, 451 N.E.2d 1338, 1349 (1983)). Although the Employee Defendants were not permitted to exceed "such preliminary competitive activities and commence business as a rival concern while still employed,"*id.,* Instant did not prove that the Employee Defendants engaged in any conduct beyond "preliminary activities" or actually competed with Instant during their employment.

**\*20** [27]Instant dedicated considerable time at the trial to questioning the other Employee Defendants about DeFazio's efforts to recruit them for Connect while she was employed by Instant. Absent the Non–Recruitment Covenants, which this court has found unenforceable, there exists no fiduciary duty precluding DeFazio from soliciting Instant's employees. As a general rule, in Illinois, only a corporate officer can be held liable for soliciting employees for a new venture. *Nicor Energy v. Dillon,* No. 03 C 1169, 2003 WL 21698422, at *3 (N.D.Ill. July 30, 2003) (Zagel, J.) (citing *Smith–Shrader Co. v. Smith,* 136 Ill.App.3d 571, 91 Ill.Dec. 1, 483

N.E.2d 283, 288 (1985); *Hagshenas v. Gaylord,* 199 Ill.App.3d 60, 145 Ill.Dec. 546, 557 N.E.2d 316, 324 (1990)). Instant did not prove that DeFazio was a corporate officer. First, although DeFazio's title was "Executive Vice President of Sales and Operations of Instant Technology," a mere title is not sufficient. In order to be considered an officer, DeFazio must have performed "significant managerial and supervisory responsibilities for the operation of the ... office." *Id.* (quoting *Aon Risk Services, Inc. of Ill. v. Shetzer,* No. 01 C 7813, 2002 WL 1989466, at *4 (N.D.Ill. Aug. 27, 2002) (Conlon, J.)). On October 4, 2011, before Andrea Katz contacted DeFazio about a new venture, Borre made clear to DeFazio that she was "no longer responsible for any operations of the firm." (JTX 2.) Second, Instant cannot rely on DeFazio's phantom stock plan—which did not confer an equity interest or voting rights or create a fiduciary duty owed by Borre to DeFazio—to fashion an inverse fiduciary duty owed by DeFazio to Borre. Accordingly, the court finds that neither DeFazio nor any other Employee Defendant violated any fiduciary duty during the course of their employment by engaging in preliminary activities to outfit Connect or by soliciting Instant's employees to join Connect.

[28]The court also finds that the Employee Defendants did not violate any fiduciary duties after their employment with Instant ended. Under Illinois law, absent a valid post-employment restrictive covenant, "once an employee leaves the service of an employer, he ceases to owe that employer a fiduciary duty and is free to compete with his former employer." *Jostens, Inc. v. Kauffman,* 842 F.Supp. 352, 354 (C.D.Ill.1994) (citing *Prudential Ins. Co. v. Sempetrean,* 171 Ill.App.3d 810, 121 Ill.Dec. 709, 525 N.E.2d 1016, 1020 (1988)). Although the Employment Agreements contain post-employment restrictive covenants, the court has found that they are invalid and unenforceable. Consequently, the Employee Defendants owed no fiduciary duty, and thus breached no duty, to Instant after their employment terms ended.

### E. Employee Defendants' Alleged Violation of the Computer Fraud and Abuse Act (Count V)

Instant claims that the Employee Defendants violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, by accessing Instant's computer systems, damaging Instant's computer systems, misappropriating Instant's confidential information, and deleting data from Instant's computer systems.

[29]To state a claim for a violation of the CFAA, a plaintiff must prove: "(1) damage or loss; (2) caused by; (3) a violation of one of the substantive provisions set forth in §

1030(a); and (4) conduct involving one of the factors in § 1030(c)(4)(A)(i)(I)-(V)." *Cassetica Software, Inc. v. Computer Sciences Corp.,* No. 09 C 0003, 2009 WL 1703015, at *3 (N.D.Ill. June 18, 2009) (Kendell, J.). The "underlying concern of the [CFAA] is damage to data and ... the statute was not meant to cover the disloyal employee who walks off with confidential information." *Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Int'l,* 616 F.Supp.2d 805, 813 (N.D.Ill.2009) (Hibbler, J.) (quoting *Kluber Skahan & Assocs. v. Cordogan, Clark & Assocs., Inc.,* No. 08 C 1529, 2009 WL 466812, at *8 (N.D.Ill. Feb. 25, 2009) (Zagel, J.)) (internal quotations omitted).

[30]Instant claims the Employee Defendants "damaged" its computer systems. The CFAA defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). Courts in this district have consistently interpreted "damage" under the CFAA to include "the destruction, corruption, or deletion of electronic files, the physical destruction of a hard drive, or any diminution in the completeness or usability of the data on a computer system." *See, e.g., Farmers Ins. Exch. v. Auto Club Grp.,* 823 F.Supp.2d 847, 852 (N.D.Ill.2011) (Holderman, J.) (collecting cases). By contrast, downloading or emailing information is not enough to satisfy the damage requirement of the CFAA. *Id.*; *see also Motorola v. Lemko Corp.,* 609 F.Supp.2d 760, 769 (N.D.Ill.2009) (Kennelly, J.) ("The only harm [plaintiff] has alleged is the disclosure to a competitor of its trade secrets and other confidential information. The CFAA's definition of damage does not cover such harm....")

*21 [31]At trial, Instant proved that Bethany Meek's deleted all of the emails in her inbox directly before her resignation from Instant. Instant admitted, however, that it did not lose access to Meek's email. Meek's emails, after she deleted them, remained in two places: (i) her email trash folder and (ii) on Instant's exchange server. Because Instant did not show that any data was lost or impaired, Instant cannot sustain a claim for "damage" under the CFAA.

[32]Although Instant did not allege any "loss" in its Amended Complaint, the court must consider whether Instant can recover for its purported "damages" under the "loss" provision of the CFAA. The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18

U.S.C. § 1030(e)(11). A split has emerged among courts in this district concerning the proper construction of "loss" under the CFAA. *Compare Farmers Ins. Exch.,* 823 F.Supp.2d at 854 ("[A] plaintiff can satisfy the CFAA's definition of loss by alleging costs reasonably incurred in responding to an alleged CFAA offense, even if the alleged offense ultimately is found to have caused no damage as defined by the CFAA.") (citations omitted), *with Von Holdt v. A–1 Tool Corp.,* 714 F.Supp.2d 863, 875–76 (N.D.Ill.2010) (Manning, J.) (requiring "damage to the computer or computer system" before a plaintiff can prove "loss" under the CFAA). Courts in this district consistently agree, however, that "[c]osts not related to computer impairment or computer damages are not compensable under the CFAA."*SBS Worldwide, Inc. v. Potts,* No. 13 C 6557, 2014 WL 499001, at *9 (N.D.Ill. Feb. 7, 2014) (Holderman, J.) (quoting *Farmers Ins. Exch.,* 823 F.Supp.2d at 855) (additional citations omitted); *see also Cassetica Software,* 2009 WL 1703015, at *4 ("With respect to 'loss' under the FCAA, other courts have uniformly found that economic costs unrelated to computer systems do not fall within the statutory definition of the term."); *CustomGuide v. CareerBuilder, LLC,* 813 F.Supp.2d 990, 998 (N.D.Ill.2011) (Holderman, J.) (finding plaintiff failed to state a CFAA claim by failing to allege "any facts connecting its purported 'loss' to an interruption of service of its computer systems").

[33]Instant hired Wilke to conduct an examination of the Employee Defendants' computer "activity" between December 15, 2011 and January 2, 2012. If Instant retained Wilke to investigate data impairment or loss, the cost of Wilke's services might be compensable as a loss under the CFAA. Instant, however, hired Wilke to assist Instant's counsel in Instant's lawsuit against Defendants. Wilke testified that he was not granted access to Instant's servers, which would have been necessary to determine whether Instant had permanently lost the files stored on the thumb drives the Employee Defendants briefly retained after their employment ended. On these facts, the court finds Instant failed to establish that Wilke's examination was for the purpose of assessing impairment or loss of data.[6]

## F. Defendants' Alleged Tortious Interference with Business Expectancies (Count VI)

*22 [34] [35]Instant's Amended Complaint alleges Instant "maintained valid business relationships with many clients, candidates and third parties, and had a reasonable expectation that its relationships with those clients, candidates and third party suppliers would continue." (Am. Compl. ¶ 116.) Under Illinois law, to prove a case

of tortious interference with a business expectancy, a plaintiff must show: (i) the plaintiff's reasonable expectation of entering into a valid business relationship; (ii) the defendant's knowledge of the plaintiff's expectancy; (iii) purposeful interference by the defendant that causes the plaintiff's expectations to remain unfulfilled; and (iv) that the defendant's interference has resulted in damages to the plaintiff. *Delloma v. Consolidation Coal Co.,* 996 F.2d 168, 170–71 (7th Cir.1993). To satisfy the first element of tortious interference, a plaintiff must specifically identify the customers who "actually contemplated entering into a business relationship with [the plaintiff]." *Celex Group, Inc. v. Executive Gallery,* 877 F.Supp. 1114, 1126 n. 19 (N.D.Ill.1995) (Castillo, J.). Merely providing proof of a past customer relationship is not sufficient to prove a "reasonable expectation" of a business relationship in the future. *Id.* at 1124.

[36]As the court discussed earlier, the IT staffing industry is highly competitive. The evidence at trial showed Instant's clients used multiple staffing firms, their own company websites, and public job boards to solicit applicants for open positions. Accordingly, the fact that clients used Instant in the past provides no guarantee that they will do so in the future, or that Instant will win the business given the opportunity. As discussed earlier, when a client includes Instant in its network of IT staffing firms, Instant ultimately wins the business only 10 percent of the time. At the trial, Instant presented evidence that Connect has solicited—and in some cases won—business from a number of companies from which Instant has collected fees between 2009 and 2011. Instant did not, however, provide any evidence demonstrating a reasonable expectation of business from any of its clients in the future. Instead, Instant relied solely on proof of past relationships with its clients, which is not sufficient to create a "reasonable expectation" of future business under Illinois law. *Id.* at 1124.

Because Instant failed to prove sufficiently the threshold element of tortious interference with a business expectancy—a reasonable expectation of future business from a specific client—the court finds that Instant failed to prove that any of the Defendants tortuously interfered with a business expectancy.

## G. Defendants' Alleged Civil Conspiracy (Count VII)

[37] [38]Instant's final claim alleged a civil conspiracy among Defendants to use and misappropriate Instant's "Confidential Information, and damage Instant's computer systems." (Am. Compl. ¶¶ 123–24.) In order to prove a claim of civil conspiracy, Instant must show that

Defendants had an agreement to accomplish "either an unlawful purpose or a lawful purpose by unlawful means" and that each of the defendants "knowingly and voluntarily participated in a common scheme to commit an unlawful act or a lawful act in an unlawful manner." *Mosley v. City of Chicago,* 614 F.3d 391, 399–400 (7th Cir.2010). "The function of the conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted, or encouraged the wrongdoer's act." *Adcock v. Brakegate, Ltd.,* 164 Ill.2d 54, 206 Ill.Dec. 636, 645 N.E.2d 888, 894 (1994).

[39]Because the court finds that Instant failed to prove any of the torts alleged in its Amended Complaint—misappropriation of trade secrets, interference with contract, or interference with a business expectancy—there is no underlying tort for which Instant may "extend" liability. Thus, like Instant's tort claims, Instant's civil conspiracy claim fails as well.

## H. DeFazio's Counterclaim for Alleged Breach of Agreement and Violation of Illinois Wage Payment and Collection Act

[40]Defendant DeFazio asserted a counterclaim against Instant for breach of agreement and violation of the Illinois Wage Payment and Collection Act, 820 ILCS 115. (Dkt. No. 54.) DeFazio alleged to have earned a bonus for 2011 in the amount of $42,000, which Instant was allegedly obligated to pay DeFazio by December 30, 2011. On December 30, 2011, Instant paid DeFazio only $10,000 and declined to pay the remainder of DeFazio's allegedly earned bonus after her termination on January 3, 2012.

**\*23** At the trial, DeFazio presented a letter dated December 17, 2010 (the "Compensation Letter") from Borre to DeFazio. (JTX 5.) The Compensation Letter summarizes DeFazio's "proposed 2011 compensation package," and is signed by both Borre and DeFazio. DeFazio alleged that under the terms of the Compensation Letter, she was entitled to a $42,000 bonus for her work in 2011. (*Id.*)

The first section of the Compensation Letter, titled "Sales Goal," outlines a revenue goal and a net income goal for Instant to reach in 2011. Instant's revenue goal was $21.75 million and Instant's net income goal for 2011 was $1.3 million. (*Id.*) Directly under the $1.3 million net income goal, there are three sub-bullets: (1) "Revenue (50%)"; (2) "Net income (35%)"; and (3) "Perm Division must achieve 600K in gross revenue (15%)." (*Id.*) Although the percentages associated with each sub-bullet sum to 100%, it is not clear how the sub-bullets relate to

the $1.3 net income goal. At the trial, DeFazio contended that the sub-bullets, notwithstanding their placement under the $1.3 million net income goal, actually reflect the percentage of the total bonus attributable to revenue, net income, and "perm division" gross revenue.

The second section of the Compensation Letter, titled "Salary and Performance Bonus," outlines DeFazio's base salary and quarterly salary bumps contingent upon Instant meeting its quarterly goals for gross revenue, GPM, and net income. (*Id.*) The Compensation Letter defines the quarterly goals for gross revenue, but is silent on GPM and net income. (*Id.*) As one would expect, the gross revenue goal for the fourth quarter is $21.75 million, which is equal to the annual revenue goal stated in the preceding "Sales Goal" section. At the end of the "Salary and Performance Bonus" section, the Compensation Letter provides for an additional performance bonus. The Compensation Letter states: "You are eligible for $120,000 in performance bonus when Instant Technology achieves the above stated company revenue and net income goals. This bonus will be paid on December 30, 2011." (*Id.*)

At the trial, both DeFazio and Borre agreed that the $120,000 bonus, although set out in the "Salary and Performance Bonus" section of the Compensation Letter, was contingent upon Instant meeting the revenue and net income goals outlined in the "Sales Goal" section. In 2011, Instant fell short of its $21.75 million revenue goal, but reached its $1.3 million net income goal. Accordingly, consistent with the percentages outlined in the "Sales Goal" section, DeFazio argued that she was entitled to 35% of $120,000, or $42,000. Borre testified that the bonus was contingent upon Instant reaching both its revenue and net income goals. As Borre noted at trial, the language of the Compensation Letter states that Instant must achieve the revenue *and* the net income goals, not one or the other. Because Instant did not reach both goals in 2011, Borre declined to pay a performance bonus.[7]

In light of the ambiguity in the Compensation Letter and the lack of clarification at trial, the court cannot determine

(a) whether the percentages listed under "2011 net income goal" actually reflect the framework for the $120,000 bonus mentioned in the following section of the letter, or (b) whether the Compensation Letter provides for a partial bonus based on the percentages. DeFazio, who bears the burden of proof, did not present any other evidence at trial to support her claim to the bonus. Consequently, the court finds that DeFazio failed to prove by a preponderance of the evidence that she is entitled to the remainder of her allegedly earned $42,000 bonus.

## IV. Conclusion

**\*24** For the reasons stated above, the court determines based on the evidence presented at the April 2014 trial that Instant failed to meet its burden to prove any of the counts alleged in Instant's First Amended Verified Complaint. Instant withdrew its request for injunctive relief. Instant failed to prove the Employee Defendants breached their Employment Agreements with Instant (Count I) or their fiduciary duties to Instant (Count IV). Instant also failed to prove that any of the Defendants violated the Illinois Trade Secrets Act (Count II) or the Computer Fraud and Abuse Act (Count V), or that any of the Defendants committed any common law torts (Counts III and VI) or participated in a civil conspiracy (Count VII). The court also finds that DeFazio is not entitled to the remainder of the 2011 bonus she is seeking, but DeFazio need not return what she was given. The court directs the Clerk to enter judgment in favor of Defendants on all of Instant's claims and in favor of Instant on DeFazio's counterclaim. The court requests the parties to seek to resolve amicably any issues they may have regarding costs or fees. Civil case terminated.

## Parallel Citations

38 IER Cases 427

Footnotes

1    Instant withdrew Raimonde as a witness at the trial before he could complete his testimony about the projected losses Instant alleged were attributable to Defendants' conduct.

2    Consistent with the IT industry terminology, the court in this opinion refers to IT job seekers as "candidates" and companies seeking to fill IT positions as "clients."

3    Because the parties requested non-certified, real-time transcription of the proceedings during the trial and because a certified transcript of the trial proceedings has not been requested or prepared as of the date of this opinion's issuance, the court cannot include trial transcript citations in this opinion.

4    Borre's trial testimony was to the contrary. The court credits Borre's videotaped remarks in DTX 10 and discredits her trial testimony because during her trial testimony, Borre had several incentives to prevaricate and her demeanor on the stand evinced that she was not always forthcoming with the truth, despite being under oath.

5    Based on Wilke's testimony that his examination of DeFazio's computer revealed it had not been booted between January 3, 2012 and January 10, 2012, the court discredits Rouhoff's testimony. Rouhoff testified at the trial that she examined DeFazio's computer, the second time, sometime between January 3, 2012 and January 10, 2012. Rouhoff's alleged examinations would have required her to "boot" DeFazio's computer on two separate occasions between January 3 and January 10, which Wilke's examination showed did not occur.

6    Instant also did not present evidence relating to Wilke's fee, which would have been important for an estimate of "loss" under the CFAA.

7    Borre did not explain the basis for the $10,000 bonus Instant actually paid to DeFazio.

---

**End of Document**     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit H

2014 WL 4344307
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.

KJ Korea, Inc., d/b/a Health Korea, and Young Ki
Eun, individually, Plaintiffs,
v.
Health Korea, Inc., and Kay Park, individually,
Defendants.

CASE NO.: 13 CV 6902 | Signed September 2, 2014

**Synopsis**
**Background:** Health-product company brought action
against competitor for trademark infringement and unfair
competition under Lanham Act and state law. Competitor
moved to dismiss for failure to state claim.

**Holdings:** The District Court, Robert M. Dow, Jr., J., held
that:

[1] company adequately alleged its "HEALTH KOREA"
marks acquired secondary meaning and thus were
protectable, as required to state claims for trademark
infringement and unfair competition;

[2] company adequately alleged likelihood of consumer
confusion; and

[3] company was not required to negate fair use affirmative
defense in complaint.

Motion denied.

**Attorneys and Law Firms**

John Kahn Park, Park Law Firm, Los Angeles, CA,
Samuel S. Bae, Law Office of Samuel S. Bae, Des
Plaines, IL, for Plaintiffs.

Chol M. Yang, Law Office of Chol M. Yang, John
Michael Brom, Querrey & Harrow, Ltd., Chicago, IL, for
Defendants.

**MEMORANDUM OPINION AND ORDER**

Robert M. Dow, Jr., United States District Judge

**\*1** Plaintiffs KJ Korea, Inc. ("KJ Korea") and Young Ki
Eun filed their complaint against Defendants Health
Korea, Inc. ("Health Korea") and Kay Park, alleging
Trademark Infringement (Count I) and Unfair
Competition (Count II) under the Lanham Act; Unfair
Competition in violation of Illinois's Uniform Deceptive
Trade Practices Act (Count III); Unfair Competition in
violation of Illinois's Consumer Fraud and Deceptive
Business Practices Act (Count IV); Common Law
Trademark Infringement (Count V); Common Law Unfair
Competition (Count VI); and Unjust Enrichment (Count
VII). Defendants move for dismissal under Federal Rule
of Civil Procedure 12(b)(6) on all counts. For the reasons
stated below, the Court denies Defendants' motion to
dismiss [16] in its entirety.

**I. Background[1]**
The complaint alleges that, since 2008, Plaintiffs have
sold nutritional supplements, massage instruments, and
other health products in association with three marks, all
of which read "Health Korea" in Korean or both Korean
and English. See Compl. at ¶ 15.[2]

Plaintiffs allege that they own the first mark,

# "헬스 코리아,"

under the Lanham Act. Compl. at ¶¶ 13, 15; Exh. A. This
mark is registered in the Supplemental Register of the
U.S. Patent and Trademark Office ("U.S.P.T.O") with a
Registration Number of 3,968,033 (hereafter "the ' 033
Mark"). Compl. at ¶¶ 13, 15; Compl. Exh. A.
The complaint alleges that Plaintiffs own the second
mark, "HEALTH KOREA," under Illinois common law.
Compl. at ¶ 15. This mark has no pending application or
registration with the U.S. P.T.O. See *id.*

The complaint further alleges that Plaintiffs own the third
mark,

# 헬스코리아
## HEALTH KOREA

, under Illinois common law. *Id.* at ¶¶ 14, 15. This mark is allegedly in the application stage before the U.S. P.T.O. with a Serial Number 86040691 (hereafter, the " ′691 Mark"). *Id.*

Plaintiffs allege that, since 2008, they have sold goods and services, including massage apparatuses and nutritional supplements, in association with the three marks in California, where they now own four retail stores. *Id.* at ¶ 16. Plaintiffs allege that, since May 2009, they have spent more than one million dollars advertising these goods and services in association with their three marks in Chicago and nationwide through various television channels, including but not limited to The Asia

Network, Inc., SBS International, and Television Korea 24, Inc. *Id.* at ¶¶ 17–18. According to the complaint, plaintiffs have sold and shipped goods, including massagers and nutritional supplements, with these three marks to various retailers and distributors in Chicago since at least as early as November 2011. *Id.* at ¶ 19. They allege that, as a result of five continuous years of advertising, sales and promotions of goods and services associated with the three marks, all three marks have acquired secondary meaning in the United States. *Id.* at ¶ 20.

**\*2** Plaintiffs allege that Defendants have knowingly violated Plaintiffs' rights to the three marks in two ways. First, they have allegedly operated a retail store named and labeled



in Chicago since 2013. *Id.* at ¶ 36. Second, Defendants have allegedly published newspaper advertisements displaying the English words "HEALTH KOREA." *Id.* at ¶ 37.

Plaintiffs allege that, prior to opening the store in Cook County, Defendant Kay Park visited two of KJ Korea's retail stores in Los Angeles. *Id.* at ¶¶ 27–28. While in the stores, she allegedly observed Plaintiffs' three marks in connection with massagers and nutritional supplements as well as the store layout, the display and merchandise arrangement, and the store ambiance. *Id.* During subsequent conversations between Defendant Kay Park and KJ Korea's marketing director, Defendant Kay Park allegedly stated that she had learned of "HEALTH KOREA" through televised advertisements on SBS in Chicago and that her research showed that the mark "HEALTH KOREA" was well recognized and popular in

the Korean community. *Id.* at ¶¶ 30–31. According to Plaintiffs, she stated that any products and services bearing the "HEALTH KOREA" trademark/service mark would be successful and stated that she therefore intended to use the mark in her new store. *Id.*

The complaint alleges that KJ Korea's marketing director "clearly told Defendant Kay Park that she cannot use the trademark 'HEALTH KOREA' in any form" and that the ′033 Mark was federally registered trademark. *Id.* at ¶ 32. Plaintiffs further allege that the marketing director sent an e-mail to the same effect on July 29, 2013. *Id.* On August 14, 2013, Defendant Kay Park allegedly replied to the e-mail, stating that she nevertheless intended to name her new business "HEALTH KOREA" and that she would not remove the storefront sign marked with this same name. *Id.* at ¶ 34. Plaintiffs allege that the marketing director replied via e-mail that same day, again stating

that Defendant Kay Park "cannot use 'HEALTH KOREA' " and requesting that she "not open the new retail store using the mark 'HEALTH KOREA.' " *Id.* at ¶ 35.

Plaintiffs allege that their attorney sent a letter demanding that Defendants cease and desist from using infringing marks that would likely cause confusion with Plaintiffs' registered ′033 Mark and its common law trademarks. *Id.* at ¶ 37. They allege that Defendants ignored the letter, that they continue to use at least one infringing mark with full knowledge of Plaintiffs' federal and common law rights, and that they are knowingly and intentionally trading on Plaintiffs' goodwill and reputation. *Id.* at ¶¶ 39–40.

The complaint further states that Plaintiffs "have evidence of actual confusion since the Defendants' use of allegedly infringing marks." *Id.* at ¶ 41. The complaint itself does not, however, include this evidence. Plaintiffs additionally allege that they have and will continue to suffer damages given Defendants' intent to continue the infringing acts. *Id.* at ¶¶ 43–46.

Plaintiffs claim that these activities violate their rights to the three marks under the Lanham Act, state unfair competition statutes, and Illinois common law. Specifically, Plaintiffs claim Trademark Infringement under 15 U.S.C. § 1114 (Count I); Unfair Competition under 15 U.S.C. § 1125 (Count II); Unfair Competition in violation of Illinois's Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1 (Count III); Unfair Competition in violation of Illinois's Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 (Count IV); Common Law Trademark Infringement (Count V); Common Law Unfair Competition (Count VI); and Unjust Enrichment (Count VII). Defendants move to dismiss Plaintiffs' complaint under Federal Rule of Civil Procedure Rule 12(b)(6).

## II. Legal Standard On Motion To Dismiss

**\*3** **[1]**The purpose of a Rule 12(b)(6) motion to dismiss is not to decide the merits of the case; a Rule 12(b)(6) motion tests the sufficiency of the complaint. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir.1990). As previously noted, reviewing a motion to dismiss under Rule 12(b)(6), the Court takes as true all factual allegations in Plaintiff's complaint and draws all reasonable inferences in his favor. *Killingsworth*, 507 F.3d at 618. To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such

that the defendant is given "fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir.2007) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955) (ellipsis in original). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir.2011); *cf.Scott v. City of Chi.*, 195 F.3d 950, 952 (7th Cir.1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole.").

## III. Analysis

Each of the claims at issue in this motion involves the same elements and proofs. See *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 619 (7th Cir.1993) (holding that the elements of a state unfair competition claim mirror those of federal statutory trademark infringement); *Spex, Inc. v. Joy of Spex, Inc.*, 847 F.Supp. 567, 579 (N.D.Ill.1994) (citing *Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 908 (7th Cir.1983) (holding that "[c]laims for unfair competition and deceptive business practices [involving trade names] brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act," and noting that "Illinois courts look to federal case law and apply the same analysis to state infringement claims," including claims of unfair competition under Illinois common law); *Trans Union LLC v. Credit Research, Inc.* 142 F.Supp.2d 1029, 1038 (N.D.Ill.2001) (citing *AHP Subsidiary Holding Co.*, 1 F.3d at 619) (interpreting claims of trademark infringement under 15 U.S.C. § 1114, unfair competition under 15 U.S.C. § 1125, unfair trade practices under the Illinois Uniform Deceptive Trade Practice Act and Illinois Consumer Fraud and Deceptive Business Practices Act, as well as trademark infringement and unfair competition claims under Illinois common law to involve the same elements). Because the unjust

enrichment claim is based on trademark infringement, the Court evaluates this claim under the same standard.

[2]To state a claim for trademark infringement and unfair competition under all of these theories, a plaintiff must allege that: (1) it has a protectable right in the asserted trademarks; and (2) the defendant's use of the mark is likely to cause confusion. *CAE, Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, 673–74 (7th Cir.2001); *Packman v. Chicago Tribune Co.,* 267 F.3d 628, 638 n. 8 (7th Cir.2001).

Defendants agree that these elements apply to all claims except a claim of common law unfair competition (Count VI). Defs.' Mot. to Dismiss at 6. Specifically, Defendants argue that under *Wilson v. Electro Marine Systems, Inc.,* 915 F.2d 1110 (7th Cir.1990), "the common law of unfair competition is 'elusive', its elements 'escaping definition,' " and that unfair competition covers "conduct that 'shocks judicial sensibilities' and 'violates standards of commercial morality.' " *Id.* (citing *Wilson* 915 F.2d at 1118).

*4 *Wilson* explains that "[u]nfair competition originally was an extension of trademark law, and was limited to circumstances in which a competitor was 'passing off' or 'palming off' the product of another as his own." *Wilson,* 915 F.2d at 1118. In *International News Service v. Associated Press,* the Supreme Court "expanded the parameters of unfair competition beyond 'palming off' by refusing to 'concede that the right of equitable relief is confined to that class of cases.' " *Id.* (citing 248 U.S. 215, 241–42, 39 S.Ct. 68, 63 L.Ed. 211 (1918)). *Wilson* noted that, as the body of case law expanded, the elements of *non-trademark* related unfair competition remained "elusive." *Id.* In language that Defendants cite, the Seventh Circuit noted that, "[n]evertheless, a body of law has evolved around the theory that at times business competitors engage in activity which, while perhaps not actionable under other commercial tort theories, so 'shock[s] judicial sensibilities' or violates 'standards of commercial morality' that it cannot be tolerated." *Id.* citing (*Margarete Steiff, Inc. v. Bing,* 215 F. 204 (S.D.N.Y.1914); *People ex rel. Mosk v. Nat'l Research Co.,* 201 Cal.App.2d 765, 20 Cal.Rptr. 516 (3d Dist.1962)). Given that the theory of unfair competition before it was not trademark-related, the Seventh Circuit in *Wilson* evaluated the claim keeping this and a variety of other "admittedly subjective standards [from the Supreme Court, the Second Circuit and New York state courts] in mind." *Id.* at 1119.

The Court disagrees that the standard for Plaintiffs' common law trademark-related unfair competition claim

is whether the Defendants' activity "shocks judicial sensibilities" or "violates standards of commercial morality." First, both the Seventh Circuit and the Northern District of Illinois have interpreted claims of unfair competition brought under a trademark infringement theory to include the same elements of trademark infringement itself. See *Gimix, Inc.* 699 F.2d at 901; *AHP Subsidiary Holding Co.,* 1 F.3d at 619; *Spex, Inc.,* 847 F.Supp. at 579; and *Trans Union LLC,* 142 F.Supp.2d at 1038; see also *Thompson v. Spring–Green Lawn Care Corp.,* 126 Ill.App.3d 99, 113, 81 Ill.Dec. 202, 466 N.E.2d 1004 (Ill.App.Ct.1984) (noting that "the same set of facts and circumstances may be used to support a claim for both trademark infringement and unfair competition, and a finding in favor of the former claim typically results in a finding for the latter"). Second, *Wilson* is inapposite; to the extent that it even applied this standard, it did so in the context of an unfair competition claim that was unrelated to trademark infringement—the traditional focus of unfair competition law.

Defendants' arguments for dismissal fall within three general categories. They argue, first, that Plaintiffs lack a protectable right in the asserted trademarks; second, that Defendants' marks are unlikely to cause confusion with Plaintiffs' marks; and, third, that Defendants should prevail under a fair use defense. None of these arguments prevail at this stage of the litigation.

## A. Protectable Right

A plaintiff can allege that its mark is protectable in several ways. First, it can allege that the mark is registered in the U.S. P.T.O.'s Principal Register. Registration of a mark in the Principal Register is "prima facie evidence of the validity of the registered mark[s] * * *, of the owner's ownership of the mark[s], and of the owner's exclusive right to use the registered mark[s] in commerce on or in connection with the goods * * * specified in the certificate * * *." 15 U.S.C. § 1057(b).

[3]By contrast, a mark registered in the Supplemental Register is not entitled to this presumption of validity because it is only "capable" of becoming a trademark. 15 U.S.C. § 1094. Similarly, where a mark is unregistered with the U.S.P.T.O, "the burden is on the claimant * * * to establish that it is entitled to protection under § 43(a) of the Lanham Act." *Platinum Home Mortg. Corp. v. Platinum Fin. Group, Inc.,* 149 F.3d 722, 727 (7th Cir.1998) (citing *Mil–Mar Shoe Co., Inc. v. Shonac Corp.,* 75 F.3d 1153, 1156 (7th Cir.1996)).

[4]Where a mark is registered in the Supplemental Register or is unregistered, a Plaintiff may state a claim for

**KJ Korea, Inc. v. Health Korea, Inc., --- F.Supp.2d ---- (2014)**

2014 WL 4344307

trademark infringement and unfair competition by showing that the mark is protectable based on the degree of its distinctiveness. The level of trademark protection available generally corresponds to the distinctiveness of the mark. *Platinum Home Mortg. Corp.,* 149 F.3d at 727 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 767–68, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

**\*5** [5] [6]Marks are classified into five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful. *Platinum Home Mortg. Corp.,* 149 F.3d at 727 (citing *Two Pesos, Inc.* 505 U.S. at 767–68, 112 S.Ct. 2753). A generic term is "one that is commonly used and does not identify any particular source and, therefore, is not entitled to any trademark protection." *Id.* (citing *Liquid Controls Corp. v. Liquid Control Corp.,* 802 F.2d 934, 936 (7th Cir.1986). A descriptive mark " 'describes the ingredients, qualities, or characteristics of an article of trade or a service.' " *Id.* (citing *Liquid Controls Corp.* 802 F.2d at 936 (quoting *M.B.H. Enters. v. WOKY, Inc.,* 633 F.2d 50, 54 (7th Cir. 1980))). Generally, "it is not protected as a trademark because a merely descriptive mark is a poor means of distinguishing one source of services from another.' " *Id.* (citations and quotations omitted).

[7] [8] [9]A descriptive mark may, however, receive trademark protection if it acquires "secondary meaning in the collective consciousness of the relevant community." *Id.* (citations and quotations omitted). Secondary meaning is "a *mental association* in buyers' minds between the alleged mark and a single source of the product." *Packman,* 267 F.3d at 641. It exists when a mark "has been used so long and so exclusively by one company in association with its goods or services that the word or phrase has come to mean that those goods or services are the company's trademark." *Id.* Secondary meaning can be established through "direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market, and evidence of intentional copying." *Id.* (citation omitted).

[10]Finally, suggestive, arbitrary, or fanciful marks are "automatically entitled to trademark protection because they are inherently distinctive." *Id.* (citing *Two Pesos,* 505 U.S. at 767–68, 112 S.Ct. 2753).

[11]Defendants seek dismissal by arguing that Plaintiffs' marks are merely descriptive. In arguing that the '033 Mark is not protectable, for example, Defendants contend that "[t]he words health and Korea merely describe the quality of the goods being sold by Plaintiffs * * * * [and] it would be unfair for Plaintiffs to be awarded exclusive use of health and Korea to describe the goods they are selling to the exclusion of all other business that likewise seek to sell Korean health related products and supplements." Defs.' Mot. to Dismiss at 4. Defendants additionally argue that Plaintiffs' allegations "do not establish any secondary meaning." *Id.* at 6.

Plaintiffs' allegations regarding protectability are sufficient to survive Defendants' motion to dismiss. The complaint expressly alleges that its marks have developed secondary meaning. Compl. at ¶ 20. Its relevant factual allegations fall under two of the seven ways of demonstrating secondary meaning listed above. See *Packman,* 267 F.3d at 641.

First, the complaint addresses the amount and manner of advertising; it alleges that, over the last five years, the three marks have acquired secondary meaning through the promotion and sale of associated goods and services nationwide and through advertisements online and on at least three Korean television channels, which have cost over one million dollars. Compl. at ¶¶ 18, 20. Second, the complaint also alleges intentional copying; it states that Defendant Kay Park told KJ Korea's marketing director that she had learned of " 'HEALTH KOREA' through televised advertisements on SBS in Chicago, that her research showed that the mark "HEALTH KOREA" was well recognized and popular in the Korean community, that she believed any products and services bearing the "HEALTH KOREA" trademark/service mark would be successful, and that she therefore intended to use the mark in her new store. *Id.* at ¶¶ 30–31.

**\*6** These allegations regarding protectability provide "fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson,* 551 U.S. at 93, 127 S.Ct. 2197 (citing *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955) (ellipsis in original). They are also sufficient to raise the possibility of relief above the "speculative level," assuming they are true. *E.E.O.C.,* 496 F.3d at 776 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). To the extent that Defendants argue that these allegations are insufficient to establish protectability, their argument is premature and more appropriate to a motion for summary judgment.

**B. Likelihood of Causing Confusion**

Courts in the Seventh Circuit analyze the likelihood of confusion under a seven-factor test: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6)

actual confusion; and (7) intent of the defendant to "palm off" his product as that of another." *Packman,* 267 F.3d at 643. "No single factor is dispositive, and courts may assign varying weights to each of the factors depending on the facts presented, although, in many cases, the similarity of the marks, the defendant's intent, and actual confusion are particularly important." *Id.*

[12]The complaint includes facts relating to all but the fourth factor. Viewed together, these factual allegations are sufficient to raise the possibility of relief above the "speculative level." *E.E.O.C.,* 496 F.3d at 776 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). With respect to the first factor—similarity between marks—the complaint contends that two of Plaintiffs' three marks and both of Defendants' allegedly infringing marks include the English words "Health Korea." Compl. at ¶¶ 14, 36, 37. The complaint also alleges that the English translation of the ′033 Mark is "Health Korea." Compl. at ¶ 9. In other words, it alleges that Plaintiffs' and Defendants' marks all share the same meaning (if not somewhat identical appearance).

[13]Defendants argue that the marks are not similar because the ′033 Mark is exclusively in Korean, while Defendants' allegedly infringing marks are only in English. However, courts compare marks "in light of what happens in the marketplace, not merely by looking at the two marks side-by-side." *Id.*; *Ty, Inc. v. Jones Grp., Inc.,* 237 F.3d 891, 898 (7th Cir.2001) (internal citations and quotations omitted). Although Defendants' argument may have merit in a future phase of litigation, this argument does not warrant dismissal under Rule 12(b)(6). The factual allegations in the complaint analyzed above under the first factor are sufficient to raise the possibility of relief above the "speculative level." *E.E.O.C.,* 496 F.3d at 776 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955).

[14]In examining the second factor—similarity between the products—courts ask "whether the products are the kind the public attributes to a single source." *Ty, Inc.,* 237 F.3d at 899. The complaint addresses this factor by alleging that both Plaintiffs and Defendants produce nutritional supplements, massage apparatuses, and health food products in association with their respective marks. Compl. at ¶¶ 12, 19, 26, 50.

[15]Under the third factor—area and manner of concurrent use—courts assess "whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." *Ty, Inc.,* 237 F.3d at 900 (internal citations and quotation marks omitted). Courts may consider "the relative geographical distribution areas * * * whether there exists evidence of direct competition

between the products * * * whether the products are sold to consumers in the same type of store * * * whether the products are sold in the similar section of a particular store * * * and whether the product is sold through the same marketing channels." *Id.*

*7 The complaint addresses this factor by alleging that both Plaintiffs and Defendants sell their products, including nutritional supplements, in the Chicagoland area. Specifically, it alleges that Plaintiffs have advertised their products nationwide, including in Chicago, through several Korean television stations and online. Compl. at ¶ 17. It also alleges that Plaintiffs have sold and shipped goods, including nutritional products, to retailers and distributors in Chicago since at least as early as November 2011. Compl. at ¶ 19. Lastly, it alleges that Defendants have operated a retail store selling similar nutritional products in Chicago since August 2013. Compl. at ¶¶ 26, 36, 37,40.

[16] [17]In evaluating the fifth factor—strength of the plaintiff's mark—courts examine "the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular * * * source." *Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 464 (7th Cir.2000). "Although evidence of actual confusion, if available, is entitled to substantial weight in the likelihood of confusion analysis, this evidence is not required to prove that a likelihood of confusion exists." *CAE, Inc.,* 267 F.3d at 685 (citations omitted). Plaintiffs allege that, over the last five years, their marks have acquired secondary meaning through the promotion and sale of associated goods and services nationwide and through more than one million dollars-worth of advertisements—an allegation that suggests an increasingly strong mark. Compl. at ¶¶ 18, 20.

[18] [19]Under the sixth factor—actual confusion—courts look to "the confusion of reasonable and prudent consumers, and not confusion among sophisticated members of * * * industry." *Platinum Home Mortgage Corp.,* 149 F.3d at 729. The complaint alleges that Plaintiffs "have evidence of actual confusion" without providing any specific facts. Defendants emphasize this lack of specific facts showing actual consumer confusion in arguing for dismissal. However, the absence of factual allegations demonstrating actual confusion is not dispositive of the likelihood of confusion. *Packman,* 267 F.3d at 643 ("No single factor is dispositive, and courts may assign varying weights to each of the factors depending on the facts presented"); *CAE, Inc.,* 267 F.3d at 685 ("Although evidence of actual confusion, if available, is entitled to substantial weight in the likelihood of confusion analysis, * * * this evidence is not required to

prove that a likelihood of confusion exists") (citations omitted). Moreover, in a complaint, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Erickson,* 551 U.S. at 93, 127 S.Ct. 2197 (citing *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955) (ellipsis in original).

[20]Under the seventh factor—intent of the defendant to "palm off" his product as that of another—courts "look[ ] primarily for evidence that the defendants are attempting to 'pass off' their products as having come from the plaintiff." *Packman,* 267 F.3d at 644. Plaintiffs allege that Defendant Kay Park told KJ Korea's marketing director that she had learned of " 'HEALTH KOREA' through televised advertisements on SBS in Chicago, that her research showed that the mark "HEALTH KOREA" was well recognized and popular in the Korean community, that she believed any products and services bearing the "HEALTH KOREA" trademark/service mark would be successful, and that she therefore used the mark in her new store, despite Plaintiffs' multiple objections. *Id.* at ¶¶ 3 0–31.

[21]Defendants additionally argue that confusion is unlikely because the parties have distinct markets, product lines, and advertising channels. First, Defendants argue that, aside from nutritional supplements, the parties' product lines are generally distinct; they argue that the complaint does not allege that Defendants sell "the exact same goods and services as Plaintiffs." Defendants misconstrue this aspect of the likelihood of confusion test. Plaintiffs need not allege that both businesses sell identical goods and services. They need only allege that the commonly sold products are similar enough that "the public attributes [these products] to the same source." *Ty, Inc.,* 237 F.3d at 899.

*8 Second, the motion to dismiss contends that Plaintiffs' and Defendants' markets are distinct; Plaintiffs' stores are located in California while Defendants' store is located in Chicagoland. This argument ignores Plaintiffs' allegations that they advertise nationwide and ship their products to Chicago. To the extent that Defendants argue that Plaintiffs' presence in the Chicago market is insufficient to make confusion likely, their argument goes to the sufficiency of the proof rather than the sufficiency of the pleading and is better suited to a motion for summary judgment.

Lastly, Defendants seek dismissal by arguing that Plaintiffs fail to allege that they have sold products bearing Plaintiffs' marks. Rather, Plaintiffs allege that Defendants' store name and label allegedly infringes

Plaintiffs' marks.

Defendants cite no case law in emphasizing the distinction between marking a store name as opposed to products. Moreover, this argument ignores fundamental principles underlying trademark law, which the Seventh Circuit characterizes as follows:

> Trademarks help consumers to select goods. By identifying the source of the goods, they convey valuable information to consumers at lower costs. Easily identified trademarks reduce the costs consumers incur in searching for what they desire, and the lower the costs of search the more competitive the market. A trademark also may induce the supplier of goods to make higher quality products and to adhere to a consistent level of quality. The trademark is a valuable asset, part of the "goodwill" of a business. If the seller provides an inconsistent level of quality, or reduces quality below what consumers expect from earlier experience, that reduces the value of the trademark. The value of a trademark is in a sense a "hostage" of consumers; if the seller disappoints the consumers, they respond by devaluing the trademark. The existence of this hostage gives the seller another incentive to afford consumers the quality of goods they prefer and expect.

*Scandia Down Corp. v. Euroquilt, Inc.,* 772 F.2d 1423, 1429–30 (7th Cir.1985) (footnote omitted).

[22] [23]In other words, the likelihood of confusion test focuses not on whether the parties sell products bearing the same mark, but whether the parties' use of those marks will confuse consumers as to the *source* of goods and services. Trademark law aims to avoid confusion regarding source because it would increase consumers' search costs, reducing market demand, and disincentivize suppliers from investing in quality, creating a less competitive market. An infringing mark on store signage or in newspaper advertisements could create just as much consumer confusion as an infringing mark physically imprinted on a product itself. Accordingly, this distinction

does not justify dismissal.

**c. Fair Use Defense**

[24]Defendants argue for the first time in their reply brief that they should prevail under a fair use defense. "[A] plaintiff is not required to negate an affirmative defense in his complaint." *Tregenza v. Great Am. Commc'ns Co.,* 12 F.3d 717, 718 (7th Cir.1993) (citing *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980)).

Accordingly, the Court declines to dismiss the complaint on fair use grounds.

**III. Conclusion**

For the foregoing reasons, the Court denies Defendants' motion to dismiss all counts [16].

Footnotes

1    For the purposes of Defendant's motions to dismiss, the Court assumes as true all well-pleaded allegations set forth in the amended complaint. See *Killingsworth v. HSBC Bank Nevada, N.A.,* 507 F.3d 614, 618 (7th Cir.2007).

2    At times Defendants characterize Plaintiffs' claims as involving two marks rather than three; the complaint alleges three so the Court assumes for purposes of this opinion that there are three marks at issue.

---

End of Document                 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.    8

# Exhibit I

2015 WL 149062
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Medscript Pharmacy, LLC, Plaintiff,
v.
My Script, LLC; Khader David Pharmacy Services,
LLC; Ziad Khader; Neil Patel; Nikhil Patel; and
Daniel Leben, Defendants.
My Script, LLC; Khader David Pharmacy Services,
LLC; Ziad Khader; Neil Patel; Nikhil Patel; and
Daniel Leben, Counter–Plaintiffs,
v.
Medscript Pharmacy, LLC, Counter–Defendant.

No. 14 C 0469 | Signed January 12, 2015

**Attorneys and Law Firms**

Mark Daniel Roth, Orum & Roth, LLC, Chicago, IL, for
Plaintiff/Counter–Defendant.

Thadford A. Felton, Courtney A. Adair, David Benjamin
Goodman, Greensfelder, Hemker & Gale, P.C., Marilyn
McCabe Reidy, Johnson & Bell, Ltd., Chicago, IL, for
Defendants/Counter–Plaintiffs.

*AMENDED MEMORANDUM OPINION AND
ORDER*

Robert W. Gettleman United States District Judge

**\*1** Plaintiff Medscript Pharmacy, LLC (Medscript) has
brought a nine-count amended complaint against
defendants My Script, LLC (My Script), Khader David
Pharmacy Services, LLC d/b/a Valuscript (Valuscript),
and Patel Khader, LLC (Khader LLC), Ziad Khader, Neil
Patel, Nikhil Patel, and Daniel Leben (collectively
Non–Pharmacy Defendants). Count I alleges false
advertising pursuant to the Lanham Act (15 U.S.C. §
1125). Count II alleges a violation of the Illinois Uniform
Deceptive Trade Practices Act (IUDTPA) (815 ILCS §
510, *et seq.*). Count III alleges tortious interference with
prospective economic advantage. Count IV alleges a
violation of Florida Deceptive and Unfair Trade Practices
Act (FDUTPA) (Fla. Stat. § 501.201 *et seq.*). Count V
(mislabeled "Count IV") alleges common law unfair
competition. Count VI alleges unjust enrichment. Count
VII alleges conversion. Count VIII alleges civil
conspiracy. Count IX alleges a violation of the Illinois
Pharmacy Practice Act (225 ILCS 85, *et seq.*).

Defendants have moved to dismiss all counts pursuant to
Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon
which relief can be granted. All defendants assert that the
amended complaint: (1) violates Fed. R. Civ. P. 9(b)
because the counts based on averments of fraud (I, II, III,
IV, VIII) are not pled with specificity; (2) violates Fed. R.
Civ. P. 8(a) by failing to give notice to defendants of the
claims and relief sought against them; (3) cannot allege
the factual elements necessary to prevail on the claims
asserted in each count; (4) disguises Health Insurance
Portability and Accountability Act (HIPAA) claims and
that counts based on those claims fail because HIPAA
provides no private right of action and Medscript does not
have standing to assert claims based on the rights of third
parties[1]; and (5) cannot assert claims based on use of the
patient list at issue because it was given to
Non–Pharmacy Defendants without restriction.
Additionally, My Script moves to dismiss Count IV
(FDUTPA) because it asserts that it is in compliance with
Florida law and Count IX because Medscript has no
standing to bring the claim. For the reasons discussed
below the defendants' motions to dismiss are granted in
part and denied in part.

**FACTS[2]**
Plaintiff Medscript is a Professional Compounding
Centers of America (PCCA) certified compounding
pharmacy with its principal place of business in Illinois.
Defendant My Script is a compounding pharmacy with its
principal place of business in Michigan. Defendant
Valuscript is also a compounding pharmacy with its
principal place of business in Indiana. Non–Pharmacy
Defendants (Khader LLC, Neil Patel, Nikhil Patel,
Khader, and Leben) are former owners and members of
Medscript. Khader is a member of Khader LLC. Leben,
Khader, and Neil Patel are members of My Script. Khader
is also a member of Valuscript.

**\*2** On December 31, 2013, Non–Pharmacy Defendants
sold their interests in Medscript to Maryam Alrazzaq.
Pursuant to the sale, Medscript provided Non–Pharmacy
Defendants with a patient list, containing patients'
protected health information, to allow Non–Pharmacy
Defendants to verify the amount of payments they would
receive from Medscript post-closing.[3] By January 21,
2014, Non–Pharmacy Defendants had given the patient
list to My Script and Valuscript to market My Script and

Medscript Pharmacy, LLC v. My Script, LLC, --- F.Supp.3d ---- (2015)

2015 WL 149062

Valuscript and to induce prescribers to fill prescriptions with My Script and Valuscript rather than Medscript. Medscript alleges that the use of the patient list for marketing purposes violates HIPAA.

Upon receiving the patient list, employees or agents of My Script began calling Medscript's patients and telling them one of two false statements: (1) Medscript was out of business and My Script was taking over its patients and would fill the patients' prescriptions, and (2) Medscript had changed its name to My Script, and My Script would fill the patients' prescriptions going forward. My Script also made these false statements to prescribers. The result was that many patients and prescribers believed these statements to be true. My Script further falsely advertised itself as a PCCA certified pharmacy. Additionally, My Script used the patient list to contact and fill prescriptions for patients in Illinois, where it is not licensed to fill prescriptions.

My Script also offered ownership interests to physicians in Florida, where Medscript and My Script are both licensed. The Florida physicians accepted ownership interest, creating a kickback scheme in which physicians are rewarded for referring patients to My Script.

Upon receiving the patient list, Valuscript began sending patients unauthorized prescriptions that were supposed to be filled by Medscript, and which patients had not ordered from Valuscript. Valuscript then billed the patients' insurance carriers for the prescriptions.

My Script and Valuscript also sent their representatives prescription pads to give to prescribers that had Medscript's name on them but My Script's and Valuscript's fax numbers. The result was that prescribers believed they were filling prescriptions with Medscript but were unknowingly filling them with My Script and Valuscript.

### LEGAL STANDARD

Defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. The purpose of such a motion is to test the sufficiency of the complaint, not rule on its merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.1990). When considering the motion, the court accepts as true all well-pleaded factual allegations and draws all reasonable inference in plaintiff's favor. *McMillan v. Collection Professionals, Inc.*, 455 F.3d 754, 758 (7th Cir.2006). The complaint must plead sufficient

facts to plausibly suggest that plaintiff has a right to relief and raise that possibility above the speculative level. *Bell Atlantic Co. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

### DISCUSSION

**A. Fed. R. Civ. P. 9(b) Heightened Pleading Standard**
Defendants argue that Medscript has failed to plead the claims based on fraud with specificity as Fed. R. Civ. P. 9(b) requires, noting that Counts I, II, III, IV, and VIII are based on allegations of fraud. Defendants correctly identify that these counts require a heightened pleading standard because the counts allege that defendants engaged in fraudulent conduct, including that My Script made false statements to Medscript's patients and prescribers and My Script and Valuscript attempted to pass themselves off as Medscript by using the prescription pads. *See Platinumtel Communications, LLC v. Zefcom, LLC*, 2008 WL 5423606 (N.D.Ill. December 30, 2008) (claims of fraud alleging violations of the Lanham Act and the IUDTPA are subject to the heightened pleading standard of Rule 9(b)); *PharMerica Chicago, Inc. v. Meisels*, 772 F.Supp.2d 938, 955 (N.D.Ill.2011) (claims sounding in fraud that allege tortious interference with prospective economic advantage are subject to the heightened pleading standard of Rule 9(b)); *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir.2007) (a civil conspiracy count based on fraud required the heightened pleading standard of Rule 9(b)).

**\*3** Under Fed. R. Civ. 9(b), the amended complaint must allege "the who, what, when, where, and how" of the fraudulent conduct. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990). This standard does not require extreme specificity. In *Heffernan v. Bass*, 467 F.3d 596, 601 (7th Cir.2006), the Seventh Circuit deemed the complaint sufficient when it identified the person who made the misrepresentation and an inexact description of the time, place, and content (the complaint stated only that the time was late August or early September).

Defendants argue that Medscript's amended complaint fails because it does not plead what was actually said, to whom the representations were made, who engaged in the conduct, what conduct occurred, or how the fraud was accomplished. However, the amended complaint pleads that My Script employees made the statements and what was said: (1) Medscript was out of business and My Script was taking over its patients and would fill the

patients' prescriptions, and (2) Medscript had changed its name to My Script, and My Script would fill the patients' prescriptions going forward. Medscript also alleges that My Script and Valuscript passed themselves off as Medscript by using the prescription pads. The amended complaint further asserts that the representations were made to Medscript's patients and prescribers beginning January 2014 and that the conduct was accomplished through the defendants' use of the patient list. These assertions are sufficient under Rule 9(b).

Defendants also move to dismiss because Medscript pleads on information and belief its assertions that many patients and prescribers were duped into believing that Medscript is now My Script or that patients now must fills their prescriptions through My Script. To plead fraud on information and belief, plaintiff must satisfy two elements: (1) the facts constituting fraud are not accessible to plaintiff; and (2) plaintiff provides grounds for his suspicions that make the suspicions plausible. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir.2011). When a plaintiff is unable to attain specific information before filing a complaint, it is permitted to plead on information and belief. *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 948 (7th Cir.2013). In the instant case, Medscript states that because the names of Medscript patients whom My Script called are solely within My Script's knowledge at this stage, it is permitted to plead on information and belief. Therefore Counts I, II, III, and IV meet the heightened pleading standard required by Rule 9(b).

Count VIII (civil conspiracy), however, is not pled with sufficient particularity. To sufficiently plead a claim of civil conspiracy, a plaintiff "must eventually establish: (1) an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means; and (2) at least one tortious act by one of the coconspirators in furtherance of the agreement that caused an injury to the plaintiff." *Borsellino*, 477 F.3d at 509. In *Borsellino*, the Seventh Circuit affirmed the district court's dismissal of the plaintiff's conspiracy claim based on claims of fraud because the complaint told nothing of the nature of the purported agreement to defraud, such as when the agreement was made or who arranged the conspiracy. *Id.* Similarly, in the instant case, Medscript merely concludes that all defendants engaged in a conspiracy to commit the torts of unfair competition, intentional interference with Medscript's prospective economic advantage, conversion, and violations of Illinois and Florida law, but does not provide any factual detail about the alleged agreement, thus failing to satisfy Rule 9(b).

**\*4** Accordingly, the defendants' motions to dismiss the claims based on fraud for failing to be pled with specificity are denied for Counts I, II, III, and IV, and granted for Count VIII.

**B. Fed. R. Civ. P. 8(a) Notice**
Medscript's amended complaint alleges nine counts against some or all of defendants. Defendants assert that the amended complaint fails to put them on notice of which claims are alleged against them. In the complaint, a plaintiff is required to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 544, 127 S.Ct. 1955.

Reading the amended complaint, is it clear that Counts I, II, IV (unfair competition), and VI are alleged against My Script and Valuscript. To the extent that these counts are alleged against Non–Pharmacy Defendants, they are dismissed for failure to provide notice.

Counts III, VII, and VIII are alleged against all defendants.

Counts IV (FDUTPA) and IX are alleged only against My Script. To the extent they are alleged against Valuscript and the Non–Pharmacy Defendants, they are dismissed for failure to provide notice.

**C. Count I (Lanham Act)**
Medscript alleges that My Script and Valuscript engaged in false advertising, prohibited by the Lanham Act, for making false statements about Medscript to Medscript's patients and prescribers, using the prescription pads with Medscript's name but My Script's and Valuscript's fax numbers, and My Script advertising as a PCCA certified pharmacy. Medscript argues that *Organ Recovery Systems, Inc. v. Preservation Solutions, Inc.*, 2012 WL 2577500 (N.D.Ill. July 4, 2012), is analogous to this case. In *Organ Recovery*, the court concluded that the defendant's actions were within the scope of the Lanham Act when defendant sent generalized solicitation letters to potential customers with whom the defendant did not have an existing relationship.

There are five elements of a false advertising claim under the Lanham Act,[4] and defendants argue that the allegations do not amount to commercial advertising or promotion as required by the first element. Defendants argue that the statements were not made to the general population or a significant portion of the industry, but were person-to-person communications, and therefore do

not fall within the scope of the Lanham Act.

For a communication to be within the scope of the Lanham Act, it does not have to be made to the general public; advertising or promotion is usually directed to subsets of the public. See *Neuros Co. v. KTurbo, Inc.*, 698 F.3d 514, 523 (7th Cir.2012) ("There is no basis for limiting the Lanham Act to advertising or promotion directed to the *general* public, and the case law does not do that .... What advertising is *not* directed to subsets of the public rather than to 314 million individuals and millions of firms?") (emphasis in original). Communications must, however, be made to a significant portion of the relevant industry. In *Organ Recovery*, the court noted that "the size of the relevant purchasing public matters to determine whether there was advertising." *Organ Recovery,* 2012 WL 2577500 at *4. For instance, in *Neuros*, the Seventh Circuit noted "one of the subsets [of the public that is within the scope of the Lanham Act] is engineering firms, and others are subsets of engineering firms such as the civil engineering firms that were faxed advertisements in *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721 (7th Cir.2011)." *Neuros,* 698 F.3d at 523. In the instant case, the relevant industry is the compounding pharmacy industry, a subset of the pharmacy industry.

**\*5** Construing the amended complaint liberally, it is plausible that Medscript's patients and prescribers whom My Script and Valuscript contacted represent a significant portion of the compounding pharmacy industry. Facts outside the four corners of the complaint may show otherwise, but at the pleading stage this court finds that the amended complaint minimally states a claim under the Lanham Act. Accordingly, the defendants' motions to dismiss Count I are denied.

## D. Count II (IUDTPA)

Plaintiff and defendants agree that a claim under IUDTPA is analyzed using the same standards as a claim under the Lanham Act (alleged in Count I). See *Dynamic Fluid Control (PTY) Ltd. v. Int'l Valve Mfg., LLC*, 790 F.Supp.2d 732, 739 (N.D.Ill.2011) ("Where factual allegations underlying a Lanham Act claim also form the basis for a claim under the [IUDTPA], the [IUDTPA] claim 'must rise or fall based on the Lanham Act claim.'" (quoting *MJ & Partners Rest. Ltd. P'ship v. Zadikoff*, 10 F.Supp.2d 922, 929 (N.D.Ill.1998)).

Because the motions to dismiss Count I are denied, the motions to dismiss Count II are also denied.

## E. Count III (Tortious Interference)

Medscript alleges that the defendants engaged in tortious interference with prospective economic advantage[5] because the defendants knew of Medscript's economic expectancy and maliciously intended to and did disrupt Medscript's relationship with its patients and prescribers through My Script's communications to Medscript's patients and prescribers, Valuscript filling unwanted prescriptions that otherwise would have been filled by Medscript, My Script and Valuscript passing themselves off as Medscript, false advertising, using the patient list for marketing purposes, My Script entering into kickback schemes with Florida physicians, and My Script filling prescriptions in Illinois. Medscript alleges that these actions have interfered with its legitimate business expectations of continuing its relationship with its prescribers and patients and caused it injury. Defendants argue in response that: (1) Medscript does not allege that the Non–Pharmacy Defendants engaged in any conduct; (2) My Script's alleged conduct does not support a claim for tortious interference and it did not prevent Medscript's economic advantage from ripening; and (3) the allegation that Valuscript sent unwanted prescriptions that Medscript otherwise would have filled does not suggest improper conduct because prescribers can select which compounding pharmacy fills their prescriptions; (4) and the allegation that My Script and Valuscript used prescription pads with Medscript's name is not alleged in Count III and is insufficiently pled under Fed. R. Civ. P. 9(b).

For a tortious interference claim to survive a motion to dismiss, the complaint must allege specific conduct in which the defendants engaged. See *Hackman v. Dickerson Realtors, Inc.,* 520 F.Supp.2d 954, 970 (N.D.Ill.2007). In the instant case, Medscript alleges that Non–Pharmacy Defendants transferred the patient list to My Script and Valuscript, and, in turn, My Script and Valuscript used the patient list in a way that interfered with Medscript's relationships with its prescribers and patients. Previous courts have found that a plaintiff's claim for tortious interference survives when his complaint alleges that defendants made false statements that caused plaintiff to lose potential customers. *Manley v. Boat/U.S. Inc.,* 2014 WL 1647117 at *2–4 (N.D.Ill. April 23, 2014) (concluding that the plaintiff's tortious interference claim survived a motion to dismiss where the complaint alleged that defendants made false statements about plaintiff, including that plaintiff had gone out of business, had gone bankrupt, and that its license had been revoked, plaintiff identified potential customers that it lost because of the statements). The *Manley* court also inferred that the defendants gained the business that the plaintiffs lost. Applying the reasoning of *Manley* to the facts of this case,

Medscript's amended complaint sufficiently pleads that My Script engaged in tortious interference with prospective economic advantage based on false statements made to Medscript's patients and prescribers.

**\*6** Regarding the allegation that Valuscript filled unwanted prescriptions, the burden is on the plaintiff to present facts that the defendant's conduct was improper. *Miller v. Lockport Realty Group, Inc.*, 377 Ill.App.3d 369, 315 Ill.Dec. 945, 878 N.E.2d 171, 177 (2007) (" 'When, as in this case, the existence of a privilege [of competition] in favor of the defendant is apparent on the face of a claim for tortious interference... it is the plaintiff's burden to plead and prove that the defendant's conduct was unjustified or malicious.' " (quoting *Storm & Associates, Ltd. v. Cuculich*, 298 Ill.App.3d 1040, 233 Ill.Dec. 101, 700 N.E.2d 202, 210 (1998))). In this case, Medscript's amended complaint sufficiently pleads that Valuscript's conduct was improper, stating that Valuscript sent several patients prescriptions that they had not requested, which were supposed to be filled by Medscript, and billed the patients' insurance carriers for them.

Finally, the court has already determined that the claims are sufficiently pled under Fed. R. Civ. P. 9(b). The court understands "passing themselves off as Medscript" to refer to My Script and Valuscript using prescription pads with Medscript's name on them. The facts pled to support this claim are sufficient. Medscript alleges that My Script and Valuscript knew of the relationship Medscript had with its prescribers and interfered with that relationship by giving those prescribers prescription pads with Medscript's name but My Script's and Valuscript's fax numbers on them, so that prescribers would unknowingly send prescriptions to My Script and Valuscript.

Therefore, all defendants' motions to dismiss Count III are denied.

### F. Count IV (FDUTPA)

Medscript alleges that My Script violated FDUTPA by engaging in a kickback scheme in which it offered physicians ownership interests in My Script to induce the physicians to refer patients to My Script. Under the Florida Patient Self–Referral Act (F.S.A. 456.053), physicians cannot refer patients to health care service providers in which they are investors unless they qualify for certain exceptions, for which Medscript states My Script does not qualify. My Script alleges that it does qualify for the exceptions and is not violating Florida law, but because at this stage the court takes Medscript's allegations as true, these arguments will not be considered.

My Script next argues that Medscript does not have standing to bring a claim under FDUTPA because the statute allows only consumers to bring complaints. The federal district courts in Florida are divided on whether competitors can bring complaints under FDUTPA, or if only consumers have standing. Before 2001, the statute clearly allowed only consumers to bring complaints. However, "the 2001 legislative amendments to § 501.211(2) broadened the scope of FDUTPA, to authorize any person or entity who suffered a loss as a result of an unfair or deceptive trade practice or act to bring a suit for damages. Prior to 2001, subsection (2) provided that in an individual action brought 'by a *consumer*' who suffered a loss as a result of a violation of the act, 'such *consumer*' could recover actual damages. In 2001, the Florida Legislature replaced the word 'consumer' with the word 'person.' " *Kelly v. Palmer, Reifler, & Associates, P.A.*, 681 F.Supp.2d 1356, 1373 (S.D.Fla.2010). The *Kelly* court therefore found that nonconsumers, including competitors, could bring claims under the FDUTPA. The court agrees with the reasoning of *Kelly*, and holds that competitors, such as Medscript, have standing to bring claims under FDUTPA.

Lastly, My Script argues that Medscript lacks the requisite nexus to Florida to bring a claim under FDUTPA, relying on *Hutson v. Rexall Sundown, Inc.*, 837 So.2d 1090, 1094 (Fla.Dist.Ct.App.2003), in which the court concluded that non-residents lacked a sufficient relationship to Florida to be protected by FDUTPA. My Script asserts that *Hutson* is analogous to the instant case because Medscript is an Illinois corporation. Medscript, however, is licensed in Florida, does business there, and competes against My Script for clients in Florida. Because the alleged conduct took place in Florida and Medscript was injured in Florida, it has a sufficient nexus to the state to bring a claim under FDUTPA.

**\*7** Accordingly, My Script's motion to dismiss Count IV (FDUTPA) is denied.

### G. Count V (Unfair Competition)

Medscript alleges that My Script and Valuscript are liable for common law unfair competition for passing themselves off as Medscript, using protected health information for marketing purposes, violating FDUTPA, and filling prescriptions in Illinois without a license. Defendants respond that Count V is duplicative of Counts II (IUDTPA) and III (tortious interference) and should therefore be dismissed, relying on *Hoagland ex rel. Midwest Transit, Inc. v. Sandberg, Phoenix & von Gontard, P.C.*, 385 F.3d 737, 744 (7th Cir.2004). But the

*Hoagland* court concluded only that "when a breach of fiduciary duty claim is based on the same operative facts as a legal malpractice claim, and results in the same injury, the latter should be dismissed as duplicative."

In the instant case, the court has concluded that counts I and II state claims for violations of the Lanham Act and the IUDTPA. Unfair competition claims and deceptive trade practice claims brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act. *La Zaz a Trattoria, Inc. v. Lo Bue*, 2012 WL 3308846, *3 (N.D.Ill. August 10, 2012). Plaintiff's claim in Count V is sufficiently pled and not duplicative of Count II. *Seeid.* The operative facts underlying each count are not identical, however, in addition to the allegations pled in Count III, Medscript's unfair competition claim asserts that My Script falsely advertised itself as a PCCA certified pharmacy. Therefore, Medscript's unfair competition claim is not duplicative of Counts II and III, and the defendants' motions to dismiss Count V are denied.

### H. Count VI (Unjust Enrichment)
Medscript alleges that My Script and Valuscript have been unjustly enriched through their intentional and malicious use of the patient list. Defendants argue that the complaint fails to allege that My Script and Valuscript unjustly retained a benefit to Medscript's detriment. They assert that My Script and Valuscript did not act improperly in using the patient list because the list was given to the Non–Pharmacy Defendants without restriction. Defendants further argue that Medscript's theory of unjust enrichment is misplaced because the claim arises from defendants' alleged improper use of the patient list, not alleged improper retention of Medscript's property.

To state a claim for unjust enrichment under Illinois law, the plaintiff must present facts that establish that (1) the defendant has unjustly retained a benefit to the defendant's detriment, and (2) the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience. *Williams v. National Housing Exchange Inc.*, 949 F.Supp. 650, 653 (N.D.Ill.1996). Medscript alleges that the defendants were unjustly enriched through their use of the patient list, which includes My Script making false statements to patients and prescribers, Valuscript filling prescriptions that otherwise would have been filled by Medscript, and My Script and Valuscript using prescription pads that caused prescribers to believe they were sending prescriptions to Medscript, while they were sending prescriptions to My Script and Valuscript. These facts

sufficiently state a claim for unjust enrichment because they allege that the defendants' improperly benefitted by contacting Medscript's patients and prescribers. Thus, the defendants' motions to dismiss Count VI are denied.

### I. Count VII (Conversion)
**\*8** Medscript alleges that all defendants exerted unauthorized control over Medscript's property, the patient list. Defendants argue that this claim fails because Medscript fails to allege that it has an exclusive right to the patient list, that Medscript is entitled to immediate possession of the list, or that Medscript demanded possession of the list.

The elements of a conversion claim are: "(1) defendants' unauthorized and wrongful assumption of control, dominion, or ownership of the plaintiff's personal property; (2) plaintiff's right in the property; (3) plaintiff's right to the immediate possession of the property, absolutely and unconditionally; and (4) a demand for possession of the property." *G.M. Sign, Inc. v. Elm Street Chiropractic, Ltd.*, 871 F.Supp.2d 763, 767 (N.D.Ill.2012). Defendants correctly assert that Medscript has not pled that it is entitled to immediate possession of the property list or that it demanded the property list from the defendants. Additionally, Medscript concedes that it gave the patient list to Non–Pharmacy Defendants, so its conversion claim fails as a matter of law; Medscript does not have an absolute right to possession of the patient list.

Therefore, defendants' motions to dismiss Count VII are granted.

### J. Count IX (Injunction Under Pharmacy Practice Act)
Medscript alleges that My Script violated the Illinois Pharmacy Practice Act (225 ILCS 85 *et seq.*) by filling prescriptions in Illinois without a license to do so. My Script responds that Medscript does not have standing to bring the claim.

The Pharmacy Practice Act states that: "If any person shall practice as a pharmacist... without being licensed under the provisions of this Act, then any licensed pharmacist, any interested party, or any person injured thereby may... petition for [injunctive] relief." 225 ILCS 85/35.1(b). Medscript has alleged that it is a licensed pharmacy in Illinois and that My Script is not. Therefore, it has standing and has sufficiently pled Count IX. My Script's motion to dismiss Count IX is denied.

### CONCLUSION

For the reasons set forth above, the defendants' motions to dismiss are granted in part and denied in part. Counts VII and VIII are dismissed against all defendants. The court denies all defendants' motions to dismiss Counts I, II, III, V, and VI. Finally, Counts IV (FDUTPA) and IX survive against My Script only.

Defendants are directed to answer the remaining counts against them, respectively on or before January 16, 2015. The status report previously set for January 15, 2015, at 9:00 a.m. is continued until further notice.

Footnotes

1    The court concludes that Medscript's claims do not rely on its HIPAA allegation, and therefore does not reach these issues.

2    The following facts are taken from plaintiff's complaint and are assumed to be true for the purposes of this motion to dismiss. *See Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir.1995).

3    Medscript argues that the sales contract in which this agreement regarding the patient list was made should not be considered in the motions to dismiss. Defendants argue that it can be considered because it is central to Medscript's claims, citing *Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir.1993). The court agrees with the defendants, but does not find the sales contract necessary to rule on the motions to dismiss.

4    The elements are: (1) A false statement of fact by the defendant in a commercial advertisement; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material; and (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement. *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir.1999).

5    The elements of a claim for tortious interference with prospective economic advantage are: (1) a reasonable expectancy of entering into a valid business relationship; (2) the defendant's knowledge of the expectancy; (3) an intentional and unjustified interference by the defendant that induced or caused breach or termination of the expectancy; and (4) damage to the plaintiff resulting from the defendant's interference. *Borsellino,* 477 F.3d at 508.

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit J

Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc., Not Reported in...

2005 WL 3159680

2005 WL 3159680
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

MERCURY SKYLINE YACHT CHARTERS, an
Illinois corporation doing business as Chicago's
First Lady Cruises, Plaintiff,
v.
THE DAVE MATTHEWS BAND, INC., a Virginia
corporation, and Stefan A. Wohl, an individual,
Defendants.

No. 05 C 1698. | Nov. 22, 2005.

**Attorneys and Law Firms**

James S. Montana, Jr., Cindy S. Stuyvesant, and Ludwig
Edward Kolman, Vedder, Price, Kaufman & Kammholz,
P.C., Chicago, IL, for Plaintiff.

Molly Josephine Zillig, Jay R. Starrett, Whyte,
Hirschboeck, Dudek, S.C., Milwaukee, WI; Christopher
Noel Skey, Jonathan D. King, Tracy Lee Bradford, DLA
Piper, Rudnick, Gray, Cary US, LLP, John David Burke,
Ice Miller, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

FILIP, J.

**\*1** Plaintiff, Mercury Skyline Yacht Charters, Inc., d/b/a
Chicago's First Lady Cruises ("MSYC" or "Plaintiff"),
filed a complaint in the Circuit Court of Cook County on
February 23, 2005, against Dave Matthews Band, Inc.
("DMB") and Stefan A. Wohl ("Wohl") (collectively,
"Defendants"). On March 23, 2005, Defendants filed a
Notice of Removal of the case to this Court based upon
diversity jurisdiction. (D.E.1.)[1]

Plaintiff's Complaint, which is attached to the Notice of
Removal, brings the following claims against Defendants:
trespass ("Count I"); public nuisance ("Count II");
tortious interference with business relationships ("Count
III"); gross negligence ("Count IV"); and negligence
("Count V").(*Id.*) The case is before the Court on DMB's
and Wohl's motions to dismiss (D.E.11, 14) for failure to
state claims upon which relief can be granted,

*see*Fed.R.Civ.P. 12(b)(6), and motions to strike certain
requests for damages. *See*Fed.R.Civ.P. 12(f). For the
reasons stated below, Defendants' motions to dismiss and
to strike are granted in part and denied in part.

**FACTS[2]**
In the summer of 2004, Wohl was an employee of DMB
whose duties included driving one of the Four Seasons
motor coaches leased by DMB for its summer concert
tour. (D.E. 1 ¶ 8.) The Four Seasons motor coach is
equipped with, among other things, an 80 to 100 gallon
collection tank for human waste.(*Id.* ¶ 14.)The tank is
emptied by pushing a toggle switch located behind the
driver's seat. (*Id.*) The contents of the coach's tank empty
through a drain located underneath the motor coach, and a
full tank can be emptied in 90 seconds to 2 minutes. (*Id.*)
Wohl's responsibilities relating to the operation of the
leased Four Seasons motor coaches included the disposal
of the contents of the coach collection tank. (*Id.* ¶ 15.)

According to the Complaint, on August 7 and 8, 2004,
DMB performed two concerts in East Troy, Wisconsin, at
the Alpine Valley Music Theater. (*Id.* ¶ 11.)DMB's
concert tour schedule causes the band to regularly travel
through the state of Illinois, and DMB stayed at the
Peninsula Hotel in downtown Chicago, Illinois, for its
Wisconsin concert dates. (*Id.* ¶¶ 7, 11, 33.)On August 7
and 8, Four Seasons motor coaches were used to transport
DMB, its crew, and equipment between the Peninsula
Hotel and the Wisconsin concert site. (*Id.* ¶ 11.)On
Sunday, August 8, at around 1 p.m., Wohl started driving
a Four Seasons motor coach from a City of Chicago coach
staging area located on Kinzie Street, west of the Chicago
River, and traveled east on Kinzie Street. (*Id.* ¶¶ 13,
18.)Wohl was driving the motor coach to the Peninsula
Hotel where he was to provide transportation to a member
of DMB. (*Id.* ¶ 18.)Wohl's route took him over the
Chicago River via the Kinzie Street bridge. (*Id.* ¶¶ 16,
18.)The Kinzie Street bridge has a large, open grated area
at its center. (*Id.* ¶ 16.)

**\*2** On summer weekend days, the downtown section of
the Chicago River is used and traveled by a substantial
number of commercial and recreational watercraft; this
river traffic is readily visible from adjacent Chicago
roadways and bridges. (*Id.* ¶ 17.)On Sunday, August 8,
the motor vessel *Chicago's Little Lady ("Chicago's Little
Lady"* ), U.S. Coast Guard No. 1079694, was traveling
northbound on the Chicago River. (*Id.* ¶ 19.)*Chicago's
Little Lady*, which was operated by MSYC, was carrying
approximately 117 passengers, 3 crew members, and a
volunteer docent from the Chicago Architectural

Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc., Not Reported in...

2005 WL 3159680

Foundation. (*Id.*) At 1:18 p.m., the same time as Wohl was driving over the Kinzie Street bridge, *Chicago's Little Lady* passed below the Kinzie Street bridge. (*Id.* ¶ 19.)

As Wohl drove the motor coach over the grated portion of the Kinzie Street bridge, he slowed the vehicle. (*Id.* ¶ 20.)Wohl then intentionally discharged the contents of the motor coach's human waste collection tank through the drain underneath the coach. (*Id.*) The contents of the tank fell from the bottom of the motor coach, through the grates of the Kinzie Street bridge, into the Chicago River and onto *Chicago's Little Lady.*(*Id.* ¶ 22.)

The discharged contents of the tank-a foul-smelling, brownish-yellow liquid-drenched the vessel and dozens of its passengers, getting into passengers' eyes, mouths, and hair and soaking their clothing and personal belongings.(*Id.* ¶ 27.)Many passengers experienced nausea and vomiting from their exposure or proximity to the human waste. (*Id.* ¶ 29.)The waste spill onto *Chicago's Little Lady* and its passengers and crew prompted the ship's captain to turn the vessel around and return the ship to its landing. (*Id.* ¶ 30.)

The Complaint further alleges that in the weeks following the dumping incident, MSYC personnel spent considerable time, energy, and money cleaning up *Chicago's Little Lady.*(*Id.* ¶ 32.)MSYC also addressed passenger refund requests and other passenger needs. (*Id.*) In addition, MSYC responded to the local, national, and international media, and cooperated with law enforcement officials. (*Id.*)

Plaintiff alleges that Defendants' tortious actions "proximately caused MSYC to suffer damages, including but not limited to lost profits from its architectural tour and charter business...."(*Id.* ¶ 38.)For each count, Plaintiff seeks compensatory damages in excess of $50,000 and punitive damages in the amount of $5,000,000 and such other relief as the Court deems just and proper. (*See, e.g., id.* at 9)

Wohl's motion seeks dismissal of (1) Counts I, II, IV and V for failure to state a cause of action because Plaintiff's recovery is barred by the application of the economic loss doctrine of Illinois law, (2) Count III for failure to state a cause of action for tortious interference with business relationships, and (3) Count II for failure to state a claim for public nuisance. (*See* D.E. 14.) DMB's motion requests that the Court: (1) dismiss Count III for failure to allege the elements of tortious interference with business relationships; (2) dismiss Count IV for gross negligence for failing to plead a recognized cause of action; (3) strike

or dismiss the claim for punitive damages in each Count against DMB; and (4) strike or dismiss certain damages claims relating to Counts I and II. (*See* D.E. 11.) As explained below, the motions are denied in part and granted in part.

## LEGAL STANDARDS

**\*3** "A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of a complaint for failure to state a claim upon which relief may be granted."*Johnson v. Rivera,* 272 F.3d 519, 520-21 (7th Cir.2001). In ruling on a motion to dismiss, the court must assume all facts alleged in the complaint to be true and view the allegations in the light most favorable to plaintiffs. *See, e.g., Singer v. Pierce & Assocs., P.C.,* 383 F.3d 596, 597 (7th Cir.2004); *Marshall-Mosby v. Corp. Receivables, Inc.,* 205 F.3d 323, 326 (7th Cir.2000). Dismissal for failure to state a claim is appropriate where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Lee v. City of Chicago,* 330 F.3d 456, 459 (7th Cir.2003).

"A federal court exercising diversity jurisdiction must consult the choice-of-law rules of the state in which the court sits to determine which state's substantive law should apply."*Reid by Reid v. Norfolk & W. Ry. Co.,* 157 F.3d 1106, 1110 n. 3 (7th Cir.1998) (citing *GATX Leasing Corp. v. Nat'l Union Fire Ins. Co.,* 64 F.3d 1112, 1114 (7th Cir.1995)). Illinois courts apply the law of the state where the tort occurred, unless another state has a more significant relationship to the occurrence or to the parties. *See id.* (citing *Walters v. Maren Eng'g Corp.,* 246 Ill.App.3d 1084, 186 Ill.Dec. 931, 617 N.E.2d 170, 173 (Ill.App.Ct.1993)). The Court will apply Illinois law in this case, because the alleged tort occurred in Illinois, and because Illinois has the most significant relationship to the occurrence and to the parties, based on Illinois being the place of injury, the domicile of the Plaintiff, and the place where the parties' relationship is centered. *See id.; see also Frederick v. Simmons Airlines, Inc.,* 144 F.3d 500, 504 (7th Cir.1998).

## DISCUSSION

### I. Economic Loss Rule

Defendant Wohl moves to dismiss Counts I, II, IV, and V on the basis that Plaintiff has failed to state a basis upon

Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc., Not Reported in...

2005 WL 3159680

which the requested relief can be granted. Wohl argues that Plaintiff's requested economic damages in the form of lost profits are not recoverable under Illinois law because Plaintiff has not alleged any property damage. The Court disagrees with Wohl's arguments and finds that Plaintiff has alleged sufficient property damage to support its claim for lost profits.

"At common law [in Illinois], solely economic losses are generally not recoverable in tort actions;" this well-established proposition of Illinois law has come to be known as the economic loss rule. *See In re Chicago Flood Litig.,* 176 Ill.2d 179, 223 Ill.Dec. 532, 680 N.E.2d 265, 274 (Ill.1997) (citing *Ill. Bell Switching Station Litig.,* 161 Ill.2d 233, 204 Ill.Dec. 216, 641 N.E.2d 440, 446 (Ill.1994)). In *Moorman Manuf. Co. v. Nat'l Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (Ill.1982), the Illinois Supreme Court adopted the economic loss rule and held that a products liability plaintiff cannot recover solely economic losses under the tort theories of strict liability, negligence, and innocent misrepresentation. *See id.* at 453. *Moorman* defined economic loss as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits-without any claim of personal injury or damage to other property as well as the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold."*Id.* at 449 (internal citations and quotation marks omitted). The court reasoned that "[t]ort theory is appropriately suited for personal injury or property damage resulting from a sudden or dangerous occurrence ... The remedy for economic loss, loss relating to a purchaser's disappointed expectations due to deterioration, internal breakdown or nonaccidental cause, on the other hand, lies in contract."*Id.* at 450;*accord, e.g., Ill. Bell Switching Station Litig.,* 204 Ill.Dec. 216, 641 N.E.2d at 444 ("The *Moorman* holding is bottomed upon the theory that tort law affords a remedy for losses occasioned for personal injuries or damage to one's property, but contract law and the Uniform Commercial Code offer the appropriate remedy for economic losses occasioned by diminished commercial expectations not coupled with injury to person or property.").

**\*4** Subsequent Illinois Supreme Court cases applied the economic loss rule outside of the products liability context. In *Redarowicz v. Ohlendorf,* 92 Ill.2d 171, 65 Ill.Dec. 411, 441 N.E.2d 324 (Ill.1982), a person who bought a home from a prior homeowner brought a negligence claim against the original builder, seeking recovery for the costs of repairing and replacing faulty construction of the home. *See id.* at 326.The court applied the economic loss rule and held that the

plaintiff/homeowner could not recover the repair and replacement costs, which the court characterized as solely economic losses, "disappointed expectations" and "loss of bargain." *See id.*In *Anderson Elec., Inc. v. Ledbetter Erection Corp.,* 115 Ill.2d 146, 104 Ill.Dec. 689, 503 N.E.2d 246 (Ill.1986), the Illinois Supreme Court applied the economic loss rule in a services context. *See id.* at 247.In *Anderson Elec., Inc.,* a third party had hired the plaintiff to do electrical contracting and had hired the defendant to inspect and supervise the work. *See id.*The plaintiff brought a negligence claim against the defendant in its supervisory role, and the court held that "a plaintiff seeking to recover purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort, regardless of the plaintiff's inability to recover under an action in contract."*Id.* at 249.

A recent Illinois Supreme Court case has further defined the scope of the economic loss rule. In that case, *In re Chicago Flood Litig.,* plaintiffs brought multiple claims against the City of Chicago-including claims for private nuisance and negligence-stemming from a flood caused by a city contractor in a city-owned, underground freight tunnel. *See id.,* 223 Ill.Dec. 532, 680 N.E.2d at 268. Plaintiffs, who included numerous individuals and businesses in the area of the flood, as well as an insurer of individuals and area businesses, sought damages from the city for losses caused by the flood, including: injury to property; lost revenues, sales, profits and good will; lost wages, tips and commissions; lost inventory; and expenses incurred in obtaining alternate lodging. *See id.*The court reviewed several certified questions under an interlocutory appeal, one of which was "whether the *Moorman* doctrine bars the claims of those plaintiffs who allege only economic loss."*Id.* at 269.[5]The Illinois Supreme Court affirmed the lower courts' decisions to dismiss the claims of plaintiffs who had not alleged property damage, because those plaintiffs did not satisfy any of the three exceptions to the economic loss rule. *Id.* at 275.The Illinois Supreme Court instructed that the three exceptions are:

> (1) where the plaintiff sustained damage, *i.e.,* personal injury or property damage, resulting from a sudden or dangerous occurrence; (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation, *i.e.,* fraud; and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transaction.

**\*5** *Id.* (internal citations omitted). The court in *In re Chicago Flood Litig.* also held that plaintiffs who had alleged unspecified property damage were barred from

Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc., Not Reported in...

2005 WL 3159680

recovering under the economic loss doctrine. *See id.* at 277.

Turning to the case at hand, the Court concludes that Plaintiff's claims for lost profits are not barred by the economic loss doctrine because Plaintiff's allegations satisfy the first exception to the economic loss rule, as articulated in *In re Chicago Flood Litig. See id.* at 275-76 (stating that the first exception to the economic loss rule "is composed of a sudden, dangerous, or calamitous event coupled with personal injury or property damage."); *accord, e.g., Trans States Airlines v. Pratt & Whitney Canada, Inc.,* 177 Ill.2d 21, 224 Ill.Dec. 484, 682 N.E.2d 45, 48 (Ill.1997) (" 'The event, by itself, does not constitute an exception to the economic loss rule. Rather, the exception is composed of a sudden, dangerous, or calamitous event coupled with personal injury or property damage." ') (quoting *In re Chicago Flood Litig.,* 223 Ill.Dec. 532, 680 N.E.2d at 275).

The Court will consider in turn the two elements of the first exception to the economic loss rule. *See, e.g., Mars, Inc. v. Heritage Builders of Effingham,* 327 Ill.App.3d 346, 261 Ill.Dec. 458, 763 N.E.2d 428, 435 (Ill.App.Ct.2002) (describing the inquiry into the first exception to economic loss rule as "necessarily bipartite"). Courts have, somewhat circularly, defined a sudden and dangerous occurrence as "when the sudden occurrence is 'highly dangerous and presents the likelihood of personal injury or injury to other property.' ' *Mars, Inc.,* 261 Ill.Dec. 458, 763 N.E.2d at 435 (quoting *Stepan Co. v. Winter Panel Corp.,* 948 F.Supp. 802, 808 (N.D.Ill.1996)). Because Plaintiff's allegations suggest that the dumping of the human waste from the motor coach in the present matter happened quickly (*see, e.g.,* D.E. 1 ¶ 29, 30 (the "spill" of waste "hit" and "drenched" ship and passengers)), and presented a material risk of personal injury or injury to property (*see, e.g., id.* ¶ 29, 30 ("noxious" waste "soaked the vessel and passenger's clothing and personal belongings")), the incident resembles events that courts applying Illinois law have found to be "sudden, dangerous, or calamitous." *See In re Chicago Flood Litig.,* 223 Ill.Dec. 532, 680 N.E.2d at 275-76 (underground flood); *MCI Worldcom Network Servs., Inc. v. Big John's Sewer Contractors, Inc.,* No. 03 C 4991, 2003 WL 22532804, at *3 (N.D.Ill. Nov.7, 2003) (Castillo, J.) (excavation in violation of statutes); *Mars, Inc.,* 261 Ill.Dec. 458, 763 N.E.2d at 436 (thunderstorm); *Elecs. Group. Inc. v. Cent. Roofing Co.,* 164 Ill.App.3d 915, 115 Ill.Dec. 844, 518 N.E.2d 369, 371 (Ill.App.Ct.1987) (substantial leaking of water through roof in single day); *United Airlines Inc. v. CEI Indus. of Ill., Inc.,* 148 Ill.App.3d 332, 102 Ill.Dec. 1, 499 N.E.2d 558, 562-63 (Ill.App.Ct.1986) (roof collapse). Precedent teaches that to satisfy the first exception to the economic

loss rule, "the time period between the calamitous event (the collapsing roof, brake failure, or flood) and the damage to other property (the inventory and equipment, the vehicle, or water damage to a store) is short and sudden, almost contemporaneous." *Nabisco v. Am. United Logistics,* No. 99 C 0763, 2000 WL 748131, at *6 (N.D.Ill., June 1, 2000) (Ashman, M.J.) (collecting cases to illustrate what is and "what is not a sudden or calamitous occurrence."). The contemporaneousness of the dumping and the damage to *Chicago's Little Lady* distinguishes the case at hand from cases where courts have not found a sudden or calamitous event. *See, e.g., id.* at *6 (gradual and prolonged seeping of chemicals through packaging of food products was not sudden or calamitous); *NBD Bank v. Krueger Ringier, Inc.,* 292 Ill.App.3d 691, 226 Ill.Dec. 921, 686 N.E.2d 704, 708 (Ill.App.Ct.1997) (collecting cases and holding that petroleum gradually leaking through ruptured underground storage tanks and into soil was not a sudden or calamitous occurrence).

**\*6** Turning to the element of property damage, Plaintiff alleges that *Chicago's Little Lady* was "contaminat[ed]" and that cleaning up the ship required "considerable time, energy and expense...." (D.E. 1 ¶¶ 32, 40.) The allegations relating to the ship's condition after the spill are incorporated by reference in all the subsequent counts. (*See, e.g., id.* ¶ 34, 226 Ill.Dec. 921, 686 N.E.2d 704.) The Court views Plaintiff's property damage allegations as falling within the range of property damage that courts have found sufficient, when coupled with a sudden and calamitous event, to apply the first exception to the economic loss rule. *See, e.g., In re Chicago Flood Litig.,* 223 Ill.Dec. 532, 680 N.E.2d at 276 (lost perishable inventory); *MCI Worldcom Network Servs.,* 2003 WL 22532804, at *3 (severed fiber optic cable); *In re Starlink Corn Prods. Liab. Litig.,* 212 F.Supp.2d 828, 842-43 (N.D.Ill.2002) (Moran, J.) (contaminated corn crop); *United Airlines, Inc.,* 102 Ill.Dec. 1, 499 N.E.2d at 562 (water damage to "walls, furniture, furnishings").

Wohl contends that *Palatine Nat'l Bank v. Charles Greengard Assocs. Inc.,* 119 Ill.App.3d 376, 74 Ill.Dec. 914, 456 N.E.2d 635 (Ill.App.Ct.1983), is on point and establishes the proposition that clean up costs are to be treated as separate from property damage. (*See* D.E. 14 at 4.) The Court respectfully disagrees. In *Palatine Nat'l Bank,* property developers brought a tort action against an engineering firm, alleging that the firm had designed an inadequate storm and surface water drainage system. *See id.,* 74 Ill.Dec. 914, 456 N.E.2d at 637. The court found that "[t]he only possible allegation of property damage ... the clean up and restoration of the premises due to the flood" was insufficient to meet the standard for the first

Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc., Not Reported in...

2005 WL 3159680

exception to the economic loss doctrine, because "the damage relates to the natural accumulation of water on the premises and not to the 'type of sudden and dangerous occurrence best served by the policy of tort law.' " *Id.* at 638-39 (quoting *Moorman Manuf. Co.,* 61 Ill.Dec. 746, 435 N.E.2d at 450). Plaintiff's allegations of "human waste dumping" (*see, e.g.,* D.E. 1 ¶ 32) differ significantly from the "natural accumulation of water" in *Palatine Nat'l Bank,* (*id.,* 74 Ill.Dec. 914, 456 N.E.2d at 639), and as was discussed previously, fall into the category of a sudden or dangerous occurrence. In addition, because the damages in *Palatine Nat'l Bank* sprang from the allegedly negligent performance of contracted-for services, the damages could also have been categorized as disappointed commercial expectations (*see id.* at 638), which precedent teaches are barred by the economic loss rule. *See, e.g., id.* at 638-39; *Redarowicz,* 65 Ill.Dec. 411, 441 N.E.2d at 326.

In summary, Plaintiff's allegations of a "sudden, dangerous or calamitous event," *i.e.,* the alleged dumping, coupled with the allegations of the contamination of *Chicago's Little Lady,* are sufficient to permit Plaintiff to state a claim for recovering lost profits under the first exception to the economic loss rule.[4] Accordingly, the Court finds that Plaintiff's claims are not barred by the economic loss doctrine and denies Wohl's motion to dismiss Counts I, II, IV, and V.

### II. Tortious Interference with Business Relationships

**\*7** Both DMB and Wohl have moved to dismiss Count III for tortious interference with business relationships on the grounds that Plaintiff has failed to state a claim upon which relief can be granted. Defendants argue that the Complaint falls short of making out a claim for either tortious interference with contract or tortious interference with prospective business relationships. The Court agrees.

The Complaint contains allegations that suggest that Plaintiff is claiming both interference with existing contracts ("ticketed passengers"), as well as interference with prospective business relationships ("prospective passengers"). (D.E. 1 ¶¶ 44, 48.) Although Count III is somewhat vague, it appears to attempt to allege both of the standard tortious interference commercial torts-tortious interference with an existing contract and tortious interference with a prospective business relationship. The Court will assume that Plaintiff is attempting to invoke both torts, and will analyze both of them. For the reasons explained below, the Court finds that neither tort has been sufficiently pleaded on the facts as alleged.

The elements of a claim for tortious interference with an existing contract are: " '(1) the existence of a valid and enforceable contract between the plaintiff and another, (2) the defendant's awareness of that contract, (3) the defendant's intentional and unjustifiable inducement of a breach of the contract, (4) a subsequent breach by the other, caused by defendant's wrongful conduct, and (5) damages.' " *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co.,* 192 F.3d 724, 731 (7th Cir.1999) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 676 (Ill.1989)). Where the plaintiff's economic expectancy has not yet solidified into a contractual relationship, he can still recover in tort by showing: " '(1) [a] reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from the interference.' " *Int'l Mktg., Ltd.,* 192 F.3d at 731 (quoting *Dowd & Dowd, Ltd. v. Gleason,* 181 Ill.2d 460, 230 Ill.Dec. 229, 693 N.E.2d 358, 370 (Ill.1998)).

Plaintiff's allegations fail with respect to multiple elements of the tort of intentional interference with contract. First, Plaintiff has not sufficiently alleged that Defendants were aware of Plaintiff's contracts with ticketed passengers. Plaintiff's sole allegation that could potentially relate to knowledge of existing contracts is its statement that Defendants "knew or should have known that this portion of the Chicago River, including the area near Kinzie Street bridge, is highly traveled by commercial and recreational watercraft."(D.E. 1 ¶ 24.) Precedent teaches that allegations of actual awareness of existing contracts are required. *See, e.g., Kraft Chem. Co. v. Ill. Bell Tel. Co.,* 240 Ill.App.3d 192, 181 Ill.Dec. 170, 608 N.E.2d 243, 247 (Ill.App.Ct.1992) (finding that plaintiffs failed to show that defendant landscapers, who severed an underground fiber optic cable and interrupted communications service, had specific knowledge of existing contracts for phone service between the proposed customer class and telephone company); *accord, e.g., HPI Health Care Servs., Inc.,* 137 Ill.Dec. 19, 545 N.E.2d at 676. Plaintiff's allegation of Defendants' knowledge about Chicago River watercraft activity falls short of alleging that Defendants was actually aware of Plaintiff's contracts with ticketed passengers.

**\*8** Plaintiff implicitly concedes that it has not pleaded a basis to satisfy this element of the tort, as Plaintiff states in a response brief that the Defendants had "constructive knowledge" of the Plaintiff's business relationships and expectancies. (Plaintiff's Response to DMB's Motion to

Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc., Not Reported in...

2005 WL 3159680

Dismiss at 2.) Plaintiff offers no authority in support of its "constructive knowledge" position, nor for its related assertion that "actual or constructive knowledge of the operation of commercial tour boats necessarily includes awareness of commercial expectancies of the commercial tour boat operators with their passengers."(*Id.* at 8, 137 Ill.Dec. 19, 545 N.E.2d 672.) More specifically, Plaintiff offers no authority to suggest that an "awareness of commercial expectancies" is sufficient knowledge of a contract. The one case that Plaintiff cites for this point, *NEG Micon USA, Inc. v. N. Alternative Energy,* No. 03 C 5851, 2004 WL 609373 (N.D.Ill. Mar.23, 2004) (Guzman, J.), involved a defendant corporate entity charged with tortiously interfering with a contract; the defendant corporation was formed by individuals who had been officers of the corporation that was a party to the disputed contract at the time the contract was formed. *See id.* at *2. Under that factual scenario, the court understandably found the element of knowledge to be sufficiently alleged. *See id.* at *4 ("NEG Micon alleges Navitas was aware of the Agreement between NEG Micon and NAE.").

Second, Plaintiff has not alleged that Defendants intentionally and unjustifiably induced a breach of contract. *See Panter v. Marshall Field & Co.,* 646 F.2d 271, 298 (7th Cir.1981) ("Illinois courts have consistently held that the plaintiff must allege ... facts which demonstrate that the defendants acted with the purpose of injuring the plaintiff's expectancies.") (collecting cases). As a practical matter, it seems to the Court to be difficult for a defendant intentionally to interfere with a contract of which it is unaware, and, perhaps tacitly acknowledging this issue, Plaintiff has omitted such an allegation from its complaint. Plaintiff alleges that Defendants intentionally discharged the waste while traveling on the bridge (D.E. 1 ¶ 46), but Plaintiff does not allege that the nonaccidental discharge was in any way intended to induce a breach of contract. *See HPI Health Care Servs., Inc.,* 137 Ill.Dec. 19, 545 N.E.2d at 676 (discussing the "generally recognized" "elements of this tort" in Illinois, which include " 'the defendant's intentional and unjustified inducement of a breach of the contract' ") (quoting *Prudential Ins. Co. v. Van Matre,* 158 Ill.App.3d 298, 110 Ill.Dec. 563, 511 N.E.2d 740, 744 (Ill.App.Ct.1987) (further internal quotation and citation omitted).

Plaintiff also cites the Restatement (Second) of Torts, § 767 cmt d., which says that a "plaintiff must show that the interference was 'either desired by the actor or known by him to be a substantially certain result of his conduct." ' (Plaintiff's Response to DMB's Motion to Dismiss at 9 (quoting Restatement).) This statement would appear to hurt Plaintiff's cause, not assist it. Plaintiff does not allege

that the Defendants intended or desired to interfere with its contracts or business expectancies; instead, the Complaint alleges that the Defendants intended to discharge the waste on the bridge. (*See id.*(citing D.E. 1 ¶ 46).) Neither the Complaint nor common experience suggest that it is "substantially certain" that something dropped off of the Kinzie Street bridge, even for 90 to 120 seconds, will strike any boat. And while the Court need not verge outside the corners of the Complaint to resolve the motion to dismiss, when one thinks of the Plaintiff's proffered "substantial certainty" criterion, it is hard to ignore the practical, commonsense reality that there are geometrically more pleasure craft that travel that section of the Chicago River than ticketed tour boats. In any event, and simply put, the Complaint, at least as presently framed, does not outline any basis to conclude that the Defendants intentionally induced the passengers of Plaintiff to breach their contracts or intended to interfere with Plaintiff's putative commercial relationships.

**\*9** When analyzed as a potential claim for tortious interference with prospective business advantage, Count III also fails. First, Plaintiff's claim is defective with respect to intentional interference, as explained immediately above.

Second, Plaintiff alleges a "reasonable expectation of continuing to have business relationships with architectural tour and charter customers."(D.E. 1 ¶ 45.) However, Plaintiff does not allege that Defendants had knowledge of that expectation-such an omission is fatal to a claim for tortious interference with prospective business advantage. *See, e.g., Futurevision, Inc. v. Dahl,* 139 Ill.App.3d 61, 93 Ill.Dec. 683, 487 N.E.2d 127, 131 (Ill.App.Ct.1985) (dismissing claim and stating "[a] necessary element to state a cause of action for interference with a prospective business advantage is defendant's knowledge of a reasonable business expectancy and defendant's intentional interference which prevents the expectancy from ripening into a valid business relationship.") (collecting cases).

Third, Plaintiff fails to allege that Defendants directed any misdeeds towards future clients of the Plaintiff, as is required under Illinois law. Plaintiff alleges that Defendants "recklessly, wantonly and maliciously interfered with MSYC's prospective business relationships with tour and charter passengers by subjecting it to unwanted and negative media attention that deterred prospective passengers from doing business with it."(D.E. 1 ¶ 48.) However, while Plaintiff alleges Defendants' intentional interference with its prospective business relationships, the action alleged, *i.e.,* the dumping of waste, was directed at Plaintiff rather than at

Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc., Not Reported in...

2005 WL 3159680

prospective passengers. As explained by then District Judge Rovner in *Westland v. Sero of New Haven, Inc.,* 601 F.Supp. 163 (N.D.Ill.1985), "an allegation of conduct directed by defendant toward a third party through which the defendant purposely causes that third party not to enter into or continue with a prospective contractual relationship with the plaintiff is essential to stating a cause of action for the tort of intentional interference with a prospective business opportunity."*Id.* at 166 (collecting cases); *accord, e.g., Schuler v. Abbott Labs.,* 265 Ill.App.3d 991, 203 Ill.Dec. 105, 639 N.E.2d 144, 147 (Ill.App.Ct.1993) ( "Plaintiff must also allege action by the interfering party directed towards the party with whom the plaintiff expects to do business."); *Cohabco Cigar Co. v. U.S. Tobacco Co.,* No. 98 C 1580, 1999 WL 988805, at *13 (N.D.Ill. Oct.22, 1999) (Kocoras, J.) (similar); *McIntosh v. Magna Sys., Inc.,* 539 F.Supp. 1185, 1193 (N.D.Ill.1982) (Aspen, J.) (collecting cases and holding that "the tort of intentional interference with a prospective business opportunity requires that plaintiff allege some conduct directed toward a third party through which defendants purposely cause that third party not to enter into or continue a prospective contractual relationship with plaintiff.").[5] Because Plaintiff solely alleges acts of intentional interference that were directed at Plaintiff itself rather than at prospective passengers, it does not state a required element of the claim for tortious interference with prospective business relationships.

**\*10** For all of these reasons, the Court holds that Plaintiff has failed to state a claim for either tortious interference with contract or with prospective business relationships and so dismisses Count III without prejudice.

## III. Gross Negligence

DMB moves to dismiss Count IV on the basis that Illinois law does not recognize gross negligence as a cause of action. (*See* D.E. 13 at 10.) The Court agrees with DMB that Count IV should be dismissed. Regarding distinctions between different degrees of negligence, longstanding Illinois Supreme Court precedent instructs that "the authorities establish the proposition that the rights of the parties are not affected by any question of the degree of ... negligence."*Chicago, R.I. & P. Ry. Co. v. Hamler,* 215 Ill. 525, 74 N.E. 705, 708 (Ill.1905). Courts generally have interpreted *Chicago, R.I. & P. Ry. Co.* as eliminating the cause of action for gross negligence in Illinois. In this regard, most notably, in *Merit Ins. Co. v. Colao,* 603 F.2d 654, 659 (7th Cir.1979), the Seventh Circuit cited *Chicago, R.I. & P. Ry. Co.* and taught that "Illinois does not recognize gross negligence as an independent ground for recovery."*Accord, e.g., Instituto Nacional de Comercializacion Agricola v. Cont'l Ill. Nat'l Bank &*

*Trust Co. of Chicago,* 530 F.Supp. 279, 283 (N.D.Ill.1982) (Shadur, J.) (treating claim for gross negligence as a simple negligence action because "Illinois does not recognize an action for gross negligence."). Under this caselaw, including the Seventh Circuit's teaching, the Court accepts DMB's argument that Illinois does not recognize gross negligence as an independent cause of action.[6]Accordingly, the Court grants DMB's motion to dismiss Count IV.

Plaintiff apparently acknowledges the tenuousness of the claim of gross negligence and suggests that Count IV properly could be reframed as a claim for willful and wanton conduct. (*See* Plaintiff's Response to DMB's Motion to Dismiss at 11.) However, precedent also instructs that Illinois does not recognize an independent cause of action for willful and wanton conduct. *See Ziarko v. Soo Line R.R.,* 161 Ill.2d 267, 204 Ill.Dec. 178, 641 N.E.2d 402, 406 (Ill.1994) (collecting Illinois appellate cases and holding that "[t]here is no separate and independent tort for 'willful and wanton' misconduct."); *accord, e.g., Sorkin v. Blackman, Kallick & Co.,* 184 Ill.App.3d 873, 133 Ill.Dec. 133, 540 N.E.2d 999, 1003 (Ill.App.Ct.1989) ("[w]illful and wanton misconduct affects the amount of damages and is not a separate tort."). Instead, willful and wanton conduct typically is alleged in conjunction with both intentional torts and negligence to support a claim for punitive damages.[7]*See Kelsay v. Motorola, Inc.,* 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d 353, 359 (Ill.1979) ("[i]t has long been established in this State that punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard for the rights of others.") (citing *Consol. Coal Co. v. Haenni,* 146 Ill. 614, 35 N.E. 162, 165 (Ill.1893)); *accord, e.g., Giles v. General Motors,* 344 Ill.App.3d 1191, 280 Ill.Dec. 607, 802 N.E.2d 858, 865-66 (Ill.App.Ct.2003) (denying motion to dismiss claim for punitive damages where plaintiff pleaded willful and wanton conduct in conjunction with allegations of negligence); *Doe v. Chand,* 335 Ill.App.3d 809, 269 Ill.Dec. 543, 781 N.E.2d 340, 349 (Ill.App.Ct.2002) (stating that "[p]unitive damages are warranted where an otherwise negligent act is accompanied by outrageous conduct or acts committed with malice or reckless indifference to the rights of others.")

**\*11** For the foregoing reasons, the Court grants DMB's motion to dismiss Count IV for failure to state a claim upon which relief can be granted. *See*Fed.R.Civ.P. 12(b)(6). The Court also gives Plaintiff leave to amend its complaint and replead its remaining causes of action if it

Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc., Not Reported in...

2005 WL 3159680

determines that such amendment is necessary to sufficiently allege willful and wanton conduct so as to support any particular damages theory. *See* Fed.R.Civ.P. 15(a); *see, e.g., Brunt v. Serv. Employees Int'l Union,* 284 F.3d 715, 720 (7th Cir.2002) ("Rule 15(a) provides that leave to amend a pleading shall be freely given when justice so requires.").

## IV. Public Nuisance

Wohl moves to dismiss Count II for public nuisance on the grounds that Plaintiff has failed to state a claim upon which relief can be granted. The Court finds that Plaintiff has adequately stated a claim for public nuisance and therefore denies Wohl's motion.

The Illinois Supreme Court has defined public nuisance as "an unreasonable interference with a right common to the general public." *See City of Chicago v. Beretta U.S.A. Corp.,* 213 Ill.2d 351, 290 Ill.Dec. 525, 821 N.E.2d 1099, 1111 (Ill.2004) (internal quotation marks and citation omitted). Illinois law further establishes that a public nuisance is "the doing of or the failure to do something that injuriously affects the safety, health or morals of the public, or works some substantial annoyance, inconvenience, or injury to the public. *Id.* at 1114 (collecting authorities, including *Vill. of Wilsonville v. SCA Servs., Inc.,* 86 Ill.2d 1, 55 Ill.Dec. 499, 426 N.E.2d 824, 837 (Ill.1981)); *accord City of Chicago v. Am. Cyanamid Co.,* 355 Ill.App.3d 209, 291 Ill.Dec. 116, 823 N.E.2d 126, 131 (Ill.App.Ct.2005). To state a cause of action for public nuisance, a basis must be alleged in support of (1) the existence of a public right; (2) a substantial and unreasonable interference with that right by the defendant; (3) proximate cause; and (4) injury. *See Beretta,* 290 Ill.Dec. 525, 821 N.E.2d at 1113. "Thus, the first element that must be alleged to state a claim for public nuisance is the existence of a right common to the public." *Id.* at 1114. Precedent instructs that the concept includes, for example, "the right of public health, public safety, public peace, public comfort, and public convenience." *Id.* (citation omitted). For public nuisance actions, a private individual may recover damages only if he has "suffered harm of a kind different from that suffered by other members of the public exercising the right common to the public that was the subject of interference." *Young v. Bryco Arms,* 213 Ill.2d 433, 290 Ill.Dec. 504, 821 N.E.2d 1078, 1083 (Ill.2004) (noting that "special damage" requirement is "well-established law in Illinois.") (internal quotation marks and citation omitted); *see also In re Starlink Corn Prods. Liab. Litig.,* 212 F.Supp.2d at 848 ("The harm must be of a different type, not merely a difference in severity or imposing a disproportionate share of the burden on plaintiffs.").

As for the pleading standards for public nuisance, precedent teaches that they "are not exacting because the 'concept of common law public nuisance eludes precise definition.' " *Beretta* at 1110 (quoting *City of Chicago v. Festival Theatre Corp.,* 91 Ill.2d 295, 63 Ill.Dec. 421, 438 N.E.2d 159, 164 (Ill.1982)); *Am. Cyanamid Co.,* 291 Ill.Dec. 116, 823 N.E.2d at 129. Federal district courts (reviewing pleadings under the more lenient standards of Fed.R.Civ.P. 12(b)(6)) have similarly commented. *See, e.g., In re Starlink Corn Prods. Liab. Litig.,* 212 F.Supp.2d at 848 (denying a motion to dismiss public nuisance claim and noting the "limited depth of review courts typically undertake on a motion to dismiss a public nuisance claim.").

**\*12** Wohl argues that Plaintiff has not alleged a violation of a public right and instead has "merely asserted an alleged violation of an individual right that has resulted in harm to individual members of the general public." (D.E. 14 at 7.) In support of his argument, Wohl points to the standard for a public right articulated in *Am. Cyanamid:* a public right is "collective in nature and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured." *Id.,* 291 Ill.Dec. 116, 823 N.E.2d at 131 (internal quotation marks and citation omitted). The Court respectfully disagrees with Wohl's characterization of Plaintiff's allegations. Although the Complaint does not explicitly name the public rights at issue, the Court can infer that Plaintiff is alleging a violation of the public's right to health, welfare and comfort based on having large amounts of human waste discharged into a public waterway.[8] (*See* D.E. 1 ¶¶ 20, 26, 27); *see, e.g., In re Starlink Corn Prods. Liab. Litig.,* 212 F.Supp.2d at 848 (alleged public right of "health, safety, comfort and convenience" relating to the alleged contamination of corn and food supply "certainly satisfied" permissive pleading standard for public nuisance); *City of Chicago v. Latronica Asphalt & Grading, Inc.,* 346 Ill.App.3d 264, 281 Ill.Dec. 913, 805 N.E.2d 281, 290 (Ill.App.Ct.2004) (illegal disposal of construction debris resulted in violation of public right because "waste disposed of on the Site became airborne and scattered onto the public way and nearby properties.") (internal quotation marks omitted). Thus, the Court believes that Plaintiff has alleged a sufficient violation of a public right.

Moreover, Plaintiff's claim falls within the well-established category of nuisance cases that invoke the public right to be free from "odors, fumes, dust, and other sources of pollution." *See Beretta,* 290 Ill.Dec. 525, 821 N.E.2d at 1114 (collecting Illinois public nuisance cases where the "[p]ublic comfort has been affected by

Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc., Not Reported in...

2005 WL 3159680

odors, fumes, dust, and other sources of pollution."). Plaintiff's allegation of a violation of a public right relating to the Chicago River also resembles many other public nuisance claims because the allegations deal with the contamination of "an indivisible resource shared by the public at large, like air, water, or public rights of way."*Am. Cyanamid,* 291 Ill.Dec. 116, 823 N.E.2d at 131;*see also id.*(offering as illustrations of violations of public rights "prevent[ing] the use of public bathing beach" or a "kill[ing] the fish in a navigable stream"); *accord, e.g., Latronica Asphalt,* 281 Ill.Dec. 913, 805 N.E.2d at 287 (stating that public nuisance includes the causing or allowing of "any offal [or] filth ... to be collected, deposited or to remain in any place, to the prejudice of others.") (internal quotation marks and citation omitted); *Tamalunis v. City of Georgetown,* 185 Ill.App.3d 173, 134 Ill.Dec. 223, 542 N.E.2d 402, 410 (Ill.Ct.App.1989) ("The Illinois Supreme Court has determined the discharge of untreated sewage and the illegal dumping of refuse to be abatable nuisances.") (collecting cases); *Cook v. City of Du Quoin,* 256 Ill.App. 452, 1930 WL 3039, at *2 (Ill.App.Ct.1930) (city's discharge of sewage into creek was a public nuisance).

**\*13** Bearing in mind the "permissive standard" for pleading a public right, the Court concludes that Plaintiff has alleged sufficiently a violation of the public's right to health, welfare and comfort relating to the indivisible resource of the Chicago River. *See In re Starlink Corn Prods. Liab. Litig.,* 212 F.Supp.2d at 848. Accordingly, the Court denies Wohl's motion to dismiss the claim for public nuisance.

## V. Public Nuisance and Trespass Damages

DMB requested that the Court dismiss or strike Plaintiff's prayer for relief for public nuisance to the extent that Plaintiff seeks recovery of "prospective or future damages," or damages other than for its "personal inconvenience, annoyance and discomfort." (D.E. 13 at 11.) To the extent that Plaintiff requests damages based on Defendants' future conduct, the Court agrees with DMB that future or prospective damages are unavailable for Plaintiff's public nuisance action. *See Beretta,* 290 Ill.Dec. 525, 821 N.E.2d at 1138 ("An award for damages in an action for nuisance is retroactive, applying to past conduct ....") (internal quotation marks and citation omitted). However, the Court disagrees with DMB that Plaintiff's potential recovery is limited to damages for personal inconvenience, annoyance and discomfort.

As an initial matter, recent Illinois Supreme Court precedent dealing with private nuisance[9] instructs that "[a] plaintiff in a private nuisance action may recover *all*

*consequential damages* flowing from the injury to the use and enjoyment of his or her person or property. However, recovery of damages for solely economic loss is not permitted."*In re Chicago Flood Litig.,* 223 Ill.Dec. 532, 680 N.E.2d at 278 (citing *Schatz v. Abbott Labs., Inc.,* 51 Ill.2d 143, 281 N.E.2d 323 (Ill.1972) (other citations omitted) (emphasis added).[10] Although Plaintiff's claim is for public nuisance rather than for private nuisance, Defendants offer no basis to conclude that the rule should be different, and the Court finds that Plaintiff should be able to claim consequential damages.

For public nuisance actions, a private individual may recover damages only if he has "suffered harm of a kind different from that suffered by other members of the public exercising the right common to the public that was the subject of interference."*Young,* 290 Ill.Dec. 504, 821 N.E.2d at 1083 (internal quotation marks and citation omitted). The types of special damage that private plaintiffs bringing public nuisance actions may allege include, for example, "physical harm to chattels." *In re Starlink Corn Prods. Liab. Litig.,* 212 F.Supp.2d at 848.

In the instant case, Plaintiff alleges physical harm to chattels, by stating, for example, that *Chicago's Little Lady* was "contaminat[ed]." (D.E. 1 ¶ 40.) Plaintiff's allegations of harm are of a different type than the harm allegedly done to the public's rights of health and comfort. Therefore, Plaintiff has alleged sufficient special harm to state a claim for private damages and should be able to recover for those damages. *See In re Starlink Corn Prods. Liab. Litig.,* 212 F.Supp.2d at 848 (farmers were able to state a claim for private action for public nuisance by alleging both contamination of the public's food supply (public harm) and damages to their fields, grain supply, and their crop sales (private harm)).

**\*14** DMB suggests in passing that Plaintiff's damages for Count I, its claim of trespass, should be "similarly limited," because " 'the same rules of damages apply whether the action be in trespass or for a nuisance." ' (D.E. 21 at 14-15 (quoting *Kugel v. Vill. of Brookfield,* 322 Ill.App. 349, 54 N.E.2d 92, 95 (Ill.App.Ct.1944).) *But see Ariola v. Nigro,* 16 Ill.2d 46, 156 N.E.2d 536, 543 (Ill.1959) ("With reference to the issue of damages, the rule is well-established that one who trespasses or assumes control over the property of another without authority is responsible for all the consequences.") (citation omitted). Assuming that DMB states a still-correct proposition of law, the Court's analysis permitting recovery of consequential damages for the public nuisance claim should apply for the trespass claim. Thus, the Court concludes that Plaintiff's recovery for Count I is not limited to damages for personal

Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc., Not Reported in...

2005 WL 3159680

inconvenience, annoyance and discomfort.

Accordingly, the Court grants DMB's motion to strike Plaintiff's claims for damages for Counts I and II to the extent that Plaintiff seeks future or prospective damages. The Court denies DMB's motion to dismiss or strike Plaintiff's claims for damages outside of the category of personal inconvenience, annoyance, and discomfort.

## VI. Punitive Damages Analysis

DMB moves to strike or to dismiss Plaintiff's request for punitive damages for Counts I-IV, arguing that Plaintiff has failed to allege a basis for an award of punitive damages against DMB. (D.E. 11 at 1-2.) The Court agrees with DMB's argument.

DMB suggests, and the Complaint reflects, that *respondeat superior* is the theory of Plaintiff's case against DMB-*i.e.,* DMB is liable as Wohl's employer. (D.E. 13 at 3-4; *see, e.g.,* D.E. 1 ¶ 23 ("At all times relevant to this complaint, Wohl acted under the supervision of the Band and within the scope of his employment duties."); *id.* ¶ 10 ("The Band was and is Wohl's principal and Wohl is the Band's agent. The Band was and is, therefore, responsible for any conduct by Wohl in furtherance of his duties on behalf of the Band."); *see also id.* ¶¶ 8, 9.)[11] Precedent teaches that when liability of a corporate defendant is predicated on *respondeat superior,* "the punitive and admonitory justifications for the imposition of punitive damages are sharply diminished."*Mattyasovszky v. W. Towns Bus Co.,* 61 Ill.2d 31, 330 N.E.2d 509, 512 (Ill.1975). Imposition of punitive damages in situations of vicarious liability is "narrowly circumscribed." *Kennan v. Checker Taxi Co., Inc.,* 250 Ill.App.3d 155, 189 Ill.Dec. 891, 620 N.E.2d 1208, 1212 (Ill.App.Ct.1993). The Illinois Supreme Court in *Mattyasovszky* delineated four situations where there was adequate "corporate complicity" for punitive damages to lie against a principal for the act of an agent: "(a) the principal authorized the doing and the manner of the act; (b) the agent was unfit and the principal was reckless in employing him; (c) the agent was employed in a managerial capacity and was acting in the scope of his employment; or (d) the principal or a managerial agent of the principal ratified or approved the act."*Id.,* 330 N.E.2d at 512 (internal quotation marks and citation omitted); *Jannotta v. Subway Sandwich Shops, Inc.,* 125 F.3d 503, 513-14 (7th Cir.1997) (same); *Smith v. Am. Gen. Life & Accident Ins. Co.,* No. 99 C 3743, 2002 WL 215527, at *9 (N.D.Ill. Feb.11, 2002) (Lefkow, J.) (same). To establish the requisite corporate complicity for an award of punitive damages, the plaintiff must offer a basis to find that there has been *"deliberate corporate participation." Kennan,*

189 Ill.Dec. 891, 620 N.E.2d at 1212 (emphasis in *Kennan;* citing *Tolle v. Interstate Sys. Truck Lines, Inc.,* 42 Ill.App.3d 771, 1 Ill.Dec. 437, 356 N.E.2d 625, 627 (Ill.App.Ct.1976)).

**\*15** In the present matter, Plaintiff has not made allegations that would equate to "deliberate corporate participation" on the part of DMB, which is a prerequisite to the imposition of such sanctions under Illinois law in this context. *See, e.g., Kennan,* 189 Ill.Dec. 891, 620 N.E.2d at 1212 (internal quotation marks, citation, and emphasis omitted). The only actions allegedly taken by DMB relating to this lawsuit were employing Wohl and withholding income taxes, Social Security and Medicare taxes from his paycheck. (*See* D.E. 1 ¶¶ 8, 9.) Because of that employment relationship, Plaintiff alleges that DMB had the right to control and direct how Wohl performed his duties and that DMB is therefore responsible for Wohl's conduct in the furtherance of his duties on behalf of DMB. (*See id.* ¶ 10, 189 Ill.Dec. 891, 620 N.E.2d 1208.) These allegations are sufficient to state a claim for vicarious liability against DMB. However, as a basis for an award of punitive damages against DMB, the Court does not regard these allegations, at least as pleaded, as "the sort of deliberate action ... which would bring [them] within the complicity rule."*Brummerstedt v. Am. Airlines, Inc.,* 845 F.Supp. 532, 534 (N.D.Ill.1993) (Aspen, J.) (dismissing claim for punitive damages where plaintiff did not indicate that the corporation participated in or condoned the employee's alleged misconduct, or that the employee was a manager acting within the scope of employment); *see also Bahl v. D.A. Express, Inc.,* No. 90 C 20014, 1990 WL 304278, at *1 (N.D.Ill. June 14, 1990) (Roszkowski, J.) (striking punitive damages portion of complaint given that plaintiff did not allege that corporate defendant "approved, authorized or ratified" the employee's alleged misconduct).

Plaintiff cites to *Arlington Fin. Corp. v. Ben Franklin Bank of Ill.,* No. 98 C 7068, 1999 WL 89567 (N.D.Ill. Feb.16, 1999) (Conlon, J.), for the proposition that "where a complaint states claims which may allow a finding of culpable conduct by the defendant depending on facts developed through discovery, it would be 'inappropriate to foreclose prematurely the possibility of recovery of punitive damages.' " (Plaintiff's Response to DMB's Motion to Dismiss at 4 (quoting *Arlington Fin. Corp.,* 1999 WL 89567, at *7).) However, the present matter is distinguishable from *Arlington. Arlington* was testing the claim for punitive damages for the sufficiency of its allegations of willful misconduct, as opposed to the sufficiency of allegations of deliberate corporate participation. *See Arlington,* 1999 WL 89567, at *6. Judge Conlon's opinion in *Arlington* cannot fairly be read to

Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc., Not Reported in...

2005 WL 3159680

abrogate the principle of Illinois law that, in this *respondeat superior* setting, the punitive and admonitory justifications for awarding punitive damages are relatively weak, such that precedent requires allegations of some corporate participation in the misconduct. *See, e.g., Brummerstedt,* 845 F.Supp. at 534 ("Where the employer itself has committed no intentional wrong, then, Illinois courts will not impose the harsh sanction of punitive damages.") (collecting cases); *Twardy v. Northwest Airlines, Inc.,* No. 00 C 6493, 2001 WL 199567, at *5 (N.D.Ill. Feb.28, 2001) (Plunkett, J.). Nor can *Arlington* be fairly read to eliminate a plaintiff's burden to at least outline or adumbrate a basis for seeking punitive damages-which burden Plaintiff has failed to meet. Because the Complaint lacks any allegations of corporate participation by DMB, the Court finds that Plaintiff has not sufficiently stated a claim for punitive damages.

**\*16** The Court also rejects Plaintiff's argument that "the factual predicates demonstrating the Band's participation or corporate complicity in Wohl's illegal conduct are substantially similar to those alleged by the plaintiff in *Deal v. Byford."*(Plaintiff's Response to DMB's Motion to Dismiss at 5.) In *Deal v. Byford,* 127 Ill.2d 192, 130 Ill.Dec. 200, 537 N.E.2d 267 (Ill.1989), the Illinois Supreme Court ruled that there was a sufficient basis to impose punitive damages against a principal under a theory of *respondeat superior. See id.* at 273.In that case, it was undisputed that the employee who committed the misconduct was the "resident manager" of the apartment complex and was "acting within the scope of his employment."*Id.* The court determined that these admissions met the standard of the fourth corporate

complicity situation of *Mattyasovszky.See id.*(permitting "the imposition of punitive damages against a principal when the agent is employed in a managerial capacity and is acting within the scope of his employment."). Because the Plaintiff does not seriously even allege that Wohl was playing a managerial role (indeed, Wohl is alleged to be a bus driver) while operating one of DMB's tour buses, the outcome in *Deal* does not aid Plaintiff's request for punitive damages.

The Court concludes that Plaintiff's demand for punitive damages against DMB should be stricken without prejudice. Plaintiff is given leave to amend its complaint and replead its claims for punitive damages against DMB. *See*Fed.R.Civ.P. 15(a); *see, e.g., Brunt,* 284 F.3d at 720.[12]

## CONCLUSION

For the reasons stated above, the Court respectfully denies in part and grants in part the various motions to dismiss and motion to strike. (D.E.11, 14.) The Court dismisses Counts III and IV without prejudice, strikes Plaintiff's claims for future or prospective damages for Counts I and II, and strikes Plaintiff's requests for punitive damages against DMB for Counts I-V without prejudice.

So ordered.

Footnotes

[1]  The various docket entries in this case are designated "D.E. ___."

[2]  The following facts are taken from Plaintiff's Complaint. For present purposes, the Court accepts the allegations as true, as precedent instructs. The Court takes no position on whether the allegations are actually well-founded.

[3]  The Illinois Supreme Court in *In re Chicago Flood Litig.* noted that "[o]ur answers to these certified questions do not affect the applicability of the Tort Immunity Act to these claims."*Id.,* 176 Ill.2d 179, 223 Ill.Dec. 532, 680 N.E.2d 265, 274 (Ill.1997). Because the analysis of defendants' liability proceeded independently from any considerations of municipal immunity, this Court finds that the court's economic loss rule in *In re Chicago Flood Litig.* can be readily applied to the case *sub judice.*

[4]  Although Wohl's motion to dismiss Counts I, II, IV, and V on the basis of the application of the economic loss doctrine is denied, the Court notes that it respectfully disagrees with Plaintiff's arguments that *Congregation of the Passion, Holy Cross Province v. Touche, Ross & Co.,* 159 Ill.2d 137, 201 Ill.Dec. 71, 636 N.E.2d 503 (Ill.1994), would permit recovery in the present matter in the absence of allegations of property damage. (Plaintiff's Response to Wohl's Motion to Dismiss at 4.) *Congregation of the Passion, Holy Cross Province* is one in a line of Illinois professional malpractice cases, where courts evaluated whether the defendants' duty arose under the contract for professional services or whether the professional owed an extracontractual duty to the plaintiff that would permit an action in tort. *See id.,* 201 Ill.Dec. 71, 636 N.E.2d at 514 ("The evolution of the economic loss doctrine shows that the doctrine is applicable to the service industry only where the duty of the party performing the service is defined by the contract that he executes with his client."); *see id.* at 515 (holding that the duty an accountant owes to his client is extracontractual and so the economic loss doctrine does not bar recovery for solely economic losses); *see also 2314 Lincoln Park W. Condominium Assoc.*

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc., Not Reported in...

2005 WL 3159680

*v. Mann, Gin, Ebel & Frazier, Ltd.,* 136 Ill.2d 302, 144 Ill.Dec. 227, 555 N.E.2d 346, 353 (Ill.1990) (conducting similar analysis and holding that economic loss doctrine barred plaintiff's recovery in tort against architect for solely economic damages because architect's responsibility originated in contract). Because the parties in the present matter have no contractual relationship for professional services, the narrow exception to the economic loss rule explored in cases such as *Congregation of the Passion, Holy Cross Province* is inapplicable.

5      The Court notes that Plaintiff does not allege that the intentional discharge of waste onto the passengers deterred current passengers from buying a ticket from MSYC for another river trip.

6      The Court acknowledges Plaintiff's citation of *Mathias v. Accor Econ. Lodge,* No. 01 C 6329, 2002 WL 221523, at *4 (N.D.Ill. Feb.13, 2002), which denied a motion to dismiss a claim for gross negligence and defined gross negligence as "an action that is committed with actual or deliberate intention to harm or with an utter indifference or conscious disregard for the safety of others."Because *Mathias* appears to conflict with the weight of authority, including the teaching of the Seventh Circuit, the Court respectfully declines Plaintiff's invitation to rely on it.

7      Willful and wanton misconduct may properly be alleged as a basis for liability where the cause of action is against one of various governmental entities, officials, or employees in cases where an immunity statute establishes a standard of "willful and wanton misconduct" as a basis for assessing liability. *See, e.g., Am. Nat'l Bank & Trust Co. v. City of Chicago,* 192 Ill.2d 274, 248 Ill.Dec. 900, 735 N.E.2d 551, 555 (Ill.2000) (finding that allegations supported claims that paramedics and city engaged in willful and wanton misconduct, precluding a dismissal based on immunity under Illinois Emergency Medical Services Act); *Munizza v. City of Chicago,* 222 Ill.App.3d 50, 164 Ill.Dec. 645, 583 N.E.2d 561, 565-66 (Ill.App.Ct.1991) (holding that plaintiffs had alleged insufficient facts to plead willful and wanton misconduct so as to overcome the tort immunity of city, public agency and public employees). However, for the case at hand, there is no applicable immunity statute that would necessitate Plaintiff bringing a separate cause of action for willful and wanton misconduct.

8      At the stage of a motion to dismiss, the court must accept the plaintiff's allegations as true and draw all reasonable inferences in the plaintiff's favor. *See Bressner v. Ambroziak,* 379 F.3d 478, 480 (7th Cir.2004).

9      Although the cause of action of public nuisance "eludes precise definition" (*City of Chicago v. Am. Cyanamid Co.,* 355 Ill.App.3d 209, 291 Ill.Dec. 116, 823 N.E.2d 126, 129 (Ill.App.Ct.2005)), Illinois courts have defined it sufficiently to recognize it as a separate action from private nuisance. *See City of Chicago v. Beretta U.S.A. Corp.,* 213 Ill.2d 351, 290 Ill.Dec. 525, 821 N.E.2d 1099, 1110 (Ill.2004) (noting that public nuisance is often " 'negatively defined' by distinguishing it from other tort actions") (quoting *City of Chicago v. Festival Theatre Corp.,* 91 Ill.2d 295, 63 Ill.Dec. 421, 438 N.E.2d 159, 164 (Ill.1982)). In this regard, Illinois law defines a private nuisance as "a nontrespassory invasion of another's interest in the private use and enjoyment of land"*In re Starlink Corn Prods. Liab. Litig.,* 212 F.Supp.2d 828, 844-45 (N.D.Ill.2002) (internal quotation marks and citation omitted). Illinois law defines a public nuisance as "an unreasonable interference with a right common to the general public."*Id.* at 848 (internal quotation marks and citation omitted).

10     As the parties discuss, Illinois law distinguishes between two types of damages for private nuisance-damages caused by permanent nuisances and those caused by temporary nuisances. *See Statler v. Catalano,* 167 Ill.App.3d 397, 118 Ill.Dec. 283, 521 N.E.2d 565, 571 (Ill.App.Ct.1988)."A permanent nuisance is one characterized as continuing indefinitely and the structure constituting the nuisance is a lawful one, or one which the person or entity has a legal right to maintain.... A temporary nuisance is one which is occasional, intermittent, or recurrent and is remediable, removable or abatable."*Tamalunis v. City of Georgetown,* 185 Ill.App.3d 173, 134 Ill.Dec. 223, 542 N.E.2d 402, 404 (Ill.App.Ct.1989). Precedent instructs that "the proper measure of damages for a permanent nuisance is the market value of the land, while the proper measure of damages for a temporary nuisance is the discomfort and deprivation of the use and enjoyment of a person's home."*Statler,* 118 Ill.Dec. 283, 521 N.E.2d at 571;*see also Tamalunis,* 134 Ill.Dec. 223, 542 N.E.2d at 410 ("Generally, the measure of damages for a temporary nuisance is the personal inconvenience, annoyance, and discomfort suffered on account of the nuisance.") (collecting cases). However, contrary to DMB's assertion, precedent also teaches that the amount recoverable for temporary nuisance "cannot be gauged by any definite rule," and may include, under appropriate circumstances, lost profits, where they can be determined with reasonable certainty. *Schatz v. Abbott Labs., Inc.,* 51 Ill.2d 143, 281 N.E.2d 323, 325-26 (Ill.1972); *see id.* at 326 ("Where, as here, plaintiffs' damages flow from a loss of business, the amount of compensation should be the same whether the cause be a breach of contract, negligence or nuisance.") (citation omitted). Moreover, the nuisance at issue in *In re Chicago Flood Litig.* would seem to be characterized as temporary, and in light of the Illinois Supreme Court permitting "all consequential damages" for that nuisance, the Court disagrees with DMB that recovery for private nuisance actions is restricted to damages for personal inconvenience, annoyance, and discomfort. *See id.,* 223 Ill.Dec. 532, 680 N.E.2d at 279. The Court provides this context on the damages available for private nuisance actions because of the close relationship between public and private nuisance and because parties refer to private nuisance cases in their briefs.

11     Plaintiff argues that the use of the plural "Defendants," and references to "Wohl and the Band" in the Complaint serve to "expressly allege ... the Band's complicity" in the wrongful conduct. (Plaintiff's Response to DMB's Motion to Dismiss at 4.)

However, the Complaint states that "Wohl intentionally, illegally and purposefully caused the contents of the motor coach's human waste collection tank to empty through the drain underneath the motor coach into the river."(D.E. 1 ¶ 20.) Because the Complaint indicates that Wohl singlehandedly committed the tortious act at issue, the Court reads boilerplate plural references such as "Defendants' deliberate and reckless discharge ..." as merely serving to allege DMB's vicarious liability as opposed to alleging any direct liability. (*Id.* ¶ 33, 223 Ill.Dec. 532, 680 N.E.2d 265.)

12 However, in repleading, Plaintiff should be wary of making conclusory allegations that merely parrot the corporate complicity standard for punitive damages. *See, e.g., Twardy v. Northwest Airlines, Inc.,* No. 00 C 6493, 2001 WL 199567, at *5 (N.D.Ill. Feb.28, 2001) (Plunkett, J.) (stating that allegations such as "[d]efendant authorized the act the way in which it was done" were insufficient to state a claim for punitive damages in *respondeat superior* setting).

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

# Exhibit K

2014 WL 4703925
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.

Underground Solutions, Inc., Plaintiff,
v.
Eugene Palermo, Defendant.

No. 13 C 8407 | Signed September 22, 2014

**Attorneys and Law Firms**

Christopher T. Sheean, Swanson, Martin & Bell LLP,
Chicago, IL, for Plaintiff.

John David Fitzpatrick, Stephen J. Rosenfeld, Steven P.
Mandell, Mandell Menkes LLC, Chicago, IL, for
Defendant.

### *MEMORANDUM OPINION AND ORDER*

MATTHEW F. KENNELLY, District Judge:

**\*1** Underground Solutions, Inc. (UGSI) has sued Eugene
Palermo, asserting claims of trade libel, interference with
prospective economic advantage, interference with
contract, false advertising under the Lanham Act, 15
U.S.C. § 1125(a)(1), and violation of the Illinois Uniform
Deceptive Trade Practices Act (IUDTPA), 815 ILCS
510/2(a)(7)– (8). Palermo has moved to dismiss UGSI's
complaint for failure to state a claim.

For the reasons stated below, the Court grants Palermo's
motion in part and denies the motion in part. The Court
dismisses UGSI's intentional interference with
prospective economic advantage (Count 2), tortious
interference with contract (Count 5), and IUDTPA (Count
3) claims, with leave to amend. The Court denies
Palermo's motion to dismiss as to UGSI's trade libel
(Count 1) and Lanham Act (Count 4) claims.

### Background

For purposes of the motion to dismiss, the Court accepts
as true the following facts alleged in UGSI's complaint.
UGSI is a Delaware corporation with its principal place of
business in California. Compl. ¶ 14. UGSI sells and
develops fusible polyvinyl chloride (PVC) pipe, which is
used "in water and wastewater pipeline applications, as
well as for conduit for electrical and fiber optic
applications." *Id.* ¶ 1. UGSI is "the sole supplier of
thermally buttfused PVC pipe in the United States." *Id.* ¶
15.

Palermo is a Tennessee resident. *Id.* ¶ 17. UGSI alleges
that Palermo was hired to act as a paid spokesperson for
its competitor, Performance Pipe. *Id.* ¶¶ 8–9, 22.
Performance Pipe manufactures high-density
polyethylene (HDPE) pipe, which "was the primary pipe
material utilized in trenchless water and wastewater
applications prior to the introduction of Fusible PVCTM
pipe." *Id.* ¶ 2, 17.

UGSI alleges that since October 2010, Palermo has
presented false and misleading information at multiple
industry conferences and has published false and
misleading information on his website. *Id.* ¶¶ 10, 23–24.
Those misrepresentations concern "the quality,
characteristics, and reliability of Fusible PVCTM pipe
and thermally butt-fused PVC joints." *Id.* ¶ 9. UGSI
alleges that Palermo disseminated false information
without disclosing his affiliation with Performance Pipe,
which gave the false impression that his conclusions were
"based on objective scientific evidence and valid third
party investigation." *Id.* ¶ 23. Additionally, UGSI alleges
that Palermo "contacted UGSI's customers following
pipeline incidents involving Fusible PVCTM pipe and
told the customers that the Fusible PVCTM pipe and/or
thermally butt fused PVC joints caused the incident,
despite Palermo's failure to conduct a thorough and
complete investigation of the cause of such pipeline
incidents." *Id.* ¶ 11.

UGSI claims that it suffered damage as a result of
Palermo's misrepresentations. Specifically, UGSI alleges
that "existing and prospective customers have been
deterred from buying UGSI's products." *Id.* ¶ 46. UGSI
also claims that its pipes were being considered for
upcoming projects but that Palermo's statements
dissuaded potential purchasers. *Id.* ¶¶ 52–53. UGSI
alleges that its pipes were "excluded from consideration
by at least two consulting engineering firms based in
Illinois that design water and wastewater treatment
projects and recommend pipe materials to municipal,
commercial, and industrial customers." *Id.* ¶¶ 34–36. The
complaint quotes e-mails UGSI received from two
consulting engineers who expressed hesitation about

2014 WL 4703925

using UGSI's pipes after reading Palermo's reports. *Id.* ¶¶ 35–36. UGSI also alleges that as a result of Palermo's misrepresentations, engineers and municipalities that "had previously specified Fusible PVCTM pipe as the only acceptable material for their projects changed the specifications to include an alternate product, such as HDPE."*Id.* ¶ 46.

**\*2** Palermo has moved to dismiss UGSI's complaint in its entirety.

### Discussion

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court accepts the plaintiff's allegations as true and draws reasonable inferences in the plaintiff's favor. *Parish v. City of Elkhart,* 614 F.3d 677, 679 (7th Cir.2010). To survive a motion to dismiss, the plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

### A. Statute of limitations

Palermo seeks dismissal on the ground that the statute of limitations expired on each of UGSI's claims before UGSI filed its lawsuit on November 21, 2013. Palermo argues that UGSI's claims are time barred because all of the claims arose in October 2010, which is when UGSI alleges that Palermo began making false statements. In response, UGSI contends that presentment and publication after November 2010 can form the basis for liability.[1] For the reasons set forth below, Palermo is not entitled to dismissal on this basis.

### 1. Applicable limitations periods

As a threshold matter, the Court must determine which limitations periods apply to UGSI's claims. A district court sitting in diversity must apply the choice of law principles from the forum state to determine which state's law governs. *West Bend Mut. Ins. Co. v. Arbor Homes LLC,* 703 F.3d 1092, 1095 (7th Cir.2013). The Court must therefore apply Illinois choice of law rules to determine the governing statute of limitations. In Illinois, statutes of limitation are procedural, and thus the Illinois statute of limitations applies to all claims unless the Illinois borrowing statute is triggered. *SeeNewell Co. v. Petersen,* 325 Ill.App.3d 661, 668–69, 758 N.E.2d 903, 908 (2001).

The parties do not dispute that a one-year limitations period applies to UGSI's trade label claim under Illinois law. *See*735 ILCS 5/13–201 (one-year limitations period for libel); *Johnson Controls, Inc. v. Exide Corp.,* 152 F.Supp.2d 1075, 1078 (N.D. Ill. 2001) (applying the libel limitations period to trade label).[2]

The parties also agree that a three-year limitations period applies to UGSI's Lanham Act and IUDTPA claims. *See*815 ILCS 505/10(a)(e); *Clever Ideas, Inc. v. Citicorp Diners Club, Inc.,* No. 02 C 5096, 2003 WL 21982141, at \*13 (N.D.Ill. Aug. 20, 2003) (noting that the three-year statute of limitations from the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA) has been applied to IUDTPA claims); *Johnson Controls, Inc.,* 152 F.Supp.2d at 1079 (noting that courts have applied the ICFA limitations period to Lanham Act claims).

**\*3** The parties disagree about which limitations period applies to the tortious interference claims. Palermo argues that California's two-year limitations period applies to UGSI's interference claims, whereas UGSI argues that Illinois' five-year period applies. For the reasons stated below, the Illinois borrowing statute is triggered with respect to UGSI's interference claims. Thus California's two-year limitations period applies.

The Illinois borrowing statute applies if (1) the cause of action arises in another state, (2) the other state's statute of limitations is shorter than the Illinois period, and (3) none of the parties reside in Illinois. 735 ILCS 5/13–210; *Emp'rs Ins. of Wausau v. Ehlco Liquidating Trust,* 309 Ill.App.3d 730, 737, 723 N.E.2d 687, 693 (1999). The last two requirements are easily met. California's limitations period is shorter than Illinois' limitations period. Compare Cal.Civ.Proc.Code § 339(1) (two years); *Kolani v. Gluska,* 64 Cal.App. 4th 402, 408, 75 Cal.Rptr.2d 257, 260 (1998) (applying § 339(1) to intentional interference with prospective economic advantage claim); *DC Comics v. Pac. Pictures Corp.,* 938 F.Supp.2d 941, 948 (C.D.Cal.2013) (applying § 339(1) to tortious interference with contract claim), *with*735 ILCS 5/13–205 (five-year limitations period for "all civil actions not otherwise provided for"). And none of the parties reside in Illinois.

Both parties agree that the Court must apply the approach described in the Restatement (Second) of Conflicts of Law to determine where the claim arose for purposes of the borrowing statute. *SeeEhlco,* 309 Ill.App.3d at 739,

2014 WL 4703925

723 N.E.2d at 694; *Mitchell v. United Asbestos Corp.*, 100 Ill.App.3d 485, 499, 426 N.E.2d 350, 360 (1981). The parties disagree about the result of that analysis. UGSI argues that the law of the place of the injury should apply because "the complaint specifically identifies two instances where the 'injury was felt in Illinois'—emails from two consulting engineering firms in Illinois who expressed concern with UGSI's Fusible PVC® pipe after reviewing Palermo's false statements." Pl.'s Resp. to Def.'s Mot. to Dismiss at 4. Palermo argues that California law should apply because UGSI's principal place of business is in California.

To determine which state has the most significant interest as required under the Second Restatement, the Court must apply a " 'two-step process in which the court (1) chooses a presumptively applicable law under the appropriate jurisdiction-selecting rule, and (2) tests this choice against the principles of § 6 in light of relevant contacts identified by general provisions like § 145 (torts).' " *Townsend v. Sears, Roebuck & Co.*, 227 Ill.2d 147, 164, 879 N.E.2d 893, 903 (2007) (quoting P. Borchers, *Courts and the Second Conflicts Restatement: Some Observations and an Empirical Note*, 56 Md. L. Rev. 1232, 1247 (1997)).

Here, the applicable presumptive rule is section 151, which states that "[t]he choice-of-law rules involving injurious falsehood are the same as those involving defamation." Restatement (Second) of Conflicts of Law § 151. *See also* *Kelco Metals, Inc. v. Morgan*, No. 09 C 4476, 2010 WL 1427583, at *5 (N.D.Ill. Apr. 5, 2010) (applying section 151 to tortious interference claims involving injurious falsehood). For cases involving defamation or injurious falsehood disseminated in multiple states, there is a presumption in favor of applying the law of the plaintiff's domicile. *See* *Kamelgard v. Macura*, 585 F.3d 334, 341 (7th Cir.2009); *Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 916 (7th Cir.1994) ("[T]he Illinois cases say that in a multistate defamation case ... the applicable law is that of the victim's domicile, period.").

**\*4** The Restatement contemplates instances where a state other than the state of the plaintiff's domicile might have the most significant relationship, including when "the matter claimed to be defamatory related to an activity of the plaintiff that is principally located in this state" or "the plaintiff suffered greater special damages in this state than in the state of its principal place of business." Restatement (Second) of Conflicts of Law § 150, cmt. f. UGSI does not claim that Palermo's alleged false statements involved activity principally located in Illinois; indeed, UGSI's business is nationwide, and Palermo's allegedly false statements were made in many states. Compl. ¶ 1. UGSI

refers to two e-mails from Illinois consulting firms expressing concerns about Palermo's studies to show it suffered damage in Illinois, but it provides no indication that damages were greater in Illinois than in California. California law therefore presumptively applies.

The second step of the Second Restatement approach is to test the presumption by balancing the factors of section 145 to determine which state has the most significant interest. Those factors include the place where the injury occurred, the place where the conduct causing the injury occurred, the parties' domicile, and the place where the relationship is centered. Restatement (Second) of Conflicts of Law § 145. UGSI alleges that Palermo made false statements in multiple states, but it points specifically to injury suffered in Illinois. The first factor therefore points slightly in favor of Illinois law. Palermo gave presentations in Florida, Minnesota, Michigan, and other states (though none in California or Illinois),[3] but he also allegedly contacted customers in Illinois about a pipeline incident. Because UGSI has alleged some conduct in Illinois, this factor also slightly favors Illinois. The domicile of the parties, however, cuts strongly in favor of California law, because UGSI's principal place of business is in California. California has a strong interest in protecting its businesses from injurious falsehood. Illinois, on the other hand, has a less significant interest in preventing injuries to out-of-state businesses. Based on the strong presumption in favor of applying the law of the plaintiff's domicile and California's interest in the application of its law, California's statute of limitations applies to the two interference claims. *See* *Townsend*, 227 Ill.2d at 162, 879 N.E.2d at 902 (expressing concern that courts "have undervalued the specific presumptive rules").

Based on this analysis, California law also applies to UGSI's claims for trade libel and tortious interference.

**2. Accrual arguments**

Palermo argues that UGSI's claims are time barred. But "a plaintiff is not required to negate an affirmative defense, such as the statute of limitations, in his complaint." *Clark v. City of Braidwood*, 318 F.3d 764, 767 (7th Cir.2003); *see also* *Richards v. Mitcheff*, 696 F.3d 635, 637–38 (7th Cir.2012). A court may dismiss a complaint under Rule 12(b)(6) based on the statute of limitations only "if the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir.2009) (internal quotation marks omitted). The complaint does not set forth enough information to make such a determination in this case.

altered or added to, or the website is directed to a new audience.").

### a. Single publication rule

The single publication rule does not provide a basis to dismiss UGSI's claims for failure to state a claim. Under the single publication rule, the statute of limitations for libel or any tort related to a single publication, exhibition, or presentation begins to run when the material is first published. *See* Cal. Civ.Code § 3425.3; 740 ILCS 165/1; *Shively v. Bozanich,* 31 Cal.4th 1230, 1245, 80 P.3d 676, 684 (2003). The Court also assumes for purposes of discussion that the same rule applies to Lanham Act claims. *See Yeager v. Bowlin,* 495 Fed.Appx. 780, 781–82 (9th Cir.2012). The single publication rule, however, only applies to copies of "any one presentation to an audience." Cal. Civ.Code § 3425.3; 740 ILCS 165/1. UGSI alleges that Palermo made multiple presentations and published "variations" of his slide show on his website. Compl. ¶ 24. Each new presentation to a different audience that took place within the statutory period therefore triggers liability for the particular publication. *See Blair v. Nev. Landing P'ship,* 369 Ill.App.3d 318, 325, 859 N.E.2d 1188, 1194 (2006) (citing *Lehman v. Discovery Commc'ns, Inc.,* 332 F.Supp.2d 534, 539 (E.D.N.Y.2004)). Each new presentation was "intended to reach a new audience and is therefore an additional communication." *Lehman,* 332 F.Supp.2d at 539 (stating that a television rebroadcast "has renewed impact with each viewing and creates a new opportunity for injury"). UGSI's claims are therefore not time barred as to Palermo's live presentations within the limitations periods.

**\*5** Although the statute of limitations generally begins to run in this context when a website is first published, UGSI's complaint alleges that different versions of Palermo's slide show were posted on the Internet. Compl. ¶ 24. UGSI points out that the slide show copy attached to Palermo's motion to dismiss reports 2012 pipe failures, which indicates that at least one version was published during or after 2012. Accordingly, the Court does not have information that would permit a ruling on a motion to dismiss that the single publication rule applies to bar the reports and slide show copies posted to Palermo's website. *See Blair,* 369 Ill.App.3d at 325, 859 N.E.2d at 1194 (stating in the context of a right to privacy claim that a "republication of the plaintiff's likeness can constitute a new cause of action if the publication is altered so as to reach a new audience or promote a different product"); *Yeager v. Bowlin,* 693 F.3d 1076, 1082 (9th Cir.2012) ("[U]nder California law, a statement on a website is not republished unless the statement itself is substantively

### b. Discovery rule

UGSI invokes the discovery rule to argue that it can obtain relief for conduct that took place outside the applicable limitations periods. *See* Cal.Civ.Proc.Code § 339(1) (action "shall not be deemed to have accrued until the discovery of the loss or damage suffered by the aggrieved party thereunder"); *Sam Kholi Enters., Inc. v. Jones Motor Grp., Inc.,* No. 11–CV–0177 W POR, 2012 WL 4497325, at \*5 (S.D.Cal. Sept. 28, 2012) (applying discovery rule to interference claims). UGSI does not allege in its complaint when it discovered Palermo's alleged misrepresentations. Because UGSI's complaint is "silent as to the date of discovery," *Clark,* 318 F.3d at 767, the Court cannot determine on a motion to dismiss that the discovery rule is inapplicable.

### c. Special damages

UGSI argues that its claim for trade libel is not time barred because the action accrued only after it suffered special damages. Because the Illinois borrowing statute does not apply to UGSI's trade libel claim, Illinois accrual rules govern even though California's substantive law applies. *See Thomas v. Guardsmark, Inc.,* 381 F.3d 701, 707 (7th Cir.2004). The one court to address accrual for a trade libel claim under Illinois law applied the defamation accrual rule, which as a general rule is the time of publication. *See Johnson Controls,* 152 F.Supp.2d at 1078. In that case, however, both parties agreed to treat defamation and trade libel the same for statute of limitations purposes. *Id.* at 1078 n.7.

Under Illinois law, "[a] tort cause of action accrues when all the elements of the suit ... are present." *Ericksen v. Vill. of Willow Springs,* 279 Ill.App.3d 210, 215, 660 N.E.2d 62, 66 (1995). *Accord Gerbasi v. PHH Home Loans, LLC,* No. B240288, 2013 WL 2448407, at \*2 (Cal. Ct.App. June 6, 2013). Under California law, special damages are an element of trade libel. Thus "[a] cause of action for trade libel [ ] accrues when the plaintiff suffers 'special damages in the form of pecuniary loss.' " *Consortium Info. Servs., Inc. v. Experian Info. Solutions, Inc.,* No. G043781, 2011 WL 1782114, at \*5 (Cal.Ct.App. May 10, 2011) (unpublished) (quoting *Guess, Inc. v. Superior Court,* 176 Cal.App.3d 473, 478, 222 Cal.Rptr.

2014 WL 4703925

79 (1986)). The complaint does not specify when UGSI first suffered such damages, so the Court cannot determine on a Rule 12(b)(6) motion that UGSI's trade libel claim accrued outside the limitations period.

### d. Continuing violation

As to UGSI's Lanham Act and IUDTPA claims, it appears that the majority of the presentations took place after the November 21, 2010 accrual date. Although neither party invoked the doctrine, the "notion of a continuing wrong" applies to Lanham Act claims in the Seventh Circuit. *Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d 813, 821 (7th Cir.1999) (internal quotation marks omitted). *SeeHot Wax, Inc. v. Warsaw Chem. Co.,* 45 F.Supp.2d 635, 647 (N.D.Ill.1999) (continuing wrong principles apply to Lanham Act false advertising claims). The continuing violation doctrine allows a plaintiff to pursue relief for "a time-barred act by linking it with an act that is within the limitations period." *Selan v. Kiley,* 969 F.2d 560, 564–65 (7th Cir.1992). For continuing violation principles to apply, the unlawful acts must be a "series, a continuum, rather than a concatenation of unrelated acts." *Moskowitz v. Trs. of Purdue Univ.,* 5 F.3d 279, 282 (7th Cir.1993). The continuing violation doctrine will "delay the deadline for suing with respect to the earliest acts in the series only if their character was not apparent when they were committed but became so when viewed in the light of the later acts." *Id.* As with the discovery rule, the Court cannot determine on a motion to dismiss that the continuing violation doctrine does not apply. Thus the Court cannot appropriately dismiss UGSI's Lanham Act or IUDTPA claim based on the statute of limitations. For the reasons stated above, Palermo is not entitled to dismissal of UGSI's claims based on the statute of limitations.

## B. Failure to state a claim

### 1. Trade libel

#### a. Special damages

*6 Palermo contends that UGSI has insufficiently alleged special damages as required to state a claim for trade libel. Federal Rule of Civil Procedure 9(g) provides that "[i]f an item of special damage is claimed, it must be specifically stated."

For the same reasons that California's statute of limitations applies to UGSI's interference claims, California's substantive law applies to UGSI's trade libel. A claim for trade libel requires proof of special damages under California law. A plaintiff must allege "specific pecuniary loss." *Leonardini v. Shell Oil Co.,* 216 Cal.App.3d 547, 572, 264 Cal.Rptr. 883, 898 (1989). For a plaintiff to prevail in an action for trade libel, "it is not enough to show a general decline in his business resulting from the falsehood, even where no other cause for it is apparent." *Erlich v. Etner,* 224 Cal.App.2d 69, 73, 36 Cal.Rptr. 256, 259 (1964). Rather, a plaintiff generally "must identify the particular purchasers who have refrained from dealing with him, and specify the transactions of which he claims to have been deprived." *Id.* at 74, 36 Cal.Rptr. at 259 (internal quotation marks omitted).

On a motion to dismiss in federal court, however, the requirement to "specifically state" items of special damages does not present so high a hurdle. "[I]t is enough to identify a concrete loss." *Pippen v. NBCUniversal Media, LLC,* 734 F.3d 610, 614 (7th Cir.2013), *cert. denied,*134 S.Ct. 2829 (2014). In *Pippen,* the plaintiff alleged that "endorsement and personal-appearance opportunities dwindled as a result of the defendants' false reports" and "identified specific business opportunities that had been available to him earlier but that, following the defendants' statements, were available no more." *Id.* The court found this sufficient under Rule 9(g). *Id.* In addition, though the plaintiff must allege "some actual pecuniary loss," "an estimation of final total dollar amounts lost is unnecessary." *Action Repair, Inc. v. Am. Broad. Cos.,* 776 F.2d 143, 149–50 (7th Cir.1985) (internal citation omitted). In *Fleck Bros. Co. v. Sullivan,* 385 F.2d 223 (7th Cir.1967), the complaint's allegation that the plaintiff "expended time, money, and effort to reestablish its credit" was sufficient to "notify defendants of plaintiff's claim that it has suffered monetary loss" as a result of the defendant's libelous statements. *Id.* at 225.

UGSI alleges that because of Palermo's misrepresentations, "UGSI personnel were and are required to expend extensive time and effort to address customers' and prospective customers' questions about Fusible PVCTM pipe and assuage their concerns." Compl. ¶ 47. The complaint also quotes e-mails from consulting engineers expressing concern about Palermo's reports. *Id.* ¶¶ 35–36. UGSI has sufficiently alleged special damages.

#### b. Disparagement by implication

2014 WL 4703925

Palermo argues that UGSI's trade libel claim fails "as a matter of law because the alleged defamatory statements related to the fused PVC products in general rather than UGSI itself." Def.'s Mem. in Support of Mot. to Dismiss at 7. UGSI argues that it alleged disparagement by implication because UGSI is the only seller of butt-fused PVC pipe in North America.

**\*7** "California courts have not explicitly determined whether a cause of action for disparagement can exist where a publication does not expressly identify a disparaged product or business." *E.piphany, Inc. v. St. Paul Fire & Marine Ins. Co.,* 590 F.Supp.2d 1244, 1252 (N.D.Cal.2008). Nonetheless, at least one federal district court has found "that disparagement by implication is actionable under California law." *Id.* Further, the California Supreme Court has stated that in cases involving defamation and other injurious falsehoods, the requirement that the statement "be 'of and concerning,' the plaintiff" does not require the plaintiff be mentioned by name; instead he "may be identified by clear implication." *Blatty v. N.Y. Times Co.,* 42 Cal.3d 1033, 1044 n.1, 728 P.2d 1177, 1184 n.1 (1986). Because UGSI alleges that it is the sole supplier of buttfused PVC pipe in the United States, by implication Palermo's allegedly false statements targeted UGSI, and only UGSI. Compl. ¶ 16. A court in this district has allowed claims of disparagement by implication to survive a motion to dismiss in a similar case. *See, e.g.,Morton Grove Pharm., Inc. v. Nat'l Pediculosis Ass'n, Inc.,* 494 F.Supp.2d 934, 943 (N.D.Ill.2007) (denying motion to dismiss IUDTPA trade disparagement claims even though the defendants did not name the product because the plaintiff was the sole manufacturer in the United States). UGSI has stated a claim for trade libel by implication.

## 2. Intentional interference with prospective economic advantage

### a. *Noerr–Pennington* immunity

Palermo argues that the *Noerr–Pennington* doctrine immunizes him from liability for intentional interference with prospective economic advantage because his statements were directed at municipal customers and non-profit associations that set pipe standards for municipalities. *E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington,* 381 U.S. 657 (1965). The *Noerr–Pennington* doctrine, originally developed in the antitrust context, has been applied in other areas to provide absolute immunity for those who exercise their

First Amendment right to petition the government. *SeeCardtoons, L.C. v. Major League Baseball Players Ass'n,* 208 F.3d 885, 889 (10th Cir.2000) ("To the extent that Supreme Court precedent can be read to extend *Noerr–Pennington* outside of the antitrust context, it does so solely on the basis of the right to petition.").

Courts applying *Noerr–Pennington* outside of the antitrust context have declined to grant immunity in cases involving fraud and misrepresentation. For instance, the U.S. Court of Appeals for the D.C. Circuit held that *Noerr–Pennington* "does not protect deliberately false or misleading statements." *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1123 (D.C.Cir.2009) (holding *Noerr–Pennington* did not immunize a tobacco company that made knowingly false statements about the risks of smoking). This approach is consistent with the Supreme Court's holding in *McDonald v. Smith,* 472 U.S. 479 (1985), that the First Amendment right to petition did not provide absolute immunity to an individual who made libelous statements to the President. *Id.* at 485 ("The right to petition is guaranteed; the right to commit libel with impunity is not."). On a motion to dismiss, this Court assumes as true UGSI's allegations that Palermo intentionally made false statements about its products. The Court therefore declines to dismiss based on *Noerr–Pennington* immunity.

Even if Palermo's statements were not intentionally false, he would not be entitled to immunity. It does not appear that Palermo directly petitioned any government official. At least one circuit has refused to confer immunity for statements made during communications between private parties. *SeeCardtoons,* 208 F.3d at 892 (refusing to grant immunity for prelitigation threats between private parties and noting that "[t]he plain language of the First Amendment protects only those petitions which are made to 'the Government' ").

### b. Failure to identify prospective economic benefit

Palermo also argues that UGSI's claim for intentional interference with prospective economic advantage is deficient because it does not identify any existing relationships with clients or prospective customers that were affected by Palermo's statements. The elements of a claim intentional interference with prospective economic advantage under California law are:

> **\*8** (1) an economic relationship between the plaintiff and some third party, with the probability of

2014 WL 4703925

future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.

*Youst v. Longo,* 43 Cal.3d 64, 71 n.6, 729 P.2d 728, 733 n.6 (1987). A plaintiff must show "that it is reasonably probable that the lost economic advantage would have been realized but for the defendant's interference." *Id.* at 71, 729 P.2d at 733.

"[A] federal court sitting in diversity applies federal pleading requirements." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.,* 536 F.3d 663, 670 (7th Cir.2008). Federal courts have required plaintiffs to allege a lost contract, failed negotiation, or ongoing business relationship to state a claim for intentional interference with prospective economic advantage under California law. The Ninth Circuit affirmed dismissal of an intentional interference claim when the plaintiff "failed to plead facts either showing or allowing the inference of actual disruption to its relationship with the Customers." *Sybersound Records, Inc. v. UAV Corp.,* 517 F.3d 1137, 1151 (9th Cir.2008). There, the complaint alleged that the plaintiff had "been harmed because its ongoing business and economic relationships with Customers have been disrupted." *Id.* The court held that this was insufficient because the plaintiff "failed to plead facts either showing or allowing the inference of actual disruption to its relationship with the Customers" and because the plaintiff did not "allege, for example, that it lost a contract nor that a negotiation with a Customer failed." *Id.*

The court in *Sybersound* also cited with approval a district court decision dismissing an intentional interference claim. *Id.* (citing *Silicon Knights, Inc. v. Crystal Dynamics, Inc.,* 983 F.Supp. 1303, 1313 (N.D.Cal.1997)). In that case, the court determined that the complaint contained no allegations "from which the court or defendants could infer the probable disruption of an actual economic relationship by means of alleged defamatory statements." *Silicon Knights, Inc.,* 983 F.Supp. at 1312. The court noted that "[t]he complaint does not allege that Silicon Knights was in the midst of negotiations ... and that the third party pulled out of the negotiations or awarded business to another because of these alleged acts by Defendants." *Id. See also* *Newcal Indus., Inc. v. IKON Office Solutions, Inc.,* Nos. C 04–02776 JSW, C 10– 5974

JSW, 2011 WL 1899404, at *6 (N.D.Cal. May 19, 2011).

Given these precedents, UGSI's allegations that its products "were being considered by several municipalities for upcoming projects" and that potential customers "were dissuaded" based on Palermo's statements are insufficient. Compl. ¶ 24. UGSI's complaint also refers to two consulting engineers who expressed concerns about Palermo's reports and alleges that the company's pipes were "excluded from consideration by at least two consulting engineering firms." *Id.* ¶¶ 34–36. The complaint does not, however, identify any pending contract that was lost or negotiations that were thwarted by Palermo's alleged misrepresentations. *Cf.Impeva Labs, Inc. v. Sys. Planning Corp.,* No. 5:12–CV–00125–EJD, 2012 WL 3647716, at *6 (N.D.Cal. Aug. 23, 2012) (plaintiff sufficiently alleged a relationship with a reasonable probability of future economic benefit when it had "engaged in business discussions" with a potential purchaser and the plaintiff later lost the bid). The Court therefore dismisses UGSI's claim for intentional interference with prospective economic advantage, with leave to amend.

### 3. Tortious interference with contract arguments

*\*9* Palermo argues that UGSI has not stated a claim for tortious interference with contract because it does not identify any valid contract with a third party that Palermo caused to be breached. To state a claim for tortious interference with contract under California law, a plaintiff must allege: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.,* 50 Cal.3d 1118, 1126, 791 P.2d 587, 589–90 (1990). Federal courts considering such claims under California law have held that a plaintiff cannot survive a motion to dismiss unless it pleads "specific facts establishing the existence of valid contracts with third parties and [the defendant's] awareness of such contracts." *F.M. Tarbell Co. v. A & L Partners, Inc.,* No. CV 10–1589 PSG EX, 2011 WL 1153539, at *4 (C.D.Cal. Mar. 23, 2011). *See alsoname.space, Inc. v. Internet Corp. for Assigned Names & Numbers,* No. CV 12–8676 PA PLAX, 2013 WL 2151478, at *8 (C.D.Cal. Mar. 4, 2013). Although UGSI claims that Palermo "intended to and did cause at least one customer to breach its contract with UGSI for Fusible PVCTM pipe," Compl. ¶ 71, to state a viable claim, UGSI must identify that or some other particular contract that was breached due to Palermo's actions.

**4. Lanham Act**

Palermo concedes that the Supreme Court's recent decision in *Lexmark International, Inc. v. Static Control Components, Inc.,* 134 S.Ct. 1377 (2014), undercuts his argument that he cannot be liable for false advertising under the Lanham Act because he and UGSI are not direct competitors. *Id.* at 1392 (stating that it is "a mistake to infer that because the Lanham Act treats false advertising as a form of unfair competition, it can protect only the false-advertiser's direct competitors"). Palermo argues that UGSI's Lanham Act claim nonetheless should be dismissed because Palermo did not engage in "commercial advertising or promotion" as required under section 43(a) of the Lanham Act.

Section 43(a)(1)(B) permits a suit against anyone who "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). Palermo argues that his face-to-face presentations are not "advertising or promotion" under the Lanham Act. UGSI, on the other hand, alleges that Palermo engaged in promotion by giving speeches and posting reports as a paid spokesperson for UGSI's competitor, Performance Pipe.

Palermo mistakenly relies on the fact that many courts, including this one, have refused to allow Lanham Act claims when the alleged misrepresentations took place in face-to-face meetings with a small number of individuals. *See Installation Servs., Inc. v. Elec. Research, Inc.,* No. 04 C 6906, 2005 WL 645244, at *2 (N.D.Ill. Mar. 21, 2005) (Kennelly, J.) (false statements made during an in person meeting were not "advertising or promotion" because they were not disseminated to the purchasing public); *Johnson Controls,* 152 F.Supp.2d at 1082 (misrepresentation made to a single customer while negotiating a supply contract was not actionable). The Seventh Circuit has distinguished between "promotional material disseminated to anonymous recipients" to which the Lanham Act applies and "face-to-face communication" such as "a person-to-person pitch by an account executive." *First Health Grp. Corp. v. BCE Emergis Corp.,* 269 F.3d 800, 803–04 (7th Cir.2001). As this Court has previously stated, the distinction rests on whether a communication is a "generalized solicitation rather than an individualized communication." *Organ Recovery Sys., Inc. v. Pres. Solutions, Inc.,* No. 11 C 4041, 2012 WL 2577500, at *4 (Kennelly, J.) (N.D.Ill. July 4, 2012).

Palermo cites *Sanderson v. Culligan International Co.,* 415 F.3d 620 (7th Cir.2005), in which the Seventh Circuit held that three "person-to-person communications at trade shows" were not "promotional materials disseminated to anonymous recipients." *Id.* at 624 (internal quotation marks omitted). The Seventh Circuit, however, recently clarified that its holding in *Sanderson* did not mean that " 'advertising or promotion' is always limited to published or broadcast materials" distributed to the general public. *Neuros Co. v. KTurbo, Inc.,* 698 F.3d 514, 521 (7th Cir.2012). In *Neuros,* a manufacturer of turbo blowers sued its competitor pursuant to the Lanham Act and the IUDTPA for giving false slide show presentations to "engineering firms that advise waste water treatment plants on which turbo blowers to buy." *Id.* at 518. In finding that the slide show presentations constituted "promotion" under the Lanham Act, the court observed that "there are industries in which promotion–a systematic communicative endeavor to persuade possible customers to buy the seller's product–takes a form other than publishing or broadcasting." *Id.* at 522. In *Neuros,* as here, "[t]he de facto customers ... are the consulting engineers who manage the plants' bidding and purchasing." *Id.*

**\*10** Because an activity is promotional if it involves dissemination to anonymous members of the purchasing public, Palermo's presentations to a large group of industry members for the purpose of directing customers to select Performance Pipe's products amount to "advertising or promotion" under the Lanham Act. *See Seven–Up Co. v. Coca–Cola Co.,* 86 F.3d 1379, 1386 (5th Cir.1996) (Coca–Cola's presentation designed "to target these independent bottlers and convince them, based on comparative sales statistics, to switch from 7UP to Sprite" was promotional); *Johnson Controls,* 152 F.Supp.2d at 1081 (representations must "be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry"). The materials that were published on the Internet are also promotional under the Lanham Act. *See Neuros* Co., 698 F.3d at 522. For these reasons, the Court declines to dismiss UGSI's Lanham Act claim.

**5. IUDTPA**

UGSI alleges that Palermo engaged in deceptive trade practices under the IUDTPA by making false and misleading representations concerning the quality of UGSI's products. *See* 815 ILCS 510/2(a)(7)–(8). Palermo argues that UGSI cannot assert a claim under the statute because there is not a sufficient nexus to Illinois.

The Illinois Supreme Court has held that a plaintiff may

sue under the ICFA only "if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois." *Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill.2d 100, 187, 835 N.E.2d 801, 853–54 (2005). Many courts have applied the reasoning in *Avery* to IUDTPA claims, and the Court agrees with those decisions. *See, e.g.,Purepecha Enters., Inc. v. El Matador Spices & Dry Chiles,* No. 11 C 2569, 2012 WL 3686776, at *14 (N.D.Ill. Aug. 24, 2012); *Miche Bag, LLC v. Be You, LLC,* No. 11 C 720, 2011 WL 4449683, at *6 n.3 (N.D.Ill. Sept. 26, 2011); *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.,* 809 F.Supp.2d 857, 859 (N.D.Ill.2011); *In re Sears, Roebuck & Co.,* No. MDL–1703, 2006 WL 1443737, at *3 (N.D.Ill. May 17, 2006).

In *Avery,* the court refrained from articulating a "bright-line test" for determining whether a transaction occurred in Illinois. Instead, the court looked to factors including the plaintiff's residence, where the deception occurred, where the damage to the plaintiff occurred, and whether the plaintiff communicated with the defendant or its agents in Illinois. *Avery,* 216 Ill.2d at 187–90, 835 N.E.2d at 854–55. Courts applying the *Avery* factors have dismissed claims that fail to allege sales or conduct directed to Illinois when no party was an Illinois citizen. *See, e.g.,Miche Bag,* 2011 WL 4449683, at *6; *Sears, Roebuck & Co.,* 2006 WL 1443737, at *3 (granting motion to dismiss as to nonIllinois plaintiffs but denying motion as to Illinois plaintiffs).

In *Avery,* the court held that nonresident plaintiffs could not sue an Illinois insurance company under the ICFA because "[t]he overwhelming majority of circumstances relating to the disputed transactions ... occurred outside of Illinois for the out-of-state plaintiffs." *Avery,* 216 Ill.2d at 187, 835 N.E.2d at 854. UGSI has not alleged that Palermo's misrepresentations "occurred primarily and substantially in Illinois." *Vulcan Golf, LLC v. Google Inc.,* 552 F.Supp.2d 752, 775 (N.D.Ill.2008) (granting motion to dismiss because the Illinois plaintiffs "point to

no allegations that plausibly suggest that the purported deceptive domain scheme occurred primarily and substantially in Illinois"). Apart from UGSI's claims that a Performance Pipe sales manager presented Palermo's materials at an Illinois conference and that Palermo contacted an Illinois customer after a pipeline incident, the bulk of the alleged misrepresentations took place outside of Illinois. UGSI alleges two examples of effects in Illinois—the two e-mails from Illinois engineers expressing concern about Palermo's reports. Those allegations do not mean that UGSI felt injury in Illinois. Apart from targeting some business to the state, UGSI has alleged no connection to Illinois. For this reason, the Court dismisses UGSI's IUDTPA claim, with leave to amend, assuming UGSI can do so in a way that includes a sufficient nexus to Illinois.

**Conclusion**

**\*11** For the foregoing reasons, the Court grants Palermo's motion to dismiss in part and denies it in part [dkt. no. 15]. The Court dismisses UGSI's IUDTPA, interference with prospective economic advantage, and interference with contract claims with leave to amend (Counts 2, 3, and 5) but declines to dismiss UGSI's Lanham Act and trade libel claims (Counts 1 and 4). UGSI has until October 13, 2014 to seek leave to amend, attaching a proposed amended complaint that it contends states viable claims under the IUDTPA and for tortious interference. Rule 26(a)(1) disclosures are likewise to be made by October 13, 2014. The case is set for a status hearing on October 20, 2014 at 9:00 a.m., in chambers, to set a schedule for further proceedings. The Court directs the parties to discuss and attempt to agree on a schedule to propose to the Court.

Footnotes

1    The complaint lists presentations during which a different sales manager at Performance Pipe presented Palermo's materials. Compl. ¶ 27. The parties have not briefed whether Palermo can be liable for those presentations, so the Court does not address that issue.

2    California courts dispute whether the statute of limitations for trade libel is one or two years. *SeeRebel, LLC v. Aqua Connect, Inc.,* No. CV 13–4539 RSWL MANX, 2014 WL 2890242, at *4 (C.D. Cal. June 24, 2014). The Court need not address this issue because there is no basis to borrow California's limitations period.

3    It does not appear that Palermo gave a presentation in Illinois. Rather, a Performance Pipe sales manager presented Palermo's reports at an Illinois conference in 2012. Compl. ¶ 27.

Underground Solutions, Inc. v. Palermo, Not Reported in F.Supp.3d (2014)

2014 WL 4703925

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit L

2002 WL 598511

2002 WL 598511
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.

UNIQUE ENVELOPE CORP., an Illinois
corporation Plaintiff,
v.
GSAMERICA, INC., a Tennessee corporation,
Defendants.
GSAMERICA, INC., a Tennesee corporation,
Counter-Plaintiffs,
v.
UNIQUE ENVELOPE CORP., an Illinois
corporation, Melvin Kozbiel, Colette Kozbiel, and
Darrel Kozbiel Counter-Defendant.

No. 00C7811. | April 18, 2002.

**MEMORANDUM, OPINION AND ORDER**

ANDERSEN, District J.

**\*1** This case is before the court on the motion of
Plaintiff/Counter-Defendant Unique Envelope ("Unique")
to dismiss Counts II, III and IV of
Defendant/Counter-Plaintiff GSAmerica's ("GSA")
second amended counterclaim pursuant to Fed.R.Civ.P.
12(b)(6). For the reasons stated below, we grant in part
and deny in part Unique's motion to dismiss.

**BACKGROUND**

Unique has filed a motion to dismiss GSA's amended
counterclaim. Instead of filing a response to the motion to
dismiss, GSA filed a motion for leave to file a second
amended counterclaim. We hereby give GSA leave to file
its second amended counterclaim, and we will consider
Unique's motion to dismiss as to the second amended
counterclaim.

The following allegations are taken from the second
amended counterclaim. GSA is in the business of print
management as a "middleman." GSA buys printing
products to sell to customers for use in the customers'

printing business. Unique manufactures envelopes and
provides printing and lithographic services.
Counter-defendant Melvin Kozbiel ("Melvin") is
Unique's president and Board member and owns 60
percent of the company. Counter-defendant Colette
Kozbiel ("Colette") supervises Unique's finances, is a
member of Unique's Board of Directors, and owns 40
percent of the company. Counter-defendant Darrel
Kozbiel ("Darrel") is in charge of Unique's production
line. GSA and Unique entered into an agreement whereby
Unique promised to deliver envelopes for a Christmas
card line to GSA. In its counterclaim, GSA alleges that
Unique failed to deliver the envelopes as promised and
that GSA was damaged as a result.

In January 1997, GSA entered into a business relationship
with Empress Greetings, Inc. to provide print
management services for Empress' TVA Christmas line
("TVA"). In April 1997, GSA began a search for a vendor
to produce envelopes for the TVA line. On April 15,
1997, in an effort to win the TVA account, Darrel traveled
to California on behalf of Unique to meet with GSA
president Louis Rosenberg. At that meeting, Darrel
allegedly represented that Unique was familiar with the
industry standards for premium Christmas card lines and
acknowledged that the TVA line was a premium
Christmas card line. He also allegedly represented that
Unique had substantial experience producing envelopes of
quality equal to those produced for the TVA line and
would produce envelopes equal in quality to the TVA line
produced by a previous vender.

In addition, Darrel allegedly stated that Unique
understood the critical nature of delivery times for the
seasonal TVA Christmas line and that Unique could meet
the delivery schedule if chosen by GSA to be the vendor
for the TVA line. Unique also allegedly represented that it
was familiar with the practice in the Christmas card
industry of providing payment terms known as partial
Christmas dating, which means that thirty percent of the
payment was due net 90 days and seventy percent was
due the following January 10th. Unique allegedly
promised that it would provide GSA partial Christmas
dating for all of the projected envelopes for the TVA line.
The parties discussed the possibility of Unique purchasing
an envelope manufacturing machine used by the vendor
that had previously produced the TVA line.

**\*2** At that meeting, Unique reviewed samples of previous
TVA lines and subsequently offered GSA the following
proposed agreement to produce the TVA line: 1) Unique
would provide GSA with partial Christmas dating; 2)
Unique would adhere to the delivery schedules required

by GSA; 3) Unique would provide envelopes in the quantities required by GSA; 4) Unique would provide envelopes to GSA pursuant to industry standards and, specifically, of the same quality as the samples provided to Unique by GSA; and 5) Unique would purchase the envelope manufacturing machine from the previous vendor of the TVA line. In reliance on the above representations made by Darrel on behalf of Unique and the terms of the proposed agreement, GSA entered into a contract whereby Unique became the vendor for the TVA line.

GSA has filed a four-count second amended counterclaim against Unique alleging the following claims: breach of contract against Unique (Count I); fraud against Darrel Kozbiel (Count II); fraud against Melvin and Colette Kozbiel (Count III); and tortious interference with prospective economic advantage against Unique (Count IV). Unique's motion to dismiss seeks to dismiss only counts II, III and IV.

## DISCUSSION

When deciding a motion to dismiss, we consider all of the allegations of the complaint to be true and view all well-pleaded facts and any reasonable inferences drawn from the facts in the light most favorable to the plaintiff. *Sherwin Manor Nursing Center, Inc. v. McAuliffe*, 37 F.3d 1216, 1219 (7th Cir.1994). Dismissal is proper only if it is clear from the complaint that no set of facts consistent with its allegations would entitle plaintiff to relief. *Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984).*

### I. Fraud

To state a claim for common law fraud, plaintiff must allege that: 1) defendant made a statement (or omission); 2) the statement was material; 3) the statement was untrue; 4) the defendant knew the statement was untrue or was in culpable ignorance of the statement's veracity; 5) the defendant had the intent that plaintiff rely on the statement; 6) plaintiff actually relied on the statement; and 7) the plaintiff suffered damage. *Small v. Sussman*, 713 N.E.2d 1216, 1221 (Ill.App.1999). In addition to these elements, a plaintiff pleading fraud in federal court must satisfy the particularity requirements of Fed.R.Civ.P. 9(b).

GSA alleges fraud against Darrel Kozbiel (Count II) and Melvin and Colette Kozbiel (Count III) asserting that Darrel represented that: 1) Unique would provide partial Christmas dating for envelopes Unique manufactured for the TVA line; 2) Unique would meet all of GSA's requirements for the TVA line without placing a credit limit on GSA; 3) Unique had substantial experience in producing envelopes of quality equal to those previously produced for the TVA line; 4) Unique would deliver envelopes on time; and 5) Unique would deliver envelopes of high quality.

GSA further alleges that these representations were false statements of material fact that Darrel, Melvin and Colette knew were untrue. GSA claims that the statements were made for the purpose of inducing GSA to award Unique the TVA account. GSA claims that it had a right to rely on these statements, that it did rely on these statements, and that by relying on these statements it was injured.

**\*3** In evaluating whether GSA has stated a cause of action for fraud, we must first determine whether the representations made were statements or omissions of material fact and not mere promises or expressions of opinions. *See, e.g., Lefebvre Intergraphic, Inc. v. Sanden Machine Limited, 946 F.Supp 1358, 1364 (N.D.Ill.1996) (citing People ex rel. Peters v. Murphy-Knight, 248 Ill.App.3d 382, 387, 187 Ill.Dec. 868, 872, 618 N.E.2d 459, 463 (1st Dist.1993)); Equity Capital v. Kreider Transp. Serv., Inc., 967 F.2d 249 (7th Cir.1992)).* A statement that "merely expresses an opinion or that relates to future or contingent events, rather than past or present facts, does not constitute an actionable representation."*West v. Western Cas. and Sur. Co., 846 F.2d 387, 393 (7th Cir.1988).* The misrepresentation "must be an affirmance of fact and not a mere promise or expression of opinion or intention; or in other words 'the fraud must be in the original contract or transaction, and not in its fulfillment." ' *Lefebvre, 946 F. Supp at 1364 (citing Zabrowski v. Hoffman Rosner Corp., 43 Ill.App.3d 21, 23, 1 Ill.Dec 465, 467, 356 N.E.2d 653, 655 (2d Dist.1976)).*

Darrel's representations that Unique would provide partial Christmas dating for envelopes Unique manufactured for the TVA line, meet all of GSA's requirements for the TVA line without placing a credit limit on GSA, deliver envelopes on time, and deliver envelopes of high quality are not statements of past or present fact but are expressions of opinion or intention that relate to future events. These statements are all promises to meet the delivery, quality, and billing requirements of GSA and, therefore, the fraud with regard to these statements is not in the original contract or transaction, but in its fulfillment. Therefore, these representations are not statements of material fact and do not provide a sufficient basis for GSA to bring a cause of action for fraud.

However, Darrel's representation that Unique had substantial experience in producing envelopes of quality equal to those previously produced for the TVA line is a statement of past or present fact and, accordingly, is a statement of material fact. GSA alleges that this statement is untrue, that the counter-defendants knew it to be untrue, and that the counter-defendants made this statement for the purpose of inducing GSA to award Unique the TVA account. GSA further alleges that it had the right to rely on this statement, did rely on this statement, and was injured because it relied on this statement. Therefore, GSA has adequately stated a claim for fraud with respect to Darrel's representation that Unique had substantial experience in producing envelopes of quality equal to those previously produced for the TVA line.

Accordingly, Unique's motion to dismiss Counts II and III is denied with respect to the alleged representation made by Darrel that Unique had substantial experience producing envelopes of quality equal to those previously produced for the TVA line. The motion is granted as to the other allegations of fraud in Counts II and III.

## II. Tortious Interference With Prospective Economic Advantage

**\*4** In Illinois, the elements for a tortious interference with prospective economic advantage claim are: 1) a reasonable expectancy of a valid business relationship; 2) defendant must know about it; 3) defendant must intentionally interfere and defeat this legitimate expectancy; and 4) the intentional interference must injure the plaintiff. *Fellhauer v. City of Geneva, 190 Ill.App.3d 592, 546 N.E.2d 791, 800, 137 Ill.Dec. 846 (Ill.App. 2nd Dist.1989).* A plaintiff states a cause of action only if he alleges a business expectancy with a specific third party, *Du Page Aviation v. Du Page Airport Authority, 229 Ill.App.3d 793, 594 N.E.2d 1334, 1340-41, 171 Ill.Dec. 814 (Ill.App. 2nd Dist.1992),* and action by the interfering party directed toward the party with whom the plaintiff expects to do business. *Galinski v. Kessler, 134 Ill.App.3d 602, 480 N.E.2d 1176, 1180-81, 89 Ill.Dec. 433 (Ill.App. 1st Dist.1985); Westland v. Sero of New Haven, Inc., 601 F.Supp. 163, 165-66 (N.D.Ill.1985).*

GSA alleges that it entered into negotiations with a third party, Starr Toof, for the purpose of selling Starr Toof its assets. GSA claims that it reasonably expected to consummate a transaction whereby Starr Toof would purchase the assets of GSA. GSA alleges that Unique learned of its contract negotiations with Starr Toof and contacted Starr Toof for the purpose of intentionally interfering with an expected contract between it and Starr Toof. GSA further alleges that it suffered injury as a result of Unique's actions.

In this case, GSA has adequately alleged a cause of action for tortious interference with prospective economic advantage. GSA has alleged that it had a reasonable expectancy of a valid business relationship, that Unique knew about it and intentionally interfered with the expectancy. GSA further alleges that Unique's actions prevented the expectancy from happening and that it suffered injury as a result. Thus, we find that GSA has stated a cause of action for tortious interference with prospective economic advantage.

For these reasons, we deny the motion to dismiss Count IV of GSA's second amended counterclaim.

## CONCLUSION

For the foregoing reasons, we grant GSA leave to file its second amended counterclaim. We grant in part and deny in part the motion of Unique Envelope to dismiss Counts II, III and IV of GSA's second amended counterclaim. The allegations in Counts II and III pertaining to Unique's representation that it had substantial experience in producing envelopes of quality equal to those previously produced for the TVA line remain, while all other allegations in Counts II and III are dismissed. The motion with regard to Count IV of the Second Amended Counterclaim is denied.

It is so ordered.

---

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.