# **<u>Exhibit 1</u>**

**1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ANGIODYNAMICS, INC.,         )
      Plaintiff, )
vs.                )  1:14-cv-12246-IT
NORFOLK MEDICAL         )
PRODUCTS, INC.,         )
      Defendants.)

The deposition of MICHAEL J. DALTON, called by the Plaintiff for examination, pursuant to the Rules of Civil Procedure for United States District Courts pertaining to the taking of depositions, taken before Rosemarie LaMantia, a Notary Public in and for the County of DuPage, State of Illinois, and a Certified Shorthand Reporter of said state, CSR License No. 084-002661, at Suite 2100, 70 West Madison Street, Chicago, Illinois, on the 18th day of March, A.D. 2015, commencing at the hour of 9:30 o'clock p.m.

LAMANTIA REPORTING SERVICE, INC.
(312) 282-5353

**2**

A-P-P-E-A-R-A-N-C-E-S:
KACVINSKY DAISAK BLUNI PLLC
50 Doaks Lane
Marblehead, Massachusetts 01945
(781) 336-0113
BY: MS. SUZANNE M. PARKER
and
WILLIAM P. OBERHARDT, LLC
70 West Madison Street
Suite 2100
Chicago, Illinois 60602
(312) 251-1000
BY: MR. WILLIAM P. OBERHARDT
   On behalf of the Plaintiff;
SKOKOS LAW GROUP, LLC
1100 Jorie Boulevard
Suite 220
Oak Brook, Illinois 60523
(630) 368-1699
BY: MS. SOULA SKOKOS
   On behalf of the Defendant.
ALSO PRESENT:
Joseph Cirillo, Videographer
         * * * * *

LAMANTIA REPORTING SERVICE, INC.
(312) 282-5353

**3**

INDEX

THE WITNESS:
MICHAEL J. DALTON
Direct Examination by Ms. Parker......6, 270
Cross-Examination by Ms. Skokos..........261
      EXHIBITS
Norfolk Exhibit No. 1 marked for ID.......13
Norfolk Exhibit No. 2 marked for ID......135
Norfolk Exhibit No. 3 marked for ID......151
Norfolk Group Exhibit No. 4 marked ID....161

LAMANTIA REPORTING SERVICE, INC.
(312) 282-5353

**4**

THE VIDEOGRAPHER: My name is Joseph Cirillo in association with TTA Legal Video. My address is 1130 Hassle Road, Hoffman Estates, Illinois.

This deposition is taking place on March 18th. The time is now 9:46 a.m. The location of this deposition is 70 West Madison Street, 21st floor, Chicago, Illinois. This deposition is being taken in the matter of Audio -- AudioDynamics, Inc. Versus Norfolk Medical Products, Inc., Case Number 1:14-cv-12246 for the United States District Court of Massachusetts.

The deponent's name is Michael J. Dalton. You're -- yes, sir, I'm hearing you chomping on that.

THE WITNESS: It's a Halls.

THE VIDEOGRAPHER: All right. This deposition is being taken on behalf of the Plaintiff. The party at whose instance the deposition is being recorded on an audiovisual recording device is the Plaintiff.

Counsel, would you, please,

LAMANTIA REPORTING SERVICE, INC.
(312) 282-5353

193

1 if he did. I don't recall.
2    **Q.** So why were you writing them to ask
3 him to ask for written verification from the
4 AngioDynamics' representatives of the
5 claims?
6    **A. Wait. Where are you reading?**
7    **Q.** The last sentence of the second
8 paragraph.
9    **A. I think your interpretation of that**
10 **is incorrect.**
11    **Q.** What were you asking him to do?
12    **A. Please share this letter with**
13 **anyone who may have heard these comments.**
14    **Q.** No. The second -- the last
15 sentence of the -- the second to the last
16 sentence of the second paragraph. Please
17 ask for written verification from the
18 AngioDynamics' representative of the claim
19 that AngioDynamics owns or will soon own the
20 SportPort?
21       MS. SKOKOS: Can you repeat the
22 question?
23       MS. PARKER: Strike the
24 question.
      LAMANTIA REPORTING SERVICE, INC.
      (312) 282-5353

194

1 BY MS. PARKER:
2    **Q.** Did Norfolk receive written
3 verification from anyone that an
4 AngioDynamics' representative made the claim
5 that AngioDynamics owns or will soon own the
6 SportPort?
7    **A. Written, no.**
8    **Q.** So Norfolk has no written
9 verification that anyone from AngioDynamics
10 made the representation that AngioDynamics
11 owns or will soon own the SportPort?
12    **A. I do not have written**
13 **documentation, no.**
14    **Q.** Precisely what is the evidence that
15 someone from AngioDynamics allegedly said
16 that AngioDynamics owns or will soon own the
17 SportPort?
18    **A. Statements from salesmen through**
19 **Mark Martin.**
20    **Q.** Which salesmen?
21    **A. Don't recall. Don't recall.**
22    **Q.** Did you ever find out?
23    **A. No.**
24    **Q.** So Mark -- so you heard -- let me
      LAMANTIA REPORTING SERVICE, INC.
      (312) 282-5353

195

1 just make sure I understand correctly. You
2 heard from Mark Martin who heard from one
3 salesperson, one Progressive sales employee
4 who heard from whom, that AngioDynamics said
5 something?
6    **A. I -- I don't recall the**
7 **particulars.**
8    **Q.** So we're talking fourth level
9 hearsay?
10    **A. No. No, my -- my phone call with**
11 **Zoe -- no, I can't say that. No, not Zoe.**
12 **Well -- we'll get more detail for you.**
13    **Q.** Do you believe -- do you believe
14 that this lawsuit -- so you say at the end
15 of the letter, in the second to last
16 paragraph, while we must believe that the
17 person or persons telling these stories are
18 simply ignorant of the facts and have been
19 told this by management, it is also entirely
20 possible that they know the truth and are
21 intentionally creating falsehoods to both
22 strengthen their competitive position and to
23 remove the competition. What does that
24 mean?
      LAMANTIA REPORTING SERVICE, INC.
      (312) 282-5353

196

1    **A. Is there a question there?**
2    **Q.** What does that mean? What does
3 that long sentence mean?
4    **A. It means exactly what it says.**
5    **Q.** So you're alleging some kind of a
6 conspiracy by the management of
7 AngioDynamics, which is being implemented
8 through the salespeople?
9    **A. Yes. Yes.**
10    **Q.** And is this lawsuit part of that
11 conspiracy, the Boston lawsuit part of that
12 conspiracy?
13    **A. Boston lawsuit? It could be. I**
14 **don't know. It could be. I have no idea.**
15    **Q.** Part of the alleged conspiracy.
16       Okay. So --
17    **A. Part of the alleged conspiracy,**
18 **yes.**
19    **Q.** So you believe that this lawsuit,
20 the reason that I'm here today taking your
21 deposition is somehow connected to the
22 statements that the AngioDynamics
23 salespeople allegedly made to somebody?
24    **A. Well, they didn't allegedly make.**
      LAMANTIA REPORTING SERVICE, INC.
      (312) 282-5353

## 197

1 **They did make and it was to salesmen of**
2 **our -- our distributor.**
3   Q. Okay. They -- so they made them,
4 now, you're saying that they made them not
5 to Zoe, but to --
6   **A. Well --**
7   Q. -- the people who work for Mark
8 Martin?
9   **A. No. The AngioDynamics people did**
10 **not make them to the salesmen. They made**
11 **them to the purchasing agent, to the nurse,**
12 **to the decision maker at different**
13 **hospitals. And one of them that we know of**
14 **was to Zoe.**
15   Q. Okay. And then what happened after
16 they made the statement to Zoe?
17   **A. I don't know. We just -- there is**
18 **not much you can do about it. That's what**
19 **this letter was about, this -- this letter**
20 **was to hopefully go to the purchasing agent,**
21 **whoever decision maker was, and say, here,**
22 **this is the truth. If you don't believe it,**
23 **call us.**
24   Q. And Zoe works at the University of

LAMANTIA REPORTING SERVICE, INC.
(312) 282-5353

## 198

1 Texas, Southwestern?
2   **A. Not anymore.**
3   Q. But she did at that time?
4   **A. Yes.**
5   Q. Okay. And did the alleged
6 statement that was made to Zoe, was it made
7 to anybody else?
8   **A. She suggested it was -- Dr.**
9 **Matasupherasa was there also.**
10   Q. She said that to you?
11   **A. Yes.**
12   Q. She told you that personally?
13   **A. Pretty sure she did.**
14   Q. And did you write down notes from
15 that conversation?
16   **A. No.**
17   Q. You didn't think that was important
18 enough to write down?
19   **A. No, just part of doing business,**
20 **part of life. That's it.**
21   Q. So you remember the names but you
22 don't remember the date --
23   **A. Zoe, yeah.**
24   Q. -- but you don't remember the date?

LAMANTIA REPORTING SERVICE, INC.
(312) 282-5353

## 199

1   **A. No.**
2   Q. And do you remember the name of the
3 AngioDynamics salesperson?
4   **A. I never met him, no, don't.**
5   Q. Do you know his name or her name?
6   **A. I knew it at one time.**
7   Q. And to your knowledge, was there
8 any consequence of that -- of -- was there
9 any consequence to Norfolk of that statement
10 having been made allegedly from the
11 AngioDynamics salesperson to Zoe at the
12 University of Texas, Southwestern?
13   **A. Yes, they stopped the study.**
14   Q. And how do you know they stopped
15 the study? You told me earlier today they
16 completed the study.
17   **A. This was after the study, after the**
18 **in vitro evaluation. After the in vitro**
19 **evaluation was done, then they made the**
20 **statements. And they -- and we never got**
21 **in.**
22   Q. What does that mean, we never got
23 in?
24   **A. They never purchased -- well, they**

LAMANTIA REPORTING SERVICE, INC.
(312) 282-5353

## 200

1 **didn't purchase any products for a long**
2 **time.**
3   Q. So let's just be very clear on
4 this.
5     The study that you talked about
6 earlier today, the purpose of which was to
7 evaluate the flow rate of the SportPort in
8 vitro on the University of Texas,
9 Southwestern equipment was completed?
10   **A. Yes.**
11   Q. And was completely unaffected by
12 any alleged statement that an AngioDynamics'
13 salesperson allegedly made?
14   **A. The study was completely**
15 **unaffected. Yes. No. The in vitro study**
16 **was completed.**
17   Q. Had been completed?
18   **A. Had been completed.**
19   Q. When was the study completed?
20   **A. I don't know. I can't -- I don't**
21 **recall the dates.**
22   Q. Okay. But after that. So after
23 that.
24     And at what -- so the

LAMANTIA REPORTING SERVICE, INC.
(312) 282-5353

201

1 AngioDynamics -- so the Norfolk study with
2 south -- University of Texas, Southwestern,
3 had been completed, and then eventually
4 University of Texas, Southwestern bought
5 SportPort from Norfolk?
6     **A. Eventually.**
7     Q. When?
8     **A. I think it was last week.**
9     Q. And what did they buy?
10     **A. Five Sportports.**
11     Q. So between the -- July --
12     **A. July.**
13     Q. -- of 2014 --
14     **A. Yeah, and today.**
15     Q. -- and today, University of Texas,
16 Southwestern interact -- what was University
17 of Texas, Southwestern's interaction with
18 Norfolk relating to the SportPort?
19     **A. Nothing. We couldn't do anything.**
20 **They -- they believed that -- that the**
21 **company was no good. Whoever -- the**
22 **salesman that made the statement killed the**
23 **project.**
24     Q. And how do you know that? When

LAMANTIA REPORTING SERVICE, INC.
(312) 282-5353

202

1 what did Zoe leave? How do you know that --
2     **A. -- I don't know when she left. I**
3 **don't know when she left. I don't have the**
4 **particulars in mind.**
5     Q. How do you know -- so if -- Zoe was
6 the person to whom the AngioDynamics
7 salesperson made the statement, correct?
8     **A. Yes.**
9     Q. And Zoe left when?
10     **A. I don't know.**
11     Q. Was she there in September?
12     **A. Was she there in September? I**
13 **don't know. My -- my time frame is not very**
14 **good. I can't tell you.**
15     Q. Was it -- was she there in October?
16     **A. I can't even tell you when the**
17 **study was done. It was in the summertime.**
18 **Well, it wasn't very hot.**
19     Q. Well, when did you file your
20 federal complaint against AngioDynamics?
21     **A. I don't know.**
22     Q. When was the last time you spoke
23 with Zoe?
24     **A. Probably four months ago, five**

LAMANTIA REPORTING SERVICE, INC.
(312) 282-5353

203

1 **months ago.**
2     Q. So before filing your federal
3 lawsuit you didn't check again with Zoe to
4 make sure your facts were correct?
5     **A. Did not? She wouldn't, she -- she**
6 **is a hard person to get to know -- in touch**
7 **with.**
8     Q. Did you confirm with anyone at the
9 University of Texas, Southwestern, about why
10 they weren't buying your ports between July
11 of 2014 and allegedly February of 2015?
12     **A. This is March. March. No, we let**
13 **the -- no.**
14     Q. Have you had any communications
15 with anybody at the University of Texas,
16 Southwestern, other than Zoe?
17     **A. Yes.**
18     Q. Who?
19     **A. Her replacement, Jennifer.**
20     Q. Okay.
21     **A. I don't know what Jennifer's last**
22 **name is.**
23     Q. When did Jennifer start working
24 there?

LAMANTIA REPORTING SERVICE, INC.
(312) 282-5353

204

1     **A. A few months ago.**
2     Q. How many is a few?
3     **A. I guess before Christmas. I --**
4 **I -- I don't know.**
5     Q. Have you personally had
6 conversations with Jennifer?
7     **A. No.**
8     Q. Who has had conversations with
9 Jennifer?
10     **A. Natan.**
11     Q. So you have no idea, you're
12 surmising that the reason that the
13 University of Texas, Southwestern, went
14 through a purchasing hiatus was because of
15 statements allegedly made by an
16 AngioDynamics salesperson?
17     **A. It's not essentially correct. I**
18 **know -- there is facts that I know, but I**
19 **can't -- I talked to Zoe, didn't talk to**
20 **Jennifer. We've talked with the salesman**
21 **Brian Gaddy(phonetic) in the area.**
22     Q. Who is Brian Gaddy?
23     **A. He is a salesman.**
24     Q. Whose?

LAMANTIA REPORTING SERVICE, INC.
(312) 282-5353